# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CALIFORNIA VALLEY MIWOK TRIBE,

    4260 Shippee Lane
    Stockton, CA 95212

SILVIA BURLEY,

    4260 Shippee Lane
    Stockton, CA 95212

RASHEL REZNOR,

    4260 Shippee Lane
    Stockton, CA 95212

ANJELICA PAULK,

    4260 Shippee Lane
    Stockton, CA 95212

TRISTIAN WALLACE.

    4260 Shippee Lane
    Stockton, CA 95212

       *Plaintiffs*,


       v.

UNITED STATES DEPARTMENT OF THE INTERIOR, DAVID BERNHARDT, in his official capacity as Acting Secretary of the Interior;

    U.S. Department of the Interior
    1849 C Street, N.W.
    Washington, D.C. 20240

**Case No.**


**COMPLAINT FOR INJUNCTION AND DECLARATORY RELIEF**

BUREAU OF INDIAN AFFAIRS, TARA
SWEENEY, in her official capacity as
Assistant Secretary – Indian Affairs;

   U.S. Department of the Interior
   1849 C Street, N.W.
   Washington, D.C. 20240

MERVEL HARRIS, in his official capacity as
Acting Pacific Regional Director;

   Bureau of Indian Affairs
   2800 Cottage Way
   Sacramento, CA 95825

TROY BURDICK, in his official capacity as
Superintendent of the Central California
Agency.

   Bureau of Indian Affairs
   650 Capitol Mall, Suite 8-500
   Sacramento, CA 95814

    *Defendants.*

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs, the California Valley Miwok Tribe, General Council, and enrolled members
Silvia Burley, Rashel Rezner, Anjelica Paulk and Tristian Wallace ("Tribe") file this Complaint
against Defendants, David Bernhardt, in his official capacity as Acting Secretary of the Interior,
and the U.S. Department of the Interior, and alleges as follows.

### INTRODUCTION

1.   Plaintiffs bring this action against the Defendants including the U.S. Department of

    Interior, its subdivision, Bureau of Indian Affairs (BIA), and appropriate public officials

    (the BIA, Interior, and the public officials (being collectively referred to as the

    "Defendants" or "the Department") seeking redress from a December 21, 2018 Decision

validating a purported petition to allow a Secretarial election under the Indian

Reorganization Act of 1934, Section 16 and its accompanying regulations, 25 C.F.R Part

81.

2.     The authority for making the purported Decision is delegated by the Secretary or

Assistant Secretary of Indian Affairs, to the Acting Pacific Regional Director.

3.     The Decision fails to analyze as a threshold matter, or misinterprets and misapplies, the

plain meaning of the Indian Reorganization Act ("IRA") to trigger the application of the

25 C.F.R. Part 81 regulations and misinterprets and misapplies the plain meaning of the

regulation.

4.     The IRA, Section 16, allows an "Indian tribe" to affirmatively request the BIA to validate

an IRA Secretarial election and Section 19 provides necessary definitions required to

interpret the application of Section 16 prior to the application of 25 C.F.R. Part 81.

5.     The BIA's Decision validating a Secretarial election allegedly arose by a submission of a

purported petition received from a collection of individuals who are not members of any

federally recognized tribe, including the Plaintiffs' government, and nothing in the record

indicates that these individuals meet the technical requirements of the IRA to be an

"Indian tribe," and "Indian" of a tribe allowing the application of 25 C.F.R. Part 81.

6.     The regulations define "Indian tribe," "petitioners," and "tribal members" as eligible to

invoke the rights afforded to tribes under an IRA Secretarial election.

7.     Only the Plaintiffs can request a Section 16 election. The historical record, and by BIA's

own dealings, show that Plaintiffs are the federally acknowledged Tribe with a definite

membership, governed under traditional governing documents and law.

8.   No statute or judicial order authorizes the BIA to organize or reorganize an already
     federally recognized tribe with definite and existing membership. Non-members seeking
     membership in the Tribe must apply in accordance with tribal law to Appellants' General
     Council.

9.   The Department's Decision validating the non-members' petitioner for a Secretarial
     election exceeds the plain statutory grant of authority to render a decision to validate an
     IRA Secretarial election.

10.  The Decision, and all acts and decisions following and made to implement the Decision
     are unlawful and must be set aside because the Bureau of Indian Affairs acted arbitrarily,
     capriciously, abused its discretion, or was otherwise not in accordance with the law,
     including the IRA, and all actions related to the Decision are in excess of the express
     statutory jurisdiction, authority or limitations under law including the IRA.

11.  The Decision is therefore *ultra vires* and an unlawful interference in a tribal membership
     dispute because the IRA does not apply and therefore the IRA's accompanying
     regulations do not apply.

12.  Furthermore, the Tribe's due process rights were violated as a result of a failure by the
     Department to provide notice of its December 21, 2018 Decision, at all stages at issue in
     this matter.

## JURISDICTION

13.  This civil action is brought under P.L. 100-581, 102 Stat.2983 (1988) (amending the
     Indian Reorganization Act of 19834, 48 Stat. 984), and under 42 U.S.C. §1983 for
     violation of the due process clause of the 5th Amendment to the U.S. Constitution.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and under 28 U.S.C. § 1362 because this matter arises under the laws of the United States presenting a federal question and is a civil action by an Indian tribe arising under the Constitution, laws or treaties of the United States.

15. Moreover, actions and decisions of Department of the Interior Officials provide judicial review requested relief available under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

16. Specifically, Defendants have consented to suit and Defendant's actions are reviewable and a remedy is available under the various provisions of the APA, including 5 U.S.C. § 702 (providing for judicial review of agency action under the APA), 5 U.S.C. §704, 5 U.S.C. §705, and 5 U.S.C. §706(2)(A), §706(2)(B), §706(2)(C), and in doing so this Court "shall decide all relevant question of law, interpret constitutional and statutory provisions and determine the meaning of applicability of the terms of an agency action."

17. Declaratory relief is authorized pursuant to Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

**VENUE**

18. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) because the Federal Defendants are located here and the challenged agency decision was made by or on behalf of the Secretary of the Interior (*see generally Alabama v. U.S. Army Corps of Eng'rs*, 304 F. Supp. 3d 56, 62 (D.D.C. 2018).

19. There is a strong nexus of the claims at issue in this case to the District of Columbia because Plaintiff's claims here "focus" on the interpretation of federal statutes." *Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124, 128-29 (D.D.C. 2001).

5

20. Furthermore, "[t]he Government cannot reasonably claim to be inconvenienced by litigating in this district; after all, this is its home forum." *Stewart v. Anzar*, 308 F. Supp. 3d 239, 248 (D.D.C. 2018).

21. The interpretation of the Indian Reorganization Act (IRA) and the Plaintiffs constitutional claims have broad-reaching, national policy implications and therefore the Plaintiffs' choice of venue is at home to the agency.

22. Therefore, venue is proper in this Court.

### PARTIES

23. Plaintiffs are enrolled members of the California Valley Miwok Tribe of California (the Tribe) and under traditional tribal law and traditional governing documents form the General Council of the Tribe.

24. The Tribe predates the Indian Reorganization Act of 1934.

25. Land was purchased, in Calaveras County for the Tribe pursuant to a 1916 congressional appropriation for homeless Indians of California that came to be known as Sheep Ranch Rancheria and the Tribe would be called that name until 2001.

26. The Tribe is indisputably a federally recognized tribe appearing on all annual announcements since the enactment of P.L. 103-454, 108 Stat 4791 (1994) as well as in the first Federal Register notices United States issued reporting a government-to-government relationship extending services to tribes dating back to 1972. *See* "American Indians and Their Federal Relationship, Department of Interior," BIA (1972) *See also* Notice, Indian Tribal Entities that have a Government-to-Government Relationship with the United States, 44 Fed Reg 7235, 7236 (Feb. 6, 1979), EX 3. *See* 60 Fed. Reg. 9250 (Feb. 16, 1995), 84 Fed. Reg 1200, 1201 (Feb 1, 2019).

27. All individual Plaintiffs became formally enrolled members of the Tribe under traditional tribal law in 1998 by Yakima Dixie, then sole member and chief of the federally acknowledged tribe, Sheep Ranch Rancheria.

28. Bureau of Indian Affairs officials consulted with the Tribe in September 1998 recommending the Tribe continue as a traditional governing law tribe and for a number of years thereafter, acknowledged and conducted government-to-government relations with the Tribe.

29. In November 1998, Yakima Dixie and the other adult members promulgated a tribal resolution that serves as the legal foundation and governing document of the Tribe.

30. The Plaintiff Tribe and Plaintiffs' General Council and the Tribe's members, constitute the last recognized government that the United States recognized to conduct a government-to-government relationship with since at least 2011, if not 2003 and before. Any hiatus created by Decisions or actions of the federal government is unlawful according to precedent, therefore by operation of law, the Plaintiffs continue to be the entity that the federal government acknowledges.

31. In 1998, all adult members are part of the Tribe's General Council and Mr. Dixie served as spokesperson for the tribal government in relations with the federal government, and later, individual Plaintiff, Silvia Burley would serve in that role and does to this day.

32. In 2001, Plaintiffs sought a name change for the Tribe from Sheep Ranch Rancheria to California Valley Miwok Tribe of California and that request was approved by the BIA.

33. Plaintiffs did not file the petition seeking a Secretarial election under the IRA, precisely what has that led to the claim in this matter.

34. In March 2019 individual Plaintiff members registered for the unlawfully scheduled Secretarial election to be conducted April 15, 2019, solely for the purpose of preserving their rights to challenge the Decision; and any and all actions in this matter, including their registration, does not endorse or admit that the Department's actions were lawful or endorsed by the Plaintiffs in their individual or official capacity.

35. Defendant, the United States Department of the Interior (the Department), is an administrative agency of the United States.

36. Within the Department is the Bureau of Indian Affairs (BIA), the federal office most directly responsible for implementing the United States' trust responsibility and conducting government-to-government relations with federally recognized Indian tribes. The Assistant Secretary-Indian Affairs is responsible for overall management of the BIA and is responsible for its actions.

37. The Secretary has delegated this authority to the Assistant Secretary-Indian Affairs. The Secretary has direct line authority over the Assistant Secretary-Indian Affairs and is responsible for the Assistant Secretary's decisions. And the Assistant Secretary has further delegated regulatory authority to various line officials within the Department nationwide including in this matter, to the Pacific Regional Director and the Superintendent for the Central California Agency.

38. The Acting Secretary Bernhardt, and nominee designate, is the federal official responsible for implementing and honoring the United States' trust responsibility to Indian tribes. Secretary Bernhardt is responsible for the arbitrary, capricious, and unlawful conduct described in this Complaint.

## BACKGROUND

39. This matter is the latest episode in a long and unnecessarily complex dispute concerning the federally recognized California Valley Miwok Tribe of California.

40. The Dispute started as a leadership dispute in 1999 between Yakima Dixie and Plaintiff Silvia Burley. That leadership dispute has ceased because the death of Mr. Dixie moots the leadership dispute. As discussed in detail below, the facts indicate that with Mr. Dixie's death, this matter is a tribal membership dispute that the Department must provide the Tribe an opportunity to resolve.

The following background provides context to the unlawful Decision now before this Court.

41. It is undisputed that in 1916, the United States purchased approximately one acre in Calaveras County, California, for the benefit of 12 individually named Indians living in what was known as Sheepranch, CA. The Indian Agent, John Terrell, who in 1915 recommended the purchase of roughly one acre, described the group of 12 named individuals as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as Sheepranch."

42. The historical record indicates that John Terrell, as required under congressional statutory authorization, identified and purchased lands for *homeless* Indians; however was never authorized to create a reservation or rancheria.

43. There is currently no reservation associated with the Tribe or other land held in trust by the United States.

44. The Tribe and the land came to be referred to as the "Sheep Ranch Rancheria."

45. On June 18, 1934, the U.S. Congress enacted the Indian Reorganization Act (IRA), also called the Wheeler–Howard Act, aimed at decreasing federal control of American Indian affairs and increasing Indian self-government and responsibility. The BIA implemented the Act by mandating a referendum to determine whether "designated" tribes "want to exclude themselves from the application of the Indian Reorganization Act." The record shows that in 1935 only one adult Indian, Jeff Davis, lived on the Sheep Ranch land. Indian agent reports indicate that Mr. Davis voted "in favor of the IRA," however, there is no record that Mr. Davis organized the Tribe in accordance with Section 16 of the IRA.

46. In 2001, a formal request of the Plaintiffs' prompted the Department to formally agree to change the name of the Tribe to the California Valley Miwok Tribe of California.

47. In 1993, a probate appeal of Mabel Dixie determined that the parcel commonly referred to as "Sheep Ranch Rancheria" was distributed under the amendments to the California Termination Act, *see infra.,* and was to be conveyed in fee to Mabel Dixie's heirs.

48. In 1995, the Department determined that the land was passed individually to Yakima Dixie as an individual. Yakima Dixie was considered the only member of the Tribe and the federal government acknowledged Mr. Dixie as the tribal representative for purposes of conducting government to government relations.

49. Despite the 1995 order from the Department that the Sheep Ranch Rancheria land should pass individually to Yakima Dixie, in 2000 to 2001, the Tribe, including tribal member, Yakima Dixie, worked with the BIA to correct the title.

50. In 1994, Yakima Dixie wrote the BIA asking for assistance with home repairs and describing himself as "the only descendant and recognized ... member of the Tribe."

51. In September 1995, Silvia Burley "contacted BIA for information related to her Indian heritage.

52. At the Department's suggestion, individual Plaintiff, Ms. Silvia Burley contacted Yakima Dixie concerning potential membership in the tribe.

53. On August 5, 1998, Mr. Dixie signed a statement accepting Burley as an enrolled member of the Tribe and also enrolling Silvia Burley's two daughters, Rashel Reznor and Anjelica Paulk, and Ms. Burley's granddaughter, Tristian Wallace—all individually named Plaintiffs in this matter.

54. In September of 1998, Department officials met with Mr. Dixie and Ms. Burley, as recorded in an transcript of the meeting "to discuss organizing the Tribe."

55. In a Letter dated September 24, 1998, the same Department officials sent correspondence to spokesperson Yakima Dixie, recommending that, "given the small size of the Tribe, we recommend that the Tribe operate as a General Council," which could elect or appoint a chairperson and conduct business.

56. On November 5, 1998, with the further assistance of the Department, the Tribe signed Resolution GC-98-01 ("Resolution" or "Governing Document") establishing a General Council, consisting of Yakima Dixie, Silva Burley, Rashel Reznor and Anjelica Paulk to serve as the governing body of the Tribe. Mr. Dixie would be considered spokesperson for the Tribe under tribal resolution.

57. The November 5, 1998 Resolution serves as the Tribe's governing document lawfully organizing the Tribe's governing status under traditional law and remains the law to this day.

58. As recently as 2010, the position of the Department was that the Tribe's organizational status was reported as "Traditional/Other."

59. In April 20, 1999, at a General Council meeting, Yakima Dixie resigned as the Tribe's Chairman by handwritten letter as well as an executed General Council resolution.

60. The following day on April 21, 1999, it is alleged that Mr. Dixie claimed he did not resign.

61. Ms. Burley would be the appointed Chairperson of the General Council and the Department recognized Ms. Burley as tribal representative/spokesperson based primarily on Mr. Dixie's resignation in April 1999 in a series of letters and other actions from 1999 to Oct. 31, 2003

62. Mr. Dixie's challenge to Ms. Burley's 1999 appointment as tribal representative led to administrative review and litigation because the Department treated Yakima Dixie's claims that he did not resign and that his resignation paperwork was forged. Despite these claims by Mr. Dixie, Ms. Burley was recognized as tribal representative in a government to government relationship with the Tribe in 1999, 2000, 2001, 2002, and 2003

63. However, in 2012 deposition Mr. Dixie's admitted that he lied about the accusation of forgery and admitted he indeed resigned from tribal leadership in 1999.

64. In litigation related to the Tribe's frozen funds from the Indian Gaming Special Distribution Fund, Yakima Dixie, in a sworn deposition, admitted that his signature was in fact his signature on the April 20, 1999 document indicating he resigned his position as California Valley Miwok Tribal Chairman (tribal representative/spokesperson); he also admitted that he misrepresented that the April 20, 1999 documents were forged and that he did indeed resign from his Chairmanship of the General Council.

65. Doubtless, Yakima Dixie's lies colored and provided a context, both inside and outside the Department, that there was a perceived and ongoing leadership dispute ensuing within the Tribe and its impact on law and policy application to this Tribe has been profound and detrimental.

66. During this time period, from the early 1990s to the mid-2000s, the Department was involved in significant administrative and litigation matters concerning the restoration of tribes in California, membership disputes nationwide, and requests related to establishing IRA constitutions for tribes that had been traditionally organized or forcing traditionally organized tribes to adopt IRA constitutions despite having no authority.

67. For instance, in *Ransom v. Babbitt,* 69 F. Supp2.d 141, 154-155 (D.D.C. 1999) the court found that the Department "wanted" the Saint Regis Mohawk Tribe to embrace an IRA constitutional form of government and in doing so the Department "took steps to frustrate the will of the Tribe and support the Constitutional regime." District Court Judge Kollar-Kotelly, continued, "Defendant's [the Department] rhetoric endorsing the principles of self-government and tribal sovereignty ultimately ring hollow here." *Id.* at 155.

68. In addition, California created a special context for tribal organization and the application of the IRA.

69. In 1958 the U.S. Congress enacted the third in a series of termination acts intended to distribute rancheria and reservation lands in California, naming forty (40) specific tribes. *See* California Termination Act of 1958, Pub. L. No. 85-671, 72 Stat. 619 (August 18, 1958). the termination acts were amended in 1964 purportedly authorizing the termination of all Rancherias and reservations within the borders of California. *See* P.L. 88-419, 78 Stat 390 (August 11, 1964).

70.  In 1979, individuals from a number of terminated tribes filed what came to be known as
     the *Tillie Hardwick* action seeking "restoration of their status as Indians and entitlement
     to federal Indian benefits, as well as the right to reestablish their tribes as formal
     government entities."

71.  At no time was the Sheep Ranch Rancheria or the California Valley Miwok Tribe a
     litigant in the *Tillie Harwick* matter.

72.  In July 1983, the United States entered into a stipulation for entry of judgment ("1983
     Stipulation") with respect to members of seventeen former tribes. *See, Tillie Hardwick, et
     al. v. United States of America, et al.* Case #C-79-1710-SW).

73.  *Tillie Hardwick* did not determine whether or to what extent the boundaries of the 17
     Rancherias were restored, but it did autorize, by judicial order, the basis that the
     Department was to ensure that individuals were to be identified to participate in the
     restoration of tribal governments.

74.  According to *Tillie Hardwick*, the Department was authorized by judicial order to find
     eligible Indian participants in restoring the tribal governance structures, and in that
     context, necessarily was required to determine family lineage to enable each of the 17
     tribes involved in the *Tillie Hardwick* litigation to reestablish its government.

75.  For example, during the 1990s and early 2000s, even when the Department attempted to
     implement the *Tillie Hardwick* stipulated judicial orders, the Department's actions were
     challenged a number of times including in the cases of the Buena Vista Tribe and the
     Cloverdale Tribe.

76.  The circumstances and actions by the Department in Buena Vista alone created so much
     controversy that the Senate Committee on Indian Affairs Committee held hearings on

September 26, 2002 in Washington, DC. "Intra-Tribal Leadership and Tribal Governance," Hearing before the Committee on Indian Affairs, United States Senate, 107th Congress, September 26, 2002.

77. Committee Chairman, Senator Ben Nighthorse Campbell stated that "a series of [tribal] disputes has caused the Department of the Interior and the Congress, to get involved…In the one [dispute] that brings us here today, the BIA removed the tribal leadership in favor of a challenging faction for the Buena Vista Me-Wuks in 2002."

78. These hearings led the U.S. Congress to modify Section 16 of the IRA to add subsection (h) entitled "Tribal sovereignty."

79. At the essence of this matter is the fact that the Sheep Ranch Rancheria was *not* among the 40 tribes specifically named to be terminated in the 1958 termination act.

80. The termination of the Sheep Ranch Rancheria was never completed by the Department. The Tribe therefore is not a terminated California tribe and no judicial order exists to restore the Tribe, resolve the distribution issues, or mandate reorganization of the California Valley Miwok, unlike the seventeen (17) other tribes in California that were impacted by the case of *Tillie Hardwick. See, e.g. Tillie Hardwick v. United States,* NC-79-1710SW (N.D. Cal. Dec 22, 1983) (stipulated judgment).

81. The California Valley Miwok Tribe of California formalized its traditional governance structure by adopting their tribal Resolution with advice and assistance by the Department in 1998.

82. Numerous other tribes nationwide similarly have five or fewer members, are organized under traditional tribal law, and all membership decisions under federal law and policy are exclusively internal tribal matters.

83.  At the time of adoption of the 1998 governing documents the Sheep Ranch Rancheria had only five members.

84.  The Sheep Ranch Rancheria was never terminated by the United States and no federal law organizes the tribe or grants special authority over the Tribe.

85.  Nothing provides direction or orders the Department to organize or reorganize the Tribe.

86.  No traditional tribal law or tribal governing document provides the Department with the authority to organize, reorganize, hold or assist in holding elections or referenda on behalf of the Tribe, or provide technical assistance to the Tribe.

87.  In 1966, the record shows only one adult Indian, Mabel Hodge Dixie, the mother to Yakima Dixie, lived on the land that had been originally set aside in 1916. Mabel Hodge Dixie died in July 1971. After almost 20 years of probate, the Department filed an appeal petition with the Office of Hearings and Appeals because the BIA had determined that it should take steps to "restore" the Band as a federally recognized tribe and recover the property for the benefit of the tribe.

88.  It is in this context of the Department's nationwide dealings with tribal organizational status and membership that was both active and at times challenged; it therefore might not be surprising that shortly after forming the traditional organizing structure through the Tribe's Governing Document, outside of the IRA, the Department began pressuring the Tribe to submit a constitution and organize or reorganize the Tribe.

89.  For instance, in an Letter dated October 31, 2001, the Department stated that the agency urged the General Council to "abide by the will of the people of the Sheep Ranch Rancheria in the 1935 election and to comply with an act of Congress by seeking formal reorganization under the Indian Reorganization Act."

90.   Further pressure from the Department came in a Letter dated March 4, 2004. The Tribe
      sought guidance on seeking funds under the Indian Self-Determination and Education
      Assistance Act. In response the BIA attempted to cajole the Tribe to "complete the
      reorganization process contemplated by the Indian Reorganization Act" and further stated
      that it "strongly recommends that the Tribe complete the reorganization process
      contemplated by Section 16 of the Indian Reorganization Act" in order to meet Aid-to-
      Government Standards.

91.   On November 24, 2003, Department official Dale Riesling, wrote to Plaintiffs, General
      Council, and Ms. Burley, "the Bureau of Indian Affairs maintains a government-
      government relationship with the California [sic] Band of Miwok Indians through the
      tribal council chaired by Ms. Silvia [sic] Burley."

92.   In the following months, Ms. Burley was told by Department officials that the Tribe
      needed to show they were organized.

93.   Less than six (6) months after the Department, through Superintendent Riesling,
      reaffirmed its government-to-government relationship, in a Letter dated on or about
      March 26, 2004, the Department, through the Central California Agency Superintendent,
      wrote the Tribe again this time responding to the Tribe's efforts to show they were an
      "organized tribe." In that Letter, the Department rejected a proposed constitution from
      Ms. Burley because she had not involved what the BIA asserted was the "whole tribal
      community" in the governmental organization process.

94.   In that letter responding to the Plaintiffs submission, Superintendent Riesling stated,

           "the BIA does not yet view your tribe to be an "organized" Indian Tribe and this
           view is borne out not only by the document that you have presented as the tribe's
           constitution but additionally, by our relations over the last several decades with
           members of the tribal community in and around Sheep Ranch Rancheria."

17

95. Superintendent Riesling further stated that for the Tribe (Plaintiffs) to be organized, that it was required, without citation or authority, to identify a "greater tribal community" and articulate what appear to be other standards that are often applied to the context of *Tillie Hardwick* tribes, such as a "Base Roll," The Department further misstates the historical facts, noting that the "tribe did not exist until the 1990s."

96. On or about February 20, 2009 Chairperson of the Calaveras Band of Miwuk Indians, an unrecognized tribe, stated in a declaration under oath, that "in a meeting they had with Troy Burdick, he said we [individuals associated with Calaveras Band of Miwuk Indians] could apply to the BIA for membership in the California Valley Miwok Tribe."

97. On or about February 20, 2009 Chairperson of the Calaveras Band of Miwuk Indians, an un recognized tribe, stated in a declaration under oath that she "felt uncomfortable with the prospect that members of our Tribe could submit an application to the BIA to become members of the federally recognized California Valley Miwok Tribe because we are a separate Indian entity and wish to remain so."

98. Litigation and further administrative review ensued. For instance, the Tribe's General Council challenged the February 2005 administrative decision by the Assistant Secretary resulting in *Cal. Valley Miwok Tribe v. United States.* 424 F. Supp. 2d 197 (D.D.C. 2006).

99. After the District Court dismissed Plaintiffs' challenge, *Cal. Valley Miwok Tribe v. United States.* 424 F. Supp. 2d 197 (D.D.C. 2006), the D. C. Circuit Court of Appeals affirmed, *Cal. Valley Miwok Tribe v. United States,* S 15 F.3d 1262 (D.C. Cir. 2008).

100. As a result of the 2008 litigation outcomes, the Department rejected Plaintiffs new appeal objecting to, among other matters, the Superintendent's decision to continue to assist the

Tribe in organizing its government according to the IRA because it viewed the matter as "effectively and functionally a tribal enrollment dispute; and then referred the manner to [the IBIA] on jurisdictional grounds." *See* 51 IBIA 103 (Jan. 2010).

101. The 2010 decision by the IBIA, in turn, led to further administrative decision-making in 2011, when the Department's, Assistant Secretary-Indian Affairs (AS-IA), Larry Echo Hawk, issued a Decision, dated August 31, 2011, that again parties promptly challenged in federal court resulting in the matters before the this District Court and Circuit Court of Appeals for the District of Columbia.

102. On remand to the Department from the DC Circuit Court, the new AS-IA, Kevin Washburn, issued a memorandum on December 31, 2015. The 2015 Washburn Decision was challenged in federal court in California; culminating in unpublished *California Valley Miwok Tribe v. Zinke*, 2:16-cv-01345-WBS-CKD (9th Cir. 2018).

## STATUTORY AND REGULATORY FRAMEWORK

103. The Indian Reorganization Act of 1934, P.L. 73-383; 48 Stat. 984-988 (1934) (the "IRA") was landmark legislation enacted to reverse the disastrous effects of earlier federal laws and policies which caused the loss of over 90 million acres of Indian lands during the previous half century. 25 U.S.C. § 461 et seq. (1934).

104. The IRA, among other things provides Indian tribes the right to organize and adopt constitutions with the assistance of the federal government. IRA, Section 16(a). 25 U.S.C § 476(a) (granting "Indian tribes" a right to organize under the statue), Section 16(h) (contemplating that tribes are sufficiently organized under traditional tribal law and government systems), and Section 19, 25 U.S.C. §479 (defining "Indian" and "tribe").

105. Over the past eight decades the response to the IRA is divided. Some tribes voted to reject the IRA completely and continued as organized tribal governments under traditional law and practice. A majority of tribes, often after federal pressure, elected to come under the provisions. *See* Graham D. Taylor, The New Deal and American Indian Tribalism: The Administration of the Indian Reorganization Act, 1934-35, at 32, 155-158 (Univ. of Neb. Press 1980).

106. Although one objective of the IRA was to limit pervasive federal administrative power, the IRA framework often perpetuated federal supervisory authority by requiring secretarial approval of the constitutions and other tribal laws. *See also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.04[3][a][1] (Nell Jessup Newton ed. 2012). Discrepancies between IRA structures and tribal patterns of community decision making and accountability, as well as secretarial veto power over ordinances, have created special challenges for tribal governments. *Id.*

107. Section 19 of the IRA defines "Indian": "… shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. Section 19, 48 Stat. 984, 988. The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." Section 16, 48 Stat. 984, 987.

108. Section 16 was amended in 2004 to add section "h". Under Section 16(h), the IRA authorizes a tribe to adopt governing document under procedures other than those

specified under other provisions of Section 16. P.L. 108-204, 118 Stat. 543 (March 2, 2004).

109.   Accompanying regulations implementing the IRA, Section 16 are found at 25 C.F.R. § 81 (4-1-18 Edition) (promulgated in 2015, 80 Fed Reg. 63094 ). Part 81 prescribes the Department's procedures for authorizing and conducting elections when Federal statute or the terms of a tribal governing document require the Secretary to conduct and approve an election to: (a) Adopt, amend, or revoke tribal governing documents; or (b) Adopt or amend charters. § 81.1. Part 81 applies only to federally recognized tribes and only in three situations.

110.   For instance, where a tribe needs to adopt a new governing document to reorganize outside of a federal statute and their current governing document requires approval under the Secretary's general authority to approve, § 81.2(a)(2); a Secretarial election will be conducted in accordance with the Part 81 procedures unless the tribe's governing document provides otherwise and is not contrary to federal voting qualifications or substantive provisions, § 81.2(b). Additionally, the Department may authorize a Secretarial election under Part 81 if the recognized governing body of the tribe requests one where the tribal governing documents have become outdated and the amendment cannot be effected under them.

111.   The regulations purportedly expand the class of those that may avail themselves of the right to request a Secretarial election. The regulations provides that *tribe* or a *petitioner* may submit a request for a Secretarial election by either submitting (1) a duly adopted tribal resolution, ordinance or other document, or (2) in the absence of an existing governing document, a petition that has been verified by the Bureau as having the

minimum number of required signatures of tribal members and the exact document or amended language to be voted on. § 81.6(a)(1)-(2).

112. According to the regulations, *"tribe"* means any Indian or Alaska Native tribe, band, nations, pueblo, village or community that is listed in the Federal Register under 25 U.S.C. 479a—1(a), as recognized and receiving services from the Bureau of Indian Affairs. § 81.4.

113. *"Petitioner"* means a *tribal member* who is 18 years or older (and, if the tribe's governing document imposes additional requirements for petitioning, also meets those requirements), and signs a petition. *Id.* (emphasis added).

114. *"Petition"* means the official document submitted by the petitioners to the Secretary to call a Secretarial election for the purpose of adopting or ratifying a new governing document, amending the tribe's existing governing document, or revoking the tribe's existing governing document. *"Governing document"* means any written document that prescribes the extent, limitations, and manner in which the tribe exercises its sovereign powers. *Id.* *"Eligible voter"* means a *tribal member* who will be 18 years of age or older on the date of the Secretarial election (and, if the tribe's governing document imposes additional requirements for voting in the Secretarial election, also meets those requirements). *Id.* (emphasis added).

## FACTUAL ALLEGATIONS RELATED TO THE DEPARTMENT'S DECEMBER 2018 DECISION MISINTERPRETION FEDERAL LAW AND ALL CONSEQUENTIAL ACTIONS RELATED TO THAT DECISION

The Background above is incorporated as additional factual allegations as if fully set forth here, by reference.

115. On or about December 31, 2015, Assistant Secretary – Indian Affairs ("AS-IA"), Kevin Washburn states, in a Letter dated December 31, 2015, the Department "is loath to become involved in tribal membership disputes…".

116. On or about December 31, 2015, AS-IA Washburn states, in a Letter dated December 31, 2015, stated "[w]hether decedents of Miwoks identified in the 1929 Census shall be included in the organization of the CVMT is an internal tribal decision that shall be made by the individuals who make up the "Eligible Groups" that for "purposes of reorganization, the Tribe's membership is properly drawn…."

117. On or about December 31, 2015, AS-IA Washburn states, in a Letter dated December 31, 2015, asserts that three groups of individuals are identified as "Eligible Groups"

118. On or about December 31, 2015, AS-IA Washburn states, in a Letter dated December 31, 2015, that in many instances the Department has assisted in the initial organization of an unorganized tribe. In this case the reorganization of the Tribe has never properly occurred."

119. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, states "I encourage" individuals who make up "Eligible Groups" to "participate in the Tribe's reorganization efforts."

120. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, states, "[f]or purposes of administering the Department's statutory responsibilities to Indians and Indian tribes, I must ensure that CVMT leadership consists of valid representatives of the Tribe."

121. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, states that Plaintiffs "points to the 1998 [tribal governing document] as the basis" for

Plaintiffs' leadership. At the time of the enactment, the 1998 [governing document] undoubtably seemed a reasonable, practical mechanism for establishing a tribal body to *manage the process* of reorganizing the Tribe." [emphasis in original].

122. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, determined that the Department would not "recognize the actions to establish a governing structure taken pursuant to the 1998 [governing document]. [Plaintiffs] do not represent the CVMT."

123. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, "concludes that the Tribe's membership is more than five people, and the 1998 General Council does not consist of valid representatives of the Tribe."

124. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, states, "I encourage the Tribe to petition for a Secretarial election under 25 C.F.R. Part 81 within 90 days of this decision."

125. On or about December 31, 2015, AS-IA Washburn, in a Letter dated December 31, 2015, stated that the "[Regional Director] will work with Eligible Groups to help the Tribe attain its manifest goal of reorganizing. This is a role that BIA has undertaken in other situations involving California Rancherias."

126. On or about September 17, 2017, Regional Director ("RD"), Amy Dutschke, in a Letter dated September 17, 2017, rejected non-member petitioners' submission of a constitution that purportedly organizing the California Valley Miwok Tribe "under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. §461 et seq." because it violated the civil rights of the Plaintiffs.

127. The September 17, 2017 Letter stated that the Washburn Decision of December 31, 2015 "authorized" the BIA "to receive" submissions from the non-member individuals for the "purpose of establishing the validity of the 2013 Constitution. In the alternative, the Tribe was encouraged by the AS-IA to petition for a Secretarial Election under 25 Code of Federal Regulations Part 81 within 90 days.

128. In an email dated December 12, 2017, Plaintiffs communicated by email through their counsel, to RD Dutschke that Yakima Dixie, member of the Tribe died. In that email, Plaintiffs state that the death of Yakima Dixie puts to rest the leadership dispute between Yakima Dixie and Silvia Burley as Tribal Representative of the Tribe's General Council.

129. On or about June 11, 2018, the non-member petitioners, sent Plaintiffs, Silvia Burley a Letter dated June 9, 2018 requesting the participation of individuals at a July 21, 2018 meeting held at the Mountain Ranch Community Center located in Mountain Ranch, CA.

130. The purpose of the July 21, 2018 meeting was the signing of the Petition for a Secretarial election for the non-members proposed constitution for the Plaintiffs Tribe. The letter further requested individuals to confirm their contact information and to certify whether or not they qualify for membership.

131. On or about July 30, 2018, the non-member petitioners, in a Letter dated July 30, 2018, state to "tribal community member[s]" to request a Secretarial election to ratify a proposed "Constitution and obtain federal recognition for the Tribal government."

132. The Letter dated July 30, 2018, the non-member petitioners scheduled a meeting date for August 18, 2018 at the Mountain Ranch Community Center to discuss the Tribal Petition and Secretarial election Process to purportedly "formally organize [the Tribe] for the first time."

133. The Letter dated July 30, 2018 stated that the purpose of the meeting was to continue to collect signatures of "adult members" for a purported petition for Secretarial election. This letter further states that "anyone who has already submitted documentation to the Tribe, establishing that they meet the criteria for membership under the 2013 Constitution, will remain a Tribal member."

134. On or about August 8, 2018, Manuel Corrales, Jr., attorney for the Plaintiffs, received a Letter dated August 8, 2018 from James Rusk of Sheppard Mullin, attorney for the non-member petitioners. The Letter purports to inform Plaintiffs of the non-member petitioners plans to move forward with the Petition for a Secretarial election.

135. The Letter dated August 8, 2018 states that Plaintiffs were purportedly "eligible to participate in the initial organization of the Tribe."

136. On or about October 29, 2018, non-member petitioners submitted a Petition requesting a purported Secretarial election and to accept a purported "Constitution and Voters List" to the BIA.

137. Plaintiffs were provided no Notice of the submission of a petition purporting to request a purported Secretarial election from the Department.

138. On or about November 1, 2018, Plaintiff, Tribal member, Tristian Wallace received a postcard from the non-member petitioners. The postcard informed Wallace that a petition for a Secretarial election and Voters List was submitted to the BIA on October 26, 2018 and that there would be a general meeting scheduled for November 17, 2018.

139. On or about November 27, 2018, Plaintiffs, through Tribal Representative Silvia Burley and the California Valley Miwok Tribe, General Council, sent a Letter dated November 27, 2018 to AS-IA, Tara Sweeney, requesting that the current AS-IA reconsider the

Washburn Decision of December 31, 2015 and to put a stop to the purported Secretarial election that Plaintiffs came to be aware of through the post-card by non-member Petitioners. The Letter dated November 27, 2018, informed AS-IA Sweeney of the death of Yakima Dixie, the only other tribal member of the California Valley Miwok Tribe prolonging the long-running "leadership dispute" and therefore, the leadership dispute is moot.

140. On or about December 21, 2018, the Acting Regional Director, Mervel Harris sent a letter to the non-member petitioners, their "spokesperson," and their attorney informing them of the BIA's decision to validate their petition requesting a Secretarial election.

141. The Letter dated December 21, 2018 states that upon receipt of the petition on October 29, 2018, the Superintendent posted a copy of the original petition at the Central California Agency for 30 days, and on November 29, 2018, no challenges had been received by the Superintendent and the petition was removed from its posted location.

142. No record exists that the Department provided Plaintiffs notice at any stage of the non-members purported Petition for a Secretarial election on behalf of the Tribe and provided no Notice by their own admission of the Decision reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

143. Defendants at the time of the non-members petition remained in litigation with Plaintiffs in the United States Circuit Court for the Ninth Circuit, and at the time of the December 21, 2018 Decision, the Ninth Circuit had rendered its unpublished opinion.

144. The Letter dated December 21, 2018 states that the Acting Pacific Regional Director validated the non-member petitioners request for a Secretarial election "in accordance

with 25 C.F.R. Part 81.62." The Letter dated December 21, 2018 further states that the "Local Bureau Official (Superintendent), on December 13, 2018, delivered the petition by memorandum providing his recommendation for approval of this office."

145. The Superintendent's memorandum referred to in the Letter dated December 21, 2018 is not publicly available.

146. The Letter dated December 21, 2018 states it complies with various provisions of 25 C.F.R. Part 81 and states that the petition is "considered a "tribal request" for purposes of calling and conducting a Secretarial election."

147. Nothing in the Letter dated December 21, 2018 provides information, analysis or a determination that the non-members met the elements of the IRA Section 16 and 19.

148. On or about January 29, 2019, the non-member petitioners, through Chadd Everone, sent a letter to Plaintiff, Chairperson Silvia Burley, challenging the Secretarial election and the genealogy of Jeff Davis, the "progenitor" of some 85 percent of the so-called "eligible group." Also attached to this letter was another letter (dated January 24, 2019) from the same non-member petitioner(s) to AS-IA Sweeney also challenging this Secretarial election and Davis' ancestry.

149. On or about February 5, 2019 Plaintiffs were informed by third parties of the December 21, 2018 Decision validating a Secretarial election.

150. On February 8, 2019, the Tribe promptly filed a Notice of Appeal to the Interior Board of Indian Appeals challenging this December 21, 2018 Decision.

151. Plaintiffs provided Notice of Appeal to the Department, including the Bureau of Indian Affairs, Office of the AS-IA, Pacific Regional Office and the Central California Agency.

152. On or about February 15, 2019, despite knowledge of Plaintiffs' Notice of Appeal of the December 21, 2018 Decision, Troy Burdick, Superintendent of the Central California Agency took agency action to implement the December 21, 2018 Decision.

153. In a Letter dated February 15, 2018, the Superintendent, provides an enclosed a packet to so-called "Eligible Voter[s] of the California Valley Miwok Tribe" scheduling a purported Secretarial election for April 15, 2019 for the purpose of the "eligible voters" to vote to adopt or reject the non-member petitioners' proposed Constitution.

154. In the Letter dated February 15, 2018 Superintendent Burdick appointed Carol Rogers-Davis as the "Chairperson" of the Secretarial Election Board pursuant to 25 C.F.R. Part 81.

155. Ms. Carol Roger-Davis is currently an employee of the Bureau of Indian Affairs.

156. On or about November 10, 2004, Ms. Carol Roger-Davis stated, under oath, that "[i]n 1998 or 1999 … Silvia Burley contacted Yakima Dixie about formally organizing the Tribe with tribal government, governing documents, a membership roll, etc. At the time, BIA recognized Yakima Dixie as the representative of the Tribe."

157. On or about November 10, 2004, Ms. Carol Roger-Davis stated, under oath, that individual Plaintiff, Silvia Burley was the Tribe's chairperson in 1999 and that "BIA accepted this notice [Plaintiff Burley was elected new chairperson] and began to communicate with Ms. Burley on tribal matters."

158. On or about November 10, 2004, Ms. Carol Roger-Davis stated, under oath, that "according to BIA records, there was no formal organized structure of the Tribe" in February 2004.

159. On or about November 10, 2004, Ms. Carol Roger-Davis, under oath, stated that after reviewing the Tribe's enrollment ordinance and a recently submitted constitution in February of 2004, the BIA "determined that it was inappropriate to continue to acknowledge Ms. Burley as a tribal chairperson."

160. In the Letter dated February 15, 2019 a non-member "spokesperson" for the non-member petitioners appointed non-member tribal representatives to serve on the Secretarial Election Board.

161. The Letter dated February 15, 2019 included a packet in which the BIA provided voter registration information, an official election notice, a sample ballot, and a copy of the non-member petitioners' proposed Constitution. The letter stated that March 15, 2019 was the deadline to register to vote with the Secretarial Election Board.

162. On or about February 26, 2019 attorneys for the non-member petitioners, sent a letter to AS-IA Sweeney responding to the January 24, 2018 letter, submitted by non-Indian, former assistant to Yakima Dixie, Chadd Everone, challenging the Secretarial Election based on the ancestry and eligibility of the "eligible group" or non-member petitioners.

163. Non-members petitioners' attorney stated that Mr. Everone no longer speaks for the non-member petitioners, he possesses no standing to challenge the election, his letter presents no new information, and reaffirming Jeff Davis' ancestry.

164. On or about March 13, 2019 individual Plaintiffs in an effort to preserve their rights, registered and returned paperwork related to voter eligibility in response to the Letter dated February 15, 2019. Individual Plaintiffs filed a Letter dated March 13, 2019 objecting to the Department's authority to conduct a Secretarial election stating,

> "I represent the lawful General Council under tribal and federal law, and we, and the General Council, file this paperwork only to preserve the Tribe's rights for any

and all future action related to legal challenge and do not agree, support, or acknowledge the BIA's authority to interfere with internal tribal matters. We believe that the BIA's setting of a date for an election concerning tribal documents is not within its authority.... We request that the BIA immediately cease its planning and holding of the April 15,2019 so-called election."

165. On or about March 13, 2019, Chadd Everone sent a letter (dated March 12, 2019) to individual Plaintiff, Anjelica Paulk. In this letter, Mr. Everone urged Ms. Paulk to "vote NO" on the non-member petitioners' proposed Constitution.

166. On March 18, 2019, attorneys for Plaintiffs, Chairperson Burley and the California Valley Miwok Tribe, sent a letter to Chief Administrative Law Judge Thomas Blaser *via* Overnight Delivery challenging the March 14, 2019 IBIA Order Consolidating the Appeals.

167. On or about March 20, 2019, the non-member petitioners, via their attorneys, sent a letter to Plaintiffs responding to the "false claims by Chadd Everone" and urging the eligible voters to "vote YES!" on the Constitution proposed by the non-member petitioners. To urge the voters to vote yes, the non-member petitioners state "[t]he Tribe will...be entitled to receive nearly $27 million that the California Gambling Control Commission is holding in trust for the Tribe, as well as approximately $1 million annually thereafter..."

168. The Department's December 21, 2018 Decision provides no statutory authority, judicial authority, or an order providing express authority that would grant the Department authority or direction to undertake a process to "restore" or reorganize a Tribe that pre-dates the IRA, governed itself traditionally historically, and is already organized with governing documents.

169. At no time has any purported "eligible voter" been a member of the federally recognized known as the California Valley Miwok Tribe or the Sheep Ranch Rancheria.

170. Furthermore, the Department's December 21, 2018 Decision offers no law, judicial order, or traditional governing instrument providing the Department with express authority to restore, organize, or reorganize a federally recognized tribe known as the California Valley Miwok Tribe of California (formerly Sheep Ranch Rancheria).

171. BIA provides no explanation or information as to non-member petitioners that are alleged or known to be associated with petitions for federal acknowledgment under 25 C.F.R §83 or members of other federally recognized Tribes.

## PLAINTIFF'S CLAIMS FOR RELIEF

## CLAIM 1 – VIOLATIONS OF THE DUE PROCESS CLAUSE, FIFTH AMENDMENT, UNITED STATES CONSTITUTION, 453 U.S.C §1983.

The background and each allegation above are incorporated as if fully set forth here, by reference.

172. Despite this well-defined duty, and previous dealing with the Plaintiffs, Defendants provided Plaintiffs with no notice that a purported petition to organize or reorganize the California Valley Miwok Tribe from non-member individuals was submitted to the Department nor did the Defendants provide notice to the Plaintiffs of the December 21, 2018 Decision to validate the same purported petition to conduct a purported Secretarial election as required by law.

173. Furthermore, despite knowledge of Plaintiffs Notice of Appeal and challenge of the December 21, 2018 Decision, Defendants took administrative action on February 15, 2019 to schedule the Secretarial election.

174. Furthermore, Defendants have failed to respond to Plaintiffs Notice of Appeal of the February 15, 2019 administrative action to schedule the purported Secretarial election April 15, 2019.

175. Furthermore, Defendant's appointed a non-neutral and bias agency official that provided previous testimony adverse to the position of the Plaintiffs stating the Tribe is no organized, in an adjudicative proceeding under oath against Plaintiffs, to serve as the purport Chairperson of the unlawful Secretarial Election Board.

176. Plaintiffs are informed and believe that the acts of the Defendants, their employees and agents, were intentional in failing to protect and preserve Plaintiffs' rights as set forth in this count.

177. Defendants were deliberately indifferent to the likelihood that the Defendants owed Plaintiffs a duty under the due process clause of the Fifth to the U.S. Constitution

178. As a direct and proximate consequence of the acts of Defendants' agents and employees, Plaintiffs have suffered and continue to suffer loss of their rights, privileges and immunities as the Tribe's government officials, General Council, its members, and tribal representatives of the California Valley Miwok Tribe in its government-to-government relationship with the United States.

**PLAINTIFFS' CLAIM FOR RELIEF CLAIM 2 – VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT (APA)**

Each allegation above are incorporated as if fully set forth here, by reference.

179. No law, statute, regulation, judicial order, or tribal governing document in this matter allows, or grants, the Department authority to examine, determine, or require such criteria related to membership, Indian ancestry, heritage, ethnicity, or specifically develop a base

roll, membership roll, or determine membership for the California Valley Miwok Tribe in order to validate, determine, or conduct a Secretarial election pursuant to the IRA that in doing so mandates the Tribe to hold organizational or reorganizational elections or other methods leading to the potential placement of non-members into an already federally recognized and self-governing tribe in accordance with 25 U.S.C. §476h.

180. Under the APA, the court may hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706 (2)(a). 121. The 2018 Department Decision constitutes a final agency action reviewable pursuant to the Administrative Procedure Act. 5 U.S.C. §§ 702 and 706.

181. The Department Decision of December 21, 2019 is a "final agency action for which there is no other adequate remedy in a court" within the meaning of the APA, 5 U.S.C. § 704.

182. The Decision to validate a petition to conduct a purported Secretarial election from non-member petitioners is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

183. The Decision validate a petition to conduct a purported Secretarial election from non-member petitioners is an abuse of discretion under 5 U.S.C. § 706.

**PRAYER FOR RELIEF WHEREFORE**, the California Valley Miwok Tribe of California respectfully requests that this Court:

Plaintiffs respectfully request that this Court provide declaratory and injunctive relief under the laws of the United States, including but not limited to 5 U.S.C. §§ 701-706 and 28 U.S.C. §§ 2201-2202. This action arises under federal law, including but not limited to the IRA. 25 U.S.C. § 5108.

A.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Defendant's

Decision to validate, schedule, and conduct a Secretarial election is contrary to

and its application here is in violation of the plain meaning of the Indian

Reorganization Act of 1934, Section 16a, 16h, and Section 19; and

B.     Hold unlawful, and set aside, Defendant's Decisions to validate, schedule, and

conduct a Secretarial election as arbitrary and capricious and an abuse of

discretion, and the Department's change in policy as arbitrary and capricious

pursuant to 5 U.S.C. § 706(2)(A); and

C.     Enjoin the Defendants from further interference in internal Tribal membership

matters in accordance with long-standing principles, policy, and legal precedent

in the United States; and

D.     Issue all other appropriate injunctive or equitable relief necessary to provide

complete relief to Plaintiffs; and

E.     Issue an award of costs and fees, including attorneys' fees, pursuant to the Equal

Access to Justice Act, 28 U.S.C. § 2412; and

F.      Grant Plaintiffs such other and further relief that the Court may deem is just and

proper.

Dated: 2 day of April, 2019

Respectfully submitted,

Peter D. Lepsch, Bar No. 495548
plepsch@ndnlaw.com
John Peebles, Bar No. NE15730
jpeebles@ndnlaw.com

Fredericks, Peebles & Patterson LLP
2020 L Street, Suite 250
Sacramento, CA
(916) 441-2700

*Attorneys for the California Valley Miwok Tribe*

## VERIFICATION

I declare under penalty of perjury under the laws of the United States of American that

the foregoing is true and correct. Executed on April 1, 2019.

Silvia Burley, Chairperson
California Valley Miwok Tribe