# EXHIBIT LIST

| Exhibit No. | Document | Date |
|---|---|---|
| 1. | Decision Letter validating Petition for Secretarial election from Acting Pacific Regional Director, Mervel Harris | 12/21/2018 |
| 2. | Probate Decision from Office of Hearings and Appeals, ALJ William Hammet | 04/14/1993 |
| 3. | Dept. of Interior, Memorandum re: Office of Administrative Hearings determination re: Yakima Dixie inheritance of Sheep Ranch Land | 03/17/1995 |
| 4. | Dept. of Interior Memorandum re: Correcting Land Title from "tribal" tract to "individually owned" tract. | 12/14/2000 |
| 5. | Letter from Superintendent Dale Risling, Sr. advising the Tribe to operate as a General Council | 09/24/1998 |
| 6. | Resolution #GC-98-01 establishing a General Council form of tribal governance | 11/05/1998 |
| 7. | Letter from BIA recognizing govt-to-govt relationship with CVMT through Chairperson Burley | 11/24/2003 |
| 8. | Deposition of Yakima Dixie | 02/07/2012 |
| 9. | Letter from BIA pressuring Tribe to organize under IRA | 10/31/2001 |
| 10. | Letter from BIA re: ISDEAA funds and pressuring Tribe to complete reorganization process | 03/04/2002 |
| 11. | Letter from BIA stating that BIA does not view Tribe has "organized" | 03/26/2004 |
| 12. | AS-IA Larry EchoHawk Decision | 08/31/2011 |
| 13. | AS-IA Kevin Washburn Decision | 12/30/2015 |
| 14. | Response to Order to Show Cause | 03/21/2019 |
| 15. | Letter from BIA Superintendent Burdick, Scheduling the Secretarial election | 02/15/2019 |
| 16. | Letter from Pacific Regional Director, Amy Dutschke | 09/11/2017 |
| 17. | Pre-Docketing Notice and Order to Show Cause | 02/25/2019 |

# EXHIBIT 1



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way, Room. W-2820
Sacramento, California 95825

**DEC 2 1 2018**

IN REPLY REFER TO

Tribal Government Services

CERTIFIED MAIL NO: 7017 1070 0000 8970 1138
RETURN RECEIPT REQUESTED

Michael Mendibles, Spokesperson
California Valley Miwok Tribe Petitioners
℅ James Rusk, Attorney
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109

Dear Mr. Mendibles:

This is to inform you of my decision to validate the petition requesting a Secretarial election permitting the eligible voters of the California Valley Miwok Tribe to adopt or reject the proposed Constitution of the California Valley Miwok Tribe (Also Known As Sheep Ranch of Me-Wuk Indians of California), officially filed by you with the Superintendent, Central California Agency October 29, 2018. In accordance with 25 Code of Federal Regulations (25 CFR) Part 81.62 the Local Bureau Official (Superintendent), on December 13, 2018, delivered the petition by memorandum providing his recommendation for approval to this Office.

Upon receipt of the petition, on October 29, 2018, in accordance with 25 CFR Part 81.60(a)(1) the Superintendent posted a copy of the original petition, a copy of the proposed Constitution, and instructions on how to challenge the petition at the Central California Agency for 30 days. On November 29, 2018, no challenges were received by the Superintendent and the petition was removed from its posted location.

In accordance with 25 CFR Part 81.62(a)(4) by his December 13, 2018, memorandum the Superintendent verified the petition submitted by you complied with 25 CFR Part 81 Subpart F, including the format in which the petition was presented to and signed by the eligible voters of the Tribe as required by 25 CFR Part 81.55.

Further the petitioners have verified they utilized the eligibility requirements established by the Assistant Secretary — Indian Affairs December 30, 2015, decision in an attempt to identify all persons eligible to participate in the Tribe's initial organization. Through its own process the petitioners have identified 289 individuals eligible to participate who descend from the following historical documents:

1. The Individuals Listed on the 1915 Terrell Census and Their Descendants
2. The Descendants of Rancheria Resident Jeff Davis (Who Was the Only Person on the 1935 IRA Voters List for the Rancheria)
3. The Heirs of Mabel Dixie (The Sole Indian Resident of the Rancheria Eligible to Vote on its Termination in 1967).

The petition contains 153 valid signatures of the 289 identified eligible voters, exceeding the fifty percent (50%) requirement of 25 CFR 81.57(b). The first signature was dated July 21, 2018 and the last signature was dated September 15, 2015, 56 days following the first signature and well within the one year requirement set forth in 25 CFR Part 81.58.

Following the Central California Agency's technical review and the Solicitor's Office legal review it was determined no technical assistance was required as the document appears to be legally and technically sufficient.

Pursuant to the Indian Reorganization Act, 25 USC § 476 et seq, as amended, and in accordance with the authority in 25 CFR § 81.62, I possess the authority to validate a Secretarial election petition; however, please be advised that validation of the petition does not carry with it the presumption of approval should the Constitution be adopted. If necessary, I may exercise the discretionary authority to disapprove the Constitution, if any provisions are in conflict with Federal Law. As evidenced above, the petition satisfies all the requirements of 25 CFR Part 81 Subpart F, and is hereby considered validated; it will now be considered a "tribal request" for purposes of calling and conducting a Secretarial election. Further, please be advised, in accordance with 25 CFR Part 81.62(b)(2) this is a final agency action for the Department of the Interior.

This Office will notify the Superintendent, Central California Agency, by memorandum to begin working with you and the petitioners to call and conduct a Secretarial for permitting the eligible voters of the California Valley Miwok Tribe to adopt or reject the proposed Constitution of the California Valley Miwok Tribe (Also Known As Sheep Ranch of Me-Wuk Indians of California). Should you have a question, please contact Harley Long, Tribal Government Officer, at (916) 978-6067, or you may write to the above address.

Sincerely,

Acting

Regional Director

cc: Superintendent, Central California Agency

# CERTIFICATE OF SERVICE

I declare I am employed in the County of Sacramento, State of California.  My business address is: 2020 L Street, Suite 250, Sacramento, California 95811.  I am over the age of eighteen (18) years and not a party to the within action.

On February 7, 2019, I served the within: NOTICE OF APPEAL, on the parties listed below, addressed as follows:

Mervel Harris
Acting Regional Director
United States Department of the Interior
Bureau of Indian Affairs, Pacific Regional Office
2800 Cottage Way, Room W-2820,
Sacramento, CA 95825

Tara Katuk Mac Lean Sweeney
Assistant Secretary – Indian Affairs
Department of the Interior
1849 C Street, N.W. MS-4660-MIB
Washington, D.C. 20240

Interior Board of Indian Appeals
United States Department of the Interior
801 North Quincy Street, MS 300 QC,
Arlington, VA 22203

Troy Burdick, Superintendent
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

Amy Dutschke
Pacific Regional Director
2800 Cottage Way
Sacramento, CA 95825

Dale Risling
Deputy Regional Director
2800 Cottage Way
Sacramento, CA 95825

Michael Mendibles, Spokesperson
California Valley Miwok Tribe Petitioners
c/o James Rusk, Attorney
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109

John Tahsuda
Principal Deputy Assistant Secretary—
Indian Affairs
U.S. Department of the Interior
MS-4160-MIB
1849 C. Street, N.W.
Washington, DC 20240

Office of the Solicitor
Pacific Southwest Region
2800 Cottage Way, Room E-1713
Sacramento, CA 95825-1890

XX   By First Class Mail by placing a true copy thereof in a sealed envelope with postage thereon fully prepaid and placing the envelope in the firm's daily mail processing center for mailing in the United States mail at Sacramento, California.

_____
DIANA CROW

# EXHIBIT 2

UNITED STATES DEPARTMENT OF THE INTERIOR
OFFICE OF HEARINGS AND APPEALS
2020 Hurley Way, Suite 150
Sacramento, CA 95825
(916) 978-4326

PROBATE NO:
IP PH 76I 91

NOTICE
TO ALL PERSONS HAVING AN INTEREST IN THE
SUBJECT MATTER OF THIS PROCEEDING

NOTICE IS GIVEN That on _____APR 1 4 1993_____ a decision was
entered in the estate of MABEL HODGE DIXIE, a deceased California
Indian.  A copy is attached to this notice.

This decision becomes final sixty (60) days from the date of this
notice unless within such period, a written notice of appeal shall
have been filed with the Interior Board of Indian Appeals, 4015 Wilson
Boulevard, Arlington, Virginia 22203, IN ACCORDANCE WITH THE
PROVISIONS OF 43 CFR 4.320.

The notice of appeal shall give or shall be followed by a concise
but complete statement of the grounds upon which the appeal is based.

THIS NOTICE TO PARTIES IN INTEREST HERE NAMED AND TO ALL PARTIES.

Land Titles & Records Section, Sacramento Area Office,
  BIA, Federal Office Bldg., 2800 Cottage Way, Sacramento, CA.,
  95825
Superintendent, Central California Agency, 1824 Tribute Rd.,
  Suite J, Sacramento, CA  95815-4308
Merle Butler, c/o Central California Agency,
Sally N. Willett, Administrative Law Judge, 2901 N. Central Ave.,
  Suite 955, Phoenix, AZ  85012
Yakima Dixie, PO Box 41, Sheep Ranch, CA  95252
Violet Girouard,  PO Box 41, Sheep Ranch, CA  95252
Merle Butler, c/o Central California Agency, BIA
Melvin Dixie, c/o Violet Girouard, PO Box 41, Sheep Ranch, CA  95252
Melvin Dixie, c/o Central California Agency, BIA

Dated and mailed: APR 0 4 1993

By: _____

_William E. Hammett_
William E. Hammett
Administrative Law Judge

CVMT-2011-000074



## United States Department of the Interior

### OFFICE OF HEARINGS AND APPEALS
2020 Hurley Way, Suite 150
SACRAMENTO, CA 95825



IN THE MATTER OF THE ESTATE OF )
                                           )
MABEL HODGE DIXIE )
                                           )
DECEASED CALIFORNIA INDIAN )
                                           )

PROBATE IP PH 761 91
(FORMERLY IP SA 7N 72
ORDER DENYING RELIEF
REQUESTED IN PETITION TO
MODIFY ORDER DATED
NOVEMBER 1, 1971

### BACKGROUND OF CASE

The land which comprises the Sheep Ranch Rancheria was purchased in 1916 pursuant to a Federal statute which authorized the purchase of land for homeless California Indians. No tribal designation was made in connection with the purchase. Later, such land was designated as the Sheep Ranch Rancheria.

In 1958, the Congress enacted an Act entitled "An Act to provide for the distribution of the land and assets of certain Indian rancherias and reservations in California and for other purposes", which Act was approved August 18, 1958. Such Act was amended by the Act of August 11, 1964, P.L. 88-419, 78 Stat. 390.

Pursuant to such legislation, a plan of distribution of the assets of the Rancheria was developed "after consultation with Mrs. Mabel Hodge Dixie of the Sheep Ranch Rancheria." This plan received final approval of the Assistant Commissioner of Indian Affairs, on October 12, 1966, and the effective date of the plan is October 14, 1966. A copy of the plan as approved is attached to and incorporated in this Order by reference. It is noteworthy that the plan contains the statement "accepted by distributee in referendum by vote of 1 for and 1 against." Correspondence in the case file and received as a part of Exhibit 1 at the hearing, discloses that the Bureau of Indian Affairs considered that Mabel Hodge Dixie was the only person it was necessary to deal with concerning the distribution plan.

Representatives of the Bureau of Indian Affairs have conceded that the Government did not meet the requirement of the Plan of Distribution. Nevertheless, a deed conveying the land comprising the Sheep Ranch Rancheria was prepared and executed by personnel of the Bureau of Indian Affairs and recorded by the Bureau, at Bureau expense, in the land records of Calaveras County, California, on April 26, 1967. A copy of the deed was sent to Mabel Hodge Dixie with a letter dated May 2, 1967. Copies of the deed and letter are attached and incorporated in this order. It is noted that the deed does not contain any language referring to any conditions upon which delivery is prefaced, and the letter does not contain any such language. In fact the letter reflects that the deed transfers title. The mere reference in the deed to the authority under which it is executed does not, in this forum's opinion, incorporate within such instrument any of the responsibilities set forth in the distribution plan.

The evidence elicited at the hearing on May 12, 1992, discloses that the Area Director, Bureau of Indian Affairs, stated in a letter addressed to Ms. Dixie through someone named Hayden Stevens, that "the setting up of the conservator is now in process (sic) and at such time that it is consummated, title will then be passed to you upon receipt of the deed."  Also, there is further mention of a conservator in a memorandum from the Area Realty Officer, BIA, to the Area Director, subject "Sheep Ranch Rancheria," which memorandum is dated August 13, 1971,  Of particular note is the language "the deed was never delivered to her (Dixie) because the Bureau of Indian Affairs was unable to get a court appointed conservator."  Copies of the letter and the memorandum are attached and incorporated in this Order.

Mabel Hodge Dixie executed a quitclaim deed dated September 6, 1967, by which she purportedly reconveyed such land to the United States and such deed was recorded in the land records of Calaveras County, California, at the request of the United States Department of the Interior.  A copy of the deed is attached and incorporated in this order by reference.  Evidence adduced at the hearing held May 12, 1992, disclosed that the deed was prepared by the Bureau of Indian Affairs; that it was taken to the Sheep Ranch Rancheria and executed by Mabel Hodge Dixie; that her signature was acknowledged by a Bureau employee who was a notary public; and that the deed was recorded in the land records at the Bureau's request and expense.

Mabel Hodge Dixie died July 11, 1971, and the Bureau of Indian Affairs submitted probate data to then Hearing Examiner Alexander Wilson so that he could set the estate for hearing.  Included with the probate assembly was an inventory entitled, "Inventory and Appraisement of Indian Trust Land of Mabel Hodge Dixie, Unallotted California Indian, Sacramento Area Office, Sacramento, California," which inventory described the land referred to as the Sheep Ranch Rancheria.   The inventory was certified to by the Area Realty Officer.

On November 1, 1971, Examiner Wilson issued an Order Determining Heirs of Mabel Hodge Dixie.  The Sheep Ranch Rancheria property was the only trust property which Mabel Hodge Dixie was shown to possess.

In October of 1990, the Superintendent of the Central California Agency, Bureau of Indian Affairs filed a petition to modify the decedent's estate to delete the Sheep Ranch Rancheria property from the inventory.  Such petition was filed with

CVMT-2011-000076

PROBATE
IP PH 76I 91

Administrative Law Judge Sally N. Willett who now has probate jurisdiction in the Central California area.   After meeting the requirements of 43 CFR 4.242, Judge Willett reopened the estate and set the matter for further hearing on July 30, 1991.  There was no appearance at such hearing and she transferred the case to this forum for further action.  After due notice, this forum held a hearing on May 12, 1992.  Testimony was taken and documents were received in the record as Comprehensive Exhibit No. 1.  This forum is entering this decision based on the evidence elicited at such hearing.

An analysis of the record discloses that three concepts of title and possession are evident.

## CONCEPTS OF TITLE AND POSSESSION

1.  Notwithstanding the Government's contention as to lack of delivery, there was an effective delivery of the deed from the United States of America to Mabel Hodge Dixie, and that the title and possession acquired by the quitclaim deed is questionable considering the circumstances under which the quitclaim deed was acquired and executed.

2.  That there was no delivery of the deed to Ms. Dixie and that the quitclaim deed cleared title in the United States of America but that the quitclaim deed could not be utilized to claim that it constituted a rejection of the plan of distribution for the Sheep Ranch Rancheria.

3.  That there was no delivery of the deed to Ms. Dixie; that the quitclaim deed assured title in the United States of America; and the quitclaim deed can be used to show that Ms. Dixie rejected the distribution plan.  This third concept appears to summarize the Government's position.

As indicated by the evidence, representatives of the Government have presumed over a period of time that the responsibilities of the Government, as set forth in the plan, are conditions precedent to execution and delivery of a deed conveying the land covered by the Sheep Ranch Rancheria to Mabel Hodge Dixie and that since the deed was executed and recorded before the conditions were performed by the Government, the deed did not pass title to Mabel Hodge Dixie.

-3-

CVMT-2011-000077

The letter dated May 2, 1967, discloses that a copy of the
deed was sent to Mabel Hodge Dixie, and the record discloses that
the Bureau had the deed recorded at its expense in the land records
of Calaveras County, California.  The deed did not contain any
language which imposed conditions precedent to delivery of title,
and it did not incorporate any conditions by reference.  Mere
recitation of authority for execution of the deed could not be
construed as incorporation of the Government's responsibilities
under the distribution plan within the framework of the deed.

Where an issue is raised as to the nondelivery of a deed, the
party raising, and having the affirmative of, that issue has the
burden of proving it; and when a presumption of delivery arises,
nothing except the most satisfactory evidence of nondelivery can
prevail against it,(see cases cited in 23 Am Jur 2d 150 and 172).
It has been stated that "the delivery of a deed is completed when
the grantor has put it beyond his power to reclaim, and hence
placing in a mailbox a deed in a stamped envelope addressed to the
grantee operates as a delivery to him," and it has also been stated
that "while the fact that a deed is on record is prima facie
evidence of delivery, the deposit for recording of a deed by the
grantor or his agent and the actual recording thereof do not
constitute delivery as a matter of law, for the question remains
whether, by so doing, the grantor intended to deliver the deed."
(See 23 Am Jur 2d, 137).  The Government had the burden of proving
nondelivery and it has not offered any evidence to show that at the
time the deed was sent to Ms. Dixie and at the time that it was
recorded that the Government intended the delivery to be other than
final.  For the reasons stated, I find that delivery of the deed
to Ms. Dixie was completed when she was sent a copy of the deed and
the deed was recorded in the land records without any instruction
to the recorder that the recordation was to be conditioned on any
other event.

The Government's role in the preparation,execution, and
acquisition of the quitclaim deed from Mabel Hodge Dixie to the
United States of America raises serious questions as to the quality
of the title received.  The quitclaim deed recites that "for a
valuable consideration paid by the party of the second part, the
receipt of which is hereby acknowledged" that the land comprising
the Sheep Ranch Rancheria is conveyed to the United States of
America.  The deed makes a further recitation as follows:

-4-

PROBATE
IP PH 76I 91

This quitclaim deed is executed in order to clear the record and to restore title in and to the United States of America just as though that certain deed dated April 11, 1967, from the United States of America to Mabel Hodge Dixie, which was inadvertently executed and recorded in Book 229, Page 184, in the Records of Calaveras County, California, on April 26, 1967, was never in fact executed and recorded, the said deed having been executed and recorded prior to compliance with all of the statutory requirements set forth in the Rancheria Act of August 18, 1958 (72 Stat. 619), as amended August 11, 1964 (78 Stat. 390) and which deed was not intended to pass title nor did said deed actually pass title.

If, in fact, the deed to Mabel Hodge Dixie was a valid conveyance, the recitations made in the deed were a material misrepresentation of the facts, no matter how innocently made, leading Mabel Hodge Dixie to execute the quitclaim deed. Further, the quitclaim deed was prepared by employees of the Bureau of Indian Affairs; taken to the Rancheria by an employee of the Bureau where the deed was executed by Ms. Dixie; her signature was acknowledged by an BIA employee; and the deed was recorded in the land records of the said county at BIA expense. There is no indication that Mabel Hodge Dixie was provided independent counsel as to the legal consequences of her action, or that, indeed, she had to take any action. In addition, if the deed to her was valid and delivery made, then, in this forum's opinion, it could be well argued that there was a lack of consideration for the quitclaim deed. Certainly, the vague assertion of "valuable consideration paid" taken in context with the definitive statement of the purpose of the deed would lead one to believe that the only consideration for the deed was the purpose stated concerning clearing the record and restoring title in the United States of America. Lastly, there is a very disturbing matter introduced into the record at the hearing. For reasons not disclosed in the record, BIA personnel thought that a conservator was required for the affairs of Mabel Hodge Dixie. This raises some concern that she made not have been considered competent. The law does not invalidate a conveyance to an incompetent, however, it is a different matter when reviewing a deed executed by a person whose competency may be at issue.

CVMT-2011-000079

PROBATE
IP PH 76I 91

For the reasons, I have stated herein, I am of the opinion that there was a valid delivery of the deed to Mabel Hodge Dixie, however, the record is not sufficient to determine the quality of title, if any, received by the United States of America by virtue of the quitclaim deed.

As to the second concept of title and possession, the Government appears to recognize that it might still have some obligations under the distribution plan, otherwise, why would its representatives feel the need to treat the quitclaim deed as a refutation of the distribution plan by Mabel Hodge Dixie. Regardless of why the Government might consider that the quitclaim deed be treated as refutation of the plan, I find that it cannot be used for such purpose. The clearly stated purpose of the quitclaim deed is to clear the record and restore title in the United States of America. There would have had to have been an intent of Mabel Hodge Dixie to refute the plan and plainly such intent is not revealed in the deed. The Government's representatives are responsible for the wording in the deed, and it would constitute an act of misrepresentation on the Government's part to use the quitclaim deed for a purpose other than the stated purpose. This forum is certain that the Government's representatives would not want to engage in conduct which would be tantamount to misrepresentation. The Government has failed to produce any other document or any statement of Mabel Hodge Dixie in which she stated, or even in which it could be implied that, she refuted the distribution plan. For the reasons stated, I find that the quitclaim deed cannot be used as evidence that Mabel Hodge Dixie refuted the distribution plan.

The Federal employee who testified at the May 12, 1992, hearing indicated that she was most knowledgeable about matters surrounding the termination of the California rancherias and the problems which developed from such termination. She further testified that she was not aware of any subsequent legislation which abolished the distribution plans authorized by the Federal legislation providing for termination of the rancherias. Therefore, if the quitclaim deed does not constitute refutation of the distribution plan by Ms. Dixie, then it may well be argued that the plan is still viable.

As the Federal employee testified, the reason why the members of other terminated rancherias, or their heirs, were allowed to bring the land of such rancherias back into trust status was because it was a part of the settlements made in the various class actions filed against the Government. Mabel Hodge Dixie was not

CVMT-2011-000080

a party plaintiff in any class action.   Notwithstanding that the quitclaim deed could not have brought the property back into trust status, if one assumes the Government's position that the deed from the United States of America to Mabel Hodge Dixie was invalid, then it is certainly arguable that the Sheep Ranch rancheria land did not lose whatever trust status it may have enjoyed prior to execution of the deed to Mabel Hodge Dixie.

If one accepts the third concept of title and possession, which this forum most does not, then the Government would be correct in its contention that the Sheep Ranch Rancheria land should not have been included as trust land in the inventory of the estate of Mabel Hodge Dixie and that the Government should be granted the relief requested, i.e., that such land be excluded from the inventory of her trust land.

Based on the findings, conclusions, and rulings made herein, this forum finds and so determines that it cannot grant the relief requested in the petition to modify the estate to exclude the said land\from the inventory of trust interests.

Accordingly, it is hereby ordered that the requested relief be, and is, denied.

This decision is final for the Department unless notice of appeal is filed with the Interior Board of Indian Appeals pursuant to 43 CFR 4.320, et seq, within sixty days from the date hereof. Rights of appeal are more fully described in the notice accompanying this Order.

Dated at Sacramento, California,          APR 1 4 1993

William E. Hammett
William E. Hammett
Administrative Law Judge

CVMT-2011-000081

# EXHIBIT 3

UNITED STATES GOVERNMENT

# memorandum

DATE: MAR 1 7 1995

REPLY TO
ATTN OF: *Acting* Area Director, Sacramento Area Office

SUBJECT: Sheep Ranch Rancheria

TO: Superintendent, Central California Agency
Attention: Realty Officer

This is to confirm our discussion regarding the current status of the .92 acre of land in Calaveras County and referred to as the Sheep Ranch Rancheria. For the record, we are submitting the following summary.

1. On August 18, 1966, a plan for the distribution of the assets of the rancheria pursuant to the California Rancheria Act was approved which called for the title to the subject property to be conveyed in fee simple to Mable Hodge Dixie, the sole distributee. The property was deeded to Mable Hodge Dixie on April 11, 1967 and recorded on Calveras County, but the deed was never delivered to Mrs. Dixie.

2. Mable Hodge Dixie subsequently executed a quitclaim deed (for the Sheep Ranch Rancheria) back to the United States in 1967.

3. Mable Hodge Dixie died on July 11, 1971 and an Interior probate was requested in order to enable the conveyance of fee simple title to her heirs.

4. The probate determination of November 1, 1971 held that Mable had five heirs, however, no deeds for fee simple title were ever issued to the heirs.

5. On November 28, 1989, the Sacramento Area Director requested a revocation of the Sheep Ranch distribution plan, but the matter was remanded back to the Area Director on December 22, 1989 for review by the Solicitor as to the protection of the rights of any parties [Mable's heirs] that might be adversely affected by the revocation.

6. At the recommendation of the Office of the Solicitor, the Superintendent filed a petition to reopen the case and seek a determination that the property was erroneously included in Mable's estate and that title was still vested in the name of the United States. In the order issued April 14, 1993, No. IP PH 76I 91, the Administrative Law Judge denied the Superintendent's request and held that the heirs of Mable Hodge Dixie were vested with title.

The heirs in the 1971 order were: Merle Butler, her husband, as to a 2/6 interest; Richard Dixie, her son as to a 1/6 interest; Yakima Dixie, her son as to a 1/6 interest; Melvin Dixie, her son as to a 1/6 interest; and Tommy Dixie, her son as to a 1/6 interest. As Richard and Tommy are deceased, further probate action is necessary. The record also indicates that Merle Butler is a non-Indian, but efforts should be made to verify this.

As a result of our discussion, the following clarifications are made: (1) the Sheep Ranch Rancheria of Me-Wuk Indians of California shall remain on the BIA's

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114

CVMT-2011-000083

☆U.S.GPO:1981-0-281-782/20347

-2-

list of Indian Entities Recognized and Eligible to Receive Services, and (2) the .92 acre will be moved from our acreage reports as "tribal" land and will be added to our listing of "individually-owned" land.

Once the additional estates have been probated, the heirs should be asked to consider submission of a formal request to revoke the Sheep Ranch distribution plan.

*Amy L. Dutschke*

cc:  Tribal Operations Officer, CCA
     Tribal Operations Officer, SAO
     Supervisory Realty Specialist, LTRO

CVMT-2011-000084

# EXHIBIT 4

APR-02-01 12:04 FROM:BIA CCA

UNITED STATES GOVERNMENT

# memorandum

RECEIVED
BUREAU OF INDIAN AFFAIRS
PACIFIC REGION

DATE: DEC 1 4 2000

REPLY TO
ATTN OF: Realty Officer, Pacific Region, Sacramento

SUBJECT: Land Title Corrections – Sheep Ranch Rancheria

2000 DEC 14  P 2: 59

LAND TITLES & RECORDS
OFFICE

TO: Supervisor, Land Titles & Records Office

We have received a request from the Tribal Chairperson at the Sheep Ranch Rancheria to correct the title data maintained in LRIS for the Sheep Ranch Rancheria, your reference: 528-T5104.

As a result of the probate of the estate of Mabel Hodge Dixie, her heirs were determined under Probate Case File No. IP SA 7N 72. The 1972 probate determination was upheld in 1993 by the Administrative Law Judge under Probate Case File No. IP PH 761 91. As the conclusion was that Mabel's heirs are vested with title to the .92 acre tract, the Rancheria is requesting a change from its designation as a "T" (tribal) tract. Once the correction is made, we are requesting that a new Title Status Report be issued. When issued, please provide the TSR to me for appropriate action. As the Rancheria is seeking a determination by the Assistant Secretary that they are a landless tribe, your early attention is requested.

In addition, the testimony given in probate No. IP PH 761 91 to the Administrative Law Judge by Yakima Dixie, son and heir of Mabel Hodge Dixie, reflects that the following individuals are also deceased: Mabel's spouse, Merle Butler; and Mabel's sons, Richard and Tommy Dixie. We have requested the Central California Agency to request death certificates for these individuals, and to add them to the list of estates needing probate action. By copy of this memorandum, we are requesting the Central California Agency staff to make sure they provide you with appropriate death notices if they have not done so already.

Carmen David

cc: Realty Officer, CCA w/copy of inc.
    Larry Scrivner, Deputy Director, Ofc. of Trust Responsibilities

OPTIONAL FORM NO. 10
(REV. 1-80)

5010-114

U.S. GPO: 1994-300-692/80210

# EXHIBIT 5

03/02/2005  13:15    3015995385                THOMPSOMASS                        PAGE  18



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Central California Agency
1824 Tribute Road, Suite J
Sacramento, CA 95815-4308

SEP 2 4 1998

IN REPLY REFER TO:

Yakima K. Dixie, Spokesperson
Sheep Ranch Rancheria
11178 School Street
Sheep Ranch, California 95250

Dear Mr. Dixie:

The purpose of this correspondence is to summarize the issues discussed during a meeting held with you and Silvia Burley on September 8, 1998, at your residence on the Sheep Ranch Rancheria in Sheep Ranch, California.  The purpose of the meeting was to discuss the process of formally organizing the Tribe.  In attendance at this meeting from my staff was Mr. Raymond Fry, Tribal Operations Officer, and Mr. Brian Golding, Sr., Tribal Operations Specialist.

## Status of the Tribe

The Sheep Ranch Rancheria is a federally recognized Tribe, as it was not lawfully terminated pursuant to the provisions of the California Rancheria Act.  The California Rancheria Act provided for the termination of specific Tribes by distributing the assets of the Tribes to those persons determined eligible, and in exchange, the recipients of the assets would no longer be eligible to receive services and benefits available to Indian people.  The Plan of Distribution of the Assets of the Sheep Ranch Rancheria, approved by the Associate Commissioner of Indian Affairs on October 12, 1966, identified your mother, Mabel (Hodge) Dixie as the sole distributee entitled to participate in the distribution of the assets of the Sheep Ranch Rancheria.  The Distribution Plan has not been revoked.

## Membership

In those situations where an "unterminated" Tribe is pursuing reorganization, the persons possessing the right to reorganize the Tribe is usually specified by the decision of the court, as the majority of "unterminated" Tribes regain federal recognition through litigation.  Usually, the court decision will state that the persons possessing the right to reorganize the Tribe are those persons still living who are listed as distributees or dependent members on the federally approved Distribution Plan.  In some cases the courts have extended this right of participation to the lineal descendents of distributees or dependent members, whether living or deceased.

3

CVMT-2011-000172

In this case, the usual manner of determining who may reorganize the Tribe does not apply here as there is no such court decision. However, with the passing of Mabel (Hodge) Dixie, a probate was ordered, and the Administrative Law Judge issued an Order of Determination of Heirs on October 1, 1971, as reaffirmed by subsequent Order issued on April 14, 1993. The Order listed the land comprising the Sheep Ranch Rancheria as part of the estate of Mabel (Hodge) Dixie. The Order then listed the following persons as possessing a certain undivided interest in the Sheep Ranch Rancheria:

| Merle Butler, husband | Undivided 1/3 interest | Deceased |
| Richard Dixie, son | Undivided 1/6 interest | Deceased |
| Yakima Dixie, son | Undivided 1/6 interest | |
| Melvin Dixie, son | Undivided 1/6 interest | |
| Tommy Dixie, son | Undivided 1/6 interest | Deceased |

During our meeting, you explained to us that three of the heirs were deceased, and that the whereabouts of your brother, Melvin Dixie, were presently unknown.

We believe that for the purposes of determining the initial membership of the Tribe, we are held to the Order of the Administrative Law Judge. Based upon your statement that three of the heirs were deceased, the two remaining heirs are those persons possessing the right to initially organize the Tribe.

On August 5, 1998, as the Spokesperson of the Tribe, you accepted Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace as enrolled members of the Tribe. Therefore, these persons as well, provided that they are at least eighteen years of age, possess the right to participate in the initial organization of the Tribe.

At the conclusion of our meeting, you were going to consider what enrollment criteria should be applied to future prospective members. Our understanding is that such criteria will be used to identify other persons eligible to participate in the initial organization of the Tribe. Eventually, such criteria would be included in the Tribe's Constitution.

Governance

Tribes that are in the process of initially organizing usually consider how they will govern themselves until such time as the Tribe adopts a Constitution through a Secretarial Election, and Secretarial approval is obtained. Agency staff explained two options for the consideration of the General Membership:

1) the members could operate as a General Council, retaining all powers and authorities, and delegating specific limited powers to a Chairperson, and

CVMT-2011-000173

2) the members could form an Interim Tribal Council, and delegate from the General Council various general powers and authorities to the Interim Tribal Council.

In this case, given the small size of the Tribe, we recommend that the Tribe operate as a General Council, as described in the first option above. Enclosed for your consideration, is a draft General Council resolution (Resolution #GC-98-01) specifying general powers of the General Council and rules for governing the Tribe.

A number of the provisions of the draft resolution may be changed by the Tribe to reflect the manner in which it desires to conduct business. For instance, the first "Resolved" clause on the second page lists seven (7) specific powers to be exercised by the General Council. For the most part, this list involves those powers that the General Council would exercise in order to accomplish the initial organization process. There is no mention of other powers, such as the power to purchase land, since such a power most likely would not be used during the organization process. Rather, such a power would be used after the Tribe organizes, and would be included in the Tribe's Constitution.

Another example of a change to consider is the fourth "Resolved" clause on the second page. This clause states that regular meetings of the General Council will be held on the second Saturday of each month. The Tribe may wish to change this to a day of the week that will best meet the Tribe's needs.

Once the General Council adopted such a resolution, the General Council would then proceed to elect or appoint a Chairperson. The General Council would then be able to proceed with the conduct of business, in a manner consistent with the authorizing resolution. Additional powers can be specified by the General Council through either an amendment to the authorizing resolution, or adoption of another authorizing resolution.

## Grant Funding

We discussed the fact that the Bureau of Indian Affairs makes grants, under the provisions of the Indian Self-Determination and Education Assistance Act, as amended, to Tribes for the purpose of strengthening or improving Tribal government and developing Tribal capacity to enter into future contracts. Such grants can be used to cover costs incurred by the Tribe in establishing a Tribal office, equipment and furniture, supplies, and legal assistance. In this case, we advised the Tribe that the first grant would be made in the amount of $50,000.

In order to apply for and receive funding from the Bureau, the Self-Determination Act requires that a Tribe indicate by resolution its desire to receive grant funding. Enclosed is a draft General Council resolution (Resolution #GC-98-02) which fulfills this requirement.

CVMT-2011-000174

We discussed the nature of congressional appropriations regarding the funding that Tribes receive. We recommended that the Tribe consider reprogramming funds from various programs into the Consolidated Tribal Government program. Such reprogramming would then provide the Tribe with the greatest flexibility in using the funds in the upcoming year. As a result of our discussion, you provided the Agency staff present with a letter proscribing your reprogramming preferences. A copy of this letter is enclosed for your records.

## Bureau Costs Associated with Organizing

We discussed the Bureau's role in providing technical assistance to Tribes in the process of organizing the Tribe. The Bureau receives some funding from each of the Tribes in our jurisdiction as a means of providing a minimum amount of technical assistance. But in those cases where a Tribe is pursuing formal organization, such funds are insufficient to cover all costs.

We request that the Tribe consider the adoption of the enclosed draft General Council resolution (Resolution #GC-98-03). The purpose of this resolution is to authorize the Bureau to charge expenses related to the organization of the Tribe to the Tribe's FY 1998 Tribal Priority Allocation funding. One example of a cost supporting the organization process is the purchase of death certificates for the three deceased heirs. The death certificates are necessary for the initiation of the probate process. Another example of such costs is the hiring of a new Bureau employee, or the temporary assignment of an existing Bureau employee, to work directly with the Tribe in the organization process. Such work may focus on the enrollment process, development of administrative management systems, or on issues related to governance.

## Other Issues

*Probates:* We discussed the status of the land, and the need for additional probates to be completed to determine the status of the estates of deceased heirs. We agreed to obtain copies of the death certificates of the deceased heirs. A request for death certificates was prepared, and we expect the processing of the request by the State Office of Vital Records within the next month. Once received, we will then proceed with preparing the probates.

The fact that there are probate actions remaining to be taken directly impacts your ability to enter into a homesite lease. This is relevant to the question you asked regarding Silvia's eligibility for assistance under the Housing Improvement Program (HIP). An applicant under the HIP must demonstrate ownership or control over land, either through an assignment or a homesite lease. In this case, as the land is considered as individually-owned trust land, you and the other heirs would have to enter into a homesite lease with Ms. Burley. Other eligibility criteria exists for the HIP that are beyond the purview of this letter. We have requested that the HIP send an application to Ms. Burley for her review.

**Septic Tank:** With regard to the septic tank issue you brought to our attention, we researched our files and found that the house you are currently occupying was constructed under the HIP in 1967. The issue is addressed in a memorandum from the Agency Realty Officer to the Area Realty Officer, dated August 12, 1971, which states, "The 20' x 24' house was constructed in 1967 at a cost of $8,500.00 and the septic tank, installed by Phoenix Health Service, would cost about $1,500.00." We contacted the Indian Health Service, California Area Office, here in Sacramento, and inquired whether they will be able to provide maintenance services to you. We obtained their commitment to perform the work within the next couple of months. We will work with you to ensure that the work is completed in an appropriate manner.

**Access to Rancheria:** We discussed the notion that the driveway leading up to the Sheep Ranch Rancheria was not within the Rancheria. We agreed to look into the ownership of the driveway. Please find enclosed an Assessor's Parcel Map of a portion of the Sheep Ranch Townsite. This map shows a number of "paper" roads that do not exist today. We are currently researching the ownership of the paper roads to determine what rights the Tribe may have to assert a use right to the driveway.

**Next Meeting:** We agreed that another meeting was necessary to discuss the draft resolutions and additional details of the organization process. We propose that we meet on Friday, October 2, 1998, at 11:00 a.m., to be held at your residence in Sheep Ranch, California.

I thank you for your concern and positive participation in the organization process. I am certain that if we continue to work together, the organization process will be completed without undue delay. Toward this end, I extend the assistance of my staff, upon your written request.

Sincerely,

Dale Risling, Sr.
Superintendent

# EXHIBIT 6

RESOLUTION #GC-98-01

## ESTABLISHING A GENERAL COUNCIL TO SERVE AS THE GOVERNING BODY OF THE SHEEP RANCH BAND OF ME-WUK INDIANS

**WHEREAS,** The Sheep Ranch Band of Me-Wuk Indians of the Sheep Ranch Rancheria of California ("the Tribe") was not terminated pursuant to the provisions of the Act of August 18, 1958, P.L. 85-671, 72 Stat. 619, as amended by the Act of August 11, 1964, P.L. 88-419, 78 Stat/ 390 ("the Rancheria Act"), and is a federally recognized Indian Tribe as confirmed by the inclusion of the Tribe in the list of Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, as published in the Federal Register on October 23, 1997.

**WHEREAS,** The plan of Distribution of the Assets of the Sheep Ranch Rancheria, approved by the Associate Commissioner of Indian Affairs on October 12, 1966, identified Mabel (Hodge) Dixie as the sole distributee entitled to participate in the distribution of the assets of the Sheep Ranch Rancheria;

**WHEREAS,** The Bureau of Indian Affairs did not completely implement the steps necessary to effect the termination of the Tribe prior to the passing of Mabel (Hodge) Dixie;

**WHEREAS,** The estate of Mabel (Hodge) Dixie was probated and Order of Determination of Heirs was issued on October 1, 1971, listing the following persons as possessing a certain undivided interest in the Sheep Ranch Rancheria:

| | |
|---|---|
| Merle Butler, husband | Undivided 1/3 interest |
| Richard Dixie, son | Undivided 1/6 interest |
| Yakima Dixie, son | Undivided 1/6 interest |
| Melvin Dixie, son | Undivided 1/6 interest |
| Tommy Dixie, son | Undivided 1/6 interest |

and this Order was reaffirmed by another Order issued on April 14, 1993;

**WHEREAS,** The surviving heirs are believed to be Yakima and Melvin Dixie, as the other heirs are or are believed to be deceased, and their heirs are in the process of requesting the estates of the deceased heirs be probated, and it is believed that the deceased heirs had no issue;

**WHEREAS,** The whereabouts of Melvin Dixie are unknown;

**WHEREAS,** The membership of the Tribe currently consists of at least the following individuals; Yakima Dixie, Silvia Fawn Burley, Rashel Kawehilani Reznor, Anjelica Josett Paulk, and Tristian Shawnee Wallace; this membership may change in the future consistent with the Tribe's ratified constitution and any duly

enacted Tribal membership statutes.

**WHEREAS,** The Tribe, on June 12, 1935, voted to accept the terms of the Indian Reorganization Act (P.L. 73-383; 48 Stat. 984) but never formally organized pursuant to federal statute, and now desires to pursue the formal organization of the Tribe; now, therefore, be it

**RESOLVED,** That Yakima Dixie, Silvia Fawn Burley, and Rashel Kawehilani Reznor, as a majority of the adult members of the Tribe, hereby establishes a General Council to serve as the governing body of the Tribe;

**RESOLVED,** That the General Council shall consist of all members of the Tribe who are at least eighteen years of age, and each member shall have one vote;

**RESOLVED,** That the General Council shall have the following specific powers to exercise in the best interest of the Tribe and its members:

(a) To consult, negotiate, contract, or conclude agreements with the Bureau of Indian Affairs, for the purpose of furthering the development and adoption of a Constitution;

(b) To administer assets received from such agreements specified in (a) above, including the power to establish bank accounts and designate signers thereupon;

(c) To administer the day-to-day affairs related to such agreements specified in (a) above;

(d) To develop and adopt policies and procedures regarding personnel, financial management, procurement and property management, and other such policies and procedures necessary to comply with all laws, regulations, rules, and policies related to funding received from such agreements specified in (a) above;

(e) To employ legal counsel for the purpose of assisting in the development of the Constitution and the policies and procedures specified in (d) above, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior or his authorized representative;

(f) To receive advice from and make recommendations to the Secretary of the Interior with regard to all appropriation estimates or federal projects for the benefit of the Tribe prior to the submission of such estimates to the Office of Management and Budget and to Congress;

(g) To faithfully advise the General Council of all activities provided for in this resolution at each regularly scheduled meeting of the General Council;

(h) To purchase real property and put such real property into trust with the United States government for the benefit of the Tribe;

**RESOLVED,** That all other inherent rights and powers not specifically listed herein shall vest in the General Council, provided that the General Council may specifically list such other rights and powers through subsequent resolution of the General Council;

**RESOLVED,** That the General Council shall appoint from among its members a Chairperson, who shall preside over all meetings of the General Council and rights and powers through



subsequent resolutions of the General Council, provided that in the absence of the Chairperson, a Chairperson Pro Tem shall be appointed from members convening the meeting;

**RESOLVED,** That the Chairperson shall notice and convene regular meetings of the General Council on the second Saturday of each month following the adoption of this resolution, provided that special meetings of the General Council may be called by the Chairperson upon providing a least fifteen (15) days notice stating the purpose of the meeting;

**RESOLVED,** That the Chairperson shall call a special meeting of the General Council, within thirty (30) days of receipt of a petition stating the purpose of the meeting, signed by at least fifty-one percent (51%) of the General Council, and the Chairperson shall provide at least fifteen (15) days notice stating the purpose of the meeting, provided that at such meeting, it shall be the first duty of the General Council to determine the validity of the petition;

**RESOLVED,** That the General Council shall elect from among its members a Secretary/Treasurer, who shall record the minutes of all General Council meetings, maintain the official records of the Tribe, certify the enactment of all resolutions, and disburse all funds as ordered by the General Council;

**RESOLVED,** That the quorum requirement for meetings of the General Council shall be conducted pursuant to Robert's Rules of Order;

**RESOLVED,** That the General Council shall exist until a Constitution is formally adopted by the Tribe and approved by the Secretary of the Interior or his authorized representative, unless this resolution is rescinded through subsequent resolution of the General Council.

### CERTIFICATION

We, the undersigned as a majority of the adult members of the General Council of the Sheep Ranch Band of Me-Wuk Indians of the Sheep Ranch Rancheria of California ("the Tribe"), do hereby certify that at a duly noticed, called, and convened special meeting of the General Council held on _THursday_, in Sheep Ranch, California, where a quorum was present, this resolution was adopted by a vote of _2_ in favor, _0_ opposed, and _0_ abstaining. We further certify that this resolution has not been rescinded, amended, or modified in any way.

Dated this _5_ day of _November_, 1998:

_Yakima Dixie_
Yakima Dixie

_Silvia Burley_
Silvia Burley

_____
Rashel Reznor

# EXHIBIT 7



# United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

IN REPLY REFER TO

NOV 2 4 2003

To Whom It May Concern:

As of this date, the Bureau of Indian Affairs maintains a government to government relationship with the California Band of Miwok Indians through the tribal council chaired by Ms. Sylvia Burley.

If you any questions in this matter, please contact Raymond Fry, Division Manager, Tribal Services, at (916) 930-3794.

Sincerely,

Dale Risling, Sr.
Superintendent

# EXHIBIT 8

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO - CENTRAL DISTRICT

--oOo--

CALIFORNIA VALLEY MIWOK TRIBE,           )

                  Plaintiff,           )

vs.                                      )   Case No.

CALIFORNIA GAMBLING CONTROL              )   37-2008-00075326-

COMMISSION,                              )   CU-CO-CTL

                  Defendant.           )

                            )   VOLUME II


Continued Deposition of

YAKIMA KENNETH DIXIE

February 7, 2012

--oOo--

Reported by:            MARY BARDELLINI, CSR No. 2976

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 124

| 1 | APPEARANCES |
| 2 | |
| 3 | For the Plaintiff: |
| | LAW OFFICE OF MANUEL CORRALES, JR. |
| 4 | By:  MANUEL CORRALES, JR. |
| 5 | Attorney at Law |
| 6 | 11753 Avenida Sivrita |
| 7 | San Diego, California 92128 |
| 8 | (858)521-0634; Fax (858)521-0633 |
| 9 | mannycorrales@yahoo.com |
| 10 | |
| 11 | SINGLETON & ASSOCIATES |
| 12 | By:  TERRY SINGLETON |
| 13 | Attorney at Law |
| 14 | 1950 Fifth Avenue, Suite 200 |
| 15 | San Diego, California 92101 |
| 16 | (619)239-3225; Fax (619)702-5592 |
| 17 | terry@terrysingleton.com |

Page 125

| 1 | For the Defendant: |
| 2 | STATE OF CALIFORNIA |
| 3 | DEPARTMENT OF JUSTICE |
| 4 | OFFICE OF THE ATTORNEY GENERAL |
| 5 | By:  NEIL D. HOUSTON |
| 6 | Deputy Attorney General |
| 7 | 1300 I Street |
| 8 | Sacramento, California 95814 |
| 9 | (916)322-5476; Fax (916)327-2319 |
| 10 | neil.houston@doj.ca.gov |
| 11 | |
| 12 | |
| 13 | For the Witness: |
| 14 | SHEPPARD MULLIN RICHTER & HAMPTON, LLP |
| 15 | By:  MATTHEW S. MCCONNELL |
| 16 | JAMES RUSK |
| 17 | Attorneys at Law |
| 18 | 12275 El Camino Real, Suite 200 |
| 19 | San Diego, California 92130-2006 |
| 20 | (858)720-8928; Fax (858)509-3691 |
| 21 | mmcconnell@sheppardmullin.com |
| 22 | jrusk@sheppardmullin.com |

Page 126

| 1 | Videographer: |
| 2 | JORDAN MEDIA, INCORPORATED |
| 3 | By:  TERI WEESNER |
| 4 | 1228 Madison Avenue |
| 5 | San Diego, California 92116 |
| 6 | |
| 7 | |
| 8 | Also Present: |
| 9 | Silvia Burley |
| 10 | Tiger Paulk |
| 11 | Michael Mendibles |

Page 127

| 1 | INDEX OF EXAMINATION |
| 2 | Page |
| 3 | By Mr. Corrales        132, 203 |
| 4 | By Mr. McConnell       200, 217 |
| 5 | |
| 6 | |
| 7 | --oOo-- |

Deposition of Yakima Kenneth Dixie, Volume II  CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 128

INDEX OF EXHIBITS

Plaintiff's

Exhibit        Description              Page

32  Letter dated July 7, 1999, to Bureau of        167
    Indian Affairs Superintendent from Mary T.
    Wynne, 2 pages

33  Sheep Ranch Tribe of Me-Wuk Indians, Formal   170
    Notice of Resignation, Yakima K. Dixie,
    April 20, 1999, 1 page

34  General Council Governing Body of the Sheep    172
    Ranch Tribe of Me-Wuk Indians, Special
    Meeting, 20 April 1999, 1 page

35  General Council Meeting Certification of       172
    Notice, 5-8-99, 1 page

36  Development Agreement, 30 April 1999, 17       173
    pages

37  Letter dated Mar 7, 2000, to Silvia Burley     177
    from Dale Risling, Sr., CMVT 01561 through
    01566

38  Report of Probation Officer, Yakima Kenneth    185
    Dixie, 86 through 96

--oOo--

Page 129

INDEX OF QUESTIONS INSTRUCTED NOT TO ANSWER

        Page  Line
        139   17
        139   23
        155   10
        164   18
        166   22
        168   10
        168   24
        169   7
        169   12
        186   10

Page 130

BE IT REMEMBERED that, pursuant to Notice of
Taking Deposition, on Tuesday, the 7th day of February,
2012, commencing at the hour of 3:15 p.m., at the
Offices of CALIFORNIA ATTORNEY GENERAL, 1300 I Street,
Sacramento, California, before me, Mary Bardellini, a
Certified Shorthand Reporter in and for the State of
California, personally appeared

            YAKIMA KENNETH DIXIE,

called as a witness by the Plaintiff herein, pursuant to
all applicable sections of the Code of Civil Procedure
of the State of California, and, who, being by the
Certified Shorthand Reporter first duly and regularly
sworn to tell the truth, the whole truth, and nothing
but the truth, was examined and testified as follows:

    THE VIDEOGRAPHER:  We are on the record.  This
is the digital video deposition of Yakima Dixie,
testifying in the matter of California Valley Miwok
Tribe versus the California Gambling Control Commission,
et al., in the Superior Court of the State of
California, County of San Diego, Central Branch, Case
Number 37-2008-00075326-CU-CO-CTL.

    This deposition is being held at 1300 I Street,
15th Floor, Sacramento, California.

    Today is February 7th, 2012.  The time is 3:15.
My name is Teri Weesner, Legal Video Specialist with

Page 131

Jordan Media, Incorporated, at 1228 Madison Avenue in
San Diego, California.

    The certified shorthand reporter today is Mary
Bardellini in association with Kramm Court Reporting,
San Diego, California.

    Would counsel please state their appearances
for the record.

    MR. CORRALES:  Yes.  My name is Manuel
Corrales.  I represent plaintiff, California Valley
Miwok Tribe.

    MR. McCONNELL:  Matthew McConnell on behalf of
intervenors.

    MR. RUSK:  James Rusk also on behalf of
intervenors.

    THE VIDEOGRAPHER:  Would you please swear the
witness.

    (Whereupon the witness was sworn to tell the
    truth and testified as follows.)

    MR. McCONNELL:  Before we start, I'm going to
lodge an objection to the presence of Tiger Paulk.  The
Court's order regarding Mr. Dixie's deposition was
clear; it was limited to counsel and parties only.  That
was directly in response to the arguments raised by
intervenors that Mr. Paulk's presence at the last
deposition was harassing.

Page 132

1    I have asked counsel, Mr. Corrales, to -- about
2  not having Mr. Paulk present, and he has refused to do
3  so.
4        MR. CORRALES: Okay. Counsel's statement is
5  incorrect. Mr. Paulk is here under my direction as my
6  paralegal. And let's proceed.
7        CONTINUED EXAMINATION
8  BY MR. CORRALES:
9    Q. Could you please give us your full name, sir.
10 Your full name, could you give us your full name?
11       MR. McCONNELL: Asked and answered.
12       THE WITNESS: Yakima Kenneth Dixie.
13 BY MR. CORRALES:
14   Q. Mr. Dixie, are you -- are you under the
15 influence of alcohol?
16   A. No.
17   Q. Are you taking any form of medication that
18 would make it hard for you to answer the questions
19 today?
20   A. I take epileptic seizure medication.
21   Q. Are you taking that today?
22   A. No.
23   Q. Okay. Is there any reason why we can't have
24 your deposition today?
25   A. No.

Page 133

1    Q. Mr. Dixie, I'm going to be asking you questions
2  slowly because I want you to understand my questions.
3  Okay? Okay?
4    A. Okay. But, first, before we get started, who
5  are you?
6    Q. My name is Manuel Corrales. I'm an attorney.
7  I represent the plaintiff in this case, the California
8  Valley Miwok Tribe. I took your deposition last time in
9  San Andreas. Do you remember me?
10   A. I remember your face, I mean, but I didn't
11 remember your name.
12   Q. Okay. All right. We're here to answer
13 questions that you refused to answer on Fifth Amendment.
14 Do you remember that?
15   A. Don't I have that right? Isn't that my right?
16   Q. Not today, sir. We had a hearing, and the
17 judge has ordered you to answer the questions, and so
18 we're here to ask you those questions. Do you
19 understand that, sir?
20   A. You say -- you just stated that a judge ordered
21 it?
22   Q. Yes. We went to Court, and the judge ordered
23 you to answer these questions and said that you have no
24 Fifth Amendment right to refuse. Do you understand
25 that, sir?

Page 134

1    A. But that is my right.
2    Q. The judge said that you don't have that right,
3  and that's why we're here.
4    A. So therefore with that, the way you put it, I'm
5  going to refuse to answer any questions here.
6    Q. You're going to refuse to answer any questions
7  that I ask of you today?
8    A. True.
9    Q. Why is that, sir? Why would you refuse to
10 answer my questions?
11       Let the record reflect that Mr. Dixie is not
12 responding to my questions.
13       Mr. Dixie, is your silence an indication that
14 you have now refused to answer any of my questions?
15   A. Very true.
16   Q. Okay. So if I were to ask you a questions that
17 the judge ordered you to answer, you would refuse to
18 answer any of those questions?
19       MR. McCONNELL: I'm just going --
20       THE WITNESS: Let me ask you.
21       MR. McCONNELL: Hold on. We'll talk in a
22 minute. I'll object. This entire line of questions is
23 not what we're here to do. We're here to go through the
24 19 questions that were compelled. This preceding
25 monologue by you is improper and inappropriate.

Page 135

1    We'll take a break, and I will talk to my
2  client. He clearly doesn't understand because you're
3  talking about court orders and so forth and so on.
4        MR. CORRALES: Clearly, Counsel, you need to
5  talk to your client because that's why we're here. The
6  judge has ordered him to answer these questions, so you
7  might want to talk to him.
8        We'll take a break, and he can explain that to
9  you.
10       THE VIDEOGRAPHER: We're off the record at
11 3:20.
12       (Recess taken.)
13       THE VIDEOGRAPHER: We're back on the record at
14 3:24.
15       MR. HOUSTON: Also appearing, Neil Houston,
16 Deputy Attorney General, appearing for California
17 Gambling Control Commission.
18 BY MR. CORRALES:
19   Q. Okay. Mr. Dixie, you've had an opportunity
20 to -- by the way, Mr. Dixie, we're having -- I'm having
21 some difficulty -- could you remove your hat, please, so
22 we can see your face.
23   A. Anything else?
24   Q. No, sir. Are you ready to proceed, or are you
25 upset? Do you want to take a couple of minutes? Are

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 136

1 you okay?
2 **A. I'm ready. Go ahead.**
3 Q. Okay. Mr. Dixie, I'm going to ask you some
4 questions concerning the questions that we asked you
5 last time that you declined to answer. So let's
6 proceed. Are you ready, sir?
7 **A. Proceed.**
8 Q. Okay. Last time I asked you about Mr. Chadd
9 Everone. Do you remember that?
10    MR. McCONNELL: Objection. Let's ask the 19
11 questions.
12 BY MR. CORRALES:
13 Q. Do you remember that, sir, I asked you about
14 Mr. Everone? Do you remember that?
15    MR. McCONNELL: This is beyond the scope.
16    THE WITNESS: No, I don't.
17 BY MR. CORRALES:
18 Q. You don't?
19 **A. No.**
20 Q. Last time I asked you questions about Chadd
21 Everone, and I'm going to ask you a question about your
22 understanding of his role.
23    What do you understand his title deputy to be?
24 **A. I don't know.**
25 Q. Have you ever had a conversation with Mr.

Page 137

1 Everone about his title as deputy?
2 **A. Not to my knowledge, no.**
3 Q. What did Mr. Everone tell you about his title,
4 his work for you?
5    MR. McCONNELL: Objection. It's compound. Can
6 you please rephrase.
7    THE WITNESS: Does that have something to do
8 with this thing?
9 BY MR. CORRALES:
10 Q. Yes. What did he tell you about the work that
11 he was doing for you?
12    MR. McCONNELL: It's been asked and answered.
13    THE WITNESS: I don't remember.
14 BY MR. CORRALES:
15 Q. When I showed you last time a document that had
16 his title as deputy -- this is Exhibit Number 29. I'll
17 show that to you, sir. This is your deposition.
18 Exhibit Number 29, we talked about that, and you signed
19 it. And it's an appointment for Mr. Everone to be your
20 deputy. Do you see that, sir?
21    MR. McCONNELL: It's been asked and answered.
22 You can answer it again.
23    THE WITNESS: I don't remember. I don't know
24 even if that's my signature.
25 BY MR. CORRALES:

Page 138

1 Q. You doubt that's your signature? Is that a
2 yes?
3 **A. Hum?**
4 Q. Is that a yes, you doubt that that's your
5 signature?
6 **A. I don't know if it's mine or not, if I signed**
7 **that or not.**
8 Q. The document says that you are appointing Mr.
9 Everone as your deputy. Do you remember doing that?
10 **A. Not that I can recall. Only thing I got him**
11 **for is like an attorney, tribal attorney.**
12 Q. So you believe him to be the tribal attorney?
13    MR. McCONNELL: Asked and answered.
14    THE WITNESS: Uh-huh.
15 BY MR. CORRALES:
16 Q. Did Mr. Everone ever tell you that he was your
17 deputy and not your attorney?
18 **A. Not that I know of.**
19 Q. The document -- let me see the transcript
20 there, sir. Thank you.
21    The document says that Mr. Everone is appointed
22 as deputy for myself, meaning you, and the tribe. Did
23 you understand that Mr. Everone was the deputy for the
24 tribe as well?
25    MR. McCONNELL: Objection. Goes beyond the

Page 139

1 scope of Question Number 1.
2 BY MR. CORRALES:
3 Q. Your answer?
4 **A. I don't recollect.**
5 Q. Okay. The document says: He is authorized to
6 receive, discuss, and communicate all information to
7 which I would be entitled. Have you ever heard of that
8 before, sir?
9 **A. But he come to every tribal meeting we have.**
10 **He brings me what he gets from the Bureau of Indian**
11 **Affairs and other little things.**
12 Q. What do you consider him to be in relation to
13 you and the tribe?
14    MR. McCONNELL: Asked and answered.
15    THE WITNESS: He's our tribal attorney.
16 BY MR. CORRALES:
17 Q. Okay. Do you have other tribal attorneys
18 besides him?
19    MR. McCONNELL: Objection. And I'm instructing
20 you not to answer. It's beyond the scope of Question
21 Number 1.
22 BY MR. CORRALES:
23 Q. Is Mr. Everone the only attorney that you
24 understand the tribe has, that you have?
25    MR. McCONNELL: Objection. It's beyond the

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 140

1  scope of Question Number 1, and I instruct you not to
2  answer.
3  BY MR. CORRALES:
4      Q.  When you say that Mr. Everone is your attorney
5  and not your deputy, do you view him as -- do you view
6  the term deputy as the same thing as an attorney?
7      MR. McCONNELL:  It's compound, vague.  Calls
8  for a legal conclusion.  You can answer.
9      THE WITNESS:  I wish he could be in here, and
10 he could answer that question himself.  I mean ...
11 BY MR. CORRALES:
12     Q.  We'll ask him questions about this later on.
13 I'm asking you now.  Do you view him as your attorney as
14 the same as the title deputy?
15     A.  At this time I'm going to refuse --
16     MR. McCONNELL:  No, just answer.
17     THE WITNESS:  -- to answer that question.
18     MR. McCONNELL:  Just answer the question as
19 best as you can.  Just answer the questions.
20 BY MR. CORRALES:
21     Q.  Your attorney has told you you should answer
22 the question, so can I get an answer to my question.
23     Do you view his role that you perceive to be
24 your attorney as the same as the title deputy?
25     MR. McCONNELL:  Compound.  Vague.  Calls for a

Page 141

1  legal conclusion.
2      THE WITNESS:  Yeah, uh-huh, he's both.
3  BY MR. CORRALES:
4      Q.  All right.  So when you say he's both your
5  attorney and your deputy, have you used that term
6  interchangeably when you speak about him?
7      MR. McCONNELL:  Vague.  Overbroad.
8      THE WITNESS:  I'm not too sure.
9  BY MR. CORRALES:
10     Q.  Sometimes you say he's my deputy, sometimes
11 he's my attorney, meaning the same thing?
12     MR. McCONNELL:  Same objections.
13     THE WITNESS:  I still call him my attorney,
14 tribal attorney.
15 BY MR. CORRALES:
16     Q.  Have you ever referred to him as your deputy,
17 meaning that he's your attorney?
18     MR. McCONNELL:  Compound.  It's vague.
19     THE WITNESS:  I don't recollect that at this
20 time.
21 BY MR. CORRALES:
22     Q.  Okay.  Let's go to Question Number 2.  I think
23 we answered that question.  You've answered the
24 question, but I want some clarification.  Question
25 Number 2, do you understand what Mr. Everone's role is

Page 142

1  with the tribe?  You mentioned a couple of things.  He's
2  your attorney, but what do you understand his role is
3  with the tribe, what does he do?
4      A.  He's our tribal attorney.
5      Q.  What does he do as your tribal attorney?
6      A.  He does a lot of things.
7      Q.  Give me some examples of what he does, sir.
8      MR. McCONNELL:  Calls for speculation.  You can
9  answer.
10     THE WITNESS:  With that question you asked me,
11 I'm going to have my attorneys answer that for me.
12 Okay?
13 BY MR. CORRALES:
14     Q.  I don't think he can, sir.  He's not a witness.
15     MR. McCONNELL:  Yakima, just --
16 BY MR. CORRALES:
17     Q.  Tell me what you believe Mr. Everone does.
18     MR. McCONNELL:  For the tribe.
19     THE WITNESS:  I'll refuse to answer that on the
20 ground that I may incriminate myself.
21     MR. McCONNELL:  Yakima, just answer the
22 question.  Listen to the question and give the best
23 answer you can.  It's okay.
24 BY MR. CORRALES:
25     Q.  Based upon what your attorney just told you,

Page 143

1  could you answer the question.
2      MR. McCONNELL:  Could we have it read back.
3      MR. CORRALES:  I'll rephrase the question.
4  BY MR. CORRALES:
5      Q.  What do you understand Mr. Everone's role is?
6  What does he do for the tribe?
7      A.  Again, I'm going to refuse to answer that
8  question on the grounds it may incriminate me.
9      MR. McCONNELL:  Yakima, just listen to the
10 question and go ahead and give your best answer.  You
11 don't need to take the Fifth Amendment.  Just give him
12 the best answer you can from what you know.
13 BY MR. CORRALES:
14     Q.  Based upon what your attorney has told you, can
15 you answer the question, sir?
16     A.  The question on that one, I don't know.
17     Q.  What has Mr. Everone done for the tribe?
18     MR. McCONNELL:  Lacks foundation and calls for
19 speculation, but can you answer if you know.
20     THE WITNESS:  He has done a lot.  I mean,
21 he's done a lot of legal work for us.  And with that,
22 that's all I'm going to answer that question.
23 BY MR. CORRALES:
24     Q.  So you decline to answer any more about that
25 question?

Page 144

1  A. Anything concerning him.

2  Q. Mr. Dixie, the Court has ordered you to answer

3 questions concerning Mr. Everone's role with the tribe.

4 You gave me an example of him --

5  A. This guy's my attorney. When he says the Court

6 ordered him -- ordered me to answer these questions, is

7 that on a piece of paper?

8  MR. McCONNELL: It is. We're here to answer

9 these 19 questions and any reasonable follow-up. So

10 that's why you just need to listen to the questions and

11 answer to the best of your ability. You don't need

12 to -- just from what you know, go ahead and answer the

13 question. You answered it in part. So if you know more

14 about Mr. Everone's role, then go ahead and give that

15 answer.

16  THE WITNESS: Okay. Continue.

17 BY MR. CORRALES:

18  Q. Yes. What has Mr. Everone done for the tribe?

19  MR. McCONNELL: Other than legal work, as you

20 mentioned.

21  THE WITNESS: He had done a lot of legal work

22 for us.

23 BY MR. CORRALES:

24  Q. Yes, you told us that. Give us some specifics

25 as to the kind of legal work he's done.

Page 145

1  A. Well, I'm not going to go into detail. I'll

2 just put it that way. A lot of legal work that helped

3 our tribe.

4  Q. Give me an example of the kind of legal work

5 he's done for the tribe.

6  A. What did I say just a second ago?

7  Q. I heard you, sir. I'd like to have you tell me

8 what kind of legal work he's done for the tribe.

9  A. I don't believe I should answer that. I don't

10 want to incriminate myself, so therefore ...

11  MR. McCONNELL: Yakima, do you know of any

12 particular legal work that Mr. Everone has done for the

13 tribe?

14  THE WITNESS: Yeah, like the money situation.

15 BY MR. CORRALES:

16  Q. Money situation, what do you mean by that?

17  A. And then he stopped all the money from going to

18 different places where they don't supposed to go.

19  Q. What else?

20  A. That's about all.

21  Q. Okay. When you say the money situation, what

22 do you mean by that?

23  A. Well, we got -- right now I think we got, what,

24 1,800,000 I think it is at the Bureau of Indian Affairs

25 office.

Page 146

1  Q. What about that? When you say we have, what do

2 you mean by that?

3  A. And that come from the casinos that they put

4 money into it.

5  Q. Are you talking about the Revenue Sharing Trust

6 Fund money that's --

7  A. Yeah.

8  Q. That's close to $8 million. You said

9 1,800,000. Did you mean 8 million?

10  A. We've got a pretty good-sized chunk there.

11  Q. And when you said money situation, you're

12 referring to the Revenue Sharing Trust Fund money with

13 the Commission when you said that statement?

14  A. The Bureau of Indian Affairs.

15  Q. Do you understand the difference between the

16 Bureau of Indian Affairs and the California Gambling

17 Control Commission?

18  A. Yeah. I believe that they work together, and

19 they give money, and it's just setting there.

20  Q. And when you said money situation, you're

21 understand it, money with the State Commission; is that

22 fair?

23  A. Yeah. And the state puts money in it, too, so

24 we got, what, the last time was 1 million something.

25  Q. Okay. All right. And so when you say he does

Page 147

1 legal work with the money situation, that involves the

2 Commission's holding that money. What kind of things

3 did he do with that?

4  MR. McCONNELL: Lacks foundation. Calls for

5 speculation, but you can answer if you know.

6  THE WITNESS: Hum?

7  MR. McCONNELL: You can answer if you know. If

8 you have an answer, go ahead.

9  THE WITNESS: Yeah, would you repeat again.

10 BY MR. CORRALES:

11  Q. Yeah. When you say he deals with the money

12 situation, and based upon your follow-up answers with

13 respect to the Commission, the money that's being held

14 with the Commission, what specific things did he do?

15  MR. McCONNELL: Same objections, but you can --

16  THE WITNESS: He does a lot of legal work for

17 me.

18 BY MR. CORRALES:

19  Q. Yeah. Did he contact the Commission about

20 stopping the money?

21  MR. McCONNELL: Same objections.

22  THE WITNESS: I'm going to stand on the Fifth

23 on that one.

24 BY MR. CORRALES:

25  Q. Okay.

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 148

1    MR. McCONNELL: Yakima, just go ahead and
2 answer. If you know, give him an answer. If you don't
3 know, just say so. You don't need to use the Fifth
4 Amendment. Just give him your best honest answer, the
5 best you can recall.
6 BY MR. CORRALES:
7    Q. So the record is clear, Mr. Dixie, the Court
8 has already ruled on your Fifth Amendment assertions and
9 said you don't have a Fifth Amendment, so you have to
10 answer the questions.
11    A. Hum, I don't have to answer anything.
12    Q. The Court has ordered you to answer the
13 questions, sir, and has said that you do not have a
14 Fifth Amendment --
15    A. I didn't see anything on a documentation where
16 I have to.
17    MR. McCONNELL: Yakima, just give him the best
18 answer you can based on what you know. That's all you
19 have to do. So just listen to the question, and if you
20 know an answer, then it's okay to say it.
21    So let's have that question back, please.
22    MR. CORRALES: I'll rephrase the question.
23 BY MR. CORRALES:
24    Q. What specifically did Mr. Everone do in
25 communicating, if at all, with the Commission?

Page 149

1    MR. McCONNELL: Lacks foundation. Calls for
2 speculation. You can answer if you know.
3    THE WITNESS: He does a lot of legal work for
4 me.
5 BY MR. CORRALES:
6    Q. You said that. Did Mr. Everone contact the
7 Commission to tell them to stop payments?
8    A. Not that I know of.
9    Q. What did he do about this money situation that
10 you're referring to as it has to do with legal work for
11 you?
12    MR. McCONNELL: Calls for speculation and lacks
13 foundation, but you can answer if you know.
14    THE WITNESS: At the time, I don't know. I
15 mean ...
16 BY MR. CORRALES:
17    Q. So you don't know of any examples right now as
18 relates to the money situation you mentioned that he did
19 for you?
20    MR. McCONNELL: Other than what he's testified
21 to?
22    THE WITNESS: Well, why is this money situation
23 keeps coming up?
24 BY MR. CORRALES:
25    Q. You mentioned it, sir. I asked you what kind

Page 150

1 of legal work he does for you. You said money
2 situation, and he stops money from going to different
3 places. So I'm focusing right now on the statement that
4 you made that he does something with money situation,
5 and I'm trying to figure out what you mean by that
6 specifically.
7    What kinds of things did he do for you that had
8 to do with the money situation that you mentioned?
9    A. Umm, he had nothing to do with the money
10 situation.
11    Q. So, okay. You said that he stops money from
12 going different places. What did you mean by that?
13    A. Well, if I -- there was a lot of money taking
14 out of the Bureau of Indian affairs, millions. I'm not
15 talking about hundreds. I'm talking about millions.
16 And where did it all go?
17    Q. Anything else that he does --
18    A. I got a check.
19    Q. Yes.
20    A. But I refuse to sign it, refused to cash it.
21    Q. What check is that, sir?
22    A. But I don't remember the amount and stuff on
23 it.
24    Q. What was it for?
25    A. Umm -- ask these two guys right there.

Page 151

1    Q. I'm asking you, sir, what was the check for?
2    A. Ask those two guys right there. They know.
3    MR. McCONNELL: Just go ahead, if you have an
4 answer, then go ahead and give it. Do you remember what
5 the check was for?
6    THE WITNESS: No, I don't.
7 BY MR. CORRALES:
8    Q. Okay. So have you told us everything that you
9 meant by when you said that Mr. Everone stops money from
10 going different places?
11    A. I don't recollect -- it was either him or Tom
12 Wolfrum, the other tribal attorney.
13    Q. Either him or Mr. Wolfrum doing what, sir?
14    A. Put a stop on that money from going -- being
15 given out.
16    Q. Talking about putting the stop on the Revenue
17 Sharing Trust Fund money going to the California Valley
18 Miwok Tribe?
19    A. Is there a California Valley Miwok Tribe?
20    Q. Yes.
21    A. And who are they?
22    Q. I'm talking about the plaintiff in this case,
23 the California Valley Miwok Tribe, formerly known as the
24 Sheep Ranch Rancheria. Did Mr. Wolfrum or Mr. Everone
25 ever stop money going to that tribe?

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 152

1    A. You use that word pretty frequently about
2 formally. There ain't no formally. There's only one
3 Sheep Ranch, Indian Rancheria.
4    Q. Okay. Now, going back to my question. What
5 did you understand Mr. Wolfrum or Mr. Everone to be
6 stopping money for or on behalf of?
7        MR. McCONNELL: Compound. It's vague. You can
8 answer.
9        THE WITNESS: Again, I'm going to stand on the
10 Fifth Amendment.
11        MR. McCONNELL: Just go ahead and listen to
12 that question again and go ahead and give your best
13 answer. He's just asking you about who you believed the
14 money was being stopped – being sent to. Who was the
15 money going to that either Mr. Everone or Mr. Wolfrum
16 stopped, stopped that money going to? Who was it going
17 to?
18        THE WITNESS: It didn't go to nobody. It's
19 still over there.
20        MR. McCONNELL: Before it got stopped, who was
21 the money going to?
22        THE WITNESS: I don't know.
23 BY MR. CORRALES:
24    Q. Who did you understand, sir, that the money Mr.
25 Wolfrum or Mr. Everone was stopping was supposed to be

Page 153

1 going to?
2    A. I don't know.
3    Q. Okay. So when you make reference to either Mr.
4 Everone or Mr. Wolfrum stopping the money, what money
5 are you referring to?
6        MR. McCONNELL: It's asked and answered.
7        THE WITNESS: The Bureau of Indian Affairs,
8 Bureau of Indian Affairs.
9 BY MR. CORRALES:
10    Q. The BIA. Okay. Okay. Anything else that you
11 understand Mr. Everone's role to be, the things that
12 he's done for the tribe?
13    A. He's my tribal attorney.
14    Q. I'm looking for specifics, things he's done for
15 the tribe.
16        MR. McCONNELL: Other than what you've already
17 testified to, is there anything else?
18        THE WITNESS: Hum?
19        MR. McCONNELL: Other than what you've already
20 been talking about, is there anything else?
21        THE WITNESS: No.
22 BY MR. CORRALES:
23    Q. Okay. Now, did you understand that Mr. -- Mr.
24 Everone was helping you to claim that you were cheated
25 out of your chairmanship of the tribe?

Page 154

1        MR. McCONNELL: Objection. What question are
2 we on?
3        MR. CORRALES: We're still on Number 2.
4        MR. McCONNELL: Okay. That has nothing to do
5 with Question Number 2.
6 BY MR. CORRALES:
7    Q. Did you understand that, sir?
8        MR. McCONNELL: Can I hear that question back,
9 please.
10        (Record read by the Reporter.)
11        MR. McCONNELL: You've asked and answered ad
12 nauseam what Mr. Everone's role with the tribe is.
13 BY MR. CORRALES:
14    Q. Your answer, sir? Was that one of the things
15 that he did for you?
16    A. Again, I'm going to stand on the Fifth
17 Amendment. I don't want to mess everything up here.
18        MR. McCONNELL: Yakima, just listen to the
19 question, and if you have an answer, then go ahead and
20 give your best answer.
21        Would you read that back again.
22        THE WITNESS: I don't remember.
23 BY MR. CORRALES:
24    Q. Okay. You don't remember Mr. Everone helping
25 you to get back your chairmanship of the tribe?

Page 155

1        MR. McCONNELL: Misstates the evidence.
2        MR. CORRALES: Right.
3        MR. McCONNELL: Lacks foundation.
4 BY MR. CORRALES:
5    Q. Your answer?
6        MR. McCONNELL: It's been asked and answered.
7        THE WITNESS: I never did lose it. How can
8 they get something back for me when I didn't lose it.
9 BY MR. CORRALES:
10    Q. Was one of the things that you hired or asked
11 Mr. Everone to help you with, was one of the things to
12 get back your chairmanship of the tribe?
13        MR. McCONNELL: He just answered that question,
14 and this is no longer --
15        MR. CORRALES: You can answer the question,
16 sir.
17        MR. McCONNELL: I'm going to make my objection,
18 and you're not going to cut me off. My objections are
19 that this has been asked and answered. And this is well
20 beyond the scope of any reasonable follow-up to Question
21 Number 2, which is: Do you understand what Mr.
22 Everone's role is with the tribe? That's the question.
23        So I'm going to instruct you not to answer that
24 question.
25 BY MR. CORRALES:

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 156

1   Q. Mr. Dixie, as part of your understanding of Mr.
2   Everone's role with the tribe, did it include him
3   helping you get your chairmanship back from the tribe?
4       MR. McCONNELL: It's been asked and answered.
5   You can answer.
6       THE WITNESS: Not that I know of, no.
7   BY MR. CORRALES:
8   Q. As part of Mr. Everone's role with the tribe,
9   things that you've asked him to help you with, did it
10  include trying to figure out whether or not your
11  resignation from the tribe was a forgery?
12      MR. McCONNELL: Asked and answered.
13      THE WITNESS: I do believe that was a proven
14  fact by a handwriting expert.
15  BY MR. CORRALES:
16  Q. Did you ask Mr. Everone to help you with that?
17  A. No.
18  Q. Did he help you with that?
19  A. No.
20  Q. Has he consulted with you on that?
21  A. No.
22  Q. In your last deposition you said that you spoke
23  with Mr. Everone about that. Does that refresh your
24  recollection that you talked to Mr. Everone about your
25  claim that your resignation was a forgery?

Page 157

1   A. I don't remember.
2   Q. Okay.
3   A. Anything in there behind that?
4       MR. McCONNELL: Just let's hear what he's going
5   to say.
6   BY MR. CORRALES:
7   Q. Okay. We're going to get into this line of
8   questioning in a minute, but let's go to Question
9   Number 3. Question Number 3 is found on Page 28 of your
10  deposition.
11      The question was: Do you understand what that
12  means by substitution? This is after we talked about
13  your belief that you were substituted out of the
14  chairmanship, meaning, as I understand it, that the
15  chairmanship being substituted by Miss Burley. How is
16  it that you understand it, sir?
17      And then you said: In fact, who are you? And
18  I told you who I was.
19      And then -- so the Court has heard your
20  refusal. You said: Who are you? I told you who I was.
21  You said: I have nothing to do with the California
22  Valley Miwok.
23      Question: I don't know. I'm here to ask
24  questions. You are here to answer questions. On those
25  grounds I'm going to refuse to answer any more

Page 158

1   questions.
2       Okay. So we won't go into the tirade there,
3   but the question here is: Do you understand what it
4   means by substitution, meaning, as I understand it, the
5   chairmanship being substituted by Miss Burley?
6       So could we have an answer to that question,
7   sir.
8       MR. McCONNELL: Do you need to hear the
9   question?
10      THE WITNESS: Help --
11      MR. McCONNELL: Why don't we have the question
12  read back and just listen to it and answer the best you
13  can. She is going to read back the question and listen
14  carefully to her and answer the best you can.
15      (Record read by the Reporter.)
16      THE WITNESS: No. Huh-uh.
17  BY MR. CORRALES:
18  Q. Okay. On Page 28 of your deposition, if you
19  want to follow along -- actually, it starts on Page 27.
20  I believe we're talking about -- I don't know what
21  document we're talking about, but it says: This
22  document says in 1999 Mr. Dixie accidentally discovered
23  his substitution.
24      And I said on Page 28: Is that a correct
25  statement, sir?

Page 159

1       Answer: In 1995 what?
2       Question: In 1999, it says, in 1999 Mr. Dixie
3   accidentally discovered his substitution. Is that a
4   correct statement? Not that I know of.
5       And then I asked again: So did you ever
6   accidentally discover your substitution?
7       The witness: Not that I know of.
8       Okay. And that's what I mean by the question
9   substitution. So that gives you some background of what
10  is meant by the question substitution.
11      So I'll ask you again: Do you understand what
12  it means by substitution, that terminology that I used?
13      MR. McCONNELL: Objection. It's asked and
14  answered. It's vague. It lacks foundation, and it
15  calls for speculation.
16      And, for the record, you indicated you didn't
17  know what document you were referring to. You were
18  referring to Exhibit 25, a document that Mr. Dixie, in
19  his prior deposition, testified he had never seen before
20  in his life. He has no knowledge about --
21      MR. CORRALES: Let's have the witness testify.
22      MR. McCONNELL: No, I'm going to put this
23  objection on the record.
24      MR. CORRALES: It's not a proper objection.
25      MR. McCONNELL: It is a proper objection.

Page 160

1    MR. CORRALES:  Mr. Dixie, can I have you answer
2 the question.
3    MR. McCONNELL:  Don't answer yet.
4    MR. CORRALES:  Do you understand what it means
5 by substitution, meaning, as I understand it, the
6 chairmanship being substituted by Miss Burley?
7    MR. McCONNELL:  I'm not done --
8    MR. CORRALES:  Do you understand that the word
9 substitution means in the context of this question, that
10 Miss Burley is being substituted?
11    MR. McCONNELL:  My objection, you're asking the
12 witness about a phrase in a document that he has no
13 fingerprints on, has never seen before --
14    MR. CORRALES:  Okay.
15    MR. McCONNELL:  -- has no knowledge of.
16    MR. CORRALES:  Let's stop the gamesmanship,
17 sir.  We're here to get answers -- and don't smile.
18 This is not funny --
19    MR. McCONNELL:  You're right, it's not funny.
20    MR. CORRALES:  And, Counsel, Mr. -- your
21 associate here is laughing, too.  This is not a funny
22 matter.
23    MR. McCONNELL:  You're asking questions --
24    MR. CORRALES:  I want Mr. Dixie to answer the
25 questions, and I don't want you to sit here --

Page 161

1    MR. McCONNELL:  He answered the question.
2    MR. CORRALES:  -- interrupting the question
3 with your stupid, stupid objections.
4    MR. McCONNELL:  He answered the question.
5    MR. CORRALES:  Those are speaking objections.
6 They're not allowed in depositions.
7    MR. McCONNELL:  You're giving 10-minute
8 soliloquies about what --
9    MR. CORRALES:  Speaking objections are not
10 permitted.  Now, you're smiling again.  This is not
11 funny.  All right.  And so are you.  This is not funny.
12    Now, if you want to smile in front of Judge
13 Styn, let's go in front of Judge Styn, and you smile and
14 laugh at Judge Styn, but this is not funny.
15    MR. McCONNELL:  You're misstating the record
16 and you're --
17    MR. CORRALES:  This is not appropriate.
18    MR. McCONNELL:  You can characterize however
19 you want.  They are not true.
20    MR. CORRALES:  This is unprofessional.  You're
21 bating.  You're trying to cause trouble.
22    MR. McCONNELL:  That's --
23    MR. CORRALES:  The first thing you said here
24 was Mr. Paulk cannot be in this deposition.  Of course,
25 that's incorrect.  We're here to ask this witness

Page 162

1 questions without you trying to interrupt.
2    So, starting back to my question, Madam Court
3 Reporter, will you please read back my question.
4    (Record read by the Reporter.)
5    MR. McCONNELL:  I'm relodging all the
6 objections that I previously made, and this has been
7 asked and answered.  You can answer it again.
8 BY MR. CORRALES:
9    Q.  Your answer?
10    A.  I know this is not the Court at all here.  I'm
11 still going to stand on the Fifth Amendment.
12    MR. McCONNELL:  Yakima, just go ahead and give
13 your answer.  You've been asked this question before.
14 You can answer it again.  Do you understand what it
15 means by substitution?  Do you understand what that
16 means?
17    THE WITNESS:  Yeah, substitution -- on my part
18 or whose part?
19    MR. McCONNELL:  The question is:  Do you
20 understand what it means by substitution, meaning, as I
21 understand it, the chairmanship being substituted by
22 Miss Burley?  That's the question.
23    THE WITNESS:  Umm... okay.  Again, can I have a
24 couple of words with my attorneys here?
25    MR. CORRALES:  After you answer the question,

Page 163

1 you can talk to your lawyer.
2    THE WITNESS:  I didn't say that.  I didn't say
3 that.  I said could I have a couple minutes with my two
4 attorneys outside a minute.
5    MR. CORRALES:  After you answer the question.
6    THE WITNESS:  I refuse --
7    MR. McCONNELL:  Yakima --
8    THE WITNESS:  I refuse.
9    MR. McCONNELL:  Do you understand what it means
10 by substitution?
11    THE WITNESS:  Uh-huh.
12    MR. McCONNELL:  Do you understand what it means
13 by substitution?
14    THE WITNESS:  Uh-huh.
15    MR. McCONNELL:  What does it mean?
16    THE WITNESS:  Somebody taking my position and
17 substituting.
18    MR. CORRALES:  Now, you wanted to talk to your
19 lawyers, go ahead.  Take a couple of minutes.
20    THE WITNESS:  I'm going to bypass that because
21 you're too ignorant.  You're stupid.  When I asked
22 something to stop, I want to stop right then.
23 BY MR. CORRALES:
24    Q.  Okay.
25    A.  I don't want to keep on going.

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 164

1  Q.  Is it your understanding that Miss Burley took
2  over the chairmanship that you're disputing?
3       MR. McCONNELL:  Calls for a legal conclusion.
4  You can answer.
5       THE WITNESS:  That's what I understood.  I
6  mean, you know, I do believe that's -- at this living
7  day, I do believe that's the way it's still going.
8  BY MR. CORRALES:
9  Q.  Okay.  So when you say that you believe that
10  Miss Burley took over the chairmanship by substitution,
11  is it your belief that it was done by forgery?
12       MR. McCONNELL:  Compound.  Misstates the
13  testimony of the evidence, and it's been asked and
14  answered repeatedly in round one.
15  BY MR. CORRALES:
16  Q.  Your answer?
17  A.  Yeah.  Uh-huh.
18  Q.  Okay.  And in what way?
19       MR. McCONNELL:  Asked and answered beyond the
20  scope of this particular question.  I instruct you not
21  to answer.
22  BY MR. CORRALES:
23  Q.  And I take it you're following his
24  instructions?  I'll accept your silence as a yes.
25       Going to Question Number 4, quote, you said

Page 165

1  somebody that had to go to the hospital had the files.
2  Are you saying that the document that you claim to be a
3  forgery in those files?  And you answered yes.
4       The question is:  Do you remember what that
5  document was?
6  A.  I do believe it was about resigning.
7  Q.  Okay.  And what files are you talking about,
8  whose files?
9  A.  And I do believe that my attorney from
10  Washington -- not Washington, D.C., but Washington -- I
11  don't remember -- oh, yeah, Mary Wynne took that
12  document down to San Andreas, and she's an expert
13  handwriting expert, and they looked at it, and it was
14  true, that was not my signing.  That was not my writing.
15  Q.  Okay.  So Mary Wynne, is she a lawyer?
16  A.  Hum?
17  Q.  Who is Mary Wynne?
18  A.  She's an attorney.
19  Q.  And she said that the resignation was a
20  forgery?
21  A.  Yeah.
22  Q.  She told you that.  Did she ever tell you that
23  you -- that you were still the chairman because you
24  didn't resign because of the forgery?
25       MR. McCONNELL:  Compound and vague.

Page 166

1       THE WITNESS:  I don't recollect on that thing
2  that you're talking about.
3  BY MR. CORRALES:
4  Q.  Well, when you said that Mary Wynne said that
5  the document, the resignation letter was a forgery --
6  A.  Yeah --
7  Q.  What did that mean to you?  That you were still
8  the chairman of the tribe?
9  A.  No.  It was where somebody had forged my name.
10  Q.  So when you say forged your name --
11  A.  On the resignation.
12  Q.  So you didn't resign; is that what you're
13  saying?
14       MR. McCONNELL:  Asked and answered.
15       THE WITNESS:  No.
16  BY MR. CORRALES:
17  Q.  So if you didn't resign, you'd still be the
18  chairman?
19       MR. McCONNELL:  Asked and answered.
20       THE WITNESS:  I still am the chairman.
21  BY MR. CORRALES:
22  Q.  Now, did you ever -- so if you weren't the
23  chairman -- let me ask you this:  Were you ever the vice
24  chairman of the tribe?
25       MR. McCONNELL:  Objection.  It's beyond the

Page 167

1  scope of any question at issue here.  I instruct you not
2  to answer.
3  BY MR. CORRALES:
4  Q.  Okay.  So you mentioned that the document was a
5  forgery, and you said that the attorney from Washington,
6  Mary Wynne, told you it was a forgery, and therefore
7  you're still the chairman.
8       I'm going to show you what I will have marked
9  as exhibit next in order to your deposition, which I
10  believe is Exhibit Number -- excuse me -- 32.
11       (Plaintiff's Exhibit 32 was marked for
12       identification.)
13  BY MR. CORRALES:
14  Q.  This purports to be a letter from Mary Wynne to
15  the Bureau of Indian Affairs, and it has a cc file,
16  Reisling, Silvia, Charles, and Yakima -- I assume that's
17  you -- dated July 7, 1999.
18       Have you ever seen this before, sir?
19       MR. McCONNELL:  I object.  This is beyond the
20  scope of the questions.  You can answer.
21       THE WITNESS:  No.  The fact is this is the
22  first time I've seen this piece of paper.
23  BY MR. CORRALES:
24  Q.  This document purports to be a document that
25  was sent on your behalf to the Bureau of Indian Affairs

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 168

1  saying that you are the vice president of the Sheep
2  Ranch Band of Miwok Indians General Council and a member
3  of the tribe. It refers to tribal chairperson Silvia
4  Burley, and it's signed by Mary Wynne, but it's signed
5  as the attorney appointed representative, power of
6  attorney, oral request by Yakima Dixie. And so the
7  second page says Yakima Dixie, vice chairperson.
8       Have you ever seen -- let me rephrase the
9  question.
10      Do you doubt the authenticity of this letter?
11      MR. McCONNELL: Objection. Lacks foundation.
12  Calls for speculation. He's already testified he's
13  never seen this document before. It's also completely
14  beyond the scope of what we're here to talk about today.
15      MR. CORRALES: Your answer, sir?
16      MR. McCONNELL: On that ground, I instruct him
17  not to answer.
18  BY MR. CORRALES:
19      Q. So when it says here: As vice president of the
20  Sheep Ranch Band of Miwok Indians General Council and as
21  a member of the tribe, I am requesting that the BIA
22  assist the tribe in its efforts to conduct its tribal
23  business.
24      Did you ever ask Mary Wynne, the person that
25  you just mentioned in your testimony, to send that

Page 169

1  information to the BIA?
2       MR. McCONNELL: Same objection. In addition,
3  it's an attorney-client privileged communication. And
4  on that ground, as well as being beyond the scope, I
5  instruct you not to answer.
6  BY MR. CORRALES:
7       Q. Did you authorize Miss Wynne to send this
8  letter?
9       MR. McCONNELL: Same objections and again
10  instruct you not to answer.
11  BY MR. CORRALES:
12      Q. Did you ever refer to yourself as the vice
13  president or vice chairman of the Sheep Ranch Band of
14  Miwok Indians?
15      MR. McCONNELL: Objection. It's beyond the
16  scope of this deposition and instruct you not to answer.
17      MR. CORRALES: Just for the record, Counsel,
18  we're going to be back, because Mr. Dixie has answered
19  questions in a reasonable follow-up to these specific
20  questions, and he's mentioned the resignation issue.
21  He's mentioned Mary Wynne, and he stated that he was --
22  he's always been the chairperson. Always has been
23  designated as the chairperson of the tribe.
24      So this is perfectly within the scope, and
25  we're just going to have to come back.

Page 170

1  BY MR. CORRALES:
2       Q. Now, let me ask you this question, Mr. Dixie,
3  since we're on a roll here. You claim the document was
4  forgery. I'll show you what is marked -- what will be
5  marked as Exhibit 33 to your deposition.
6       (Plaintiff's Exhibit 33 was marked for
7       identification.)
8  BY MR. CORRALES:
9       Q. And this purports to be a Formal Notice of
10  Resignation signed by Yakima Kenneth Dixie. Have you
11  seen that before, sir?
12      MR. McCONNELL: What question is this in follow
13  up to?
14      MR. CORRALES: He just told me that he did not
15  sign a resignation, and that the resignation is a
16  forgery, and that his attorney, Mary Wynne, took it to a
17  forensic handwriting expert and said it was a forgery.
18  So I want to know if this is the document he's referring
19  to.
20      MR. McCONNELL: Okay.
21  BY MR. CORRALES:
22      Q. Is this the document you're referring to?
23      A. Hum -- if it concerns the resignation.
24      Q. That's what it says, Formal Notice of
25  Resignation signed -- appears to be -- purports to be

Page 171

1  the signature of Yakima Kenneth Dixie. Was this the
2  document you were referring to in your deposition
3  testimony moments ago?
4       A. I'm not too sure.
5       Q. Can you look at the document, sir.
6       A. I can see it from right here.
7       Q. You can see it from there. Do you have any
8  trouble seeing from there?
9       A. No. In fact, I don't have any copies of these
10  piece of papers you're bringing out.
11      Q. Okay. So you say you're not sure if this is
12  the document that you were just referring to in your
13  deposition testimony, correct?
14      MR. McCONNELL: Asked and answered.
15      THE WITNESS: Correct.
16  BY MR. CORRALES:
17      Q. Is that your signature?
18      A. Yeah, that's my signature.
19      Q. Okay. Next document --
20      A. On that first one over there, that's not my
21  signature.
22      Q. I'm not referring to Exhibit Number 32. Okay.
23  Now, next in order is Exhibit Number 34. This
24  purports to be a General Council Governing Body Special
25  Meeting.

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 172

1  (Plaintiff's Exhibit 34 was marked for
2  identification.)
3  BY MR. CORRALES:
4  Q. It purports to be signed by Yakima Dixie,
5  Silvia Burley, and Rashel Reznor. Let the record
6  reflect that I'm giving counsel copies.
7  Now, have you ever seen this before, sir?
8  **A. Yes, I have.**
9  Q. Is that your signature?
10 **A. Hum?**
11 Q. Is that your signature on the document?
12 **A. That is, yes.**
13 Q. The next documents is Exhibit Number 35, and it
14 purports to be a General Council Meeting for 8 May 1999,
15 and it purports to have the signature of Yakima Dixie,
16 Silvia Burley, and Rashel Reznor.
17 (Plaintiff's Exhibit 35 was marked for
18 identification.)
19 BY MR. CORRALES:
20 Q. Do you see that document, sir?
21 **A. Yes, that's true.**
22 Q. Is that your signature?
23 MR. McCONNELL: I'll object. What is this a
24 reasonable follow up to?
25 MR. CORRALES: That his testimony was that he

Page 173

1  did not resign. That his resignation was a forgery.
2  MR. McCONNELL: What does this document have to
3  do with that?
4  MR. CORRALES: His signature.
5  BY MR. CORRALES:
6  Q. Is that your signature, sir?
7  **A. Yeah.**
8  Q. Now, the other -- let me see. I want to show
9  you what's been marked next in order as Exhibit 36.
10 (Plaintiff's Exhibit 36 was marked for
11 identification.)
12 BY MR. CORRALES:
13 Q. It purports to be a Development Agreement.
14 Here's a copy.
15 Mr. Dixie, the Exhibit Number 36 -- could you
16 hand that to Mr. Dixie. It purports to be a Development
17 Agreement dated April 30th, 1999, with an addendum
18 attached to it. And it's an agreement between the Sheep
19 Ranch Tribe of Miwok Indians and BBC Entertainment.
20 I want you to look at this document and tell me
21 if you've ever seen it before. Have you seen this
22 document before, sir?
23 **A. I don't know if I seen this one at all.**
24 Q. Okay. Look it over.
25 **A. I see our attorney down there, Mary Wynne.**

Page 174

1  Q. Mary Wynne, okay. Look on Page 15. Do you see
2  on Page 15 the signature -- your signature there, sir?
3  MR. McCONNELL: Objection. What is this --
4  again, what follow up is this? Where is this falling
5  into the line of questioning here? This is not a wide
6  open you can ask whatever you want deposition.
7  MR. CORRALES: He said that his resignation was
8  a forgery.
9  MR. McCONNELL: And what does this have to do
10 with that?
11 MR. CORRALES: Well, you'll see.
12 MR. McCONNELL: I'd like to hear an offer of
13 proof or he's not going to be answering.
14 MR. CORRALES: Why don't you look at the
15 document I gave you. Look on Page 15.
16 BY MR. CORRALES:
17 Q. On Page 15, sir, you signed the document as
18 Yakima Dixie, and Silvia Burley signed as chairperson of
19 the general council. Do you see that, sir?
20 **A. I don't recollect on that one.**
21 Q. All right. Is that your signature?
22 **A. It's the first time I seen that.**
23 Q. Okay. Well, turn to Page 15. Could you turn
24 to Page 15, sir, and look at your signature and see if
25 that's yours.

Page 175

1  MR. McCONNELL: Go ahead and take a look at
2  Page 15.
3  BY MR. CORRALES:
4  Q. Is that your signature, sir?
5  **A. Yeah, that's my signature.**
6  Q. Okay. And there's an addendum here. Could you
7  assist him in going to Page 2 of the addendum, which is
8  dated July 23rd, 1999. There are various signatures.
9  Mary Wynne signed. And then you signed, Yakima Dixie,
10 tribal member. Silvia Burley signed as chairperson.
11 Is that your signature? Can you see that?
12 **A. I don't know.**
13 Q. You're not sure if that's your signature?
14 **A. Huh?**
15 Q. You're not sure or you don't know?
16 **A. I'm not sure.**
17 Q. Okay. Can you take a look again. Pick up the
18 document and look at it.
19 **A. I can see it from right here.**
20 Q. Okay. It doesn't look like your signature, or
21 does it look like your signature?
22 **A. It does not look like my signature.**
23 Q. Okay. All right. Do you doubt that's your
24 signature?
25 MR. McCONNELL: Asked and answered.

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 176

1      THE WITNESS: I'm not going to doubt it, but
2 I'm not sure.
3 BY MR. CORRALES:
4     Q. Do you recognize Mary Wynne's signature next to
5 yours, what purports to be yours?
6     **A. Umm, I don't recognize her writing. I mean ...**
7     Q. Did you authorize her to sign this document?
8     **A. Not that I know of.**
9     Q. Did you understand that when you -- when she
10 signed this document or when the signatures were put on
11 this document that the document was being signed by
12 Silvia Burley as chairperson?
13     MR. McCONNELL: Calls for speculation.
14     THE WITNESS: Not that I know of.
15 BY MR. CORRALES:
16     Q. At the time this document was signed -- there's
17 actually two dates, the one in April of 1999. Did
18 you -- let's refer to that one. On April 30th, 1999,
19 did you have any discussions with Miss Burley about her
20 signing the document? Did you?
21     **A. I don't remember.**
22     Q. Okay. All right. I want to show you next in
23 order 37, and this purports to be a letter dated
24 March 7, 2000, from Dale Risling to Silvia Burley,
25 chairperson.

Page 177

1     (Plaintiff's Exhibit 37 was marked for
2     identification.)
3 BY MR. CORRALES:
4     Q. And I want to read you something in this
5 document and ask you if that refreshes your recollection
6 or if you remember this happening.
7     Dear Miss Burley. The purpose of this
8 correspondence is to provide you with a summary of the
9 discussion that occurred during a meeting on
10 February 15, 2000, held at the Central California Agency
11 with Yakima Dixie, vice chairperson of the Sheep Ranch
12 Rancheria Tribe, his brother Melvin Dixie and other
13 interested parties.
14     Do you remember that meeting?
15     **A. No, I don't.**
16     Q. Do you remember attending a meeting with Mr.
17 Risling on February 2000, Dale Risling of the BIA, in
18 which you referred to yourself as the vice chairperson
19 of the Sheep Ranch Rancheria?
20     **A. No, I don't.**
21     Q. And then the next paragraph says: At the
22 request of Yakima Dixie, vice chairperson, which he made
23 during a meeting at the agency with him and other
24 interested parties on December 28, 1999, we scheduled a
25 meeting to be held at the agency on February 15, 2000.

Page 178

1     Do you remember making a request of the BIA,
2 that is Mr. Risling, as -- in your capacity as vice
3 chairperson of the tribe?
4     MR. McCONNELL: Compound. Misstates the
5 testimony of the evidence.
6     THE WITNESS: No.
7 BY MR. CORRALES:
8     Q. Okay. Let's go to Question Number 5. In
9 brackets it says: In your Declaration, when you say the
10 documents showing my resignation is a forgery, is it a
11 letter saying that you resigned that you claim is a
12 forgery? I believe that is what it was, yeah.
13     And then it says: When did you discover that?
14 When did you find out about that?
15     Do you understand the question, sir? I'm
16 asking when did you find out that the resignation letter
17 was what you believed to be a forgery, when did you
18 discover that?
19     **A. I don't recollect.**
20     Q. Okay. Now, on page -- what did I do with
21 that -- there it is. Page 36 of your deposition
22 transcript, you say -- actually, Page 34, in your
23 Declaration, when you say the document showing my
24 resignation is a forgery, is that a letter saying that
25 you resigned, that you claim is a forgery? I believe

Page 179

1 that it was -- okay, that's not what I'm looking for.
2 Page 36, I was right.
3     Now, did you meet Mr. Everone before or after
4 you found out about what you believed to be this
5 forgery?
6     Answer: Before, I do believe, yeah.
7     And then the question is: And did he help you
8 discover the forgery? That's the Question Number 6.
9     And you refused to answer on the grounds that
10 it might incriminate you. The Court has ruled on that
11 and ordered you to answer the question.
12     The question is: Did Mr. Everone help you
13 find out about the forgery that you claimed to be?
14     **A. Again, I'm going to stand on the Fifth**
15 **Amendment of the Constitution.**
16     MR. McCONNELL: Yakima, listen to the question.
17 The question is: Did Mr. Everone help you discover the
18 forgery? And go ahead and give your best answer.
19 BY MR. CORRALES:
20     Q. Can we get an answer, sir?
21     MR. McCONNELL: Did Mr. Everone help you
22 discover the forgery?
23     THE WITNESS: I'm going to refuse to answer
24 that question.
25     MR. McCONNELL: Go ahead, it's okay. Just go

Page 180

1  ahead and give your best recollection as far as what
2  your answer would be to whether Mr. Everone helped you
3  discover the forgery.
4      THE WITNESS:  I don't know.
5  BY MR. CORRALES:
6      Q.  You don't know.  Okay.  Going to Question
7  Number 7:  What did Mr. Everone tell you about the
8  forged document?
9      A.  I don't recollect.
10      Q.  Question Number 8:  What discussions did you
11  have with Everone about the document you believe to be
12  forged at the time that you first discovered it to be
13  forged?  What did he tell you?  What discussions did you
14  have with him?
15      A.  Again, I don't remember.
16      Q.  Did you have any kind of discussions with Mr.
17  Everone about the fact that you believe that your
18  resignation was unjust, improper, that you should be the
19  chairperson?  Did you have any kind of discussions with
20  him about that?
21      MR. McCONNELL:  It's compound and asked and
22  answered, but you can answer again.
23      THE WITNESS:  I don't know.
24  BY MR. CORRALES:
25      Q.  Do you know why Mr. Everone is claiming that

Page 181

1  you should be the chairperson because the document is
2  forged?
3      MR. McCONNELL:  Hold on.  Could you --
4      MR. CORRALES:  I'll withdraw the question.
5      THE WITNESS:  All these questions --
6      MR. CORRALES:  I'm withdrawing the question,
7  sir.
8  BY MR. CORRALES:
9      Q.  What meetings did you have with Mr. Everone
10  about the fact that Miss Burley was the chairperson and
11  not you when you first met Mr. Everone?
12      MR. McCONNELL:  It's compound.  It's vague.
13  It's been asked and answered.  Lacks foundation.
14      THE WITNESS:  I'm -- I don't recollect.  I
15  don't know.
16  BY MR. CORRALES:
17      Q.  Well, did Mr. Everone tell you that you had to
18  claim that the document, your resignation was a forgery
19  in order for him to help you get a casino?
20      MR. McCONNELL:  I'm going to object.  Sounds
21  like you're moving on to one of the questions, and if so
22  you need to read the question as it was originally
23  asked.
24  BY MR. CORRALES:
25      Q.  Your answer, sir?

Page 182

1      MR. McCONNELL:  I'm going to instruct you not
2  to answer.  I believe you're asking Question Number --
3      MR. CORRALES:  I'm not.  I'm asking follow-up
4  questions on Number 8.
5      MR. McCONNELL:  Question 12.  That's not a
6  follow-up question.
7      MR. CORRALES:  Are you going to instruct him
8  not to answer?
9      MR. McCONNELL:  The question on the record --
10      MR. CORRALES:  Instruct him not to answer and
11  we'll move on.
12      MR. McCONNELL:  The question on the record is
13  what discussions did you have with Everone about the
14  document you believed to be forged at the time you first
15  discovered it to be forged.  And his testimony is that
16  he doesn't remember such discussions.
17  BY MR. CORRALES:
18      Q.  Sir, when you had discussions with Mr. Everone
19  when you first met him, did you discuss Miss Burley's
20  chairmanship in relationship to his desire to build a
21  casino?
22      MR. McCONNELL:  It's compound and vague.
23      THE WITNESS:  I don't know.
24  BY MR. CORRALES:
25      Q.  Okay.  All right.  Question Number 9.  Why is

Page 183

1  it that you claim that the document to be a forgery that
2  says Miss Burley is the chairperson and not you?  Why do
3  you claim that to be a forgery?
4      So why do you claim the document that says that
5  you resigned as chairperson, why do you claim that be a
6  forgery?
7      A.  I do believe that document was tooken in front
8  of a handwriting expert in Sacramento.  Again, it was
9  forged.
10      Q.  Okay.
11      A.  It was not my writing.
12      Q.  So you believe it to be a forgery based upon
13  some handwriting expert saying that it wasn't your
14  handwriting; is that the only reason?
15      A.  No.
16      Q.  What's the other reason?
17      A.  No.
18      Q.  Did Mr. Everone, for example, tell you that the
19  document appears to be forged?
20      A.  No.
21      Q.  Did Mr. Everone tell you that you had to say
22  the document was a forgery in order for him to help you?
23      A.  No, nobody told me anything.
24      Q.  All right.  Question Number 10.  Is it correct
25  that when you first discovered that your resignation was

Page 184

1 forged that you said nothing to Miss Burley about you
2 being the hereditary chief?  Do you understand that
3 question, sir?
4     A.  Repeat that again.
5     Q.  Certainly.  Is it correct that when you first
6 discovered that your resignation was forged that you
7 said nothing to Miss Burley about you being the
8 hereditary chief?
9     A.  Not that I know.
10    Q.  Question Number 11.  And the communication to
11 Miss Burley about this resignation being a forgery was
12 actually created by Everone.
13        Is that right?
14    A.  Not that I know.
15    Q.  Is it correct that Mr. Everone actually
16 fabricated this forgery issue and forced you to go along
17 with it in order to assist him in getting a casino
18 built?
19    A.  Not that I know of.
20    Q.  Number 12 says:  Mr. Everone told you that in
21 order for his plans that he had for the tribe to work
22 that you had to say that the resignation was a forgery.
23        Is that correct?
24    A.  No.  Huh-uh.
25    Q.  Did you -- did you ever participate in any kind

Page 185

1 of scheme to lie about something that wasn't true in
2 order to -- in order to try to get an advantage in a
3 situation?
4        MR. McCONNELL:  Vague.
5        THE WITNESS:  No.
6 BY MR. CORRALES:
7     Q.  Your answer is no?
8     A.  Uh-huh.  No.
9     Q.  So this would have been out of character for
10 you to participate in something with Mr. Everone like
11 this, to lie about this?
12        MR. McCONNELL:  Vague.  Overly broad.
13        THE WITNESS:  No.  Meeting adjourned?
14 BY MR. CORRALES:
15    Q.  No.
16    A.  Man, I can't sit here all day listening to this
17 crap.
18    Q.  All right.  The next document, Exhibit 38,
19 purports to be -- well, I'll just read it and ask you if
20 this is true.  I'm not so sure if I want to -- well,
21 let's see.  It says here, Exhibit Number 38, Report of
22 Probation Officer.
23        (Plaintiff's Exhibit 38 was marked for
24        identification.)
25 BY MR. CORRALES:

Page 186

1     Q.  People versus Yakima Dixie.  It says here that,
2 on Page 9, this is about the murder of Mr. Jeff, and it
3 recites how the murder occurred and the victim had --
4 didn't have a leg.
5        And it said:  Defendant appears to have
6 attempted to suborn perjury.  The contents of the two
7 letters appear to be clearly an attempt to shift blame
8 to defendant's father, Vivian's son, or anyone that
9 Vivian could find at the insistence of the defendant.
10       And that you -- did you ever try and get --
11 here it is.  Here's another one.  The defendant
12 attempted to interfere with the judicial process in that
13 he attempted to get letters delivered to a witness in
14 which letters he tried to persuade a witness to commit
15 perjury.  Did you ever do that, sir?
16       MR. McCONNELL:  Objection.  I'll instruct him
17 not to answer.  That is a Fifth Amendment type question,
18 number one.
19       Number two, it's completely outside the scope
20 of the purpose of this deposition, and it's entirely and
21 absolutely irrelevant.  It's pure hearsay.  You don't
22 have to answer that.
23       MR. CORRALES:  Okay.  Just for the record, the
24 witness made a statement that he never participated in
25 such activity, and yet the probation report, which is

Page 187

1 dated 1978, which could not possibly ever be a basis for
2 a Fifth Amendment assertion, contradicts what the
3 witness just said.  So I disagree with that, and we'll
4 come back and perhaps have you answer questions about
5 that.
6        Okay.  Now, let's see.  Question Number 12 --
7        MR. McCONNELL:  You already asked it.
8        MR. CORRALES:  Okay.
9 BY MR. CORRALES:
10    Q.  Everone -- Number 13.  And Mr. Everone told you
11 that in order to get control of the tribe you had to be
12 the chairperson, but the problem was Miss Burley.  You
13 had resigned, and Miss Burley was the chairperson.  Is
14 that what he told you?
15       Your answer, sir?
16    A.  No.  Huh-uh.
17    Q.  You didn't say that.  Okay.
18       Question Number 14.  So he said to you, Mr.
19 Dixie, that you had to say that document was forged,
20 that is, your resignation was forged, and you agreed to
21 do that.  You agreed to say that.  Isn't that correct?
22    A.  No, that's not true.
23       MR. CORRALES:  Okay.  Let's take a couple of
24 minutes.  I have to use the rest room.
25       THE VIDEOGRAPHER:  We're off the record at

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 188

1   4:40. This is the end of Video Disk Number 1.
2       (Recess taken.)
3       THE VIDEOGRAPHER: We are back on the record at
4   4:55. This is the beginning of Video Disk Number 2.
5   BY MR. CORRALES:
6       Q. Okay. Mr. Dixie, you understand that you're
7   still under oath?
8       A. Yes, I do.
9       Q. Okay. Going to Question Number 15. What did
10  Mr. Everone tell you what the word consul means or
11  meant? C-O-N-S-U-L. Do you understand the question,
12  sir?
13      A. No, I don't.
14      Q. I want you to look at Exhibit Number 31 to your
15  deposition. It's a Resolution, California Valley Miwok
16  Tribe, California, Sheep Ranch Rancheria of Miwok
17  Indians, and it's got the 11178 Sheep Ranch Road
18  address.
19      And it's signed by -- purportedly signed by you
20  and others, and it says: Chadd Everone is appointed as
21  deputy and consul general. Do you see that, sir? And I
22  want to ask you if that means anything to you, that term
23  consul general? That's what I mean by the word consul.
24      A. I -- I don't think anybody ever brought that up
25  to my attention what that means. I mean ...

Page 189

1       Q. The document here, did you type or draft that
2   document, Exhibit Number whatever it is?
3       MR. McCONNELL: 31.
4       MR. CORRALES: Thank you.
5   BY MR. CORRALES:
6       Q. Exhibit Number 31, did you draft or type that
7   document?
8       MR. McCONNELL: Did you prepare Exhibit 31, the
9   typewritten part?
10      THE WITNESS: Did I type it or write it?
11  BY MR. CORRALES:
12      Q. Type it or write it.
13      A. No, not that I know of.
14      Q. Who did?
15      A. I don't know.
16      Q. Did you read it before you signed it?
17      A. Huh?
18      Q. Did you read it before you signed it?
19      A. I usually read everything before I sign it.
20      Q. When you read that part that said Everone was
21  being appointed as the deputy and consul general, what
22  did you understand the word consul to mean?
23      MR. McCONNELL: It's been asked and answered.
24      THE WITNESS: I don't know.
25  BY MR. CORRALES:

Page 190

1       Q. Have you ever heard of the term consul general
2   before, before today?
3       A. Not that I know of, no.
4       Q. So when you hear that Chadd Everone was
5   appointed by the tribe to be its deputy and consul
6   general, the term consul general doesn't mean anything
7   to you?
8       MR. McCONNELL: Asked and answered.
9       THE WITNESS: That part, no, but a deputy, I
10  know what a deputy is, but I don't know about the other
11  part.
12  BY MR. CORRALES:
13      Q. Okay. And I believe you told us what the
14  deputy means. Okay. All right. And did Mr. Everone
15  ever tell you that his title as general consul meant
16  that he was the tribe's attorney?
17      MR. McCONNELL: Asked and answered.
18      THE WITNESS: Not that I know of, no.
19      MR. CORRALES: Okay.
20  BY MR. CORRALES:
21      Q. Question Number 16. What kind of oversight of
22  the litigation strategy is Mr. Everone appointed to?
23  What does he do?
24      MR. McCONNELL: It's been asked and answered.
25      MR. CORRALES: Asked and answered. This is

Page 191

1   Question Number 16.
2       MR. McCONNELL: I know, but we spent the first
3   30 minutes of this deposition talking about that.
4       MR. CORRALES: Well, this is a little more
5   specific.
6   BY MR. CORRALES:
7       Q. Litigation strategy, what do you understand
8   litigation strategy to mean?
9       MR. McCONNELL: Let's just stick to the
10  question. What kind of --
11      MR. CORRALES: This is my question, my
12  deposition.
13      MR. McCONNELL: And this is --
14      MR. CORRALES: I'll withdraw the question and
15  lay a foundation if you please.
16  BY MR. CORRALES:
17      Q. What do you understand the word litigation or
18  term litigation strategy to mean?
19      A. I don't know.
20      Q. Okay. If I were to tell you that litigation
21  strategy has to do with this case, this lawsuit, making
22  decisions about this lawsuit, would that help you?
23      MR. McCONNELL: Calls for speculation. Assumes
24  facts.
25      THE WITNESS: No.

1  BY MR. CORRALES:
2      Q. Okay. So the question: What kind of oversight
3  of the litigation strategy is Mr. Everone appointed to,
4  what does he do, you can't answer that question because
5  you don't understand what the term litigation strategy
6  means; is that correct?
7      A. True.
8      Q. Okay. To your knowledge, what does Mr. Everone
9  do with respect to this lawsuit, the case that is going
10  on, what does he do?
11     A. What he does?
12     Q. Yeah. I mean, does he type stuff? Does he
13  meet with --
14     A. No --
15     Q. What does he do?
16        MR. McCONNELL: Lacks foundation. Calls for
17  speculation. Asked and answered. Answer again.
18  BY MR. CORRALES:
19     Q. Go ahead.
20     A. Something to do about extending life.
21     Q. Okay. Explain.
22     A. That's all I know.
23     Q. Extending life in terms of the case?
24     A. Longer living.
25     Q. Longer living for whom? You?

1      A. For everybody.
2      Q. Okay. So his role in assisting in litigation
3  strategy extends the life expectancy of everybody
4  involved with the case?
5        MR. McCONNELL: Calls for speculation.
6  Misstates.
7        THE WITNESS: That's what he does. I mean, you
8  know ...
9  BY MR. CORRALES:
10     Q. All right.
11     A. Lives in Berkeley, and he does that.
12     Q. He lives in Berkeley. Are you suggesting that
13  he has something to do with an aging society?
14     A. Yeah, I guess you could say aging, extending of
15  life.
16     Q. Okay. What does that have to do with the
17  litigation in this case?
18     A. I don't believe it has anything to do with it.
19     Q. Okay. Why did you mention it?
20        MR. McCONNELL: Argumentative.
21        THE WITNESS: Because you asked me about Chadd.
22  BY MR. CORRALES:
23     Q. Okay. So when you think about Chadd and this
24  lawsuit, you think about the aging and life expectancy
25  and not this case?

1        MR. McCONNELL: Argumentative.
2        THE WITNESS: Yeah. Uh-huh.
3        MR. CORRALES: Okay. All right.
4  BY MR. CORRALES:
5      Q. Did you understand that Mr. Everone confers
6  with attorneys in this case, like with Mr. McConnell and
7  perhaps Mr. Wolfrum, did you understand that he confers,
8  meets with them?
9      A. I don't know.
10     Q. Okay. Did Mr. Everone ever talk to you about
11  any discussions he may have had with Mr. McConnell or
12  Mr. Wolfrum about this case?
13     A. I don't know.
14     Q. For example, your deposition had to resume
15  today. You came here to your deposition. You were told
16  that you had to come to your deposition again. Did Mr.
17  Everone have any involvement in communicating that to
18  you?
19     A. Not that I know of.
20     Q. Okay. So when you say that Mr. Everone is your
21  attorney, has that stopped with respect to this case?
22     A. He's my deputy attorney for way over 10 years.
23     Q. Okay. But with respect to this case, the
24  ongoing litigation with the intervenors, we've got Velma
25  White Bear and others who want to come into the case,

1  what, to your knowledge, does Mr. Everone do with that
2  part of the litigation?
3      A. He don't.
4      Q. Does he meet with the intervenors, to your
5  knowledge?
6      A. No.
7      Q. Have you given Mr. Everone authorization to
8  meet with parties in this lawsuit like the intervenors?
9      A. Yeah. Uh-huh.
10     Q. And has he reported to you that he has done
11  that?
12     A. Yeah.
13     Q. Let's go to Question Number 17. It says that
14  Mr. Everone is responsible for contracting with
15  attorneys. I was referring to a document in your
16  deposition last time.
17        Did Mr. Everone contract with Mr. Wolfrum to be
18  your attorney? You know who Mr. Wolfrum is?
19     A. Mr. Wolfrum is my tribal attorney.
20     Q. Did Mr. Everone sign a paper with him to have
21  him help in this case?
22     A. I'm not too sure. They both live down in
23  Berkeley real close — they live right next to each
24  other in an office where Mr. Everone works, and our
25  tribal attorney, Wolfrum, he lives there, too.

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 196

1    Q. How did Mr. Wolfrum become the tribal attorney
2  in this case?
3    **A. I do think it was through Chadd, and he**
4  **suggested — I got a good attorney for you.**
5    Q. And of course Mr. Everone is your tribal
6  attorney or deputy; you followed that suggestion?
7    **A. Yeah, deputy.**
8    Q. Now, Question Number 18. How did Sheppard
9  Mullin come about to represent you in this case? Do you
10 know who Sheppard Mullin is? Lawyers?
11   **A. I think -- aren't they right here?**
12   Q. These two guys work for Sheppard Mullin, a law
13 firm?
14   **A. Yes.**
15   Q. Mr. Wolfrum also works for that law firm. The
16 question is how did that law firm come to be your
17 lawyers like Wolfrum is your lawyer?
18   **A. Here's one of the guys, you could ask him that**
19 **question.**
20   Q. Wish I could.
21   **A. And he can answer it.**
22   Q. Wish I could, but he's not a witness.
23   MR. McCONNELL: Just answer. Either you know
24 or you don't.
25 BY MR. CORRALES:

Page 197

1    Q. Just tell me your best recollection. Doesn't
2  have to be precise. Tell me the best you can about how
3  they came about to be one of the other lawyers in the
4  case.
5    **A. I don't know.**
6    Q. To your knowledge, did Mr. Everone meet with
7  them to get them to be one of the lawyers in the case,
8  like did he recommend them?
9    **A. It's a possibility there, yeah.**
10   Q. What discussions did you have with Mr. Everone
11 about Sheppard Mullin being your lawyers?
12   MR. McCONNELL: Lacks foundation.
13   THE WITNESS: None.
14 BY MR. CORRALES:
15   Q. Okay. All right. You just basically let Mr.
16 Everone handle that part of the responsibilities in
17 contracting with lawyers?
18   MR. McCONNELL: Argumentative. Misstates.
19 BY MR. CORRALES:
20   Q. His job to handle that?
21   MR. McCONNELL: Lacks foundation.
22   THE WITNESS: I don't know.
23 BY MR. CORRALES:
24   Q. Okay. All right. Other than yourself, who
25 else has the responsibility to ask or oversee what Mr.

Page 198

1  Everone is doing for the tribe?
2    MR. McCONNELL: Lacks foundation.
3    MR. CORRALES: Other than yourself.
4    MR. McCONNELL: Lacks foundation. Calls for
5  speculation. You can answer.
6    THE WITNESS: My tribal council.
7  BY MR. CORRALES:
8    Q. Your tribal council is listed there -- what is
9  that?
10   MR. McCONNELL: 31.
11 BY MR. CORRALES:
12   Q. On Exhibit 31, is that your tribal council list
13 on 31?
14   MR. McCONNELL: Are those the names of all the
15 tribal council members?
16   THE WITNESS: Uh-huh.
17   MR. McCONNELL: Are these the names of the
18 tribal council members on Exhibit 31?
19   THE WITNESS: That's Michael -- and who is this
20 one?
21   MR. McCONNELL: Antonio Lopez?
22   THE WITNESS: Yes.
23   MR. McCONNELL: And Velma White Bear?
24   THE WITNESS: Yes.
25   MR. McCONNELL: Evelyn Wilson?

Page 199

1    THE WITNESS: Yes.
2    MR. McCONNELL: Anton Azevedo?
3    THE WITNESS: Yeah, that's my counsel.
4  BY MR. CORRALES:
5    Q. Question Number 19. Do you believe that one of
6  the reasons they, meaning the plaintiff, are not
7  entitled to that money or Revenue Sharing Trust Fund
8  money is because they don't have a recognized
9  government?
10   We're talking about the tribe that's headed by
11 Silvia Burley down in the Valley. Do you believe that
12 one of the reasons that they're not entitled to the
13 money that's being stopped --
14   **A. Uh-huh.**
15   Q. -- is because they don't have a recognized
16 government?
17   **A. Well, it's not no federal property. There's**
18 **nothing there. I mean, you know, what they got, three**
19 **or four people, maybe five at the most?**
20   Q. Any other reason?
21   MR. McCONNELL: It's been asked and answered.
22 You can answer.
23   THE WITNESS: Not that I can -- no.
24   MR. CORRALES: Okay. Mr. Dixie, those are all
25 the questions I have. We may or may not see you again

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 200

1  but --
2      THE WITNESS: I'm glad and I'm happy about
3  that.
4      MR. CORRALES: That's fine. I will propose
5  that we have the same stipulation --
6      MR. McCONNELL: I have a couple of questions.
7      MR. CORRALES: Okay.
8           EXAMINATION
9  BY MR. McCONNELL:
10     Q. Mr. Dixie, earlier you were shown what was
11 marked as Exhibit 33, a document that reads Formal
12 Notice of Resignation. And it says: I, Yakima K.
13 Dixie, being of sound mind and body on this date of
14 Tuesday, April 20, 1999, am resigning as chairperson of
15 the Sheep Ranch Tribe of Miwok Indians Sheep Ranch,
16 California.
17     There's a signature on that document,
18 Exhibit 33. Did you write the signature that's on
19 Exhibit 33?
20     A. I don't believe I did. And in fact, this is
21 the first time I seen this -- well, maybe second time,
22 if, you know -- but here's my signature here.
23     MR. CORRALES: You say here's my signature
24 here, let the record reflect that the witness is
25 pointing to Exhibit Number 34.

Page 201

1  BY MR. McCONNELL:
2      Q. Let's take a look here, Mr. Dixie. Exhibit 31
3  we've looked at a number of times, the resolution
4  appointing Mr. Everone on behalf of the tribe. There's
5  a signature next to your name on that document. Do you
6  see where I'm pointing to?
7      A. Hum?
8      Q. Is that a signature that you wrote on the
9  resolution appointing Chadd Everone?
10     A. Yeah, I think so. I see my Y there.
11     MR. CORRALES: Okay. Let the record reflect
12 when the witness said can you see how my Y's are, he was
13 referring to Exhibit 33, which is the resignation, the
14 Formal Notice of Resignation.
15     MR. McCONNELL: That misstates.
16     MR. CORRALES: That is exactly what the video
17 camera will show, Mr. McConnell. You can't say it
18 misstates.
19 BY MR. McCONNELL:
20     Q. Taking a look at Exhibit 31, the signature on
21 Exhibit 31, is that how you write your signature? This
22 is again the resolution for Chadd Everone to be made the
23 deputy and consul general for the tribe. Is that how
24 you normally sign your name?
25     A. Uh-huh.

Page 202

1      Q. Is that a yes?
2      A. Uh-huh.
3      Q. We need to hear a yes.
4      A. Yeah.
5      Q. Uh-huhs don't work well.
6      A. Okay.
7      Q. Okay. And you said, as far as Exhibit 33 goes,
8  that that is not your signature, correct?
9      MR. CORRALES: Objection. Leading and
10 suggestive.
11     THE WITNESS: That's true.
12     MR. McCONNELL: Okay.
13 BY MR. McCONNELL:
14     Q. And if you take a look at what you previously
15 were shown as Exhibit 34, this is a document that
16 indicates that the General Council as the Governing Body
17 of the Sheep Ranch Tribe of the Miwok Indians has agreed
18 to accept the resignation of chairperson from Mr. Yakima
19 K. Dixie.
20     Now, did you ever resign as chairperson of the
21 Miwok Tribe?
22     A. Well, in the Miwok Tribe, in our tradition, if
23 you got -- you hold a position, you cannot resign --
24     Q. So did you ever resign?
25     A. -- until you die or whatever.

Page 203

1      Q. And did you ever resign?
2      A. Not that I know of, no.
3      Q. And you were asked about this signature. Did
4  you write the signature that's on Exhibit 34 that says
5  that you're resigning as chairperson? Did you write
6  this signature?
7      A. I don't believe I did.
8      MR. McCONNELL: I have no further questions.
9      MR. CORRALES: Okay. Let me see those two
10 documents.
11      FURTHER EXAMINATION
12 BY MR. CORRALES:
13     Q. Mr. Dixie, before we took a break -- before we
14 took a break you were asked questions about Exhibit
15 Number 33 and 34, correct? Before we took a break, do
16 you remember that, sir?
17     MR. McCONNELL: Earlier today.
18 BY MR. CORRALES:
19     Q. Earlier today, when we took a break, before we
20 took a break you were asked questions about 33 and 34;
21 is that right?
22     A. I believe so.
23     Q. Okay. And before we took a break you said --
24 the record will reflect this -- that Exhibit Number 33
25 contained your signature. Do you remember saying that?

Page 204

1  MR. McCONNELL: It's asked and answered and
2  argumentative.
3  THE WITNESS: I don't believe that --
4  BY MR. CORRALES:
5  Q. You don't believe you said that? The record
6  will reflect that you said that. Do you remember saying
7  that, sir?
8  A. I don't remember.
9  Q. Okay. So if the record reflects that you said
10 that, would you dispute that?
11  MR. McCONNELL: Argumentative.
12  BY MR. CORRALES:
13  Q. Sir, if the record -- if she reads it back and
14 says that you actually said that, would you dispute
15 that?
16  MR. McCONNELL: Argumentative and irrelevant.
17 You can answer.
18  THE WITNESS: Are you listening to my attorney?
19  BY MR. CORRALES:
20  Q. Yes or no, would you dispute that?
21  MR. McCONNELL: Same objections.
22  BY MR. CORRALES:
23  Q. If the record says that you acknowledged this
24 was your signature, would you disagree with that?
25  MR. McCONNELL: Same objections. It's also

Page 205

1  vague. You can answer.
2  BY MR. CORRALES:
3  Q. Yes or no, sir?
4  MR. McCONNELL: Same objections.
5  THE WITNESS: I do believe there was some
6  forgery here somewhere, but I'm not sure that's my
7  signature.
8  BY MR. CORRALES:
9  Q. Sir, before we took the break you testified
10 that this was your signature.
11  A. I don't remember whether I said I did or --
12  Q. The record will reflect you did say that. Do
13 you disagree with that, what the record would say?
14  MR. McCONNELL: Argumentative and irrelevant.
15  BY MR. CORRALES:
16  Q. Do you disagree with what you said earlier?
17  MR. McCONNELL: Argumentative.
18  THE WITNESS: Are you listening to my attorney?
19  BY MR. CORRALES:
20  Q. Do you disagree that what you said earlier that
21 this was your signature? Are you changing your
22 testimony, sir?
23  MR. McCONNELL: Argumentative. Asked and
24 answered.
25  BY MR. CORRALES:

Page 206

1  Q. Yes or no? Are you changing your testimony?
2  MR. McCONNELL: Same objections.
3  THE WITNESS: It's getting late. Almost time
4  for supper.
5  BY MR. CORRALES:
6  Q. Mr. Dixie, please answer the question. You
7  said Exhibit Number 33 contained your signature. Are
8  you now changing your testimony?
9  A. I don't know whether I said it was my signature
10 or looked like my signature.
11  Q. You said it was your signature. Are you
12 changing your testimony?
13  MR. McCONNELL: Asked and answered.
14 Argumentative.
15  THE WITNESS: I don't remember.
16  MR. CORRALES: That's not the question.
17  BY MR. CORRALES:
18  Q. The question is: Are you changing your
19 testimony?
20  MR. McCONNELL: Same objections.
21  THE WITNESS: No, I said what I said.
22  BY MR. CORRALES:
23  Q. Okay. And Exhibit Number 34, you previously
24 said that this was your testimony -- that this was your
25 signature. Are you changing your testimony there, too?

Page 207

1  MR. McCONNELL: Argumentative. Vague.
2  BY MR. CORRALES:
3  Q. Are you changing your testimony?
4  MR. McCONNELL: Same objections.
5  BY MR. CORRALES:
6  Q. That you said that this was your signature,
7  Exhibit 34. Are you changing your testimony, sir?
8  MR. McCONNELL: Argumentative and vague.
9  THE WITNESS: Are you listening to my attorney?
10 He's talking to you.
11  BY MR. CORRALES:
12  Q. I'm asking you, sir, answer the question.
13  A. And he's speaking up for me.
14  Q. I understand that, but you have to answer the
15 question. Earlier you said Exhibit Number 34 contained
16 your signature. Are you now changing your testimony?
17 Yes or no.
18  MR. McCONNELL: Argumentative.
19  THE WITNESS: I refuse to say any more words
20 due to the grounds it may incriminate me.
21  BY MR. CORRALES:
22  Q. You need to answer the question. Are you
23 refusing -- excuse me, I know you're refusing. You need
24 to answer the question.
25  Are you changing your testimony that you gave

Deposition of Yakima Kenneth Dixie, Volume II    CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 208

1  earlier which stated that this was your signature? Are
2  you changing that?
3      MR. McCONNELL: It's argumentative. It's been
4  asked and answered.
5  BY MR. CORRALES:
6    Q. Yes or no?
7      MR. McCONNELL: The witness has testified to
8  what his belief.
9      MR. CORRALES: Answer the question. Don't
10 coach. Are you changing your testimony, sir. You
11 previously said this was your signature. Are you
12 changing your testimony?
13     MR. McCONNELL: Your question is vague. It's
14 been asked and answered and it's argumentative.
15 BY MR. CORRALES:
16   Q. Your answer?
17     MR. McCONNELL: Do you understand the question?
18     MR. CORRALES: He understands the question.
19 Let him answer the question.
20 BY MR. CORRALES:
21   Q. Are you changing your testimony that this was
22 your signature?
23     MR. McCONNELL: It's vague --
24     MR. CORRALES: Exhibit 34.
25     THE WITNESS: You're saying you know --

Page 209

1      MR. CORRALES: It's vague.
2      THE WITNESS: Well, if you know, why ask me?
3  BY MR. CORRALES:
4    Q. I want you to tell me. Are you changing your
5  testimony?
6    A. I'm going to stand on the Fifth Amendment.
7    Q. It's not a Fifth Amendment issue. Exhibit 34,
8  you told us earlier this was your signature. Now, after
9  the break, after you had a chance to talk to your
10 lawyer, you now say this is not your signature.
11     Are you changing your testimony, sir?
12     MR. McCONNELL: Vague and argumentative.
13     MR. CORRALES: Yes or no?
14     THE WITNESS: I don't know.
15 BY MR. CORRALES:
16   Q. You don't know if you are or not?
17   A. No, I don't know if that's my signature or not.
18   Q. You stand by the testimony that you gave
19 before --
20   A. What the heck are you saying?
21   Q. Do you stand by the testimony that you gave
22 before the break?
23   A. Here's your goddamn thing.
24     MR. McCONNELL: It's asked and answered. He
25 just said that he doesn't know if it's his signature.

Page 210

1      MR. CORRALES: I know what he said.
2      THE WITNESS: I don't want it on me.
3      MR. CORRALES: I need you to answer the
4  question.
5      THE WITNESS: I'm not going to answer.
6  BY MR. CORRALES:
7    Q. Are you standing by the testimony that you gave
8  before the break about Exhibit 34 being your signature?
9      MR. McCONNELL: It's vague. Argumentative.
10 Asked and answered. He just testified he doesn't
11 believe that's his signature.
12     MR. CORRALES: Answer the question, please.
13 BY MR. CORRALES:
14   Q. Are you changing your testimony that you gave
15 before the break that the signature that's on Exhibit 34
16 is your signature? Are you changing that testimony?
17     MR. McCONNELL: Same objections.
18 BY MR. CORRALES:
19   Q. Yes or no?
20   A. Are you listening to my attorney?
21   Q. I'm trying to listen to you, and I want an
22 answer.
23   A. And I just got through saying I'm not going to
24 answer any more questions.
25   Q. You need to answer the question or we're coming

Page 211

1  right back and the judge will make you pay another
2  sanction, like he made you pay before.
3    A. I'm not coming back.
4    Q. Answer the question. Are you changing your
5  testimony from your earlier testimony where you said
6  that Exhibit Number 34 contains your signature? Are you
7  changing that now?
8      MR. McCONNELL: It's vague. Argumentative.
9  It's been asked and answered. And he already answered
10 that he doesn't believe that's his signature. You can
11 answer yet again.
12     MR. CORRALES: That's not the question.
13 BY MR. CORRALES:
14   Q. I'm not asking you the question that Mr.
15 McConnell is trying to confuse you on.
16     The question is this: Earlier you testified
17 that the signature contained on Exhibit Number 34 was
18 your signature. After the break, when you had a chance
19 to talk to your attorneys outside in the corridor, you
20 now come and say, in response to examination by your own
21 lawyer, that this signature is not your signature.
22     Are you changing your testimony?
23     MR. McCONNELL: Same objections.
24     MR. CORRALES: Yes or no?
25     MR. McCONNELL: Same objections.

Page 212

1  BY MR. CORRALES:
2    Q.  Mr. Dixie, we'll stay here as long as we can or
3  have to in order for you to answer the question. Are
4  you changing your testimony from previously given?
5    **A.  I'm going to stand on the Fifth Amendment.**
6    Q.  This has nothing to do with the Fifth
7  Amendment. I'm asking you:  Earlier you said that this
8  was your signature before we took a break. After you
9  consulted with your attorney, you now say that this is
10 not your signature, and I'm referring to Exhibit Number
11 34.
12    Are you changing your previous testimony?  Yes
13 or no?
14    MR. McCONNELL:  Same objections.
15    THE WITNESS:  We can sit here all night.
16 BY MR. CORRALES:
17    Q.  Are you changing your testimony, yes or no?
18 Answer the question.
19    MR. McCONNELL:  Same objections. Do you
20 understand the question?
21    MR. CORRALES:  He understands the question.
22 He's just refusing to answer. He just said uh-huh. Is
23 that what you said? Answer the question, sir.
24    Are you changing your testimony with respect to
25 Exhibit Number 34?

Page 213

1    MR. McCONNELL:  Same objections.
2    THE WITNESS:  We can sit here all night. Are
3  you getting hungry?
4    MR. CORRALES:  We will if we have to.
5    THE WITNESS:  We will.
6  BY MR. CORRALES:
7    Q.  Earlier, before we took a break, you testified
8  that the signature that is on Exhibit 34 was your
9  signature. After the break, after you had a chance to
10 talk to your lawyer, you now say that that is not your
11 signature.
12    Are you changing the testimony that you gave
13 before the break?
14    MR. McCONNELL:  Vague. Asked and answered.
15 Compound.
16 BY MR. CORRALES:
17    Q.  Yes or no, sir?
18    **A.  We can sit here all night.**
19    Q.  I'm asking you to answer the question, sir.
20    **A.  What did I say?  I said we can sit here all**
21 **night.**
22    Q.  I heard what you said. You don't have to slap
23 your hand on the desk.
24    **A.  I'll slap you in your face.**
25    Q.  Do you want to do that?

Page 214

1    **A.  Yeah.**
2    Q.  You'll be a dead man. Nobody threatens me,
3  including you, Mr. Dixie --
4    **A.  Don't tell me --**
5    Q.  I would be very careful about that. And, Mr.
6  McConnell, I would advise you to tell your client not to
7  make physical threats against me.
8    **A.  Don't make a comment about you can be somebody**
9  **will kill you.**
10   Q.  I'm sorry, Mr. Dixie. I have an obligation to
11 protect myself. If you want to try and physically
12 assault me, I will protect myself.
13    The question is:  Exhibit Number 34, the
14 signature that's on Exhibit 34, before we took a break
15 you said that was your signature. After you consulted
16 with your lawyer, you now say it's not your signature.
17 Are you changing your deposition testimony, yes or no?
18    MR. McCONNELL:  Same objections.
19    THE WITNESS:  We can sit here all night.
20    MR. CORRALES:  I'd like an answer to my
21 question, sir.
22    THE WITNESS:  That's what you're going to get,
23 pointblank, (indicating).
24 BY MR. CORRALES:
25    Q.  If you don't answer the question, sir, we'll

Page 215

1  come right back. The judge will make you answer the
2  question. Mr. Dixie, will you please answer the
3  question. I'll repeat the question.
4    Before we took a break you testified that your
5  signature on Exhibit Number 34 was your signature.
6  After consulting with your lawyer during the break, we
7  got back on the record, and you testified that this was
8  not your signature.
9    My question to you is:  Are you changing your
10 deposition testimony that this is your signature?
11    MR. McCONNELL:  Same objections.
12 BY MR. CORRALES:
13    Q.  Mr. Dixie, I have the option of reconvening the
14 deposition tomorrow at 9:30.
15    **A.  I'm not coming back.**
16    Q.  Since it's after hours, and I will make a phone
17 call to Judge Styn on an ex parte basis, emergency
18 basis, and ask him whether or not you are required to
19 answer the question in order to save the expense of all
20 the parties to come back and have you answer the
21 question after we go through another round of motions.
22    Now, I will do that, reconvene, because the
23 deposition notice says it will continue from time to
24 time -- from day to day until completed. And I will
25 certainly do that if you do not answer the question.

Page 216

1  So I'm going to have you and Mr. McConnell take
2  a break and confer about that for the next couple of
3  minutes and come back and see if we can have you answer
4  the question without having to have that done.
5       We'll take a couple of minutes.
6       THE VIDEOGRAPHER: We're off the record at
7  5:27.
8       (Recess taken.)
9       THE VIDEOGRAPHER: We're back on the record at
10  5:36.
11  BY MR. CORRALES:
12  Q.  Okay.  Mr. Dixie, did you have an opportunity
13  to speak with your attorney during the break?
14  A.  Yeah.
15  Q.  Okay.  And are you prepared to answer my
16  question?
17  A.  Hum?
18  Q.  Are you prepared to answer my question?
19  A.  Yeah.
20  Q.  Okay.  Before the break, the first break that
21  we had, you testified in the deposition that the
22  signature that appears on Exhibit Number 34 was your
23  signature.  After we took a break and you consulted with
24  your attorney, you then said that is not your signature.
25       So my question is:  Are you changing your

Page 217

1  testimony?
2  A.  It appears not to be my signature.
3  Q.  That's not the question.  Move to strike.
4       Are you changing your testimony, yes or no?
5  A.  No.
6       MR. CORRALES: Okay.  Those are all the
7  questions I have.
8       FURTHER EXAMINATION
9  BY MR. McCONNELL:
10  Q.  Mr. Dixie, I know this has been a long day, but
11  again turning to Exhibits 33 and 34, both of these
12  documents purporting to show your resignation, the two
13  signatures or Exhibit 33 and 34, did you write those
14  signatures?
15  A.  It appears.
16  Q.  Exhibit 33, is that a signature that you
17  believe you wrote on Exhibit 33?
18  A.  Uh-huh.
19  Q.  You believe that's your signature?
20  A.  Umm, I don't — umm, they're pretty close.
21  Q.  This is the document indicating on Tuesday,
22  April 20th, 1999, that you are resigning as chairperson.
23  Do you believe that you wrote the signature on
24  Exhibit 33 resigning as chairperson?
25  A.  I don't remember on that one.

Page 218

1  Q.  On Exhibit 34 --
2  A.  Okay.  Yeah.  Yeah.
3  Q.  Okay.  Yeah.  This is or is not your signature?
4       MR. CORRALES:  I'll object to the question.
5       THE WITNESS:  It is.
6  BY MR. McCONNELL:
7  Q.  You think it is?
8  A.  Yeah.
9  Q.  And on Exhibit 34, do you think that's your
10  signature?  Again, this is --
11  A.  Yes.
12  Q.  -- accepting the resignation of chairperson?
13  A.  Uh-huh.
14  Q.  And did you resign as chairperson of the Miwok
15  Sheep Ranch Tribe?
16  A.  Yeah.  Yes.
17  Q.  You did.  Were you able to resign as
18  chairperson?
19  A.  Yeah.
20       MR. McCONNELL:  No further questions.
21       MR. CORRALES:  Any stipulations?  Same
22  stipulations as last time?
23       MR. McCONNELL:  Okay.  Thank you.
24       MR. CORRALES:  Thank you, Mr. Dixie.
25       THE REPORTER:  Counsel, do you want this

Page 219

1  transcribed, I take it?
2       MR. CORRALES:  Yes, we do want it transcribed.
3       THE REPORTER:  Counsel, do you want a copy?
4       MR. McCONNELL:  Sure.
5       THE REPORTER:  How about this morning's
6  depositions, do you want any copies?
7       MR. HOUSTON:  Of this?  Not of this at this
8  point.  The deposition from this morning is continued
9  until tomorrow.
10       THE VIDEOGRAPHER:  We're off the record at
11  5:40.  This is the end of Disk Number 2 of today's
12  proceedings.
13       (Time noted:  5:40 p.m.)
14
15                    _____
16       YAKIMA KENNETH DIXIE
17       --oOo--
18
19
20
21
22
23
24
25

Deposition of Yakima Kenneth Dixie, Volume II   CA. VALLEY MIWOK TRIBE vs. CA. GAMBLING CONTROL COMMISSION

Page 220

```
 1  State of California    )
                          )ss.
 2  County of Placer       )

 3

 4        I, Mary Bardellini, Certified Shorthand
 5  Reporter No. 2976, State of California, do hereby
 6  certify:
 7        That said proceedings were taken at the time
 8  and place therein named and were reported by me in
 9  shorthand and transcribed by means of computer-aided
10  transcription, and that the foregoing 98 pages is a
11  full, complete, and true record of said proceedings.
12        And I further certify that I am a disinterested
13  person and am in no way interested in the outcome of
14  said action, or connected with or related to any of the
15  parties in said action, or to their respective counsel.
16        The dismantling, unsealing, or unbinding of the
17  original transcript will render the reporter's
18  certificate null and void.
19        IN WITNESS WHEREOF, I have hereunto set my hand
20  this _____ day of February 2012.
21
22
23        MARY BARDELLINI, CSR No. 2976
24
25
```

Law Office of
# MARY T. WYNNE, *Legal and Judicial Services*

Post Office Box 1218
212 Second Avenue North
Okanogan, WA 98840
Phone (509) 422-6267
Fax (509) 422-6268

Delivered Via fax on 7/7/99

*July 7, 1999*

Bureau of Indian Affairs Superintendent
Central California Agency
1824 Tribute Road, Suite J
Sacramento, CA 95815-4308

RE: Historical Copy of the file of the Sheep Ranch Tribe of Me-Wuk Indians

Dear Superintendent:

    The Sheep Ranch Band of Me-Wuk Indians have a regular General Council Meeting scheduled for the 10th day of July, 1999. On the agenda are issues that require a full and complete historical file of that Tribe, including all resolutions or other votes taken by either the membership of any governing body of the Tribe, the minutes of each meeting where any vote was taken, copies of actual ballots where available, any and all contracts signed by or on behalf of the Tribe and any other correspondence or records on file with the BIA at the Agency or Regional Offices. Also on the agenda is Brian Golding, who has agreed to assist the Tribe in its efforts regarding these matters.

    As Vice President of the Sheep Ranch Band of Me-Wuk Indians General Council and as a member of that Tribe, I am requesting that the BIA assist the Tribe in it's efforts to conduct its Tribal business. In or to assist the Tribe in reaching its goal of self governance and organization, please send the complete file described above with Mr. Golding for delivery to the Tribal Chairperson, Silvia Burley, by July 10, 1999.

    Should there be any questions regarding this request, please feel free to contact Mary T. Wynne, who is acting as a legal consultant for the Sheep Ranch Tribe.

Sincerely,

32.1

EXHIBIT
32
2-7-12

Yakima Dixie, Vice Chairperson,
Signed by Mary T. Wynne
*Attorney at Law- WSBA 12441*
*Appointed representative by*
*Power of Attorney and Oral*
*request of Yakima Dixie*
*(See attached Power of Attorney)*

*cc: file, Reisling, Silvia, Charles, Yakima*

*Enclosure: 1*

322

# Sheep Ranch Tribe of Me-Wuk Indians

## Formal notice of resignation

*I Yakima K. Dixie being of sound mind and body on this date of Tuesday April 20th, 1999, am resigning as Chairperson of the Sheep Ranch Tribe of Me-Wuk Indians  Sheep Ranch, California. This written document shall serve as a formal notice within the Tribe and to the United States Government and/or any other powers that may be.*

Signed _Yakima Kenneth Dixie_

**YAKIMA K. DIXIE**

Cc: Mr. Yakima K. Dixie
11178 School Road
P.O. BOX 41
Sheep Ranch, CA 95250
(209) 728-8625



# GENERAL COUNCIL GOVERNING BODY OF
# THE SHEEP RANCH TRIBE OF ME-WUK INDIANS

**RE:** *Chairperson*

*SPECIAL MEETING CALLED TO ORDER ON THE 20*[TH] *OF APRIL 1999.*

**Time Beginning:** 12:00 NOON

*The General Council as the Governing Body of the Sheep Ranch Tribe of Me-Wuk Indians has agreed to accept the resignation of Chairperson from Mr. Yakima K. Dixie.*
*The General Council has appointed Silvia Burley as Chairperson.*

Signed _____
              **Yakima K. Dixie (Chairperson)**
              **Sheep Ranch Tribe of Me-Wuk Indians**

Signed _____
              **Silvia Burley (Secretary/Treasurer)**
              **Sheep Ranch Tribe of Me-Wuk Indians**

Signed _____
              **Rashel K. Reznor (Tribal Member)**
              **Sheep Ranch Tribe of Me-Wuk Indians**

**RESOLVED:** *That the General Council is in agreement to the acceptance of the resignation of Mr. Yakima K. Dixie as Chairperson and has officially appointed Silvia Burley as Chairperson of the Sheep Ranch Tribe of Me-Wuk Indians, now, therefore be it.*

This Special Meeting is now adjourned.

**Time Ending:** 12:30 PM

EXHIBIT Dixie
34
2-7-12
FENGAD 800-631-6989

# GENERAL COUNCIL GOVERNING BODY
### OF THE
## SHEEP RANCH TRIBE OF ME-WUK INDIANS

# GENERAL COUNCIL MEETING:

There will be a meeting of all voting members of the Sheep Ranch Tribe of Me-Wuk Indians on the 8th day of May, 1999, at the Sheep Ranch Rancheria, starting at 2 pm and continuing until all the below agenda items are finished:

√RATIFICATION OF CONSTITUTION;
√ORGANIZATION OF PROVISIONAL GOVERNMENT;
√ELECTION OF OFFICERS;
√DEVELOPMENT AGREEMENT;
√SELECTION OF ATTORNEY & CONTRACT APPROVAL

### CERTIFICATION OF NOTICE

I certify by my signature below that I have received actual notice of the above meeting all agenda items a minimum of one week prior to attending the meeting and waive any objection to any notice requirements through my attendance and participation in the meeting:

Yakima R Dixie     5-8-99

Silvia Burley   5-8-99

Rashel Reznor   5-8-99



EXHIBIT Dixie
35
2-7-12

# DEVELOPMENT AGREEMENT

**THIS AGREEMENT** is made and entered into this _30_ day of _Apr. 1_, 1999 by and between the Sheep Ranch Tribe of Me-Wuk Indians, a Federally recognized Indian Tribe, hereinafter referred to as "Tribe," acting by and through its duly authorized Officers, who hereby certify and represent that they are empowered to so act, and BBC Entertainment, Inc,. A Minnesota corporation, with a business address of P.O. Box 21, Mission, SD, 57555 hereinafter referred to as "BBC" and/or "Developer."

**WHEREAS**, the Tribe desires to acquire land for a tribal land base and to establish physical boundaries of its closed reservation and development of a Gaming Project;

**WHEREAS**, the Tribe desires to establish an Enterprise for development and gaming purposes to provide income, training, employment, and the betterment of life for the people of the Tribe; and

**WHEREAS**, Developer has the expertise, experience, resources, and personnel who are experienced in the various fields required; and

**WHEREAS**, Developer desires to provide for the Tribe certain required , legal infrastructure, resources and financing in order to acquire a site for a gaming facility on tribal land, and for other purposes; and

**WHEREAS**, the Tribe desires to engage the Developer to perform the services and provide the necessary resources for the development and construction of a gaming facility in return for the payment of the development fee specified herein, and to provide the Enterprise financing for the same; and

**WHEREAS**, the Tribe is a sovereign entity, as that term is defined by the laws and Courts of this nation and will do nothing to diminish that sovereignty, but realizes that the investment of the substantial amounts of funds contemplated by this Agreement requires that the rights and interests of those who provide such funds need to be protected; and

36.1



EXHIBIT
36  Dixie
27-12

IN WITNESS THEREOF, this Agreement was signed, sealed and entered into the day and year above first written, in duplicate originals by the undersigned parties who represent and warrant that they have the authority so to do.

By: _Silvia Burley_   By: _Rashel K. Reznor_
SILVIA BURLEY           RASHEL K. REZNOR
Its: CHAIRPERSON OF THE   Its: TRIBAL MEMBER
GENERAL COUNCIL

By: _Yakima Dixie_
YAKIMA DIXIE
Its: TRIBAL MEMBER

BBC ENTERTAINMENT, INC.

By: _____
Charles C. Colombe
Its: PRESIDENT

By: _____

Its: SECRETARY

DEVELOPMENT AGREEMENT

Page 15 of 15

Mary T. Wynne, Attorney at Law
P.O. Box 1218      Tel 509.422.6267
Okanogan, WA 98840  Fax 509.422.6268

36.15

1  canceled without any reimbursement to the *Developer* of any project development

2  expenses accrued to date. Should a dispute regarding the existence of fault arise,

3  then this dispute shall be submitted to arbitration pursuant to Section E, Other

4  Provisions, paragraph 5, of this Agreement.

5      Further, it is understood between below signed parties that any actions taken

6  pursuant to the authority granted by this Addendum shall only be taken upon written

7  notice to all parties.

8

9      Executed on this _23_ day of _July_, 1999 at

10  _Sheep Ranch_ (City), _Calaveras County_ (County),

11  _California_ (State).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  ADDENDUM TO DEVELOPMENT AGREEMENT

28

MARY T WYNNE
ATTORNEY AT LAW
FOR FIRM
213 5th AVE. N., SUITE # 3
GRASSPORT, WA 98200
(509) 400-0007
(509) 400-0008 (FAX)

- 2 -

3b.17



# United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
Central California Agency
1824 Tribute Road, Suite J
Sacramento, CA 95815-4308

IN REPLY REFER TO:

**MAR - 7 2000**

Silvia Burley, Chairperson
Sheep Ranch Rancheria
1055 Winter Court
Tracy, California 95376

Dear Ms. Burley:

The purpose of this correspondence is to provide you with a summary of the discussion that occurred during a meeting on February 15, 2000, held at the Central California Agency (Agency), with Yakima Dixie, Vice-Chairperson of the Sheep Ranch Rancheria (Tribe), his brother Melvin Dixie, and other interested parties. The summary responds to the concerns you expressed in your letter dated February 15, 2000. We also respond to your requests expressed in your letter dated February 24, 2000.

<u>The Meeting of February 15, 2000</u>

At the request of Yakima Dixie, Vice-Chairperson, which he made during a meeting at the Agency with him and other interested parties on December 28, 1999, we scheduled a meeting to be held at the Agency on February 15, 2000. As explained in our February 4, 2000, letters to you and to Mr. Dixie, the purpose of that meeting was to discuss the issues raised in those letters, as well as steps the Tribe may take to resolve this matter internally. Mr. Dixie also requested that only members of the General Council and one non-attorney representative for each side participate in that meeting. We understood Mr. Dixie's request as a desire to ensure a free exchange of ideas among those persons comprising the body possessing authority to decide the issues.

By letters dated February 9, 2000, you informed the Agency that the Tribe concluded that the February 15, 2000, meeting was inconsistent with Tribal management of its own affairs. On that basis, you and Rashel Reznor declined to participate in that meeting.

On February 15, 2000, we informed Yakima Dixie, his brother Melvin Dixie, and other interested parties, of the decision of Rashel Reznor and you not to participate in the scheduled meeting. However, Yakima Dixie requested a brief meeting with us to address general questions arising from our February 4, 2000, letter to him. We agreed to meet for that limited purpose. The following is a summary of the ensuing discussion.

At the outset of the meeting, we reiterated to the parties present the Agency's position that the issues raised in our letter of February 4, 2000, are internal matters. As such, the parties present needed to seek redress within the appropriate Tribal forum empowered to process and decide such issues. We also reiterated our view, notwithstanding a Tribal decision to the contrary, that the appropriate Tribal forum is the General Council. At present, we view, again notwithstanding

37.1



EXHIBIT
37
2-7-12

CMVT - 01561

a Tribal decision to the contrary, the General Council as comprised of Yakima Dixie, Rashel Reznor, and you. The rights of Melvin Dixie, Rocky McKay, and other interested parties, to participate in the governance of the Tribe are to be determined by the appropriate Tribal forum, and are further discussed below.

### Your Membership Status

The discussion then turned to the assertion by Yakima Dixie that his act of August 5, 1998, to accept Rashel Reznor, Anjelica Paulk, Tristian Wallace, and you, as enrolled members of the Tribe was a limited enrollment. He explained that he intended only to grant to the four of you such membership rights necessary to qualify the four of you for services offered by the Bureau of Indian Affairs to members of federally recognized tribes. Yakima Dixie stated that his intent was consistent with the context in which you originally approached him, seeking a means of obtaining additional assistance after such assistance previously provided to you by the Jackson Rancheria was discontinued. As evidence of his position, Yakima Dixie produced videotape of a meeting held at Yakima Dixie's residence on or about October 18, 1998, at which representatives from the Agency and the California Indian Legal Services were present. We viewed a portion of the videotape documenting a discussion of your potential eligibility as a member of the Tribe to receive scholarship, housing, and other assistance. Afterward, we expressed our view that it was unlikely that the Tribe would find such a limitation on your enrollment expressed in the videotape. Further, we pointed out the fact, as stated in our letter of February 4, 2000, that the documents signed by Yakima Dixie to effect your enrollment expressed no such limitation. Moreover, we explained that Yakima Dixie's subsequent actions tended to establish the contrary view that you possess full rights of membership, since Mr. Dixie only objected to your participation in the deliberations of the decision-making body of the Tribe many months after the transition in leadership.

### Allegations of Fraud or Misconduct

The discussion then turned to the allegations of fraud or misconduct relative to the change in Tribal leadership during April and May 1999. Yakima Dixie asked what action we were going to take. We explained that there was no action for the Agency to take, consistent with our position as expressed in our letter of February 4, 2000, that the allegations are issues properly decided within the appropriate Tribal forum. Thus, we explained, in light of federal law and policy, there was no basis for Agency involvement, since this situation is a dispute of an internal nature.

### Your Decision Not to Participate in the Meeting

Yakima Dixie then asked why you and Rashel Reznor did not attend the meeting, and whether we were going to do something about your lack of participation. We explained that attendance at the meeting was not mandatory. Our reasons for fulfilling Mr. Dixie's request were threefold. First, we believed fulfilling the request was appropriate to provide a safe neutral location for the meeting. Second, by hosting a meeting at the Agency, we would assure our availability to answer general questions regarding steps the Tribe may take to resolve this matter internally. Third, we believed the meeting would assure a free exchange of ideas among the persons comprising the body possessing authority to decide the issues. However, we believed that requiring the mandatory participation of the parties would likely be viewed as an intrusion into an internal matter of the Tribe.

37.2

CMVT - 01562

We also discussed your letter to Yakima Dixie, dated February 9, 2000, wherein you informed Mr. Dixie of the Tribe's decision to extend to him a thirty-day period within which to raise his concerns and present his issues to the Tribe. We reiterated to Mr. Dixie of our position that, where issues are internal in nature, their resolution must be sought within the appropriate Tribal forum. In light of your letter and consistent with our position, we suggested that Mr. Dixie send to the Tribe a letter stating his claims and requesting a hearing. Moreover, we recommended Mr. Dixie provide the Tribe with notice of that address where he expected delivery of notices of Tribal meetings and other correspondence to occur. We also suggested that Mr. Dixie inform the Tribe of any circumstances which may limit his ability to participate in Tribal affairs, such as a lack of access to transportation or an inability to pay out-of-pocket costs of transportation. If Mr. Dixie believes such circumstances exist, he should request financial assistance from the Tribe or suggest alternatives he believes may reduce or eliminate potential barriers to his participation in Tribal affairs. We also suggested that Mr. Dixie provide the Agency with a courtesy copy of such a notice. To date, no such courtesy copy has been received at the Agency.

### Ability of Rocky McKay to Participate

During the meeting, Rocky McKay presented us with an original affidavit from his mother, Wanda Lewis, wherein she states that Yakima Dixie is the true father of Mr. McKay. We briefly reviewed the document. We then expressed our view that Mr. McKay may be entitled to participate in the organization of the Tribe, if he can establish that he is a lineal descendant of Yakima Dixie, one of the heirs now living listed in the Order of Determination of Heirs issued on November 1, 1971, as reaffirmed by subsequent Order issued on April 14, 1993. Further, we informed Mr. McKay that the subject of what evidence is acceptable for establishing his lineal descendancy is an internal matter to be determined by the Tribe. Thus, Mr. McKay's ability to participate in the organization of the Tribe also depends upon whether he can provide that type of evidence determined by the Tribe to be acceptable for purposes of establishing lineal descendancy.

We then recommended that Rocky McKay provide to the Tribe a written request to be enrolled as a member of the Tribe. We also recommended that Mr. McKay enclose with his request any documents and other evidence he believed to be acceptable for establishing his lineal descendancy.

By way of a letter dated February 25, 2000, we informed Rocky McKay that the Tribe would likely view the affidavit from Wanda Lewis as insufficient evidence of Yakima Dixie's paternity. In general, where the Bureau of Indian Affairs is performing enrollment functions, a valid affidavit from the purported father is acceptable evidence of paternity. However, as stated previously, the subject of what evidence is acceptable for establishing paternity is an internal matter to be determined by the Tribe. Thus, we recommended that Mr. McKay obtain from Yakima Dixie a notarized affidavit asserting his paternity. We also recommended that Mr. McKay seek an amendment to his birth certificate, since Yakima Dixie is not named therein as the father. We further recommended that Mr. McKay request financial and technical assistance from the Tribe in obtaining an affidavit or any other evidence the Tribe may determine to be necessary to establish his eligibility for enrollment and membership in the Tribe.

37.3

CMVT - 01563

4

In our February 25, 2000, letter to Rocky McKay, we expressed the view that the letter accompanying his correspondence dated November 22, 1999, from Yakima Dixie declaring his adoption of Mr. McKay as a member of the Tribe would likely be viewed by the Tribe as ineffective. Copies of these documents were faxed by the Agency to you on December 7, 1999. We also informed Mr. McKay that in general, only the Tribe, acting at a duly noticed, called, and convened meeting at which a quorum is present, is the proper body to consider and effect his enrollment in the Tribe.

### Ability of Melvin Dixie to Participate

Also during the February 15, 2000, meeting, we discussed the right of Melvin Dixie to participate in the organization of the Tribe. We advised Melvin Dixie that he is entitled to participate in the organization of the Tribe because he is one of the heirs now living listed in the Order of Determination of Heirs issued on November 1, 1971, as reaffirmed by subsequent Order issued on April 14, 1993. We then recommended Mr. Dixie provide to the Tribe written notice of his present address and telephone number, as the present leadership and administration of the Tribe must have such information in order to deliver proper and timely notice of Tribal meetings. We further advised Mr. Dixie to inform the Tribe of any circumstances which may limit his ability to participate in Tribal affairs, such as a lack of access to transportation or an inability to pay out-of-pocket costs of transportation. If Mr. Dixie believes such circumstances exist, he should request financial assistance from the Tribe or suggest alternatives he believes may reduce or eliminate potential barriers to his participation in Tribal affairs.

In connection with Melvin Dixie's right to participate in the organization of the Tribe, we expressed the view that he would likely be requested to provide to the Tribe proof of his identity. We explained that the subject of what evidence is acceptable for establishing identity is an internal matter to be determined by the Tribe. Therefore, we suggested that Mr. Dixie provide written notice to the Tribe of his assertion of entitlement to participate in the organization of the Tribe, and to enclose documents and other evidence he believed to be acceptable for establishing his identity.

In a subsequent letter dated February 25, 2000, we further recommended that Melvin Dixie request financial and technical assistance from the Tribe in obtaining any other evidence the Tribe might determine to be necessary.

In the aforementioned letter, we also discussed our views related to an affidavit by Melvin Dixie. The affidavit was received at the Agency on February 1, 2000. In the affidavit, among other assertions, Melvin Dixie stated that he is the father of a son. In our letter, we recommended that Melvin Dixie provide to the Tribe a written request that his son be enrolled as a member of the Tribe. We suggested Mr. Dixie enclose with his request a photocopy of the birth certificate or provide other evidence establishing that he is the father of his son. We further suggested that Mr. Dixie obtain, if not already in his possession, a certified copy of the birth certificate naming Mr. Dixie as the father of his son. Moreover, we recommended that Melvin Dixie, should he not be named in the birth certificate, complete an affidavit asserting his paternity of his son, and have the affidavit notarized. We also suggested that Melvin Dixie seek an amendment to the birth certificate if he is not named as the father in the birth certificate. We then recommended that Melvin Dixie request assistance from the Tribe in obtaining a certified birth certificate, an affidavit, or any other evidence the Tribe might determine to be necessary to establish his son's eligibility for enrollment and membership in the Tribe.

37.4

CMVT - 01564

### Your Letter of February 15, 2000

As for your concern expressed in your letter of February 15, 2000, that the meeting of the same day with Yakima and Melvin Dixie and other interested parties was improper, we assure you that the meeting was completely proper. First and foremost, we agreed to meet, at the request of an officer of the Tribe's governing body, for the limited purpose of addressing general questions arising from our letter of February 4, 2000. Moreover, we reiterated to the parties present our position as expressed in our letter of February 4, 2000, that these issues are internal matters to be considered and acted upon by the appropriate Tribal forum. Thus, we believe that our actions were consistent with our responsibility to provide technical assistance, and with established policies of non-interference, deference to Tribal decision-making, and respect for Tribal self-determination and sovereignty.

### Your Letter of February 24, 2000

In your letter of February 24, 2000, you requested copies of the "sworn affidavits" submitted to the Agency by Yakima Dixie "alleging fraud on the part of the Tribal Council and that Rocky McKay is his son." Unfortunately, we cannot fulfill your request, as no such documents by Mr. Dixie are maintained within the records of the Agency.

As to your statement that the Agency "refused" to provide the Tribe with information as to the address and location of Melvin Dixie, we have no record of a Tribal request for such information. Further, such information is contained in a system of records covered by the Privacy Act (5 USC § 552a). As such, we are unable to release this information to you without the express consent of Melvin Dixie. As stated above, we also suggested in our letter of February 25, 2000, that Mr. Dixie provide this information to the Tribe.

### Your Letter Postmarked February 2, 2000

As for your undated letter, postmarked February 2, 2000, requesting that we forward a letter to Yakima Dixie regarding the Regular Tribal Meeting scheduled for February 7, 2000, we were unable to fulfill your request. The letter was received at the Agency on Thursday afternoon, February 3, 2000. Even if the Agency, within a twenty-four hour period, had processed and forwarded the letter via overnight mail, the meeting day of Monday, February 7, 2000, would likely be the earliest Yakima Dixie would have received the letter. Thus, we return to you the enclosed sealed envelope addressed to Yakima Dixie.

### Conclusion

The issues surrounding the present leadership and membership of the Tribe are internal matters to be resolved within the appropriate Tribal forum. As a matter of policy, the Agency will not interfere in the internal matters of the Tribe. However, if in time a dispute regarding the composition of the governing body of the Tribe continues without resolution, the government-to-government relationship between the Tribe and the United States may be compromised. In such situations, the Agency will advise the Tribe to resolve the dispute internally within a reasonable period of time. The Agency will also inform the Tribe that its failure to do so may result in sanctions against the Tribe, up to and including the suspension of the government-to-government.

37.5

6

The Tribe, in the letter dated February 9, 2000, granted a thirty-day period of time to Yakima Dixie within which to raise his concerns and present his issues to the Tribe. This fact demonstrates that the Tribe is attempting to resolve this internal matter. We respectfully request that the Tribe inform us in writing of the action taken by the appropriate Tribal forum to resolve the dispute. We further request the Tribe's written response clearly explain what action was taken to resolve the dispute, the legal authority in Tribal law for the action, and the rationale for the action.

As always, Agency staff is available to the extent resources permit to provide the Tribe with technical assistance, upon your written request.

Should you have any questions with regard to this matter, please contact Mr. Raymond Fry, Tribal Operations Officer, at (916) 566-7124.

Sincerely,

Dale Risling, Sr.
Superintendent

Enclosure

37.6

CMVT - 01556

# EXHIBIT 9

06/06/2005  14:55 FAX 916 930 3780      BIA CENTRAL CAL AGENCY                    ⌀017

OCT 3 1 2001

Silvia F. Burley, Interim Chairperson
California Valley Miwok Tribe
1055 Winter Court
Tracy, California 95376

Dear Ms. Burley:

The purpose of this correspondence is to acknowledge receipt of a document entitled "Constitution of the California Valley Miwok Tribe, ratified March 6, 2000, by a vote of 2 in favor and 0 against, amended and corrected September 2001. The document appears to be an original document, bears the signatures of Silvia F. Burley, Chairperson, and Rashel K. Reznor, Secretary/Treasurer, and is dated March 6, 2000. The Agency received the document on October 22, 2001, acknowledged receipt and then forwarded it to the Branch of Tribal Operations for response.

We are uncertain of the reasons why the document was delivered to the Agency. No explanatory correspondence accompanied the document. The Agency cannot act on this document without a formal written request. However, a review of the Tribe's constitution file discloses that the Agency sent correspondence dated June 7, 2001, (copy enclosed) to you documenting a telephone conversation between you and a member of the Tribal Operations staff, Brian Golding, Sr., with regard to the "Petition to Withdraw." The petition withdraws the Tribe's request for a Secretarial election on the proposed constitution of March 6, 2000. Mr. Golding requested that you provide the Agency with a brief letter that expresses the Tribe's purpose in withdrawing the proposed constitution of March 6, 2000, as well as the intent of the Tribe to seek Secretarial approval of a proposed constitution. To date, the Agency has not received the requested letter.

According to Bureau records, the Sheep Ranch Rancheria, a federally recognized tribe, voted to accept the provisions of the Indian Reorganization Act of June 18, 1934 (Act), at a special election held June 12, 1935. Consequently, the Sheep Ranch Rancheria renamed as the California Valley Miwok Tribe as a result of the Tribe's request for a name change is subject to the provisions of the Act. Section 16 of the Act allows the Tribe to formally organize by adopting a constitution for Secretarial approval pursuant to the Act. Since the Tribal Council is charged with the moral and legislative responsibility of the Tribe, we urge the Tribal Council to abide by the will of the people of the Sheep Ranch Rancheria in the 1935 election and to comply with an act of Congress by seeking formal reorganization under the Indian Reorganization Act.

CVMT-2011-000261

06/06/2005 14:55 FAX 916 930 3780    BIA CENTRAL CAL AGENCY                    ☑018
Case 1:19-cv-00917-RCL   Document 1-6   Filed 04/01/19   Page 75 of 168
Case 1:05-cv-00739-JR   Document 9-15   Filed 06/13/05   Page 2 of 2

-2-

The Agency will continue to recognize the Tribe as an unorganized Tribe and its elected officials as an interim Tribal Council until the Tribe takes the necessary steps to complete the Secretarial election process. Agency staff is available to provide technical assistance in this matter upon receipt of the Tribe's written request. We are returning the original document to the Tribe without any action.

Please contact Raymond Fry, Tribal Operations Officer, at (916) 556-7124 should you require additional information pertaining to this matter.

                                   Sincerely,

                                   *Sgd. Dale Risling, Sr.*

                                   Dale Risling, Sr.
                                   Superintendent

Enclosures

cc:    3702-P5  California Valley Miwok Tribe FY 2002
       37102-T1 Tribal Operations Chron
       10102-T1 Superintendent Chron
       Blind Copy (Carol)

CBRogers-Davis:10/30/01

CVMT-2011-000262

# EXHIBIT 10



## United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

IN REPLY REFER TO

MAR ⁻ 4 2002

Silvia Burley, Chairperson
California Valley Miwok Tribe
1055 Winter Court
Tracy, California 95376

Dear Ms. Burley:

The purpose of this correspondence is to provide you with our recommendations regarding the Aid-to-Tribal Government program portion of the Tribe's FY 2002-2004 Self-Determination Contract Renewal Proposal, received at the Central California Agency (Agency) on December 7, 2001.

Through the Indian Self-Determination and Education Assistance Act (25 USC §450, et seq.), as amended, the Agency is to provide Tribes with technical assistance sufficient to assist Tribes with contracting. One aspect of such assistance is to provide Tribes with feedback intended to assure that a Tribe's contractual responsibilities under the Aid-to-Tribal Government program are appropriate given the particular development situation the Tribe faces at the time of contract execution. The relationship between contractual responsibilities and particular development situations is represented under the contract through the program standards. A Tribe proposes the program standards it desires to be bound by in its contract proposal, the requirements for which are set out at Title 25 of the Code of Federal Regulations, Part 900 (25 CFR § 900), Subpart C - Contract Proposal Contents. Agency staff reviews the Tribe's proposal in accordance with 25 CFR § 900, Subpart D - Review and Approval of Contract Proposals, and Subpart E - Declination Procedures.

During this review process, Agency staff may suggest to the Tribe informal recommendations intended to reflect the particular development situation of the Tribe, from the perspective of the Agency. Such recommendations generally are based upon the Agency's knowledge of and familiarity with past and present efforts of Tribes under the Agency's jurisdiction to enhance and improve their particular development situation. These recommendations also reflect the Agency's perspective that Tribal sovereignty is preserved through the establishment of appropriate and effective Tribal laws and the wise exercise of those authorities and powers resulting from such sovereignty. The primary law of the Tribe, as embodied in a constitution, and secondary laws such as ordinances dealing with enrollment, elections, assignment, land use, environmental protection, taxation, and economic development, serve as a conduit through which a Tribe's inherent sovereignty is expressed and exercised. The adoption of relevant and appropriate rules, regulations, policies, and procedures further express a Tribe's inherent sovereignty.

The Tribe, in its FY 2002-2004 Contract Renewal Proposal, did not propose any Aid-to-Tribal Government program standards that it desires to be bound by under the proposed contract. In developing appropriate program standards, the Agency strongly recommends that the Tribe

CVMT-2011-000289

complete the reorganization process contemplated by Section 16 of the Indian Reorganization Act (25 USC §476). All efforts of the Tribe during this critical time in the Tribe's governmental development should be focused on obtaining Secretarial approval of an appropriate Tribal constitution. Development of both an enrollment ordinance and an election ordinance, together with related policies and procedures, are also of great importance at this time. Therefore, for the Tribe's consideration, the Agency proposes the following program standards:

(A) **Aid To Tribal Government**
   (i)    **Enrollment Services:**
       (a)   The Contractor, in accordance with an effective constitution and other relevant laws, regulations, policies, and procedures, shall:
          (i)    maintain the membership roll;
          (ii)   process all enrollment appeals to assure due process and equal protection of individual rights;
          (iii)  perform all activities related to the certification of degree of Indian blood and of lineal descent of prospective members, necessary for Tribal determination of eligibility for Tribal enrollment and membership;
          (iv)  prepare Certifications of Degree of Indian Blood, Certificates of Enrollment, Membership Cards, and other such documents for Tribal members;
          (v)   update the Eligible Voters List.

   (ii)   **Tribal Enactments:**
       (a)   The Contractor shall develop an appropriate constitution, and submit such constitution to the BIA requesting Secretarial approval, by the expiration date of the FY 2002 Annual Funding Agreement.
       (b)   The Contractor shall develop, revise, implement, and maintain Tribal ordinances, resolutions, regulations, policies and procedures, as necessary, in accordance with an effective constitution and other relevant Tribal laws, regulations, policies, and procedures.

   (iv)  **Tribal Governance:**
       (a)   The Contractor, in accordance with an effective constitution and other relevant laws, regulations, policies, and procedures, shall:
          (i)    conduct Tribal elections, and submit a completed Report of Tribal Election Form to the Agency within a reasonable time after the election;
          (ii)   process election appeals, to assure due process and equal protection of individual rights;
          (iii)  conduct meetings of the Tribe's governing body;
          (iv)  respond to requests for information from Indian people served or represented by the Contractor, in compliance with Section 5(c) of the Indian Self-Determination Act (25 USC §450c), as amended;

(v)    obtain legal services as necessary for, but not limited to, the development of Tribal enactments and the review of proposed Tribal actions, and shall obtain Secretarial approval of all attorney contracts, if required by Tribal law.

**(v)   Labor Force Reports:**

    (a)   The Contractor shall compile and maintain the necessary statistical data for preparation of Labor Force Reports every two years, beginning with the report for the period ending December 31, 2003, and submit such reports to the Bureau of Indian Affairs, Central California Agency, within established timeframes.

**(vi)  Tribal Administration:**

    (a)   The Contractor shall conduct all aspects of program administration, including but not limited to:

        (i)    administrative decision making consistent with applicable Federal and Tribal laws, regulations, policies, and procedures;

        (ii)   development and maintenance of Tribal program policies and procedures;

        (iii)  program planning, organization, implementation, monitoring, and evaluation;

        (iv)  financial, personnel, and property management;

        (v)   development and maintenance of recordkeeping systems and databases necessary for the preparation of reports.

**(vii) Training and Technical Assistance:**

    (a)   The Contractor shall obtain training and technical assistance, pertaining to the programs, functions, services, and activities contracted herein, from third-party vendors, consistent with Tribal laws, regulations, policies, and procedures.

    (b)   The Secretary shall provide training and technical assistance to the Tribe, upon the Tribe's written request and subject to the availability of resources, relative to the development, adoption, and approval of Tribal enactments when mandated by Federal or Tribal law.

We cannot emphasize enough how critical it is to continue Tribal efforts to complete the reorganization process contemplated by Section 16 of the Indian Reorganization Act (25 USC §476), and to develop and enact key ordinances. With this in mind, please review our recommendations, and provide us with a response within fifteen (15) days, advising us of the Tribe's decision relative to our recommendations. Our recommendations do not constitute our intent to decline to renew its contract with the Tribe, at this time.

In addition, pursuant to 25 CFR § 900.17, Subpart D - Review and Approval of Contract Proposals, we respectfully request the Tribe's voluntary and express written consent to a sixty-day extension of the ninety-day period established by Section 102 of the Indian Self-Determination Act (25 USC §450f) for Agency action on the Tribe's contract renewal proposal. We deem this request as justified in light of the Agency's recent move to 650 Capitol Mall, the lack of program standards in the Tribe's contract renewal proposal, and the additional time necessary to negotiate the terms of a renewed contract.

We would appreciate the Tribe's favorable response to our extension request. Should the Tribe agree to our request, please provide the Agency with a writing stating such agreement. Further, in the interest of conserving time, please submit such writing to the Agency via facsimile at (916) 930-3780.

We commend the Tribe on its efforts to develop a strong government through the development of appropriate Tribal laws. In the interest of furthering the development and capacity-building activities of the Tribe, I extend the assistance of my staff, upon your written request.

Should you have any questions with regard to this matter, please contact Mr. Raymond Fry, Tribal Operations Officer, at (916) 566-7124.

Sincerely,

*Sgd. Dale Risling, Sr.*

Dale Risling, Sr.
Superintendent

cc:     Sunshine Jordan, Self-Determination Specialist

EXHIBIT 11



# United States Department of the Interior

### BUREAU OF INDIAN AFFAIRS
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

IN REPLY REFER TO

## MAR 26 2004

Certified Mail No. 7003 1680 0002 3896 9127
Return Receipt Requested

Ms. Sylvia Burley, Chairperson
California Valley Miwok Tribe
10601 Escondido Pl.
Stockton, California 95121

Dear Ms. Burley:

This letter acknowledges our February 11, 2004, receipt of a document represented to be the tribal constitution for the California Valley Miwok Tribe. It is our understanding that the Tribe has shared this tribal constitution with the Bureau of Indian Affairs (BIA) in an attempt to demonstrate that it is an "organized" tribe. Regretfully, we must disagree that such a demonstration is made.

Although the Tribe has not requested any assistance or comments from this office in response to your document, we provide the following observations for your consideration. As you know, the BIA's Central California Agency (CCA) has a responsibility to develop and maintain a government-to-government relationship with each of the 54 federally recognized tribes situated within CCA's jurisdiction. This relationship, includes among other things, the responsibility of working with the person or persons from each tribe who either are rightfully elected to a position of authority within the tribe or who otherwise occupy a position of authority within an unorganized tribe. To that end, the BIA has recognized you, as a person of authority within the California Valley Miwok Tribe. However, the BIA does not yet view your tribe to be an "organized" Indian Tribe and this view is borne out not only by the document that you have presented as the tribe's constitution but additionally, by our relations over the last several decades with members of the tribal community in and around Sheep Ranch Rancheria.( Let me emphasize that being an organized vis-à-vis unorganized tribe ordinarily will not impact either your tribe's day-to-day operations but could impact your tribe's continued eligibility for certain grants and services from the United States).

Where a tribe that has not previously organized seeks to do so, BIA also has a responsibility to determine that the organizational efforts reflect the involvement of the whole tribal community. We have not seen evidence that such general involvement was

Page 2 of 4

attempted or has occurred with the purported organization of your tribe. For example, we have not been made aware of any efforts to reach out to the Indian communities in and around the Sheep Ranch Rancheria, or to persons who have maintained any cultural contact with Sheep Ranch. To our knowledge, the only persons of Indian descent involved in the tribe's organization efforts, were you and your two daughters. We are unaware of any efforts to involve Yakima Dixie or Mr. Dixie's brother Melvin Dixie or any offspring of Merle Butler, Tillie Jeff or Lenny Jeff, all persons who are known to have resided at Sheep Ranch Rancheria at various times in the past 75 years and persons who have inherited an interest in the Rancheria. We are also not aware of any efforts to involve Indians( such as Lena Shelton) and their descendents who once lived adjacent to Sheep Ranch Rancheria or to investigate the possibility of involving a neighboring group. We are aware that the Indians of Sheep Ranch Rancheria were in fact, part of a larger group of Indians residing less then 20 miles away at West Point. Indeed, at your February 23, 2004 deposition, you yourself testified you were at one time of the West Point Indian Community; we understand as well, that you had siblings residing there for many years. The BIA remains available, upon your request, to assist you in identifying the members of the local Indian community, to assist in disseminating both individual and pubic notices, facilitating meetings, and otherwise providing logistical support.

It is only after the greater tribal community is initially identified that governing documents should be drafted and the Tribe's base and membership criteria identified. The participation of the greater tribal community is essential to this effort. We are very concerned about the designated "base roll" for the tribe as identified in the submitted tribal constitution; this "base roll" contains only the names of five living members all but one whom were born between 1960 and 1996, and therefore would imply that there was never any tribal community in and around Sheep Ranch Rancheria until you met with Yakima Dixie, asking for his assistance to admit you as a member. The base roll, thus, suggests that this tribe did not exist until the 1990's, with the exception of Yakima Dixie. However, BIA's records indicate with the exception not withstanding, otherwise.

Base membership rolls are used to establish a tribe's cohesiveness and community at a point in time in history. They would normally contain the names of individuals listed on historical documents which confirm Native American tribal relationships in a specific geographical region. Since tribes and bands themselves did not usually possess such historical documents, therefore, tribal base rolls have included persons listed on old census rolls, Indian Agency rolls, voters rolls, etc. Our experience with your sister Miwok tribes (e.g., Shingle Springs Rancheria, Tuolumne Rancheria, Ione Band, etcetera) leads us to believe that Miwok tradition favors base rolls identifying persons found in Miwok tribes stretching from Amador County in the North to Calavaras and Mariposa Counties in the South. The Base and Enrollment criteria for these tribes vary; for example, Amador County tribes use the 1915 Miwok Indian Census of Amador County, El Dorado County tribes utilize the 1916 Indian Census Roll, tribe(s) in Tuolumne County utilize a 1934 IRA voters' list. The base roll typically constitutes the

Page 3 of 4

cornerstone of tribal membership and based upon our experience, has been the basic starting point and foundation for each of the Miwok tribes in our jurisdiction, i.e., the Ione Band of Miwok Indians, Shingle Springs Rancheria and Tuolumne Rancheria.

We must continue to emphasis the importance of the participation of a greater tribal community in determining membership criteria. We reiterate our continued availability and willingness to assist you in this process and that via PL 93-638 contracts intended to facilitate the organization or reorganization of the tribal community, we have already extended assistance. We urge you to continue the work that you have begun towards formal organization of the California Valley Miwok Tribe.

If we can assist your efforts in any way, please contact Raymond Fry, Manager, Tribal Services, at (916) 930-3794.

Should you wish to appeal any portion of this letter, you are advised that you may do so by complying with the following:

This decision may be appealed to the Regional Director, Pacific Regional Office, Bureau of Indian Affairs, 2800 Cottage Way, Sacramento, California 95825. In accordance with the regulations in 25 CFR Part 2 (copy enclosed). Your notice of appeal must be filed in this office within 30 days of the date you receive this decision. The date of filing or notice is the date it is post marked or the date it is personally delivered to this office. Your notice of appeal must include your name, address and telephone number. It should clearly identify the decision to be appealed. If possible attach a copy of the decision. The notice of and the envelope which it is mailed, should be clearly labeled "NOTICE OF APPEAL." The notice of appeal must list the names and addresses of the interested parties known to you and certify that you have sent them copies of the notice.

You must also send a copy of your notice to the Regional Director, at the address given above.

If you are not represented by an attorney, you may request assistance from this office in the preparation of your appeal.

Page 4 of 4

If no timely appeal is filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extension of time may be granted for filing a notice of appeal.

Sincerely,

*Dale Risling, Sr.*

Dale Risling, Sr.
Superintendent

CC: Pacific Regional Director
    Debora Luther, Assistant US Attorney
    Myra Spicker, Deputy Solicitor
    Yakima Dixie-Tribal Member

# EXHIBIT 12



# United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

**AUG 3 1 2011**

Ms. Silvia Burley
10601 N. Escondido Place
Stockton, California 95212

Mr. Yakima Dixie
1231 E. Hazelton Avenue
Stockton, California 95295

Dear Ms. Burley and Mr. Dixie:

**Introduction and Decision**

On December 22, 2010, I sent you a letter setting out my decision in response to a question referred to me by the Interior Board of Indian Appeals (IBIA) in *California Valley Miwok Tribe v. Pacific Regional Director, Bureau of Indian Affairs*, 51 IBIA 103 (January 28, 2010) (IBIA decision). I determined that there was "no need for the BIA to continue its previous efforts to organize the Tribe's government, because it is organized as a General Council, pursuant to the [1998 General Council Resolution] it adopted at the suggestion of the BIA." I concluded further that there was "no need for the BIA to continue its previous efforts to ensure that the Tribe confers tribal citizenship upon other individual Miwok Indians in the surrounding area."

I issued my December decision without providing the parties a formal opportunity to brief me on the facts and issues as they saw them. As a result of subsequent actions by both parties, I determined to withdraw the December decision, and, on April 8, 2011, I requested briefing from the parties. Counsel for the parties provided detailed responses with numerous exhibits. I appreciate the time and effort that went into providing these responses. I have considered them carefully.

Based on the litigation records in the prior Federal court actions in both California and Washington, D.C., the proceedings before the Department's Interior Board of Indian Appeals, and the material submitted in response to my April 8 letter, I now find the following:

    (1) The California Valley Miwok Tribe (CVMT) is a federally recognized tribe, and has been continuously recognized by the United States since at least 1916;

    (2) At the present date, the citizenship of the CVMT consists solely of Yakima Dixie, Silvia Burley, Rashel Reznor, Anjelica Paulk, and Tristian Wallace;

(3) The CVMT today operates under a General Council form of government, pursuant to Resolution #CG-98-01, which the CVMT passed in 1998, facilitated by representatives of the Bureau of Indian Affairs (Bureau or BIA)(1998 General Council Resolution);

(4) Pursuant to the 1998 General Council Resolution, the CVMT's General Council is vested with the governmental authority of the Tribe, and may conduct the full range of government-to-government relations with the United States;

(5) Although this current General Council form of government does not render CVMT an "organized" tribe under the Indian Reorganization Act (IRA) (see e.g., 25 U.S.C. 476(a) and (d)), as a federally recognized tribe it is not required "to organize" in accord with the procedures of the IRA (25 U.S.C. § 476(h));

(6) Under the IRA, as amended, it is impermissible for the Federal government to treat tribes not "organized" under the IRA differently from those "organized" under the IRA (25 U.S.C. §§ 476(f)-(h)); and

(7) As discussed in more detail below, with respect to finding (6), on this particular legal point, I specifically diverge with a key underlying rationale of past decisions by Department of the Interior (Department) officials dealing with CVMT matters, apparently beginning around 2004, and decide to pursue a different policy direction.[1]  Under the circumstances of this case, it is inappropriate to invoke the Secretary's broad authority to manage "all Indian affairs and [] all matters arising out of Indian relations," 25 U.S.C. § 2, or any other broad-based authority, to justify interfering with the CVMT's internal governance.  Such interference would run counter to the bedrock Federal Indian law principles of tribal sovereignty and tribal self-government, according to which the tribe, as a distinct political entity, may "manag[e] its own affairs and govern[] itself." *Cherokee Nation v. Georgia*, 30 U.S. 1, 16 (1832); and would conflict with this Administration's clear commitment to protect and honor tribal sovereignty.

Obviously, the December 2010 decision, and today's reaffirmation of that decision, mark a 180-degree change of course from positions defended by this Department in administrative and judicial proceedings over the past seven years.  This change is driven by a straightforward correction in the Department's understanding of the California Valley Miwok Tribe's citizenship and a different policy perspective on the Department's legal obligations in light of those facts.

As discussed below, the BIA clearly understood in 1998 that the acknowledged CVMT citizens had the right to exercise the Tribe's inherent sovereign power in a manner they chose.  It is unfortunate that soon after the 1998 General Council Resolution was enacted, an intra-tribal leadership dispute erupted, and both sides of the dispute found, at various points in time in the intervening years, that it served their respective interests to raise the theory that the BIA had a duty to protect the rights of approximately 250 "potential citizens" of the Tribe.  A focus on that theory has shaped the BIA's and the Department's position on the citizenship question ever

---

[1] I recognize that the D.C. Circuit Court of Appeals' 2008 opinion upholding prior Department efforts to organize the CVMT pursuant to the IRA afforded broad deference to the Department's prior decisions and interpretations of the law.  *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1264-68 (D.C. Cir. 2008).

CVMT-2011-002050

since. By contrast, today's decision clears away the misconceptions that these individuals have inchoate citizenship rights that the Secretary has a duty to protect. They do not. The Tribe is not comprised of both citizens and potential citizens. Rather, the five acknowledged citizens are the only citizens of the Tribe, and the General Council of the Tribe has the exclusive authority to determine the citizenship criteria for the Tribe. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 57 (1978). I believe this change in the Department's position is the most suitable means of resolving this decade-long dispute and is in accord with principles of administrative law. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005).

## Background

This decision is necessitated by a long and complex tribal leadership dispute that resulted in extensive administrative and judicial litigation. Much of the factual background is set out in the prior decisions, so it is not necessary to repeat or even summarize all of it here.

The history of this Tribe, and the record of this case to date, demonstrates the following:

- The CVMT is a federally recognized tribe, 74 Fed. Reg. 40,218. 40,219 (Aug. 11, 2009);
- In 1916, the United States purchased approximately 0.92 acres in Calaveras County, California, for the benefit of 12 named Indians living on the Sheepranch Rancheria (now Sheep Ranch)(Rancheria) (51 IBIA at 106);
- The Indian Agent, who in 1915 recommended the purchase of the 0.92 acres. described the group of 12 named individuals as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as 'Sheepranch.'" *Id.*;
- The record shows only one adult Indian lived on the Rancheria in 1935, a Jeff Davis, who voted "in favor of the IRA" *Id.*;
- In 1966, the record shows only one adult Indian. Mabel Hodge Dixie, Yakima Dixie's mother, lived on the Rancheria, when the BIA crafted a plan for distribution of tribal assets pursuant to the California Rancheria Act of 1958, Pub. L. No. 85-671, 72 Stat. 619, *as amended by* Act of Aug. 11, 1964. Pub. L. No. 88-419, 78 Stat. 390;
- Mabel Hodge Dixie was to be the sole distributee of tribal assets under the 1966 Rancheria distribution plan;
- While the Bureau initiated the process to terminate the Tribe, it never declared the Tribe terminated and has never treated the Tribe as if it had been terminated;
- In 1994, Yakima Dixie wrote the BIA asking for assistance with home repairs and describing himself as "the only descendant and recognized . . . member of the Tribe." (51 IBIA at 107);
- At some point during the 1990s, Silvia Burley "contacted BIA for information related to her Indian heritage, which BIA provided, and by 1998—at BIA's suggestion—Burley had contacted Yakima[]" Dixie (as the IBIA has noted. "it appears that Burley may trace her ancestry to a 'Jeff Davis' who was listed on the 1913 census. . . .") 51 IBIA at 107. including footnote 7:
- On August 5, 1998, Mr. Dixie "signed a statement accepting Burley as an enrolled member of the Tribe, and also enrolling Burley's two daughters and her granddaughter." *Id.*;

3

CVMT-2011-002051

- The Tribe was not organized pursuant to the IRA prior to 1998 and did not have organic documents setting out its form of government or criteria for tribal citizenship;
- In September of 1998, BIA staff met with Mr. Dixie and Ms. Burley "to discuss organizing the Tribe," and on September 24, 1998 sent follow-up correspondence recommending that, "given the small size of the Tribe, we recommend that the Tribe operate as a General Council," which could elect or appoint a chairperson and conduct business. *Id.* at 108;
- On November 5, 1998, Mr. Dixie and Ms. Burley signed a resolution establishing a General Council, which consisted of all adult citizens of the Tribe, to serve as the governing body of the Tribe. *Id.* at 109;
- Less than five months later, leadership disputes arose between Mr. Dixie and Ms. Burley—and those conflicts have continued to the present day;[2]
- Initially the BIA recognized Mr. Dixie as Chairman, but later recognized Ms. Burley as Chairperson based primarily upon the April 1999 General Council action appointing Ms. Burley as Chairperson - an action concurred in by Mr. Dixie. *Id.*;
- Mr. Dixie later challenged Ms. Burley's 1999 appointment;
- In 2002, Ms. Burley filed suit in the name of the Tribe alleging that the Department had breached its trust responsibility to the Tribe by distributing the assets of the Rancheria to a single individual, Mabel Dixie, when the Tribe had a potential citizenship of "nearly 250 people[.]" *See* Complaint for Injunctive and Declaratory Relief at 1, *Cal. Valley Miwok Tribe v. United States*, No. 02-0912 (E.D. Cal. Apr. 29, 2002);
- In March, 2004, the BIA Superintendent rejected a proposed constitution from Ms. Burley because she had not involved the "whole tribal community" in the governmental organization process;
- On February 11, 2005, the Acting Assistant Secretary – Indian Affairs issued a decision on Mr. Dixie's 1999 appeal, ruling that the appeal of the Bureau's 1999 decision to recognize Ms. Burley as Chairperson was moot and that the BIA would recognize Ms. Burley only as a person of authority within the Tribe;
- Ms. Burley sued in D.C. District Court challenging the February 2005 decision;
- After the District Court dismissed her challenge, *Cal. Valley Miwok Tribe v. United States*, 424 F.Supp. 2d 197 (D.D.C. 2006), the D. C. Circuit Court of Appeals affirmed, *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008);
- In January 2010, the IBIA rejected Ms. Burley's appeal objecting to, among other matters, the Superintendent's decision to continue to assist the Tribe in organizing its government according to the IRA because it viewed the matter as "effectively and functionally a tribal enrollment dispute," and then referred the matter to me on jurisdictional grounds.

In response to the Board's referral, I issued my December 22, 2010 decision letter. I intended that decision to resolve the citizenship question referred to me by the IBIA by finding that the current Tribe's citizenship consisted of the five acknowledged citizens noted above and recognizing the Tribe's General Council as a tribal government with which the United States may

---

[2] I note that the Department repeatedly has offered to assist in mediating this dispute—to no avail. The amount of time and resources focused on these disputes reflects poorly on all the parties, and they must be mindful that continuing this imprudent dispute risks potential adverse consequences well beyond the Tribe and its citizens.

4

CVMT-2011-002052

conduct government-to-government relations. Almost immediately, Mr. Dixie filed suit in the D.C. District Court challenging that decision. Recognizing the complex and fundamental nature of the underlying issues, and because I desired the benefit of submissions from the interested parties, I set aside that decision and requested formal briefing.

The submissions by the parties in response to my request were thorough. I have carefully reviewed the submissions and find they were most helpful in enhancing my understanding of the parties' positions.

## Analysis

It is clear to me that the heart of this matter is a misapprehension about the nature and extent of the Secretary's role, if any, in determining tribal citizenship of a very small, uniquely situated tribe. Related to this issue is the Tribe's current reluctance to "organize" itself under the IRA, choosing instead to avail itself of the provisions in 25 U.S.C. § 476(h), first enacted in 2004, which recognizes the inherent sovereign powers of tribes "to adopt governing documents under procedures other than those specified . . . [in the IRA.]"

*Applicability of General Legal Authorities of the Secretary of the Interior in Indian Affairs*

The D.C. Circuit viewed § 476(h) as ambiguous, and then granted *Chevron* deference to the then-Secretary's interpretation of that provision. 513 F.3d at 1266-68. The D.C Circuit put great weight on the Secretary's broad authority over Indian affairs under 25 U.S.C. § 2, writing that "[w]e have previously held that this extensive grant of authority gives the Secretary broad power to carry out the federal government's unique responsibilities with respect to Indians." *Id.* at 1267, *citations omitted.* In addition to § 2, 25 U.S.C. §§ 9, and 13, and 43 U.S.C. § 1457, are often cited as the main statutory bases for the Department's general authority in Indian affairs. *Cal. Valley Miwok Tribe v. United States*, 424 F.Supp. 2d 197, 201 (D.D.C. 2006); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.03[2] at 405 (2005 ed.) [hereinafter COHEN]. The D.C. Circuit also cited two cases involving separate bands of the Seminole Nation for the general propositions that the United States has an "obligation" "to promote a tribe's political integrity" as well as "the responsibility to ensure that [a tribe's] representatives, with whom [it] must conduct government-to-government relations, are valid representatives of the [tribe] *as a whole.* " 513 F.3d at 1267(*emphasis added by the Court), citing, Seminole Nation v. United States*, 313 U.S. 286, 296 (1942). and *Seminole Nation of Oklahoma v. Norton.* 223 F.Supp. 2d 122, 140 (D.D.C. 2002).

In my view, prior Department officials misapprehended their responsibility when they: (1) took their focus off the fact that the CVMT was comprised a five individuals, and (2) mistakenly viewed the Federal government as having particular duties relating to individuals who were not citizens of the tribe. I decline to invoke the broad legal authorities cited above to further intrude into internal tribal citizenship and governance issues in the instant case. In making this decision, I also am mindful of the Supreme Court's recent guidance concerning: (1) the importance of identifying "specific rights creating or duty-imposing statutory or regulatory prescriptions" before concluding the United States is obligated to act in a particular manner in Indian affairs,

5

and (2) the central role Federal policy plays in administering Indian affairs. *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323-24, 2326-27 (June 13, 2011).

*Application of Specific Legal Authorities*

In my view, prior Department officials (from 2003 to the present) fundamentally misunderstood the role of the Federal government in addressing the CVMT citizenship and governance issues: (1) they misunderstood and ignored the legal authority of CVMT to govern itself through its General Council structure without being compelled to "organize" under the IRA; and (2) they confused the Federal government's obligations to *possible* tribal citizens with those owed to *actual* tribal citizens.

The February 11, 2005, decision of Acting Assistant Secretary – Indian Affairs Michael D. Olsen stated that, until the Tribe organized itself, the Department could not recognize anyone as the Tribe's Chairperson, and that the "first step in organizing the Tribe is identifying the putative tribal members." (2005 Decision at 1-2, *discussed in* 51 IBIA at 112). The D.C. Circuit, after citing the Secretary's broad authority under 25 U.S.C. § 2, endorsed this approach as a reasonable interpretation of 25 U.S.C. § 476(h) because "[t]he exercise of this authority is especially vital when, as is the case here, the government is determining whether a tribe is organized, and the receipt of significant federal benefits turns on the decision." 515 F.3d at 1267. As I have stated above, I reject as contrary to § 476(h) the notions that a tribe can be compelled to "organize" under the IRA and that a tribe not so organized can have "significant federal benefits" withheld from it. Either would be a clear violation of 25 U.S.C. § 476(f).

The CVMT currently consists of the five citizens identified above. Under the current facts, the Department does not have a legitimate role in attempting to force the Tribe to expand its citizenship.[3] Department officials previously referred to "the importance of participation of a greater tribal community in determining citizenship criteria." (Superintendent's 2004 Decision at 3, *discussed in* 51 IBIA at 111-112). The D.C. Circuit, referring to the Tribe's governance structure that arguably would maintain a limited citizenship, stated "[t]his antimajoritarian gambit deserves no stamp of approval from the Secretary." 515 F.3d at 1267. However, I know of no *specific statutory or regulatory authority* that warrants such intrusion into a federally recognized tribe's internal affairs. (As to the more general sources of authority cited in support of Federal oversight of tribal matters, I have explained my views on the proper scope of those authorities above). "Courts have consistently recognized that one of an Indian tribe's most basic powers is the authority to determine questions of its own membership." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 57, 72 n.32 (1978); *United States v. Wheeler*, 435 U.S., 313, 322 n.18 (1978); COHEN § 3.03[3] at 176, *citations omitted*. "[I]f the issue for which the determination is important involves internal affairs of the Indian nation, it is more consistent with principles of tribal sovereignty to defer to that nation's definition." *Id.* at 180. As discussed in the previous paragraph, I also believe that, based on an incorrect interpretation of § 476(h), the previous Administration's views on the IRA's application to this case were erroneous and led to an improper focus on expanding the size of the Tribe and altering the form of its government.

---

[3] While I believe that it is *equitably* appropriate for the CVMT General Council to reach out to potential citizens of the Tribe, I do not believe it is proper, *as a matter of law*, for the Federal government to attempt to impose such a requirement on a federally recognized tribe.

6

CVMT-2011-002054

Mr. Dixie invokes the *Alan-Wilson* IBIA cases to support the theory that the Secretary has a duty to ensure that the potential citizens are involved in the organization of an unorganized, but federally recognized tribe.[4] 30 IBIA 241. But, in fact, *Alan-Wilson* works directly against Mr. Dixie's position, and this distinction provides additional support for my decision. Unlike CVMT, the Cloverdale Rancheria was a federally recognized tribe terminated under the California Rancheria Act. It was later restored pursuant to the *Tillie Hardwick* litigation and settlement, which required the Rancheria to organize its tribal government under the IRA.

30 IBIA 241, 248.

My review of the history of the CVMT compels the conclusion set out in the December decision and reaffirmed here: the CVMT has been continuously recognized, and its political relationship with the Federal government has not been terminated. The five acknowledged citizens are the only current citizens of the Tribe, and the Tribe's General Council is authorized to exercise the Tribe's governmental authority. In this case, again, the factual record is clear: there are only five citizens of CVMT. The Federal government is under no duty or obligation to "potential citizens" of the CVMT. Those potential citizens, if they so desire, should take up their cause with the CVMT General Council directly.

Given both parties' acknowledgment of the existence of other individuals who could potentially become tribal citizens, the Department's prior positions are understandable. The Department endeavored to engage both parties in a resolution of the tribal citizenship issues, including offers of assistance from the Department's Office of Collaborative Action and Dispute Resolution (CADR) – to no avail. By the time this matter was referred to me by the IBIA in January 2010, serious doubts existed about the likelihood of the parties ever being able to work together to resolve the issues involving the citizenship and governance of the Tribe.

Absent an express commitment from the parties to formally define tribal citizenship criteria, any further effort by the Department to do so would result in an unwarranted intrusion into the internal affairs of the Tribe. Moreover, given the unfortunate history of this case, most likely such efforts would not succeed in accomplishing this objective. While there may be rare circumstances in which such an intrusion would be warranted in order for the Secretary to discharge specific responsibilities, no such specific law or circumstances exist here.

Accordingly, unless asked by the CVMT General Council, the Department will make no further efforts to assist the Tribe to organize and define its citizenship. I accept the Resolution #GC-98-01 as the interim governing document of the Tribe, and as the basis for resuming government-to-government relations between the United States and the Tribe.

While I appreciate that the General Council Resolution may prove lacking as to certain aspects of tribal governance, I also recognize that this tribe is very small and uniquely situated. Many tribes have been able to govern effectively with limited or no written governing documents.

---

[4] Mr. Dixie also invokes the case of *Seminole Nation of Oklahoma v. Norton*, 223 F.Supp.2d 122 (D.D.C. 2002) in support of his position. *Seminole Nation* involved a dispute where a particular faction of the Tribe asserted rights to tribal citizenship under an 1866 treaty. *Id.* at 138. There is no overriding treaty or congressional enactment governing tribal citizenship at issue in this dispute.

CVMT-2011-002055

## Conclusion

Based upon the foregoing analysis, I re-affirm the following:

- CVMT is a federally recognized tribe whose entire citizenship, as of this date, consists of the five acknowledged citizens;
- The 1998 Resolution established a General Council form of government, comprised of all the adult citizens of the Tribe, with whom the Department may conduct government-to-government relations;
- The Department shall respect the validly enacted resolutions of the General Council; and
- Only upon a request from the General Council will the Department assist the Tribe in refining or expanding its citizenship criteria, or developing and adopting other governing documents.

In my December 2010 decision letter I rescinded several earlier decisions. I am persuaded that such attempts to rewrite history are fraught with the risk of unintended consequences. Past actions, undertaken in good faith and in reliance on the authority of prior Agency decisions, should not be called into question by today's determination that those prior Agency decisions were erroneous. Thus, today's decision shall apply prospectively.

This decision is final for the Department and effective immediately, but implementation shall be stayed pending resolution of the litigation in the District Court for the District of Columbia, *California Valley Miwok Tribe v. Salazar*, C.A. No. 1:11-cv-00160-RWR (filed 03/16/11).

Finally, I strongly encourage the parties to work within the Tribe's existing government structure to resolve this longstanding dispute and bring this contentious period in the Tribe's history to a close.

Sincerely,

Larry Echo Hawk
Assistant Secretary – Indian Affairs

cc:     Robert A. Rosette, Esq.
565 West Chandler Boulevard, Suite 212
Chandler, Arizona 85225

Roy Goldberg, Esq.
Sheppard Mullin Richter & Hampton LLP
1300 I Street, N.W., 11th Floor East
Washington, D.C. 20005-3314

CVMT-2011-002056

Elizabeth Walker, Esq.
Walker Law LLC
429 North St. Asaph Street
Alexandria, Virginia 22314

Kenneth D. Rooney
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663

Mike Black, Director, Bureau of Indian Affairs
MS-4513-MIB
1849 C Street, N.W.
Washington, D.C. 20240

Amy Dutschke, Director
Pacific Regional Office, Bureau of Indian Affairs
2800 Cottage Way, Room W-820
Sacramento, California 95825

Troy Burdick, Superintendent
Central California Agency, Bureau of Indian Affairs
650 Capitol Mall, Suite 8-500
Sacramento, California 95814

Karen Koch, Attorney-Advisor
Office of the Solicitor, Pacific Southwest Region
2800 Cottage Way, E-1712
Sacramento, California 95825

CVMT-2011-002057

# EXHIBIT 13



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

DEC 3 0 2015

Mr. Yakima Dixie
c/o Robert Uram, Esquire
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109

Dear Mr. Dixie:

The California Valley Miwok Tribe (CVMT, Tribe) has been the subject of an internal leadership dispute for years. In December 2013, the U.S. District Court for the District of Columbia (District Court) vacated and remanded a 2011 decision by the Assistant Secretary – Indian Affairs (AS-IA) to review questions of tribal membership and government.

The Department of the Interior (Department) is loath to become involved in tribal membership disputes because of potential interference with tribal self-determination and inherent sovereignty. However, in many instances the Department has assisted in the initial organization of an unorganized tribe. In this case, the reorganization of the Tribe has never properly occurred, leaving questions as to the overall membership of the Tribe.

The factual and procedural history of this dispute has been described at length in decisions by the Interior Board of Indian Appeals (IBIA), the District Court, and the U.S. Court of Appeals for the District of Columbia Circuit (Circuit Court). [1] For purposes of this decision, I set out only the essential facts.

## Background

In 1916, the United States acquired a parcel of approximately one acre in Sheep Ranch, California, for the benefit of Mewuk[2] Indians living in that area of Calaveras County. The land became the Sheep Ranch Rancheria (Rancheria). The lone Indian residing on the Rancheria in 1935, Jeff Davis, was allowed to vote on whether to accept the Indian Reorganization Act (IRA). An Indian residing on the Rancheria in 1967, Mabel Hodge Dixie, was identified as the distributee of the Rancheria assets. Mabel's son, Yakima Dixie (Mr. Dixie), has been the

---

[1] *See CVMT v. Pacific Regional Director, BIA*, 51 IBIA 103 (IBIA 2010); *California Valley Miwok Tribe v. United States*, 424 F. Supp. 2d 197 (D.D.C. 2006) ("*CVMT I*"); *California Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C. Cir. 2008) ("*CVMT II*"); *California Valley Miwok Tribe v. Jewell*, 5 F. Supp. 3d 86 (D.D.C. 2013) ("*CVMT III*").
[2] Also spelled Miwok, Mi-Wuk, or Me-Wuk. Writing in 1906, Special Agent C.E. Kelsey used "Miwak." The former name of the federally recognized Tribe was "Sheep Ranch Rancheria of Me-Wuk Indians of California." The current name is the "California Valley Miwok Tribe."

only Indian resident of the Rancheria since Mabel's death.  Mr. Dixie purported to enroll Silvia Burley (Ms. Burley) and her family (Burley Family)[3] in the Tribe in 1998.  Since 1999, Mr. Dixie and Ms. Burley have competed for control of the Tribe, which has resulted in protracted litigation.  In 2010, IBIA referred to AS-IA a claim by Ms. Burley that "effectively implicate[d] a tribal enrollment dispute."[4]  In 2011, the AS-IA issued a decision stating that the Tribe had five members and was governed by a General Council comprising the adults among those five members.  In 2013, the District Court vacated and remanded the AS-IA's decision, directing AS-IA to "determine whether the [Tribe's] membership had been properly limited" to just Mr. Dixie and the Burley family,[5] and ensure that the tribal government consists of "valid representatives of the [tribe] as a whole."[6]

**The Sheep Ranch Rancheria**

In 1915, Special Agent John Terrell sent the Commissioner of Indian Affairs a letter with "a census of the Indians designated 'Sheepranch Indians,'" (sic), describing the group as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as 'Sheepranch.'"[7]  Importantly, Agent Terrell also noted that "to some extent the Indians of Sheepranch, Murphys, Six-Mile, Avery and Angles are interchangeable in their relations."[8]  All of those towns are located in Calaveras County, California.

In 1916, the Federal Government purchased a one acre lot in the town of Sheep Ranch for the benefit of the Indians identified by Terrell.[9]  Because the parcel was so small, only a few members of the group could reside on it at any one time; many Indians associated with the community did not reside on the Rancheria.

In 1929, the Bureau of Indian Affairs (BIA) conducted a census of the Indians of Calaveras County, which identified 147 Indians, mostly Miwuk, but also some Tuolumne.[10]  The census included children of mixed Miwuk/Tuolumne, and mixed Indian/non-Indian, ancestry.

In 1935, pursuant to the mandate of the Indian Reorganization Act (IRA),[11] BIA held referendum elections in which the adult Indians of reservations voted on whether to reject the application of the IRA.  The BIA found only one eligible adult Indian, Jeff Davis, to be residing on the Rancheria.

---

[3] Silvia Burley, her daughters Rashel Reznor and Anjelica Paulk, and Rashel's daughter Tristian Wallace.
[4] 51 IBIA 103, 105 (IBIA 2010).
[5] *CVMT III* at 99.
[6] *Id.* at 100, *quoting Seminole Nation v. Norton*, 223 F. Supp. 2d 122, 140 (D.D.C. 2002).
[7] Attachment A: 1915 Terrell Census
[8] Presumably "Angles" referred to Angel's Camp, about 5 miles southwest of Murphys and 15 miles southwest of Sheep Ranch.
[9] In 2006, the District Court suggested that the Sheep Ranch Rancheria was the same parcel occupied by Peter Hodge and his family in 1915.  *CVMT I* at 197-98 (D.D.C. 2006).  The record shows that Hodge resided two and a half miles north of Sheep Ranch, while the parcel acquired by the United States was within the town itself.
[10] Attachment B: 1929 Census.
[11] 48 Stat. 984 (1934).

The California Rancheria Act of 1958, amended in 1964,[12] authorized the termination of Federal recognition of California Rancherias by distributing each rancheria's assets to the Indians of the rancheria. The process required the development of a distribution plan identifying the distributees. At that time, the Rancheria was occupied by Mr. Dixie's mother, Mabel Hodge Dixie, along with Merle Butler.[13]  On February 9, 1967, Mabel Dixie, as the sole eligible Indian resident, voted to terminate the Rancheria. The BIA transferred title of the Rancheria's land to Mabel in April or May of 1967. In September of 1967, however, the BIA asked Mabel to quitclaim the parcel back to the United States, apparently to ensure that all of BIA's duties under the California Rancheria Act were completed before BIA transferred title to Mabel. Mabel executed the quitclaim on September 6, 1967, but no other action was taken with respect to the title prior to Mabel's death on July 1, 1971. The Tribe was never terminated.[14]

On November 1, 1971, the Office of Hearings and Appeals (OHA) issued its "Determination of Heirs" of Mabel Dixie.[15]  The OHA determined that Merle Butler, as Mabel's husband, inherited 2/6 of Mabel's trust or restricted estate, and each of her 4 sons inherited 1/6. Accordingly, the title to the Rancheria land is held in trust by the United States for Mabel Dixie's heirs, who have an undivided, inheritable, beneficial interest in the land.

**Membership in CVMT is not limited to five people.**

All of the Federal court decisions examining the CVMT dispute make clear that the Tribe is not limited to five individuals. The BIA decision under review in *CVMT I* plainly rejected the 1998 CVMT Constitution offered by Ms. Burley as controlling the Tribe's organization because it had not been ratified by the "whole tribal community."[16]  This conclusion necessarily reflected the court's consideration and rejection of the contention that the Tribe consisted solely of five people.

In affirming *CVMT I*, the Circuit Court in *CVMT II* emphasized that the Tribe had more than five people:

> This case involves an attempt by a small cluster of people within the California Valley Miwok tribe ("CVM") to organize a tribal government under the Act. CVM's chairwoman, Silvia Burley, and a group of her supporters adopted a constitution to govern the tribe without so much as consulting its membership.[17]

---

[12]  72 Stat. 619 (1958). 78 Stat. 390 (1964).

[13]  The record indicates that Merle Butler was the common-law husband of Mabel Dixie. According to a memorandum dated January 5, 1966, signed by the BIA Tribal Operations Officer, Mr. Butler agreed that Mabel Dixie should receive title to the Rancheria. Attachment D.

[14]  "The Sheep Ranch Rancheria of Me-Wuk Indians of California" was included on every list of federally recognized tribes published in the Federal Register from the first such publication in 1979, at 44 Fed. Reg. 7235. Silvia Burley and Rashel Reznor, as the Tribal Council, adopted a Resolution changing the name of the Tribe to the California Valley Miwok Tribe on March 6, 2000. The BIA began using the new name no later than October 31, 2001. The list published in 2002 noted that the Tribe had changed its name to California Valley Miwok Tribe, and it has been identified as such in every subsequent list of federally recognized tribes.

[15]  Attachment C.

[16]  March 26, 2004, letter, Superintendent to Burley; cited in *CVMT I* at  200 - 203; quoted in *CVMT II* at 1265-66; and quoted in *CVMT III* at 93.

[17]  *CVMT II* at 1263.

Lastly, in *CVMT III*, the District Court vacated the AS-IA's 2011 determination that the Tribe comprised just five people. It is true that the District Court remanded to the AS-IA the question of tribal membership, but only after noting that "the record is replete with evidence that the Tribe's membership is potentially significantly larger than just these five individuals."[18] As suggested by the District Court in *CVMT III*, and held by *CVMT I and II*, the record shows that there are far more than five people eligible to take part in the organization of the Tribe.

The term "rancheria" has been used to refer both to the land itself, and to the Indians residing thereon; which is to say, "rancheria" is synonymous with both "reservation" and "tribe." Few rancherias organized under the IRA prior to passage of the California Rancheria Act in 1958. In most instances, lands were acquired for the benefit of a band of Indians identified by Indian Agents C.E. Kelsey and John Terrell. In many instances, as in the circumstance for Sheep Ranch, a rancheria was not large enough for all members of the band to take up residence. Nonetheless, BIA field officials remained cognizant of the Indians of a band associated with, but not residing upon, each rancheria.[19] When a parcel on a rancheria came available, BIA would assign the land to such a non-resident Indian who was associated with the band, if possible. Thus, such associated band Indians who were non-residents were potential residents. And since membership in an unorganized rancheria was tied to residence, potential residents equated to potential members.

With this understanding of the Department's dealings with the California Rancherias and in light of the rulings in *CVMT I, II* and *III*, I conclude that the Tribe's membership is not properly limited to Mr. Dixie and the Burley family. Given Agent Terrell's 1915 census of the "Indians designated 'Sheepranch Indians,'" and the 1916 acquisition of land by the United States for the benefit of the Mewuk Indians residing in the Sheep Ranch area of Calaveras County, California, I find that for purposes of reorganization, the Tribe's membership is properly drawn from the Mewuk Indians for whom the Rancheria was acquired and their descendants. The history of the Rancheria, supported by the administrative record, demonstrates that this group consists of: (1) the individuals listed on the 1915 Terrell Census and their descendants; (2) the descendants of Rancheria resident Jeff Davis (who was the only person on the 1935 IRA voters list for the Rancheria); and (3) the heirs of Mabel Dixie (the sole Indian resident of the Rancheria eligible to vote on its termination in 1967) as identified by OHA in 1971 and their descendants (Dixie Heirs) (all three groups collectively identified herein as the Eligible Groups).[20]

---

[18] *CVMT III* at 98.

[19] A January 3, 1935, memorandum from the Indian Office provided population information for many Rancherias. It listed the "total population" at Sheep Ranch as 16. Attachment E. Yet the following June, only one adult Indian was found to be *residing on* the Reservation and thus eligible to vote in the IRA referendum.

[20] As one of the Dixie Heirs, Mr. Dixie is part of the group of individuals from whom the Tribe's membership is drawn. He would also be eligible for membership given that for years, he has been the only Indian residing on the Rancheria. See 25 U.S.C. § 479 (IRA's defining "tribe" as, inter alia, "the Indians residing on one reservation"). The *CVMT III* court expressed concern that the enrollment of the Burley family prejudiced the interests of Mr. Dixie's brother Melvin. The BIA's decision to strengthen a dwindling tribe by facilitating the enrollment of a family of relatives was an appropriate step to the benefit of Mr. Dixie and Melvin as well as to the Burley family. The ensuing difficulties were unforeseeable, and do not convert a reasonable agency decision into a lapse of trust duty. Melvin passed away in 2009 without issue. Attachment F.

The record also indicates that the Indians named on the 1915 Terrell Census had relatives in other Calaveras County communities.[21] In 1929, the BIA conducted a census (1929 Census) of the Indians of Calaveras County, which identified 147 Indians – mostly Miwok, but also some Tuolumne. The census included children of mixed Miwok/Tuolumne, and mixed Indian/non-Indian ancestry. Accordingly, including the descendants of the Miwok Indians identified on the 1929 Census as eligible to take part in the organization of the Tribe may be proper in light of Agent Terrell's conclusion that "to some extent the Indians of Sheepranch, Murphys, Six-Mile, Avery and Angles are interchangeable in their relations."[22] Whether the descendants of the Miwoks identified in the 1929 Census shall be included in the organization of the CVMT is an internal tribal decision that shall be made by the individuals who make up the Eligible Groups.

To the extent the Burley Family is among the individuals who make up the Eligible Groups, I encourage them to participate in the Tribe's reorganization efforts as discussed below.[23] If the Burley Family cannot demonstrate that they are part of the Eligible Groups, I leave to the Tribe, as a matter of self-governance and self-determination to clarify the membership status of the Burley Family.

**The United States does not recognize leadership for the CVMT government.**

For purposes of administering the Department's statutory responsibilities to Indians and Indian tribes, I must ensure that CVMT leadership consists of valid representatives of the Tribe as a whole. Both parties point to documents supporting their claim to be valid representatives of the Tribe. I find I cannot accept either party's claims.

Ms. Burley points to the 1998 Resolution as the basis for her leadership.[24] At the time of its enactment, the 1998 Resolution undoubtedly seemed a reasonable, practical mechanism for establishing a tribal body to *manage the process* of reorganizing the Tribe. But the actual reorganization of the Tribe can be accomplished only via a process open to the whole tribal community.[25] Federal courts have established, and my review of the record confirms, the people who approved the 1998 Resolution (Mr. Dixie, Ms. Burley, and possibly Ms. Burley's daughter Rashel Reznor) are not a majority of those eligible to take part in the reorganization of the Tribe.[26] Accordingly, I cannot recognize the actions to establish a tribal governing structure taken pursuant to the 1998 Resolution. Ms. Burley and her family do not represent the CVMT.

---

[21] Attachment A.

[22] Attachment A.

[23] The district court expressed concerns about Mr. Dixie's 1998 enrollment of the Burley family. *CVMT III* at 99. Testimony evidence in the record shows that Mr. Dixie required evidence of Ms. Burley's connection to the Miwok Indians of Sheep Ranch and suggests that the Burley family qualifies for inclusion in the Eligible Groups. In a 2004 deposition, Ms. Burley testified that "It was confirmed that his grandma and my grandpa were brother and sister." Attachment G, at 106. If documentary evidence supports Ms. Burley's testimony, the Burley family must be accorded the same right to take part in the reorganization of the Tribe as all other persons in the Eligible Groups.

[24] Attachment I.

[25] CVMT II at 44; CVMT III at 97.

[26] CVMT II at 44; CVMT III at 98.

In 2006, Mr. Dixie and others purported to ratify a Constitution, Attachment J, which set out membership criteria (Part 6) and a list of twelve people (including Ms. Burley) as the "Base Enrollment of the Tribe" (Part 7). The last section of the 2006 Constitution, "Part 11, Ratification and Confirmation," lists thirteen people, twelve of whom signed the document. There is no other text in Part 11 to explain the significance of the signatures or to shed light on whether or how the 2006 Constitution was ratified. Thus, there is nothing in the text of the 2006 Constitution that shows it was ratified via a process that provided broad notice to persons eligible to take part in the Tribe's organization. I cannot, therefore, find the 2006 Constitution to be validly enacted.

In July 2013, Mr. Dixie and others purported to ratify a new Constitution.[27] Under the 2013 Constitution, tribal membership eligibility criteria included anyone whose name appeared on, or anyone descended from someone whose name appeared on: the Terrell Census, the list of Miwok Indians on the 1929 Census, the 1935 IRA voters list for the Rancheria, or the list of Dixie Heirs. However, the record is silent on the effort to notify all those eligible to take part in the organization of the Tribe to ratify the 2013 Constitution.[28] For purposes of this decision, I find that Mr. Dixie has not demonstrated that the 2013 Constitution was validly ratified.[29] But I do not foreclose the possibility that Mr. Dixie may provide additional evidence that could demonstrate adequate notice for BIA's acceptance of the 2013 Constitution.

**Conclusion**

Responding to the court's remand, I conclude that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the Tribe. I further conclude that the individuals who make up the Eligible Groups must be given opportunity to take part in the reorganization of CVMT. At the discretion of the Eligible Groups, the Miwok Indians named on the 1929 Census and their descendants may be given that opportunity to participate in the reorganization of CVMT.

I find that Mr. Dixie has not proven that the 2013 Constitution was validly ratified. I authorize the BIA Pacific Regional Director (RD) to receive additional submissions from Mr. Dixie for the purpose of establishing whether the 2013 Constitution was validly ratified. As an alternative, I encourage the Tribe to petition for a Secretarial election under 25 C.F.R. Part 81 within 90 days of this decision.

Pursuant to today's decision, the RD will work with the Eligible Groups to help the Tribe attain its manifest goal of reorganizing. This is a role that BIA has undertaken in other situations involving California Rancherias.

---

[27] Attachment K.

[28] Mr. Dixie did not provide evidence that outreach to the greater tribal community was part of the drafting or ratification of the Constitution. Rather, the text of the Constitution itself indicates that the organizers had established a tribal membership roll *prior* to ratifying the Constitution (Section II(a); II(e)), had defined the "electorate" as adults on the membership roll (Section IV(a)), and had purported to ratify the Constitution via a vote of the electorate (Section XVIII(a)).

[29] The "Certificate of Results of Election" within Article XIII, "Adoption of Constitution," suggests that the adoption of the 2013 Constitution was "pursuant to the 2006 Constitution." Having rejected the 2006 Constitution, I cannot accept that the 2013 Constitution was validated by a process in the 2006 Constitution.

The Pacific Regional Office has suggested a number of revisions to the 2013 Constitution submitted by Mr. Dixie.[30]  If the RD concludes that the 2013 Constitution was validly ratified, I urge the Tribe to work with BIA to revise and amend its Constitution, as appropriate.

This decision is a final agency action.

Sincerely,

Kevin K. Washburn
Assistant Secretary – Indian Affairs

Attachments:

A.  1915 Terrell Census
B.  1929 Census
C.  1971 OHA determination of heirs
D.  1966 BIA memo re Mabel and Merle
E.  1935 Indian Office Memo with Rancheria censuses
F.  2009 Melvin Dixie Death Index
G.  2004 Burley deposition, selection
H.  2015 Wilmer Hale letter
I.  1998 GC resolution
J.  2006 Dixie Constitution
K.  2013 Dixie Constitution
L.  2013 BIA comments on Dixie 2013 Constitution

---

[30]  Attachment L.

Distribution list:

Representing Silvia Burley:

Jacqueline De Armas, Esq.
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

Thomas L. Strickland, Esq.
Wilmer Cutler Pickering Hale and Dorr
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006

Robert A. Rosette, Esq.
Rosette, LLP
565 W. Chandler Boulevard, Suite 212
Chandler, Arizona 85225

Saba Bazzazieh, Esq.
Rosette, LLP
1100 H Street N.W.
   Suite 400
Washington, D.C. 20005

Representing Yakima Dixie:

Robert Uram, Esq.
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109

James Rusk, Esq.
Sheppard Mullin Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109

Director, BIA

Regional Director, Pacific Regional Office

Regional Solicitor, Pacific Southwest Regional Office

# EXHIBIT 14

United States Department of the Interior
OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS

| | | |
|---|---|---|
| SILVIA BURLEY, CHAIRWOMAN, and THE CALIFORNIA VALLEY MIWOK TRIBE; SILVIA BURLEY, RASHEL REZNOR, ANGELICA PAULK, and TRISTAN WALLACE, | ) ) ) ) ) | Case No. _____ |
| Appellants, | ) ) | |
| v. | ) ) ) | **APPELLANTS' RESPONSE TO BOARD'S PRE-DOCKETING NOTICE AND ORDER TO SHOW CAUSE** |
| ACTING PACIFIC REGIONAL DIRECTOR, BUREAU OF INDIAN AFFAIRS; and THE BUREAU OF INDIAN AFFAIRS, | ) ) ) ) | |
| Appellee. | ) ) ) | |

The Board has jurisdiction over this matter. The Decision by the Acting Pacific Regional Director is not final agency action because the Acting Pacific Regional Director misinterpreted and misapplied the plain meaning of the Indian Reorganization Act (IRA). The IRA, Section 16, allows an "Indian tribe" to affirmatively request the BIA validate an IRA Secretarial election.

Petitioners are non-members of the current federally recognized tribe. The historical record, and by BIA's own dealings, show that Appellants are the federally acknowledged Tribe with a definite membership, governed under traditional governing documents and law. Only the Appellants can request a Section 16 election. Moreover, no statute or judicial order authorizes the BIA to organize or reorganize an already federally recognized tribe with definite membership. Non-members seeking membership in the Tribe must apply in accordance with tribal law to Appellants' General Council.

The Decision validating the non-members petitioner's request for a Secretarial election, the Acting Pacific Regional Director, exceeded the plain statutory grant of authority to render a decision to validate an IRA Secretarial election. The Decision is therefore *ultra virus* and an unlawful interference in a tribal membership dispute because the IRA does not apply and therefore 25 C.F.R. Part 81.62(b)(2) fails to make this final agency action.

## I. INTRODUCTION

On February 11, 2019, Silvia Burley, Chairwoman, the Tribe's General Council and members, Rashel Reznor, Angelica Paulk, Tristian Wallace, and the California Valley Miwok

1

Tribe (collectively, Appellants), by and through counsel, appealed to the Interior Board of Indian Appeals (Board) a December 21, 2018, decision (Decision) by the Acting Pacific Regional Director (Regional Director), Bureau of Indian Affairs (BIA). That Decision allegedly validates a purported petition requesting a Secretarial election, under 25 C.F.R. §81, permitting so called "eligible voters" to adopt or reject a proposed constitution for the California Valley Miwok Tribe.

The Appellants specifically appeal the Decision by Mervel Harris, Acting Pacific Regional Director of the United States Department of Interior, BIA, Pacific Regional Office, dated December 21, 2018. The Appellants Tribe's appeal arises pursuant to Title 25 Code of Federal Regulation Part 2 – Administrative Appeal, and Title 43 of the Code of Federal Regulations, Part 4.

On February 25, 2019, this Board, Ordered Appellants to show cause "why this appeal should not be summarily dismissed by the Board for lack of jurisdiction." The Board stated in the February 25 Order, "the Board notes that there is a substantial question whether the Board has jurisdiction over this appeal." Order at 2. This Response provides the Appellants' argument and points of authority.

Appellants will show that the Acting Pacific Regional Director's December 2018 Decision misinterprets and misapplies the IRA, Sections 16 and 19, and its accompanying regulations, when validating a "petition" request from individuals to hold a Secretarial election.

Since at least 1998, the California Valley Miwok Tribe has been made up of members and has been governed by a General Council, under a governing document, that the BIA assisted in creating and the BIA has formally acknowledged.[1] Since at least 2001, the Tribe has been engaged in litigation and often contentious administrative process and review related to its tribal status due to a long-running leadership dispute. Despite actual knowledge of this history, the BIA failed to provide the Tribe's General Council and the California Valley Miwok Tribe, Appellants, Notice of the December 21, 2018 Decision to validate a purported petition for a Secretarial election by non-member individuals in direct contravention of IRA's statutory scheme.

BIA specifically, consistently characterizes this matter, without explanation, on the necessary and proper application of 25 CFR Part 81 and specifically, §§81.62(b)(1) and (2) and §81.62(b) because the Tribe must represent the "whole community" and on alleged applicable concepts of majoritarianism. Based merely on BIA's characterization of its authority to derive a decision might lead to the mandatory application of Part 81, thus rendering a decision as final agency action under 25 CFR §2.6(a). The mechanical application of Part 81 regulations to a petition for Secretarial election is no substitute for making a threshold determination of whether the mandatory elements Section 16 and 19 of the IRA are present which trigger Part 81's application. Without the showing of these elements under IRA, even 25 C.F.R Part 81.62(b)(2)

---

[1] For instance, on Nov. 24, 2003, Mr. Riesling, wrote the Tribe's General Council and Ms. Burley, "the Bureau of Indian Affairs maintains a government-to-government relationship with the California [sic] Band of Miwok Indian through the tribal council chaired by Ms. Sylvia [sic] Burley." EX 29.

making the decision of the Acting Pacific Regional Director final agency action is inapplicable and therefore not final agency action but appealable under 43 C.F.R. Part 4.

However, the BIA has misinterpreted the Indian Reorganization Act's application to this Tribe and its tribal status and membership. For more than 15 years, the BIA has attempted to determine the membership of the Tribe where it has no authorization to do so. It has created confusion and litigation surrounding the status of the tribal non-IRA governance structure and category of membership that simply does not exists under the law, regulations, administrative decisions, or case law.

BIA continues to ignore the fact that the Tribe is governed under traditional law and authority outside the IRA, which must be affirmatively invoked. IRA creates no such category for "unorganized" tribes if a tribe is recognized historically and has been under federal jurisdiction before 1934.[2] The BIA fails to recognize that Part 81 applies specifically to recognized Indian tribes, only, seeking to avail themselves to IRA's organizational or reorganizational right; and nothing diminishes a tribe's right to govern itself outside the IRA. In this instance, the Tribe is organized, just not in a manner and with the membership the BIA arguably prefers.

Doubtless, BIA might have authority to determine membership if expressly directed to do so by Congress, but this is not the case here. And doubtless, Part 81 might also apply if a judicial order mandated the organization or reorganization of the Tribe by BIA. But in this case, despite all the litigation, in this matter, there is no judicial order similar to that of *Tillie Hardwick* to authorize BIA membership or reorganization.

In this matter, BIA has misapplied IRA and its statutory scheme. No other statute or court order requires BIA to reorganize the Tribe nor allows it to make membership determinations. Fundamentally, what started as a leadership dispute between the late Yakima Dixie and the current General Council, Appellants, in this matter, was then, and remains now a membership dispute by a federally acknowledged tribe that governs itself under a traditional governance system outside the IRA. Moreover, no statute, regulation or court order mandates the requirement that the California Valley Miwok Tribe and its General Council be reorganized under the IRA.

As further explained below, Appellants provide this Response to the Board to explain that the BIA's Decision is not final agency action, but more importantly, it was derived outside the authority of any BIA official to make. Appellants request an immediate order to vacate the BIA's unlawful Decision, as well as immediately vacate and stay, all related proceeding including the so-called "Secretarial election" scheduled for April 15, 2019.

In its February 25 Pre-Docketing Notice, the Board determined that that Tribe's appeal is timely. Appellants ask for the Board to take emergency action to halt the scheduled election until this Board is fully briefed. The Appellants believe that there is a high likelihood that the arguments below, once fully briefed, will prevail on the merits. In addition, the relative interim harm to the government and the non-member petitioners is minimal as it is outweighed by the

3

interference with tribal self-determination and the inherent sovereignty of a tribe to self-govern. It is doubtless that the current Tribal Council and the Tribe's current members will suffer irreparable harm without negatively halting an unlawful Secretarial election.

Appellants urge the Board to find the December 2018 Decision is not final agency action and assume jurisdiction over this matter as this is a membership matter. *See, e.g, Cahto Tribe of Laytonville Rancheria v. Pacific Regional Director*, 38 IBIA 244 (2002) and *Alan-Wilson, Sr. v. Sacramento Area Director*, 30 IBIA 241 (1997). In turn, Appellants request the Board take jurisdiction over this matter to automatically stay the so-called Secretarial election under 25 C.F.R. Part 2.6.

In the alternative, Appellants recommend an immediate notification of the Assistant Secretary of Indian Affairs that this matter involves internal tribal membership matters and recommend that the Assistant Secretary assume jurisdiction under 43 CFR Part 4 or 25 C.F.R. Part 62.[3] *See Vedolla v. Acting Pacific Regional Director*, 43 IBIA 151, 154 (2006).

In short, the BIA's December 2018 Decision is government action "in excess of statutory jurisdiction, authority or limitation," 5 U.S.C. § 706(2)(C), and BIA's Decision to conduct a Secretary election is arbitrary, capricious, or an abuse of discretion; therefore was in violation of the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* and subject to review by this Board under the regulations and, if final agency action, subject to review by the federal courts.[4]

## II.   BACKGROUND

This matter is the latest episode in a long and unnecessarily complex leadership and membership dispute of the California Valley Miwok Tribe of California. The nearly 20-year saga has led to an extensive administrative review and proceeding as well as litigation and appellate review. Despite the ruling of the case law, the latest decision by the BIA is the result of misinterpreted and misapplied law, and unlawful interference in internal tribal membership matters. Much of the factual underpinnings and procedural posture of this matter is set out in prior litigation and within the records or those matters. Appellants set-forth and provide specific and relevant facts, and procedural context here to provide explanation and support of its response to the Board's Order.

The California Valley Miwok is indisputably a federally recognized tribe appearing on all annual announcements since the enactment of P.L. 103-454, 108 Stat 4791 (1994) (EX 1) as well as in the first Federal Register notices United States issued reporting a government-to-government relationship extending services to tribes dating to 1972. *See* "American Indians and Their Federal Relationship, Department of Interior," BIA (1972). EX 2. *See also* Notice, Indian

---

[3] Arguably, the non-members petition to validate a Secretarial election under IRA and 25 C.F.R. Part 81 is a misdirected tribal enrollment dispute.

[4] Courts have strongly considered self-governance in determining whether the agency's actions are arbitrary, capricious or an abuse of discretion. *See Goodface v. Grassrope*, 708 F2d 335 (8th Cir. 1983); *Tarbell v. Interior*, 307 F Supp 2d 409, 429-429 (NDNY 2004); *Seminiole v. Norton*, 223 F Supp 2d 122, 147 (D.D.C. 2002). Courts also hold the agency to a high standard in justify their determination related to tribal governance. *See Tarbeel v. Interior*, 307 F Supp 2d 409, 424-427, 429 (NDNY 2004).

Tribal Entities that have a Government-to-Government Relationship with the United States, 44 Fed Reg 7235, 7236 (Feb. 6, 1979)[5], EX 3. *See* 60 Fed Reg 9250 (Feb. 16, 1995), EX 4. 84 Fed Reg 1200, 1201 (Feb 1, 2019), EX 5. The Tribe appears in historical publications of tribes under federal jurisdiction as of 1934 in context of the development of the Indian Reorganization Act. Theodore Haas, Ten Years After IRA (Dept of Interior 1947) (Pamphlet listing Sheep Ranch Rancheria), EX 6.

It is undisputed that in 1916, the United States purchased approximately one acre in Calaveras County, California, for the benefit of 12 individually named Indians living in what was known as Sheepranch, CA. *See California Valley Miwok Tribe v. BIA*, 51 IBIA 103, 106 (2010). The Indian Agent, John Terrell, who in 1915 recommended the purchase of roughly one acre, described the group of 12 named individuals as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as Sheepranch." *California Valley Miwok Tribe v. BIA*, 51 IBIA at 106; Ex 7.

It is important to note that John Terrell, as required under congressional statutory authorization, identified and purchased lands for *homeless* Indians. EX 8. The Indian agent was not authorized to create a reservation or rancheria. The record shows that the land was purchased for the remnants of a band of Indians individually. The record shows that, there is currently no reservation associated with the Tribe or other land held in trust by the United States. EX 9.

Over the years, the Tribe and the land came to be referred to as the "Sheep Ranch Rancheria." In 2001, the BIA would agree to change the name of the Tribe to the California Valley Miwok Tribe (Appellants). In 1993, a probate appeal of Mabel Dixie determined that the parcel commonly referred to as "Sheep Ranch Rancheria" was distributed under the amendments to the California Termination Act and was to be conveyed in fee to Mabel Dixie's heirs. EX 10. The probate appeals judge from the Department of Interior, Office of Administrative hearings, determined that the land was passed to Yakima Dixie as an individual. EX 10. In 2000, the Tribe's General Council, which included tribal member, Yakima Dixie at the time, worked with the BIA to correct the title to indicate and record that the property was held "individually." EX 11 and EX 12.

In June 1934, the Indian Reorganization Act (IRA), also called the Wheeler–Howard Act, (June 18, 1934), enacted by the U.S. Congress, aimed at decreasing federal control of American Indian affairs and increasing Indian self-government and responsibility. The BIA implemented the Act by mandating a referendum to determine whether "designated" tribes "want to exclude themselves from the application of the Indian Reorganization Act." EX. 13. The record shows only one adult Indian lived on the Sheep Ranch land in 1935, a Jeff Davis. Indian agent reports indicate that Jeff Davis voted "in favor of the IRA" *See California Valley Miwok Tribe v. BIA*, 51 IBIA at 106; *see also* EX 13 (letter June 6, 1935). There is no record that Mr. Davis organized the Tribe in accordance with Section 16 of the IRA.

---

[5] *See also* "American Indians and Their Federal Relationship," March 1972. (the BIA's first listing of federally acknowledged tribes. Sheep Ranch Rancheria is listed and the California listing distinguishes those tribes that were terminated at page 10-11.) EX 2.

In 1958, the United States Congress enacted the third in a series of termination acts intended to distribute rancheria and reservation lands in California naming specific tribes.[6] *See* California Termination Act of 1958, Pub. L. No. 85-671, 72 Stat. 619 (August 18, 1958), EX 14. The Sheep Ranch Rancheria was *not* among the 40 tribes specifically named to be terminated in the 1958 termination act. However, the termination acts were amended in 1964 purportedly authorizing the termination of all Rancherias and reservations within the borders of California. *See* P.L. 88-419, 78 Stat 390 (August 11, 1964). EX 15.

Sometime after the amendment to the California Termination Act in 1964, the BIA, crafted a plan for distribution of tribal assets of "Sheep Ranch Rancheria" pursuant to the amended termination act. EX 10. In 1966, the record shows only one adult Indian, Mabel Hodge Dixie, the mother to Yakima Dixie (see discussion below), lived on the land that had been originally set aside in 1916. EX 16. For reasons discussed in greater detail below the termination of the Sheep Ranch Rancheria was never completed by the BIA. The Tribe therefore is not a terminated California tribe and no judicial order exists to restore the Tribe, resolve the distribution issues, or mandate reorganization of the California Valley Miwok like at least 17 other tribes in California that are known as impacted by the well-known case of *Tillie Hardwick*. *See, e.g. Tillie Hardwick v. United States,* NC-79-1710SW (N.D. Cal. Dec 22, 1983) (Stipulated judgment).

Mabel Hodge Dixie died in July 1971. After almost 20 years of probate, the BIA, filed a petition with the Office of Hearings and Appeals in Phoenix, AZ to remove Sheep Ranch Rancheria as an asset of the Mabel Dixie estate because the BIA had determined that it should take steps to "restore" the Band as a federally recognized tribe and recover the property for the benefit of the tribe. EX 10.

In April 1993, Administrative Law Judge Hammett, Office of Hearing and Appeals, determined that the government conveyed good title, in fee, to Mabel Dixie in a May 1967 deed. The Judge also determined that a purported quitclaim deed from Ms. Dixie to the United States in an effort to repudiate the BIA's "Distribution Plan" was in ineffective. Judge Hammett concluded that the government conveyed the property in fee. However, despite a BIA memo dated March 1995, the deed still reflected tribal trust land despite Mr. Yakima Dixie determination to be the rightful heir to the .92 acres, commonly referred to as Sheep Ranch Rancheria. EX 11.

The Tribe worked with BIA in 2000 - 2001 to ensure that the deed reflected the decision by Judge Hammett and made sure the deed said "individually-owned" land held by Yakima Dixie, the right and sole heir to Mabel Dixie's real property. EX 10. In fact, a letter to the Tribe's General Council, and Ms. Burley, dated February 22, 2001, Central California Agency,

---

[6] Those tribes named in the 1958 Act are: Alexander Valley, Auburn, Big Sandy, Big Valley, Blue Lake, Buena Vista, Cache Creek, Chicken Ranch, Chico, Cloverdale, Cold Springs, Elk Valley, Guidiville, Graton, Greenville, Hopland, Indian Ranch, Lytton, Mark West, Middletown, Montgomery Creek, Mooretown, Nevada City, North Fork, Paskenta, Picayune, Pinoleville, Potter Valley, Quartz Valley, Redding, Redwood Valley, Robinson, Rohnerville, Ruffeys, Scotts Valley, Smith River, Strawberry Valley, Table Bluff, Table Mountain, Upper Lake, Wilton.

Superintendent Dale Riesling, Sr., wrote, "[t]his letter is to advise you that Sheep Ranch Rancheria does not have any "Tribal Trust Land" with the Bureau of Indian Affairs." EX 9.

In 1994, Yakima Dixie wrote the BIA asking for assistance with home repairs and describing himself as "the only descendant and recognized ... member of the Tribe." EX 17. *See also Calif. Vall. Miwok Tribe v. BIA*, 51 IBIA at 107. In September 1995, Silvia Burley "contacted BIA for information related to her Indian heritage. EX 18. At BIA's suggestion, Ms. Burley contacted Yakima Dixie concerning potential membership in the tribe. *See Calif. Vall. Miwok Tribe v. BIA*, 51 IBIA at 107. (including footnote 7), referring to EX 19.

On August 5, 1998, Mr. Dixie "signed a statement accepting Burley as an enrolled member of the Tribe and also enrolling Silvia Burley's two daughters, Rashel Reznor and Anjelica Paulk, and Ms. Burley's granddaughter, Tristian Wallace. *See Calif. Vall. Miwok Tribe v. BIA*, 51 IBIA at 107, also noting EX 18 and EX 19. The record also indicates that in September of 1998, BIA staff met with Mr. Dixie and Ms. Burley "to discuss organizing the Tribe." *Calif. Vall. Miwok Tribe v. BIA*, 51 IBIA at 107, 108 (EX 20). On September 24, 1998 BIA sent correspondence to spokesperson Yakima Dixie, recommending that, "given the small size of the Tribe, we recommend that the Tribe operate as a General Council," which could elect or appoint a chairperson and conduct business. *Id.* at 108 noting the detailed and thoughtful correspondence related to the Tribe's efforts to organize found in EX 21.

On November 5, 1998, Mr. Dixie and Ms. Burley signed a resolution establishing a General Council, consisting of Yakima Dixie, Silva Burley, Rashel Reznor and Anjelica Paulk to serve as the governing body of the Tribe. EX 22. Mr. Dixie was considered spokesperson for the Tribe under tribal resolution. EX 22.

Within a year, a leadership dispute arose between Mr. Dixie and the other General Council members including Ms. Burley and gave rise to considerable administrative review and multiple lawsuits and appeals. The BIA recognized Mr. Dixie as spokesperson and all four other members of the Tribe (Appellants). EX 23. Later the BIA recognized Ms. Burley as spokesperson based primarily on Mr. Dixie's resignation in April 1999 and the acceptance of that resignation by the Tribe's General Council including the appointment of Ms. Burley as spokesperson. Exhibit 24.

Mr. Dixie later challenged Ms. Burley's 1999 appointment. *See Calif. Vall. Miwok Tribe v. BIA*, 51 IBIA at 108-109.[7] Yakima Dixie claimed his resignation as chairman was forged and would serve as the bases for the confusion and leadership dispute for years. But by 2012, Yakima Dixie admitted the resignation and the signature were not forgeries and he did in fact resign as tribal chairman in April of 1999. EX 25.

---

[7] In 2012, in litigation related to the Tribe's frozen funds from Indian Gaming Special Distribution Fund, Yakima Dixie, in a sworn deposition, admitted that his signature was in fact his signature on April of 1999 document indicating he resigned his position as California Valley Miwok Tribal Chairman (Spokesperson) as well as admitted he misrepresented the April 1999 documents as forgery but more specifically admitted that the signature on the documents was indeed his and more important that Yakima Dixie admitted he indeed resigned his Chairmanship of the General Council. EX 25 and EX 31.

Mr. Dixie's very big lie would lead to considerable litigation and BIA's position that led the BIA to validate the non-member petitioners request for Secretarial election.

By 2002, the leadership dispute led to the full panoply of administrative review and litigation both directly and indirectly revolving around the leadership of the Tribe. Much of the focus of this leadership dispute migrated into the BIA's legal review of the submission and subsequent disapproval of tribal constitutions. BIA as early as October 31, 2001, pressured and misstated the law to the Tribe related to the application of IRA in these circumstances. In an October 31, 2001 Letter, BIA stated that the agency urged the General Council to "abide by the will of the people of the Sheep Ranch Rancheria in the 1935 election and to comply with an act of Congress by seeking formal reorganization under the Indian Reorganization Act." EX 26.

Further pressure from the BIA came in a March 4, 2002 letter. The Tribe sought guidance on seeking funds under the Indian Self-Determination and Education Assistance Act. In response the BIA attempted to cajole the Tribe to "complete the reorganization process contemplated by the Indian Reorganization Act" and further states that it "strongly recommends that the Tribe complete the reorganization process contemplated by Section 16 of the Indian Reorganization Act" in order to meet Aid-to-Government Standards. EX 27.

In March 2004, the BIA Superintendent rejected a proposed constitution from Ms. Burley because she had not involved what the BIA asserted was the "whole tribal community" in the governmental organization process. EX 28 and EX 29.  On February 11, 2005, the Acting Assistant Secretary - Indian Affairs issued a decision on Mr. Dixie's 1999 appeal, ruling that the appeal of the Bureau's 1999 Decision to recognize Ms. Burley as Chairperson was moot and that the BIA would recognize Ms. Burley only as a person of authority within the Tribe. EX 29 and 30.

Litigation on these matters further ensued. *See Cal. Valley Miwok Tribe v. United States.* 424 F. Supp. 2d 197 (D.D.C. 2006); *Cal. Valley Miwok Tribe v. United States,* S 15 F.3d 1262 (D.C. Cir. 2008); *see also* 51 IBIA 103 (Jan. 2010).  In 2011, the Department of the Interior, Assistant Secretary-Indian Affairs, Larry Echo Hawk, issued a Decision, August 31, 2011, that was again promptly challenged in federal court resulting in the matters before the DC District and Circuit Court of Appeals.  On remand to the Department of Interior from the DC Circuit Court, the new Assistant Secretary-Indian Affairs, Kevin Washburn issued a memorandum on December 30, 2015. The Washburn Decision was challenged in federal court in California; culminating in unpublished *California Valley Miwok Tribe v. Zinke,* 2:16-cv-01345-WBS-CKD (9th Cir. 2018).

III.     **The IBIA has Jurisdiction to Vacate the Decision and Immediately Vacate or Stay All Related Proceedings**

Doubtless, the Interior Board of Indian Appeals (Board) is a tribunal of limited jurisdiction deriving its juridical authority from regulation or otherwise delegated to it by the Secretary of the Interior. *See* 43 C.F.R. § 4.1(b)( 1).

In its Pre-Docketing Order in this matter, "the Board notes that there is a substantial question whether the Board has jurisdiction over this appeal." The Board specifically explains that while the Board has jurisdiction to hear appeals from administrative actions or decisions of BIA officials issued under regulations in 25 C.F.R. Chapter 1. *See* 43 C.F.R. § 4.330(a). The Board is not authorized to review appeals from decisions that are subject to appeal to a higher official in the Bureau of Indian Affairs prior to that official's review, *id.* § 4.331(a), or "[w]here otherwise provided by law or regulation," *id.* § 4.331(c). Hence, the Board, correctly states, "a decision which, by regulation, is final for the Department of the Interior (Department), at the time of its rendition, is not subject to further review by the Board. *See* 25 C.F.R. § 2.6(a)"

The Board's concern over jurisdiction in this matter is justified *if* non-members of a federally acknowledged tribe give rise to a valid petition for a Secretarial Election under Sections 16 & 19 of the IRA. In other words, if non-members can petition the BIA under Section 16, given the mandates of Section 19 of the IRA, then 25 CFR Part 81 applies to this Tribe. In short, if the Board believes this to be true, the Board is correct in noting that the Decision under these provisions is final for the Department under the regulation and therefore is final agency action under 25 CFR § 81.62(b)(2) and § 81.4. However, 25 C.F.R. Part 81 does not apply in this instance.

Appellants believe that a long-time federally acknowledged tribe traditionally governing itself under a 1998 resolution and traditional tribal law with known members is the only tribal body that may invoke IRA's Section 16 petition process for reorganization. Here the purported petition was not submitted by the Tribe or any Tribal members.

The Acting Regional Director exceeded his authority under IRA by validating a purported petition under these circumstances, therefore is in violation of the Administrative Procedures Act, 5 U.S.C. §§ 701 *et seq.* Furthermore, as explained in detail below, the BIA's decision expressly interferes in internal tribal matters of membership contravening black letter law and policy for more than two centuries because neither the IRA or any other law or judicial order mandate or allow the BIA to make membership determinations that substitute for the requirements that IRA Section 16 is triggered only by a federally recognized Indian tribe.

### A. The California Valley Miwok is a Long-Time Federally Recognized tribe, Governed under Traditional form of Government and its Membership is Certain

As discussed elsewhere, tribes possess inherent authority to organize and govern themselves. In fact, unless surrendered by a tribe or abrogated by Congress, tribes possess inherent and exclusive power over matters of internal tribal governance. See, e.g., *Cherokee Nation of Oklahoma*, 892 F.2d 1457 (10th Cir. 1989), 892 F.2d 1457, or 708 F.2d 335, 339, or 687 F Supp 2d 1171, 1185 (ED CA 2009) and *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1185 (E.D.Cal.2009).

The IRA is indisputably intended to enhance not reduce the powers of Indian tribes. *See, e.g., Kerr-McGee v. Navajo Nation*, 471 U.S. 195, 199 (1985). Congress reinforced this inherent fundamental governing authority "to adopt governing documents under procedures other than those specified" under IRA's provisions. *See* P.L. 108-204, title I, §103, 118 Stat. 543 (Mar. 2, 2004).

9

In 1998, the Tribe, with the assistance of the BIA, adopted a resolution that has served as its governing document outside of the IRA. In fact, the record also indicates that in September of 1998, BIA staff met with Mr. Dixie and Ms. Burley "to discuss organizing the Tribe 51 IBIA at 107, 108 (EX 20). Following that September 1998 meeting, on September 24, 1998, BIA corresponded with spokesperson Yakima Dixie, recommending that, "given the small size of the Tribe, we recommend that the Tribe operate as a General Council," which could elect or appoint a chairperson and conduct business. EX 20 and EX 24. The Tribe in its sole discretion, chose to appoint a government outside the parameters of the IRA.

As the Board is well aware, many tribes have availed themselves of the "right" to adopt a constitution under the provisions of the IRA. Many have not.

Tribes may adopt governing documents and constitutions outside the IRA process. There are in fact numerous examples, including Standing Rock Sioux Tribe and Muscogee (Creek) Nation. Some tribes in fact, and the BIA is well aware of this, operate without a constitution. For example, the Navajo Nation. As will be explained below, the absence of a written constitution does not affect the self-governing power of a tribe under federal law. Federal law applies to tribes whether or not they organize under the IRA. 25 USC §478b (reading it any other way would arguably make 478b superfluous).

For instance, in *Estate of Peter Alvin Ward*, the validity of the non-IRA governing document, a constitution, adopted by the Quinault Nation in 1975 was central to the result in that appeal. In that matter, under the provisions of 25 U.S.C. §2206(a), title to the lands at issue in *Ward* could escheat to the Quinault Nation only if the Nation exercised "jurisdiction" over the lands. The Quinault Nation had voted *not to reject* the IRA, *Estate of Peter Alvin Ward*, 19 IBIA 196, 200 (1991).

The IBIA nevertheless held that the non-IRA constitution that had been adopted by the Quinault Nation in 1975 was effective to give the Nation the necessary jurisdiction. Specifically, the IBIA found that: The Department of the Interior has long recognized the Quinault Indian Nation as the governmental authority for the Quinault Reservation. Although the 1975 constitution had not been approved by the Secretary, the governing document had been formally recognized by the BIA as the Nation's governing document. In that document, the Quinault Nation asserted jurisdiction and governmental power" over the Quinault Reservation. 19 IBIA, at 205-6 (emphasis added). This conclusion, that an "IRA tribe," a tribe that voted in 1935 for the IRA, can organize itself outside the provisions of the IRA, applies with equal force in the matter at hand. The record shows it did, the BIA assisted, the BIA formally provided acknowledgement of that governing document, and took actions in step with a government-to-government relationship.

Appellants point out that because there was no requirement pursuant to statute of judicial order (see further discussion below) that the California Valley Miwok organize under IRA, rather the 1998 Tribal governing resolution is an exercise of the Tribe's inherent authority to organize outside IRA. In short, the IRA cannot possibly be invoked to displace the General Council or

argue that the Tribe is "unorganized,"[8] hence, requiring that the BIA has the authority to validate a petition on non-Members of the currently recognized and organized tribe.

The Tribe operates as a non-IRA tribe. It is a corollary of the discussion above. Therefore, the main difference between IRA and non-IRA tribal governments is that IRA constitutions and their amendments are subject to the Act's voting and secretarial approval provisions. In this matter, only the federally acknowledged Tribe and its members, the Appellants, therefore can invoke Section 16 of the IRA.

## IV. The BIA's Interpretation of the Indian Reorganization Act Secretarial Election Provisions is Out of Line with the Statutory Scheme.

The Indian Reorganization Act, among other things authorizes Indian tribes to organize and adopt constitutions. Tribes seeking to avail themselves of Section 16 of the IRA must proactively seek and invoke those provisions. The federally acknowledged Tribe known as the Appellants, California Valley Miwok Tribe or its members, have *not* petitioned BIA seeking a Secretarial election under IRA.

In addition, the record shows the Tribe is organized, self-governing, and has certain and definite members. In this matter, the BIA purportedly validates a purported petition from non-member Indians in contravention of the IRA. As discussed below, the December 2018 Decision is based on an incorrect interpretation of the IRA and lacks any other statutory or judicial authorization to create a category of membership or create membership rolls to the exclusion of the federal acknowledged Tribe and its General Council.

BIA continues to ignore that the Tribe is governed under traditional law and authority outside the IRA. IRA creates no such category as "unorganized" tribes if a tribe is recognized historically and has been under federal jurisdiction before 1934.[9] And the BIA fails to recognize that Part 81 applies specifically to recognized tribes seeking to avail themselves to IRA's reorganizational right; and nothing diminishes a tribes right to govern itself outside the IRA. In this instance, the Tribe is organized, just not in a manner and with the membership the BIA believes is required.

Any argument that the Tribe either is not yet organized, or must reorganize, is a misunderstanding of IRA. For this to be true, the BIA must necessarily read the IRA as having restricted tribes' ability to exercise their inherent authority to promulgate governing documents. But this cannot be correct as the IRA was indisputably intended to enhance not reduce the powers of Indian tribes. *See, e.g., Kerr-McGee v. Navajo Nation,* 471 U.S. 195, 199 (1985).

---

[8] The characterization of an "unorganized" tribe has not been used in any law or regulation since its appearance in 25 C.F.R. § 242.3(a) (1965) related to the creation of a distribution plan under the California Termination Acts. EX 14 and EX 15. In this matter, note an example of 25 C.F.R. § 242 used in a letter dated February 3, 1966 in the creation of a distribution plan for the Sheep Ranch Rancheria. EX 16. It is important to recognize that those regulations found in 25 C.F.R. Part 242 (1965) were invalidated in *Kelly v. United States,* 339 F. Supp 1095, 1100-1102 (E.D. Cal. 1972).

[9] It is worth noting that the BIA states that the Band has long been recognized since at least 1916 and although the so-called Rancheria assets were distributed the tribe was likely never terminated. EX 16.

Section 16 of the IRA specifies that a tribe has "the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws." And Section 16 of IRA relies on the definition of "tribe" and "Indian" in Section 19. Read together, Section 19 and Section 16 provide the conditions and elements necessary to interpreting as a threshold matter when a secretarial election can be called and by whom.

Amended Section 16(a), 25 U.S.C. §476, states:

"Any Indian *tribe* shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto…" [emphasis supplied].

The IRA further specifically defines the terms "Indian" in and "tribe" in Section 19—

The term "Indian" as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood. …

The term "tribe" wherever used in this Act shall be construed to refer to any Indian tribe, organized band, pueblo, or the Indians residing on one reservation. The words "adult Indians" wherever used in this Act shall be construed to refer to Indians who have attained the age of twenty-one years.

Applying Section 16 to the circumstances of BIA's Decision, for the validation of the Secretarial election petition to be valid, the non-member petitioners must be an "Indian tribe" under Section 16 of the IRA. Nothing in the record shows that petitioners are a recognized tribe and while there may be evidence that the non-member petitioners, under the definition of Section 19, are (1) descendants of members of Indian "under federal jurisdiction" or (2) are all people all other persons of one-half or more Indian blood" they are *not* "members" of a federally recognized tribe.

Taking it a step further, Section 16 requires that an "Indian tribe" is the entity that has authority to avail itself of the privileges of IRA. As defined in Section 19, non-member petitioners are not tied to any reservation as defined in Section 19. In fact, the record as discussed in detail above, indicates that while the Sheep Ranch Rancheria once may have been held in trust and may have met the legal definition of a reservation for purposes of Sections 16 and 19 of the IRA, the land in Calaveras County has been held individually by Yakima Dixie, in fee until his death in 2017.

In this context, a plain reading and interpretation of Sections 16 and 19 of the IRA, shows that the BIA acted outside its authority to validate a purported Secretarial election petition submitted by non-members.

12

The December 31, 2015, Washburn Letter encourages the BIA to continue to misinterpret IRA's statutory scheme for tribal organization and misapplies it to the facts and circumstances of the California Valley Miwok. Secretary Washburn characterizes this as a leadership dispute;[10] however, his decision takes on a different light after Yakima Dixie's death. Most importantly, Mr. Dixie's absence no longer provides a basis for concerns about the BIA being unable to discern which tribal government to recognize.

The record of this matter created by the by BIA in the regional office, compounds the confusion and misinterpretation of under what circumstances IRA applies to the California Valley Miwok Tribe and whether the Tribe even needed to reorganize that led to the December 2018 Decision.

On November 24, 2003, Mr. Riesling, wrote the Appellants, General Council, and Ms. Burley, "the Bureau of Indian Affairs maintains a government-government relationship with the California [sic] Band of Miwok Indian through the tribal council chaired by Ms. Sylvia [sic] Burley." EX 29. However, less than six (6) months later on March 26, 2004, Central California Agency Superintendent wrote the Tribe again this time responding to the Tribe's effort to show they were an "organized tribe." It is unclear what prompted the Tribe to submit a constitution to BIA in an effort to show the Tribe was organized. In that letter responding to the Tribe's (the current Appellants) submission, Superintendent Riesling states,

> "the BIA does not yet view your tribe to be an "organized" Indian Tribe and this view is borne out not only by the document that you have presented as the tribe's constitution but additionally, by our relations over the last several decades with members of the tribal community in and around Sheep Ranch Rancheria." EX 28.

Superintendent Riesling further indicates that the Tribe (Appellants) is not organized and that it was required to identify a "greater tribal community" and articulate what appear to be other standards that are often applied to the context of *Tillie Hardwick* tribes, such as "Base Roll," and misstates the facts that the "tribe did not exist until the 1990s." EX 28.

Moreover, the Superintendent's use of the term "organized" to assess the state of the Tribe's governance is incongruent with the Secretarial petition regulations under 25 C.F.R Part 82 prior to their revision in 2015. *See* 80 Fed. Reg. 63106 (Oct. 19, 2015) (removing the

---

[10] Because the United States has a government-to-government relationship with tribes, courts have recognized that the Secretary of the Interior is forced on occasion must identify which of two more competing political groups to recognize as the proper representative of the tribe in order to carry on with government relations. *Wheeler v. Dept. of the Interior*, 811 F2 549 *and Seminole v Norton*, 222 F. Supp.2d 122 (D.D.C. 2002). This is not the case here. This matter more closely resembles *Ransom v Babbitt*, 69 F. Supp.2d 141 (D.D.C. 1999). In *Ransom*, the BIA continued to inappropriately force the tribe into holding Secretarial elections to adopt an IRA constitution despite the tribe's long establish traditional governing structure.

Even in instances involving special reason for federal involvement in internal tribal affairs, federal officials should favor self-government and against federal interference. *Wheeler v. Dept. of the Interior*, 811 F2d 549, 552 (10th Cir. 1987).

definitions for "organized" and "reorganized"). In the context, under the previous iteration of the regulations, the regulation defines the terms at 25 C.F.R. §82.1(k) (2011). Organized tribe means any tribe that has adopted a constitution outside of a Federal Statute and per 25 C.F.R. §82.1 (2011) Reorganized tribe means any tribe that has adopted a constitution pursuant to a Federal Statute. *See King v. Norton*, 160 F. Supp.2d 755, 757 (E.D. Mich. 2001) (discussing the definition section).

## V.    No Federal Statute or Court Order Mandates Organization or Reorganization

It is blackletter law that a tribe is free to maintain or establish its own form of government. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62-63 (1978). In rare instances, Congress has by statute dictated the manner of a tribe's form of government. *See, e.g.,* Act of June 28, 1906, 34 Stat. 539, 545 (Section 9 of the Act mandates the form of government and how elections were to be held by the Osage Tribe).

At times, Congress has specified a scheme for tribal membership or has specified what constitutes tribal membership in a specific tribe for purposes of descent and distribution. *See, e.g., Stookey v. Wilbur*, 58 F.2d 522 (D.C. Cir. 1932); *United States v. Jim*, 409 U.S. 80 (1972). It has even been the case that Congress uses its plenary power over Indian affairs to delegate authority to the Secretary of the Interior to determine tribal membership for purposes of distributing judgments of the Indian Court of Claims and promulgate tribal enrollment rolls for the distribution of tribal funds. *See* 25 U.S.C. §§1403 and 1405 as well as 25 U.S.C. §163.

No statute requires organization or reorganization of the California Valley Miwok Tribe. In addition, while in the 1960s BIA developed a Distribution Plan for the Sheep Ranch Rancheria under the California Termination Act's 1964 amendment, termination fell short of the requirements under the statute and the regulations at the time known as 25 C.F.R. 242 (1965). EX 32. For instance, the regulations specifically required that the United States publish notice in the Federal Register regarding termination and the eligibility of Ms. Mabel Dixie to receive services based on here status as an Indian. This publication went unaccomplished as required by 25 C.F.R. 242.10 (1965). EX 32.

A terminated California Valley Miwok Tribe would more likely be similarly situated to the 17 tribes subject to the *Tillie Hardwick* litigation. However, this is not the case. The judicial order in *Tillie Hardwick* required the affected tribes to be restored to the same status each possessed prior to distribution of the assets of these rancherias under the California Rancheria (Termination) Act including authorizing of the BIA to identify a "class" of individuals[11] who possess the right to formally organize a governing body of a Tribe; arguably mandating the BIA to implement the

---

[11] Over the years, the BIA has been in a position to identify individuals that would possess the right to formally form a government. This standard is a judicial standard not identification of "potential members" or even members, it is a standard created by stipulation or judicial order for restoring these tribes under *Tillie Hardwick* termination under the California Rancheria Act.

reorganization provisions of Section 16 of the IRA and its accompanying regulations under 25 C.F.R. Part 81.

In this context, any reorganization of the Tribe is not authorized or required by statute or judicial order. As a federally recognized tribe, the California Valley Miwok Tribe is exercising its inherent authority to govern itself outside of IRA.

There appears to be no statutory authority or case law or judicial order that provides the Department of Interior the authority to make assessments whether the Tribes is organized or not. The Appellants are a self-governing Tribe under case law precedent and federal common law because the Tribe possesses inherent authority to govern itself. In addition, given Congress' affirmation in §476h, BIA's inquiry into whether a tribe is organized or unorganized is extremely limited and any inquiry into that matter comes only through express authorization by federal statutory mandate or judicial order. Mr. Riesling's March 2004 application of an assessment that the Tribe was not organized seems to resuscitate a BIA policy articulated in a March 1983 Letter from the Deputy Assistant Secretary – Indian Affairs, questioning whether the Osage Tribe was "formally organized." EX 23. The continuing inquiry into the Tribe's organization or membership *vis-à-vis* the validation of the non-member petitioners request for a Secretarial election is *ultra virus*.

# VI.   CONCLUSION

As the Department of the Interior Solicitor Office admonished,

> "[t]he question of the right of the Federal Government to intervene in tribal governmental affairs is one of long-standing importance. This is true not only of tribe incorporated under the provisions of the Indian Reorganization Ac of 1934 {} but also of the many tribes which have not availed themselves of the privileges of the act."

Richmond Allan, Deputy Solicitor, M36350, June 20, 1956.

In this matter, BIA has misapplied IRA and its statutory scheme, and no other statute or court order requires BIA to reorganize the Tribe nor allows it to make membership determinations. Fundamentally, what started as a leadership dispute between the late, Yakima Dixie, and the current General Council, Appellants in this matter, was then, and remains now a membership dispute by a federally acknowledged tribe that governs itself under a traditional system outside the IRA, and no statute, regulation or court order mandates the requirement that the California Valley Miwok Tribe and its General Council be reorganized under the IRA

For reasons set forth above, Appellants urge the Board to find the December 2018 decision is not final agency action and assume jurisdiction over this matter as this is a membership matter and trigger the automatic stay of the February 15, 2019 Letter by BIA to schedule and hold an alleged Secretarial election. In the alternative, Appellants recommend an immediate notification of the Assistant Secretary of Indian Affairs that this matter involves

internal tribal membership matters and recommend that the Assistant Secretary assume jurisdiction.

Respectfully submitted this day of **March 21, 2019,**

Peter D. Lepsch
John M. Peebles
Fredericks Peebles & Morgan, LLP
2020 L Street, Suite 250
Sacramento, CA 95811

Attorneys for Appellants Silvia Burley, Chair,
the Tribe's General Council, and
the California Valley Miwok Tribe

Enclosures: Exhibits

cc.    Interested Parties:

Tara Katuk Mac Lean Sweeney
Assistant Secretary - Indian Affairs
Department of the Interior
1849 C Street, N.W. MS-4660-MIB
Washington, D.C. 20240

John Tahsuda
Principal Deputy Assistant Secretary-Indian Affairs
U.S. Department of the Interior
MS-4160-MIB
1849 C. Street, N.W.
Washington, DC 20240

Arny Dutschke
Pacific Regional Director
2800 Cottage Way
Sacramento, CA 95825

Dale Risling
Deputy Regional Director
2800 Cottage Way
Sacramento, CA 95825

Troy Burdick, Superintendent
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

Pacific Southwest Regional Solicitor
Office of the Solicitor
U.S. Department of the Interior
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

Associate Solicitor – Indian Affairs
Office of the Solicitor
MS 6513 – MIB
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Michael Mendibles, Spokesperson
California Valley Miwok Tribe Petitioners
c/o James Rusk, Attorney
Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
**Certificate of Service**

17

# EXHIBIT 15



## United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814-4710

IN REPLY REFER TO
TRIBAL OPERATIONS

FEB 15 2019

Dear Eligible Voter of the California Valley Miwok Tribe:

On December 21, 2018, the Regional Director, Pacific Region, Bureau of Indian Affairs, authorized the Superintendent, Central California Agency, Bureau of Indian Affairs, to call and conduct a Secretarial election on the proposed Constitution of the California Valley Miwok Tribe (Also known as Sheep Ranch Rancheria of Me-Wuk Indians of California) in accordance with Title 25 – Indians of the Code of Federal Regulations, Part 81 (25 CFR, Part 81). Therefore, all adult eligible voters of the California Valley Miwok Tribe are hereby advised that a Secretarial election is scheduled for April 15, 2019, for the purpose of the eligible voters to vote to adopt or reject the proposed Constitution.

**SECRETARIAL ELECTION BOARD.** In cooperation with the Spokesperson for the petitioners of the California Valley Miwok Tribe, the Superintendent of the Bureau of Indian Affairs, Central California Agency, appointed a Chairperson; subsequently, the Spokesperson provided the names of the appointed Tribal Representatives to serve on the Secretarial Election Board. The Secretarial Election Board is comprised of the following individuals:

Carol Rogers-Davis, Chairperson
Antoinette Lopez, Tribal Representative
Gilbert Ramirez, Jr., Tribal Representative

**ELECTION MATERIAL.** It shall be the duty and responsibility of the Secretarial Election Board to conduct the Secretarial election. The Board shall prepare all necessary documents and material for the successful conduct of the election. All matters pertaining to the Secretarial election shall be addressed to the Secretarial Election Board.

**REGISTRATION.** We are enclosing the following election material for your information and use in registering to vote in the Secretarial election: (1) Official Election Notice; (2) Voter Registration Form with pre-addressed, pre-paid envelope; (3) Sample Ballot; (4) Copy of the proposed Constitution. These election materials are being mailed to all adult eligible voters who are 18 years of age and older. You must register to vote with the Secretarial Election Board if you intend to vote in this Secretarial election. Please sign, date and return the Voter Registration Form in the pre-addressed, pre-paid envelope to the Chairperson of the Secretarial Election Board, Bureau of Indian Affairs, Central California Agency, by 4:30 p.m., Friday, March 15, 2019.

The List of Registered Voters will be posted on Monday, March 18, 2019, at the following locations: Bureau of Indian Affairs, Central California Agency, 650 Capitol Mall, Suite 8-500, Sacramento, California 95814; (2) Mountain Ranch Community Club, 8049 Washington Street, Mountain Ranch, California 95246. Challenges to the Registered Voters List must be received by the Secretarial Election Board at the Bureau of Indian Affairs, Central California Agency, by 4:30 p.m., Monday, March 25, 2019.

**MAILOUT BALLOT.** The Secretarial election shall be conducted entirely by U.S. Mail. There will be no polling site. The Secretarial Election Board upon receipt of the voter's completed Voter Registration Form shall send to the registered voter, a Mailout Ballot with instructions and a pre-paid, pre-addressed return envelope to permit the voter to vote by U.S. Mail. The Secretarial Election Board must receive the Mailout Ballot at the Bureau of Indian Affairs, Central California Agency, 650 Capitol Mall, Suite 8-500, Suite 8-500, Sacramento, California 95814 via U.S. Mail or by hand delivery to the Central California Agency, by 4:30 p.m., Monday, April 15, 2019.

**POSTING OF ELECTION NOTICE/RESULTS.** The Election Notice and a copy of the proposed Constitution, and the Election Results will be posted at the following locations: (1) Bureau of Indian Affairs, Central California Agency, 650 Capitol Mall, Suite 8-500, Sacramento, California 95814; (2) Mountain Ranch Community Club, 8049 Washington Street, Mountain Ranch, California 95246.

Please contact Carol Rogers-Davis, Chairperson, Secretarial Election Board, at (916) 930-3794 should you require additional information regarding this matter.

Sincerely,

Troy Burdick
Superintendent

Enclosures



# United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814-4710

IN REPLY REFER TO

FEB 1 5 2019

## NOTICE
## SECRETARIAL ELECTION
## CALIFORNIA VALLEY MIWOK TRIBE

To: Adult Eligible Voters of the California Valley Miwok Tribe

You are hereby advised that a Federal supervised Secretarial election is scheduled for April 15, 2019, for the eligible voters of the California Valley Miwok Tribe to adopt or reject the proposed Constitution of the California Valley Miwok Tribe (Also known as Sheep Ranch Rancheria of Me-Wuk Indians of California).

The United States Department of the Interior, Bureau of Indian Affairs, Central California Agency, is conducting the Secretarial election entirely by Mailout Ballot in accordance with the regulations contained under Title 25 – Indians, Code of Federal Regulations, Part 81. There will be no Polling site.

Eligible Voters who are 18 years of age or older on the date of the Secretarial election and are registered to vote in the Secretarial election shall be entitled to vote on the adoption or rejection of the proposed Constitution. A Secretarial election Notice, Voter Registration Form with return envelope, sample Mailout Ballot, and a copy of the proposed Constitution are being mailed to all eligible voters listed on the Tribe's Eligible Voter Roster. The Registered Voters List and the Results of the Secretarial election will be posted at the following locations: (1) Bureau of Indian Affairs, Central California Agency, 650 Capitol Mall, Suite 8-500, Suite 8-500, Sacramento, California 95814; (2) Mountain Ranch Community Club, 8049 Washington Street, Mountain Ranch, California 95246. The Secretarial Election Board must receive challenges to the Registered Voters List by 4:30 p.m., Monday, March 25, 2019.

<u>You must register to vote with the Secretarial Election Board by 4:30 p.m., Friday, March 15, 2019, if you intend to vote in this Secretarial election.</u> Please contact the Secretarial Election Board at (916) 930-3794 should you have any questions, regarding this Secretarial election.

Carol Rogers-Davis
Chairperson
Secretarial Election Board

OMB Control No. 1076-0153
Expires: 02/28/2019

# SECRETARIAL ELECTION
# VOTER REGISTRATION FORM

| Last Name | First Name | Middle Name | Jr/Sr/III |
|-----------|-----------|-------------|-----------|
| | | | |

| Address **where you live** | | | |
|---|---|---|---|

| City | | State | Zip Code |
|------|---|-------|----------|
| | | | |

| Address **where you get your mail** (if mail is not delivered to your home) | Date of Birth |
|---|---|

I hereby certify that I am an eligible voter of the **California Valley Miwok Tribe** and that I am at least 18 years of age or will be at least 18 years of age on the date of the Secretarial election **April 15, 2019**).

_____

Signature (*must sign to be valid*)                                           (Date)

- Completing and returning this registration is necessary if you desire to vote in the forthcoming Secretarial election;
- This form, upon completion and return to the Secretarial Election Board, will be the basis for determining whether your name will be placed upon the list of registered voters, and therefore may receive a ballot;
- Completion and return of this form is voluntary, but failure to do so will prevent you from participating in the Secretarial election;
- Print your name and address;
- Sign your name and date; and
- Return this Voter Registration Form in the pre-addressed envelope provided.

## PRIVACY ACT STATEMENT

25 CFR Part 81 authorizes the collection of this information. The information is confidential and is never disclosed without written clearance and consent of the applicant. The primary use of this information is to determine an Indian individual's eligibility to vote in a Secretarial election. Additional disclosures of this information may be to other BIA or tribal officials in the conduct of their official duties pertaining to the preparation for and conduct of a Secretarial election, or in the conduct of program review and to the Office of Inspector General or the General Accounting Office when conducting an audit of BIA Programs, or local Law Enforcement agency when the agency becomes aware of violation or possible violation of civil or criminal law, and to the General Services Administration in connection with its responsibility for records management. This information will be entered into the BIA, Tribal Rolls, Interior/BIA-7 (76 FR 59733), which can be obtained upon request from the Chief, Division of Tribal Government Services, 1849 C Street, N.W., MS-3645-MIB, Washington DC 20240. No record contained therein may be disclosed by any means of communication to any person, or to another agency, except pursuant to a written request by, or with prior written consent of the individual to whom the records pertains.

Under the Privacy Act, BIA may not give out your information except that BIA may share the information with other Federal, State, and Tribal offices and programs that have a responsibility to facilitate the Secretarial election. The information can also be given to those agencies for law enforcement purposes. This can be done without your consent. For any other person or program wanting information from your case file, you must first give your written consent. You have the right to know what records exist on you and you can ask to see them. If you believe some information in on you is inaccurate, you may contact the Chief, Division of Tribal Government Services, to request a correction.

## PAPER WORK REDUCTION ACT STATEMENT

This information is being collected to determine eligibility for voting in a Secretarial election. Response to this collection is required to obtain benefits under 25 CFR 81. A Federal Agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. Public reporting for this form is estimated to average 15 minutes per response, including the time for reviewing instructions, gathering and maintaining data, completing the form. Direct comment regarding the burden estimate or any other aspect of this form to: Information Collection Clearance Officer, Office of Regulatory Affairs & Collaborative Action – Indian Affairs, 1849 C Street, N.W., MS-3642-MIB, Washington, D.C. 20240.

US POSTAGE $00.50

UNITED STATES
DEPARTMENT OF THE INTERIOR
Bureau of Indian Affairs
Central California Agency
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814

OFFICIAL BUSINESS
Penalty for Private Use, $300

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
CENTRAL CALIFORNIA AGENCY
POST OFFICE BOX 15346
SACRAMENTO, CALIFORNIA 95851

## CALIFORNIA VALLEY MIWOK TRIBE
### SECRETARIAL ELECTION – APRIL 15, 2019

A Secretarial election called by the Secretary of the Interior under the provisions of the Indian Reorganization Act, as amended, to vote on the adoption or rejection of the proposed Constitution of the California Valley Miwok Tribe (Also known as the Sheep Ranch Rancheria of Me-Wuk Indians of California).

OFFICIAL BALLOT

*Carol B. Rogers*

Carol B. Rogers-Davis, Chairperson
ELECTION BOARD

Shall the proposed Constitution of the California Valley Miwok Tribe (Also known as the Sheep Ranch Rancheria Me-Wuk Indians of California) BE ADOPTED by the eligible voters of the California Valley Miwok Tribe?

### MARK AN "X" IN THE BOX OF YOUR CHOICE:

☐                              ☐

YES                            NO
(IN FAVOR OF)                  (AGAINST)

# The CONSTITUTION

## OF THE

## CALIFORNIA VALLEY MIWOK TRIBE

## (ALSO KNOWN AS

## SHEEP RANCH RANCHERIA OF ME-WUK INDIANS OF CALIFORNIA)

### PREAMBLE

We, the People of the California Valley Miwok Tribe (a.k.a. Sheep Ranch Rancheria of Me-Wuk Indians of California) do hereby establish this Constitution, in respect for our ancestors and future generations, in order to protect the rights of the Tribe and its members as a sovereign nation, to preserve and advance our cultural identity, to promote the general welfare of our people and descendants, and for the conduct of the affairs of our community within this legal structure.

### HISTORY

The Act of April 30, 1908 (35 Stat. 70-76) authorized the purchase of land for homeless Indians. A federal census on August 13, 1915 identified twelve Me-Wuk Indians living near the town of Sheepranch (now Sheep Ranch), California, as "the remnant of once quite a large band of Indians in former years living in and near the old decaying mining town known and designated on the map as Sheepranch," and noted they were "to some extent. .. interchangeable in their relations" with the Indians of nearby Murphys, Six-Mile, Avery and Angels Camp. Their ancestors dated back several thousand years into pre-historic times.

The United States purchased land for the benefit of these Indians, which later became known as the Sheep Ranch Rancheria. In 1935, the Tribe voted to become organized under the Indian Reorganization Act of 1934. In 1965, the Federal government prepared a distribution plan for the assets of the Tribe for the purposes of the California Rancheria Act; however, unlike other rancheria tribes, this Tribe was never terminated.

The lineal descendants of (i) the Tribal members identified on the 1915 census, (ii) those who voted in the 1935 election, and (iii) those identified in the 1965 distribution plan became known, by the Bureau of Indian Affairs, as the Eligible Groups-those making up the Tribal community who had the right to participate in the organization of the Tribe. In addition, many other members came and went from the Sheep Ranch Rancheria over the decades after 1915; and the Tribe existed as a network of related families with regional ceremonies. These members of the tribal community were identified in the 1929 Federal Indian Census Roll for Calaveras County, and the Tribe included the Mewuks on that census as members.

December 21, 2018, Authorization to conduct a Secretarial election April 15, 2019, on this version of the proposed Constitution of the California Valley Miwok Tribe (Also known as Sheep Ranch Rancheria Me-Wuk Indians of California).

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

In 1979, the Federal government began publishing a list of federally recognized tribes in the Federal Register; and therein, the Tribe was identified as: "Sheep Ranch Rancheria of Me-Wuk Indians of California". Then, in 2002, the name was changed in the Federal Register to "California Valley Miwok Tribe (formerly the Sheep Ranch Rancheria of Me-Wuk Indians of California)".

In 2006, the Tribe adopted a provisional constitution, and Tribal Council thereunder ("2006 Council"), for the purpose of establishing an interim Tribal government and completing the organization of the Tribe. In 2013, the Tribe voted to ratify a Tribal Constitution, and Tribal Council thereunder ("2013 Council"), which has governed the Tribe since that time. The Tribe intends that this Constitution shall replace and supersede any and all prior Tribal constitutions or other Tribal governing documents.

From its earliest inception, up to this Constitution, the Tribe remained governed by Me-Wuk tradition, which is centered around the values of a shared identity, mutual support, openness, consensus among the members and a "*toko hyapo*" or spokesperson. These customs continue to influence the conduct of the Tribe, as implemented by this Constitution.

## ARTICLE I – TERRITORY & JURISDICTION

§ I(a) – **TERRITORY.** The territory of the Tribe shall include, to the fullest extent possible consistent with Federal law, all lands, water, property, airspace, surface and subsurface rights, and other natural resources (i) in which the Tribe now or in the future has any interest, (ii) which are owned now or in the future by the United States for the exclusive or non-exclusive benefit of the Tribe or for individual tribal members, or (iii) which are located within the boundaries of a reservation which may be established for the Tribe, notwithstanding the issuance of any right-of-way.

§ I(b) – **JURISDICTION.** Except as prohibited by Federal law or this Constitution, the Tribe shall have jurisdiction over all tribal members and over all persons, subjects, property and all activities occurring within its territory, as defined above in this Article. Nothing in this Article shall be construed to limit the ability of the Tribe to exercise its jurisdiction, based upon its inherent sovereignty as an Indian tribe.

§ I(c) – **HEADQUARTERS LOCATION.** The traditional and cultural headquarters of the Tribe is the site of the Tribe's historic Rancheria at Sheep Ranch, California. In addition, the Tribal Council may designate the Tribe's administrative headquarters and reservation property as being at another location owned by the Tribe in fee or owned by the United States in trust on behalf of the Tribe.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

## ARTICLE II – MEMBERSHIP

**§ II(a) – ELIGIBILITY FOR MEMBERSHIP. The following individuals are eligible for membership in the Tribe, provided they are not enrolled, or otherwise formally recognized, as a member of another Federally recognized Indian tribe.**

§ II(a)1 – Eligible Groups. Any lineal descendant of one of the 13 historical members identified in the following documents:

(i) the Census of the Indians at and near Sheepranch in Calaveras County, California, by Special Indian Agent John Terrell, dated August 13, 1915. The 12 members identified in those documents are:

| | | |
|---|---|---|
| Peter Hodge | Tom Hodge | Mrs  Limpey (Rose Davis) |
| Annie Hodge | Andy Hodge | John Tecumchey |
| Malinda Hodge | Jeff Davis | Pinkey Tecumchey |
| Lena Hodge . | Betsey Davis | Mamy Duncan |

(ii) the Approved List of Voters for Indian Reorganization Act of Sheep Ranch Rancheria (Calaveras County) dated June 6, 1935 and approved by Sacramento Indian Agency Superintendent O.H. Lipps. The sole member identified in that document is:

Jeff Davis (also identified in Article II(a)(i)(i) above)

(iii) the Plan for Distribution of the Assets of the Sheep Ranch Rancheria, dated August 18, 1966 and approved by Commissioner of Indian Affairs Robert L. Bennett. The sole member identified in that document is:

Mabel Hodge Dixie

**[Article II continues on next page]**

-3-

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ II(a)2 – Census of 1929. Any one of the persons identified as exclusively "Mewuk" (as opposed to "Mewuk-Tuolumne" or "Tuolumne-Mewuk") in the Indian Census Roll for Calaveras County, dated June 30, 1929, taken by L.A. Dorrington, Superintendent, Bureau of Indian Affairs Sacramento jurisdiction, or any lineal descendant of such a person. The persons identifed as exclusively "Mewuk" in the 1929 census are:

| | | | |
|---|---|---|---|
| Barry, Lizzie | Eaph, Wilbur | Jack, Lyda | Shelton, John |
| Butler, Daisy | Fuchs, Elmira | Jeff, Hempie | Shelton, Lena J. |
| Butler, Earl | Fuchs, Paul F | Jeff, John | Shelton, Stephen |
| Butler, Frank | Geto, Alice | Jeff, Lennie | Shrum, Emma |
| Butler, Gus | Geto, Florence | Jeff, Manuel | Shrum, Georgia |
| Carlton, Lucile | Geto, Frank | Jeff, Ray | Shrum, James E. |
| Carsoner, Dan | Geto, Jeanette | Jeff, Susner | Sissel, Abbie |
| Carsoner, Mary | Geto, Laura | Jeff, Tessie | Sissel, Jesse |
| Carsoner, Tom | Geto, Louis | Jeff, Tillie | Sissel, Mayme |
| Cartega, Billy | Geto, Mary | Jeff, Walter | Swanson, Adeline D. |
| Cartega, Mary | Gold, Bernal E. | Leamed, Albert | Swanson Irene |
| Cassella, Charles | Gold, Sherwood D. | Learned, Oscar | T(F)ecumseh, John |
| Cassella, Ellwood | Hunter, Annie | Lincoln, Abraham | T(F)ecumseh, Pinky |
| Cassella, Eugene | Hunter, James | McBath, Thomas J. | Vallencia, Charles |
| Cassella, Lawrence | Hunter, Nettie | Mose, Alva | Vallencia, Gertrude |
| Crosby, Edith | Hern(m)andez, Hattie | Mose, Angie | Vallencia, Joseph |
| Crosby, Helen | Herzer, Andrew C. | Mose, Dewey | Vallencia, William |
| Crosby, Nora | Herzer, Clarence | Mose, Eva | Weirich, Clara |
| Crosby, Raymond | Herzer, Eleanor | Mose, Irene | Wilson, Charles |
| Crosby, Stanley | Herzer, Larence F. | Mose, Lester | Wilson, Ella |
| Davis, Betsy | Herzer, Louis F. | Mose, Lulu | Wilson, George |
| Davis, Jeff | Herzer, Lula | Mose, Violet | Wilson, George W. |
| Davis, Limpy | Herzer, Phillip | O'Cormor, Lillie | Wilson, Harry |
| Davis, Margaret | Herzer, Vernon G. | O'Cormor, Pedro | Wilson, Henry |
| Davis, May | Hodge, Mabel | Ross, Charlotte | Wilson, Lillie |
| Dixie, Joe | Hodge, Tex | Ross, Ida | Wilson, Luther |
| Dixie, Mary | Hodges, Andrew | Ross, Juanita | Wilson, Steve |
| Eaph, Andy | Hodges, Inez | Ross, Robert | Wilson, Viola |
| Eaph, Edna | Hodges, Patterson | Ross, Vincent | Yale, Alta C. |
| Eaph, John | Hodges, Thomas | Sawyer, Maggie | Yale, Edmund S. |
| Eaph, Lillie | Jack, Charles | Shelton, Charlie | Yale, Juline |
| Eaph, Mallinnie | Jack, Edna | Shelton, Charlotte | Yale, Tyler S. |
| Eaph, Rowena | Jack, James | Shelton, Dora | |
| Eaph, Virginia | Jack, Lavina | Shelton, Elsie | |

§ II(a)3 – Other Me-Wuk Descendants. Any lineal descendant of any other Me-Wuk Indian, in addition to those named as Mewuk on the 1929 census and listed in Article II(a)(2), who was born in Calaveras County and lived in Calaveras County at the time of the 1929 census, as determined by the Tribal Council through a process adopted by Tribal Resolution.

§ II(a)4 – Lineal Descent From An Enrolled Tribal Member. Any person who is born to an existing Tribal member is, by lineal descent, eligible to be enrolled as a member of the Tribe.

§ II(b) – ACCEPTANCE OF MEMBERSHIP. Any individual eligible to become a Tribal member shall apply for enrollment as a Tribal member by submitting their genealogy and evidence in proof of the criteria cited in Article II(a)(1-4), to the Tribe's Enrollment Committee or other authority as designated in the Enrollment By-Laws. The Tribal Council may specify, in

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

By-Laws, requirements for evidence to be deemed acceptable in proof of the membership criteria in §§ II(a)(1-4), and other rules and procedures to govern the Tribe's enrollment process. Upon verification by the Enrollment Committee or other designated authority, the Secretary or its designee shall (i) add the new member's identification in the Tribal membership roll, (ii) issue the new member a tribal enrollment number, and (iii) induct the new member into the Tribe by ceremony as prescribed by the Tribal Council.

## § II(c) – RIGHTS OF MEMBERS.

There is only one class of membership; and any person who is a member under §§ II(a)-II(b) of this Article shall have full and equal rights as any other member under this Constitution, subject to sanctions and/or loss of membership as provided in Article II(d).

## § II(d) – LOSS OF MEMBERSHIP AND SANCTIONS.

**§ II(d)1 – Loss Of Membership.** A member of the Tribe may not lose one's membership involuntarily nor be dis-enrolled for any reason other than providing erroneous facts about the person's lineage during the Enrollment process or having membership in another Federally Recognized tribe.

**§ II(d)2 – Sanctions Against Members.** On a case-by-case basis, the Tribal Council may sanction a member for a justifiable cause by withdrawing or suspending tribal benefits and privileges. Such sanctioning shall be done in writing and in accordance with the procedures established in By-Laws. Such sanctions shall not include the loss of tribal membership. Regardless of the number of Tribal Council members present or voting, any sanction imposed against a Tribal member pursuant to this Article II(d)(2) shall require the affirmative vote of at least six (6) members of the Tribal Council.

**§ II(d)3 – Reinstatement Of Tribal Benefits And Privileges.** Any person who has been sanctioned pursuant to § II(d)2, as above, may have the benefits and privileges of Tribal membership restored in accordance with procedures established in By-Laws.

**§ II(d)4 – Appeal Of Loss Of Membership Or Sanctions.** Any person who has been dis-enrolled or sanctioned may appeal to the Tribal Court in accordance with the procedures established in By-Laws.

## § II(e) – MEMBERSHIP ROLL. The Enrollment Committee shall maintain the membership roll of all current and former tribal members.

## § II(f) – OATH OF MEMBERSHIP. A member, upon becoming 18 years of age and therefore qualified, shall read this Constitution and sign an oath to uphold the Constitution and to pledge one's allegiance to the Tribe; and this oath shall be prescribed in the By-Laws.

## § II(g) – MEMBERSHIP BY-LAWS. The Tribal Council shall enact By-Laws related to Tribal membership, defining the specific procedures which govern the enrollment and other conditions of membership.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

## ARTICLE III – GOVERNANCE

**§ III(a) – GOVERNING BODIES.** The governance of the Tribe shall be: the Tribal Electorate [Article IV], the Tribal Council [Articles V & VI], and the Tribal Court [Article VII].

## ARTICLE IV – TRIBAL ELECTORATE

**§ IV(a) – THE TRIBAL ELECTORATE.** The Tribal Electorate shall be all adult members (18 years of age or older) of the Tribe. The Tribal Electorate is at-large and not segmented into geographical districts. The Tribal Electorate votes for and thereby establishes the Tribal Council (Article V). Also, the Tribal Electorate may remove a Tribal Council member(s) and fill Vacancies (Article IX & X); and make Initiatives and Referenda (Article XI) and make Amendments to the Constitution (Article XVI). The power of the Tribal Electorate shall be restricted exclusively to those functions.

## ARTICLE V – TRIBAL COUNCIL

**§ V(a) – TRIBAL COUNCIL.** The representative governing body of the Tribe shall be the Tribal Council elected by the Tribal Electorate. The Tribal Council shall exercise the powers of the legislative branch of the Tribal government (e.g., by enacting the By-Laws and Administrative Codes) and the executive branch of the Tribal government (e.g., by ensuring that Tribal law is carried out) as provided in this Constitution. There shall be seven (7) members of the Tribal Council, which shall consist of a Chairperson, a Vice Chairperson, a Secretary, a Treasurer, and three (3) At-Large Members. All Tribal Council members shall be enrolled members of the Tribe, who are members of the Tribal Electorate and who have been elected in accordance with this Constitution by the procedures in Article IX.

**§ V(b) – CHAIRPERSON.** The Tribal Council shall have one position of Chairperson who shall be at least thirty-five (35) years of age. The Chairperson is a voting member of the Council.

> **§ V(b)1 – Duties Of Chairperson.** The Chairperson is the presiding officer of the Tribal Council. The duties of the Chairperson shall include, but are not limited to, organizing the meetings and agenda for the deliberation and voting of the Tribal Council, presiding at all meetings of the Tribal Council and at General Meetings of the Tribal Electorate, administering the meetings and proceedings of the Tribal Council, over-sight of all administrative activities of the Tribe, certifying all Tribal enactments, and coordinating communication of the tribal activities to the membership. These functions may be delegated to others by the Chairperson but such delegation is subject to the over-sight of the Chairperson.

**§ V(c) – VICE CHAIRPERSON.** The Tribal Council shall have one position of Vice Chairperson who must be at least thirty-five (35) years of age.

> **§ V(c)1 – Duties of Vice Chairperson.** The duties of the Vice Chairperson shall include, but are not limited to, assisting the Chairperson and substituting for the Chairperson in the absence of that official.

-6-

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

**§ V(d) – SECRETARY.** The Tribal Council shall have one position of Secretary who must be at least thirty (30) years of age.

> **§ V(d)1 – Duties of Secretary.** The duties of the Secretary shall include, but are not limited to: taking roll call at all meetings, maintaining the minutes of all meetings, providing agendas for all meetings, attesting all Tribal enactments, overseeing the maintenance of the Tribal membership roll by the Enrollment Committee or other designated authority, and maintaining all the correspondence for the Tribe.

**§ V(e) – TREASURER.** The Tribal Council shall have one (1) position of Treasurer who must be at least thirty (30) years of age.

> **§ V(e)1 - Duties of Treasurer.** The duties of the Treasurer shall include, but are not limited to, overseeing the fiduciary affairs of the Tribe and making reports as needed to the Tribal Council.

**§ V(f) – AT-LARGE MEMBERS.** The Tribal Council shall have three (3) At-Large members, who must be at least thirty (30) years of age. The At-Large members shall perform functions as may be assigned by the Council. These are voting members of the Council.

**§ V(g) – ADJUVANT COUNCILS.** The Tribal Council shall establish a Council of Elders, a Council of Youth, or other *ad hoc* Councils as deemed appropriate, pursuant to By-Laws, to serve in an advisory capacity to the Tribal Council. Representatives of these Adjuvant Councils are elected by a majority of the Tribal Council, and they may attend Council meetings, and address, and advise the Council. However, these are non-voting positions with respect to the actions of the Tribal Council.

**§ V(h) – TRIBAL COUNCIL TERMS OF OFFICE.** The terms of office for all Tribal Council members including the Chairperson and Vice Chairperson shall be four (4) years except as provided for in Section IX(d) - The First Election. There shall be no limitations on serving consecutive terms on the Tribal Council.

**§ V(i) – DUTIES OF THE TRIBAL COUNCIL.** The duties of the Tribal Council members include, but are not limited to, those functions enumerated in this Constitution. Other functions and duties shall be defined by By-Laws pursuant to § V(1) of this Article.

**§ V(j) – MEETINGS OF THE TRIBAL COUNCIL.**

> **§ V(j)1 – Regular Monthly Meetings.** The Tribal Council shall hold regular meetings, once per month. These meeting shall be open to the members, except closed-session meeting for personnel matters and other issues considered confidential under State or Federal law. The Tribal Council shall establish requirements for notice of regular meetings of the Tribal Council. The Tribal Council shall provide notice of such meetings to the Tribal Electorate by U.S. Mail, e-mail or other appropriate means of written communication.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ V(j)2 – Special Meetings. The Chairperson or any three (3) other members of the Tribal Council may call special meetings of the Tribal Council. Adequate notice of all special meetings (in terms of subject and timing) shall be given to all members of the Tribal Council as defined in By-Laws.

§ V(j)3 – Rules Of Order. The meetings of the Tribal Council shall be conducted according to rules-of-order as defined in By-Laws.

§ V(j)4 – Recording. At each regular or special meeting of the Tribal Council, a recording of the proceedings shall be made. The Secretary or other person appointed by the Tribal Council shall take minutes of the meeting. The minutes of each regular or special meeting of the Tribal Council shall be preserved by the Tribal Council and made available to tribal members in accordance with By-Laws.

§ V(j)5 – Quorum. A quorum is required at all regular or special Tribal Council meetings in order to conduct official business of the Tribal Council. In no case shall a quorum be fewer than four (4) members of the Tribal Council, regardless of the number of Tribal Council office holders.

§ V(j)6 – Voting. Except as otherwise provided in this Constitution, the Tribal Council shall make enactments by a majority vote of a quorum of the Tribal Council. All Tribal Council members, including the Chairperson and Vice Chairperson, shall have the power to vote. Proxy voting in the Tribal Council is prohibited. The Tribal Council may adopt Tribal By-Laws, consistent with this Constitution, to establish additional voting procedures for the Tribal Council.

§ V(k) – CODE OF ETHICS. The Tribal Council shall have the power to adopt a Code of Ethics by appropriate By-Law which governs the conduct of tribal officials - Council and Administrative. The Code of Ethics may include disciplinary procedures so long as the official in question is informed in writing of the charges and given an opportunity to respond to those charges, including the opportunity to present witnesses and other evidence in one's own defense.

§ V(l) – BY-LAWS OR ENACTMENTS. The Constitution shall not be changed except by the Amendment process as defined in Article XVI. All enactments of the Tribal Council under the authority of the Constitution shall be termed a By-Law to the Constitution as described below and shall be certified by the Tribal Chairperson and attested by the Secretary in all instances.

§ V(l)1 – Tribal Laws. A Tribal Law is a By-Law to the Constitution that is enacted and certified by the Tribal Council to regulate the conduct or actions of its members, the officers of its government, the administration of programs, and the governmental process.

§ V(l)2 – Tribal Resolutions. A Tribal Resolution is a By-Law to the Tribal Laws that represents a formal expression of position, opinion, will, or intent as voted by the Tribal Council. A Resolution may be an interpretation by the Tribal Council about the meaning of a particular segment of the Constitution, a Law, or an Administrative Regulation, prior to or other than a judicial interpretation by the Tribal Court. Tribal Resolutions shall be titled according to the date of enactment, the type of enactment, and a descriptor – e.g.,

-8-

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

*yyyy-mm-dd-Resolution-descriptor.* Resolutions shall be journaled in chronologically ordered enactments.

§ V(l)3 – **Tribal Proclamation Or Executive Order.** A Tribal Proclamation or Executive Order is an expression of an intent of the Tribal Council and has no scope or duration except as specified within the Proclamation or Order. Tribal Proclamation or Executive Order shall be titled according to the date of enactment, the type of enactment, and a descriptor – e.g., *yyyy-mm-dd-Proclamation/Executive Order-descriptor.*

§ V(l)4 – **Tribal Administrative Regulation.** A Tribal Administrative Regulation is a By-Law which implements administrative procedures of a Tribal Law or Resolution as enacted by the Tribal Council. Tribal Administrative Regulations shall be titled according to the date of enactment, the type of statute, and a descriptor – e.g., *yyyy-mm-dd-Administrative-Regulation-descriptor.* And they shall be both journaled in chronologically ordered By-Laws and codified in a Code of Administrative Regulations.

## ARTICLE VI – POWERS OF THE TRIBAL COUNCIL

§ VI(a) – **PLENARY POWERS.** Except for the power allocated to the Tribal Electorate in the holding of Elections (Article IX), Removal and Vacancy (Article X), Initiative and Referendum (Article IX), and Amendments to the Constitution (Article XVI), the Tribal Council is the sole authority to exercise all powers that are vested in the Tribe through its inherent sovereignty or through federal law. The Council shall execute these powers in accordance with this Constitution. These powers shall include, but are not limited to, the following:

§ VI(a)1 – **Representations.** To represent the Tribe and act in the name of the Tribe in all matters that concern the Tribe and to make decisions for the Tribe in a manner that is consistent with this Constitution;

§ VI(a)2 – **Contracts.** To negotiate and enter into contracts with the federal, state, and local governments and other tribal governments and with individuals, associations, corporations, enterprises, or organizations;

§ VI(a)3 – **Business Entities.** To create Tribal entities to operate businesses that are conducted by a wholly-owned, subordinate entity of the Tribe; and invest as majority or minority interest in a business entity other than one which is wholly-owned by the Tribe;

§ VI(a)4 – **Property.** To purchase or accept any land or property for the Tribe;

§ VI(a)5 – **Inherited Property.** To enact laws which regulate the use, disposition, and inheritance of all real property within the Territory of the Tribe, as defined in Article I;

§ VI(a)6 – **Assets.** To prevent, veto or approve the sale, disposition, lease, or encumbrance of tribal lands, interests in land, tribal funds or other tribal assets;

§ VI(a)7 – **Legal Counsel.** To employ attorneys and other legal counsel;

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

**§ VI(a)8 – Domestic Relations.** Within the territorial jurisdiction of the Tribe and within the limitations of Article XIV – Civil Rights, to enact laws which regulate the domestic relations of persons;

**§ VI(a)9 – Individual Conduct.** Within the territorial jurisdiction of the Tribe and within the limitations of Article XIV – Civil Rights, to enact laws which regulate the conduct of individual persons;

**§ VI(a)10 – Removal.** To provide for the removal or exclusion of any member or non-member of the Tribe whose presence may be injurious to members of the Tribe and to prescribe conditions upon which any member or non-member may remain within the Territory of the Tribe;

**§ VI(a)11 – Assessments.** To levy and collect taxes, duties, fees, and assessments on individuals and entities;

**§ VI(a)12 – Allocations of Money.** To appropriate and regulate the use of tribal funds;

**§ VI(a)13 – Business Activities.** To regulate all business activities within the jurisdiction of the Tribe and to manage all tribal economic affairs and enterprises;

**§ VI(a)14 – Health and Safety.** To regulate all matters and to take all actions necessary to preserve and safeguard the health, safety, welfare, and political integrity of the Tribe;

**§ VI(a)15 – Appointments.** To appoint subordinate committees, commissions, boards, tribal officers, and employees and to set their compensation, tenure, and duties;

**§ VI(a)16 – Legal Enactments.** To enact Tribal Laws, Resolutions, and Proclamations and regulations that are necessary or incidental to the exercise of its legislative powers.

**§ VI(b) – INITIAL TRIBAL COUNCIL.** In order to maintain continuity of operations, after the adoption of this Constitution, the first Tribal Council shall consist of the following members:

Velma WhiteBear
Antonia Lopez
Michael Mendibles
Iva Sandoval
Antoinette Lopez
Gilbert Ramirez, Jr.
Any person appointed to the Tribal Council to fill the vacancy created by the death of former Tribal Council member Yakima Dixie on December 12, 2017.

That Tribal Council will stay in office until the Federal government has recognized the results of a Secretarial or Tribal election ratifying this Constitution, and thereafter until new Tribal Council members are elected as provided in Article IX(d). Prior to the first election held to elect new Tribal Council members as provided in Article IX(d), if any Tribal Council seat becomes vacant,

-10-

the Tribal Council may make appointments to fill any vacant Tribal Council seats, without regard to the procedures for filling a vacancy provided in Article X(c)(1).

## ARTICLE VII – TRIBAL COURT

§ VII(a) – **ESTABLISHMENT.** The Tribal Council shall establish the Tribal Court System by a By-Law entitled "Law for the Tribal Court System"; and the judicial power for the Tribe shall be vested in that Tribal Court. The Tribal Court System shall include the Tribal Court, itself, and such other lower courts of special jurisdiction, including forums for traditional dispute resolution, as the Tribal Council may deem necessary. There shall also be a Court of Appeals which shall be the court of last resort for all cases filed within the Tribal Court System.

§ VII(b) – **BY-LAWS.** The By-Laws for the Tribal Court System shall define such issues as: Jurisdiction; Appointment of Judges; Qualification of Judges; Compensation; Removal of Judges; and Court Procedures and Due Process.

§ VII(c) – **INITIAL COURT.** During the first five (5) years or sixty (60) months after the acceptance of this Constitution, the Tribal Council shall act as the Tribal Court and shall commission a local, qualified attorney with judicial experience as the Court of Appeals. The procedures for this intermediate, transitional Jurisdiction shall be defined in the By-Laws for the Tribal Court that shall be adopted within the first year after the ratification of this Constitution.

§ VII(d) – **INITIAL DETERMINATIONS.** The determinations of this Initial Court shall be treated as By-Laws, to which subsequent Court cases may refer as res judicata or as stare decisis.

## ARTICLE VIII – TRIBAL ADMINISTRATION

§ VIII(a) – **ADMINISTRATIVE OFFICERS AND STAFF.** The Tribal Administration shall consist of officers and staff who are appointed by majority vote of the Tribal Council. The Tribal Administration shall oversee the implementation and management of the Tribe's business and programs and deal with the day-to-day, specific operations of the Tribe. The Tribal Administration shall be subordinate to the Tribal Council; and a Tribal member shall serve on all administrative entities. This Administration shall be regulated by the By-Laws for Tribal Administration practices and policy.

## ARTICLE IX – ELECTIONS

§ IX(a) – **ELECTION PROCEDURES.** The elections shall be conducted according to the procedures as defined in Election By-Laws. The Tribal Council positions of Chairperson, Vice Chairperson, Secretary, and Treasurer are elected to those specific offices and the remaining three (3) Tribal Council positions are at-large and not by an election district.

§ IX(b) – **GENERAL ELECTIONS.** The Tribal Electorate (Article IV) shall vote on the election of Tribal Council positions (Article V) in the general elections. The Tribal Council shall establish a regular date for elections to the Tribal Council after the first election held in accordance with Article IX(d).

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ IX(c) – **SPECIAL ELECTIONS.** The Tribal Electorate (Article IV) shall vote on the recall of Tribal Council members (Article X(b)), Initiatives and Referenda (Article XI), Amendments to the Constitution (Article XVI), and other special elections, when called for by the Tribal Council, by this Constitution, or by the Tribal Electorate as provided for in this Constitution or appropriate By-Laws.

§ IX(d) – **THE FIRST ELECTION.** Given the provisions in § VI(b) for the Initial Tribal Council to serve until the Federal government has recognized the results of an election ratifying this Constitution, the first General Election shall be held within two (2) years after that recognition. The Council positions shall have staggered terms of office for the first elected Tribal Council. The initial, elected Chairperson, Vice Chairperson, and Treasurer shall serve for a term of six (6) years. The Secretary and remaining three (3) At-Large Tribal Council members shall serve for a term of four (4) years. After this initial variation, all Tribal Council positions shall be for a term of four (4) years.

§ IX(e) – **ELECTION BOARD.** The Tribal Council shall appoint an Election Board to conduct all elections including all special elections. The Election Board shall consist of five (5) tribal members of which one (1) shall be age 55 or older, another between the ages of 35 and 54, and another between the ages of 18 to 34 – provided that all members of the Election Board shall be at least 18 years of age. An Election Board member shall not be a candidate for a position on the Tribal Council. All Election Board members shall serve for a specific term of office as established in the By-Laws for Tribal Elections. The Election Board may appoint clerks, poll-workers, and others to assist the Election Board in conducting the election. In the absence of a sufficient number of Tribal members to fill the Election Board, the Tribal Council may hire non-member professionals for necessary functions.

§ IX(f) – **NOMINATIONS.** For all elections of Tribal Council members, the Election Board shall conduct a Nomination Meeting among the Tribal Electorate to accept a nomination of the candidates for the available Tribal Council seats. Notice of the Nomination Meeting shall be mailed to the Tribal Electorate at least thirty (30) days prior to the Nomination Meeting. This Nomination Meeting shall be at least sixty (60) days prior to the election date. At the Nomination Meeting, members of the Tribal Electorate may submit nominations for any vacant seat. The Election Board shall mail a notice regarding the qualified candidates to all of the Tribal Electorate at least thirty (30) days prior to the election date. The particulars of the nomination process shall be defined in the By-Laws for Elections.

§ IX(g) – **QUALIFICATIONS FOR TRIBAL COUNCIL.** Persons who are nominated to run for the Tribal Council seats must be on the Tribal membership roll and meet the age requirements which are set forth in Article V on or before the date of the election.

§ IX(h) – **ELIGIBLE VOTERS.** All members of the Tribal Electorate, as defined in Article IV, shall be eligible to vote in any General Election or Special Election and are automatically registered as eligible voters for each such election.

§ IX(i) – **BALLOTS.** All voting at regular and special elections shall be done by secret written ballot.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ IX(j) – **ABSENTEE BALLOTS.** Absentee voting shall be permitted pursuant to provisions in a By-Law.

§ IX(k) – **ELECTION RESULTS.** The Election Board shall certify the results of an election within three (3) days after the election day. The candidates receiving the highest number of votes for each available position shall be declared members of the Tribal Council.

§IX(l) – **TIE VOTES.** Tie votes between two (2) or more candidates shall be decided in a run-off election of the Tribal Electorate. If a run-off election ends in another tie, the outcome shall be decided by the existing Tribal Council. The Election Board shall certify the results of any run-off election within three (3) days after the run-off election day.

§ IX(m) – **CHALLENGES.** Any member of the Tribal Electorate may challenge the results of that election by presenting his or her challenge, in writing, to the Tribal Court within five (5) days after the election results have been certified. Causes of action may be only for lack of notice of the election, a miscount of votes, or votes by a person who is not a member of the Tribal Electorate. The Tribal Court shall decide all election challenges within ten (10) days from the date the challenge is filed. Any appeals shall be filed with the Tribal Court of Appeals within five (5) days of the issuance of the Tribal Court decision, and the Court of Appeals shall decide the appeal within ten (10) days. If the Tribal Court or Court of Appeals invalidates the election results as to one or more positions, a new election shall be held for such position(s) within sixty (60) days of the original election—provided, however, that the only candidates in the new election shall be those who received votes for the position(s) as to which the results of the challenged election were invalidated, and no Nomination Meeting shall be held to select candidates for the new election.

§ IX(n) – **OATH OF OFFICE.** The oath of office for newly elected Tribal Council members shall be administered by the Election Board within thirty (30) days after the Election Board declares the winners of the election, unless a Challenge is filed and, in that case, within thirty (30) days after a final decision by the Tribal Court or Court of Appeals. If a challenge is filed but it does not relate to all of the elected seats, then the oath of office shall be administered to the newly elected Tribal Council members whose seats have not been challenged as above, within thirty (30) days after the Election Board declares the winners. Each incumbent Tribal Council member shall remain in office until the oath of office is administered to the newly elected Tribal Council member for one's seat.

§ IX(o) – **TRANSFER OF RECORDS.** Upon expiration of the incumbent's term of office, that incumbent shall transfer all tribal records within one's control to the newly elected office holder.

§ IX(p) – **ELECTION BY-LAWS.** The Tribal Council shall enact an election By-Law that is consistent with this Constitution and which covers all necessary procedures for all elections other than the procedures stated in this Constitution.

§ IX(q) – **REFERENDA AND AMENDMENTS.** Other than elected officials, the term "Election" shall also refer to the adoption of By-Laws by Initiative and Referendum under Article XI and to Amendments under Article XVI, both of which require a vote of the Tribal Electorate.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

## ARTICLE X – REMOVAL AND VACANCY

### § X(a) – REMOVAL OF COUNCIL MEMBER BY THE TRIBAL COUNCIL.

§ X(a)1 – Removal.  The Tribal Council shall remove a Tribal Council member for a conviction of a felony by any tribal, federal, or state court while serving on the Tribal Council.

§ X(a)2 – Suspension.  The Tribal Council may suspend a Tribal Council member charged with a felony pending the outcome of the trial and any appeal.

§ X(a)3 – Discipline.  The Tribal Council may discipline or remove a Tribal Council member by a vote of at least five (5) members of the Tribal Council for converting tribal property or moneys for personal use or failing to attend four (4) regular or special meetings consecutively without good cause, or for the violation of the Tribal Code of Ethics.

§ X(a)4 – Due Process.  In all proceedings under § X(a)1, -2, and -3, above, the Tribal Council member, who is subject to these proceedings, shall be afforded full due process rights including a written statement of the charges, the right to respond to those charges, the right to be represented by counsel, and the right to present witnesses and other evidence in his or her defense.  The decision of the Tribal Council shall be final and shall be appealable to the Tribal Court only if a claim is made that there has been an error in a relevant fact(s) related to the removal, or the Tribal Constitution has been violated, or due process rights have not been afforded.  A Tribal Council member, who is removed from office, must wait at least five (5) years from the official date of removal to run again for office.

### § X(b) – RECALL OF TRIBAL COUNCIL MEMBER BY TRIBAL ELECTORATE.

§ X(b)1 – Initiative by Tribal Member.  Any member of the Tribal Electorate may initiate recall proceedings, for good cause, against any Tribal Council member by filing a written request with the Election Board, provided that a recall proceeding may not be initiated against any member of the Tribal Council whose term expires within six (6) months of the date the written request is received by the Election Board.

§ X(b)2 – Issuance of Petition.  Upon receipt of the written request, the Election Board shall issue official petition forms to the member who initiated the recall.  That member shall have sixty (60) days to collect the signatures from thirty percent (30%) of the Tribal Electorate.  Upon receipt of a valid petition, the Tribal Council shall call a special election pursuant to Article IX and appropriate By-Laws.

§ X(b)3 – Number of Recalls.  A recall petition shall be circulated for each Tribal Council member who is subject to recall.  A maximum of three (3) Tribal Council members may be recalled at a time.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ X(b)4 – Recall Meeting. The Election Board shall verify the petition within ten (10) days of receipt of the signed petitions. Verification shall determine whether the recall petition has the required number of signatories. The Election Board, in its discretion, may seek written or other confirmation of the authenticity of the signatures, including, but not limited to, by comparison to prior signatures on record with the Election Board. If the member seeking recall has collected the required number of signatures in the allotted time, then the Election Board shall hold a recall meeting within sixty (60) days of the receipt of the signed petitions. Notice of the recall meeting shall be mailed to the Tribal Electorate at least thirty (30) days prior to the recall meeting. The member initiating the recall and the Tribal Council member subject to recall shall be given a reasonable opportunity to speak and present evidence at the recall meeting.

§ X(b)5 – Majority Vote. The recall petition is approved if a majority of those voting are in favor of the recall and at least thirty percent (30%) of the Tribal Electorate casts a vote in the recall vote.

§ X(b)6 – Voting Procedures. Recall procedures, which are not specified in the Constitution, shall be held in accordance with the provisions of the By-Laws for Tribal Elections, which shall include a section on recall procedures.

§ X(c) – VACANCIES.

§ X(c)1 – Filling a Vacancy. If a Tribal Council member should become deceased or incapacitated, resign, or be removed or recalled from office, then the Tribal Council shall declare the position vacant. The Tribal Council shall fill a vacancy by special election unless there are less than six (6) months remaining in the term, in which case the Tribal Council shall leave the position vacant. The elected person who fills a vacant position shall only serve out the term of the person whom he or she is replacing.

§ X(c)2 – Resignation. All resignations from the Tribal Council shall be done in writing and shall be notarized by a currently certified Notary Public or witnessed by at least two (2) other members of the Tribal Council. Following the Tribal Council's receipt of such resignation, the Tribal Council shall issue a Proclamation in accordance with this Constitution to give effect to such resignation.

## ARTICLE XI – INITIATIVE AND REFERENDUM

§ XI(a) – INITIATIVE TO THE TRIBAL COUNCIL. Excluding issues that regard membership under Article II, land, or housing, any member of the Tribal Electorate may propose to the Tribal Council that a By-Law be adopted by the Tribal Council. Any such Initiative must be consistent with this Constitution and cannot be an Amendment to the Constitution, which is available elsewhere, under Article § XVI. Such an Initiative must be in the form of a petition, as defined under a By-Law, that has been signed by at least thirty percent (30%) of the Tribal Electorate. The Tribal Council must vote on said Initiative within sixty (60) days after receipt of the petition with its qualifying number of petition signatures. A majority vote of the Tribal Council shall decide whether the proposed By-Law is adopted and, thereafter, be in effect. If the

Tribal Council denies the petition or does not act within the sixty (60) day enactment period, the petitioner of the Initiative may use the Referendum process, below.

§ XI(b) – **REFERENDUM TO THE TRIBAL ELECTORATE.** If the Tribal Council fails to vote on an Initiative, as above, or if the Tribal Council votes against said Initiative, then the Petitioners may seek a Referendum directly to the Tribal Electorate. Pursuant to By-Laws to this Article, the Petition shall be reconstructed as a Referendum, and that shall be sent by the Tribal Council to the Tribal Electorate. Thirty percent (30%) of the Tribal Electorate must have affirmed the Referendum before it is valid, and, if so, it shall be presented to the Tribal Council for the calling of a special election pursuant to an appropriate Election By-Law under Article IX.

§XI(c) – **PROCEDURES.** Initiative and Referendum elections shall be conducted by the Election Board and shall be held in accordance with the provisions of a By-Law which deals specifically with Initiatives and Referenda procedures.

## ARTICLE XII – LAND

§ XII(a) – **LAND POLICY.** The Tribal Council shall have the authority to establish land policies, to adopt land-use By-Laws, and to otherwise regulate land within the territory of the Tribe and in accordance with this Constitution and applicable State and Federal laws.

## ARTICLE XIII – SOVEREIGN IMMUNITY

§ XIII(a) – **WAIVER.** The California Valley Miwok Tribe (also known as the Sheep Ranch Rancheria of Me-Wuk Indians of California) shall be immune from suit except to the extent that the Tribal Council expressly waives the Tribe's sovereign immunity.

## ARTICLE XIV – CIVIL RIGHTS

§ XIV(a) – **INHERENT RIGHTS OF MEMBERS.** The Tribe (its members and the elected and appointed officers) in exercising its powers of self-government shall not abrogate the following Civil Rights of individual members.

§ XIV(b) – **SPEECH AND ASSEMBLY.** The governance of the Tribe is secular and shall not make or enforce any law which prohibits the free exercise of religion, or abridges the freedoms of speech, communications, or the right of people to peaceably assembly and to petition for redress of grievances or initiate By-Laws.

§ XIV(c) – **FURTHER PROSCRIPTIONS.** The Tribe shall not violate the right of members to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, nor shall warrants be issued except on probable cause and supported by an oath or affirmation of an officer who is appointed for such actions and which describes the particular place to be searched and the person or thing to be seized.

§ XIV(d) – **DOUBLE JEOPARDY.** The Tribe shall not subject any person to prosecution more than once for the same offense and thereby place said person in double jeopardy for the same offense.

The Constitution of the California Valley Miwok Tribe
(also known as the Sheep Ranch Rancheria Of Me-Wuk Indians of California)

§ XIV(e) – **SELF-INCRIMINATION.** The Tribe shall not compel any person in any criminal case to be a witness against oneself.

§ XIV(f) – **CONDEMNATION OF PRIVATE PROPERTY.** The Tribe shall not take any private property for a public use without just compensation.

§ XIV(g) – **EXPEDITED JUDICIAL PROCEEDINGS.** The Tribe shall not deny to any person, in a criminal proceeding, the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against the accused, to have compulsory process for obtaining witnesses in favor of the accused, and at one's own expense to have the assistance of counsel for defense of the accused, and to have these rights explained at the time of arrest.

§ XIV(h) – **BAIL AND FINES.** The Tribe shall not require excessive bail, impose excessive fines, or inflict cruel and unusual punishment.

§ XIV(i) – **EQUAL PROTECTION.** The Tribe shall not deny to any person (member or non-member) within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law.

§ XIV(j) – **PROSCRIBED PROCEDURES.** The Tribe shall not create any law of attainder which declares a person or group of persons guilty of some crime and punishes them without benefit of a trial; nor shall the Tribe find a person or group of persons guilty of a violation, ex post facto.

§ XIV(k) – **TRIAL BY JURY.** The Tribe shall not deny to any person, who is accused of an offense which is punishable by imprisonment, the right, upon request, to a trial by jury of not less than six persons.

## ARTICLE XV – GENERAL MEETINGS

§ XV(a) – **ANNUAL GENERAL MEETING.** The Tribal Council shall call at least one (1) general meeting per year of all members of the Tribe to report, identify, and discuss important tribal matters. The procedures for calling and conducting such general meetings, including the required notice to the Tribal Electorate, shall be specified in Tribal By-Laws.

## ARTICLE XVI – AMENDMENTS

§ XVI(a) – **CONSTITUTIONAL PROVISIONS.** This Constitution may be amended by a vote of sixty percent (60%) of the Tribal Electorate voting at an election called for that purpose in accordance with procedures in this Constitution and further defined in By-Laws.

## ARTICLE XVII – SAVINGS AND SEVERABILITY

§ XVII(a) – **PRIOR ENACTMENTS.** All prior Enactments, agreements and commitments adopted or entered into by the 2006 Council or the 2013 Council on behalf of the Tribe shall

-17-

continue in full force and effect and continue to bind the Tribe, unless subsequently modified, to the extent consistent with this Constitution.

**§ XVII(b) – INVALIDATION OF SECTIONS.** If any section or element of this Constitution be judged to be illegal by a competent authority, then that section or element shall become null and void without any of the other sections or elements of this Constitution becoming null and void nor there be a need to revise this Constitution by Amendment.

## ARTICLE XVIII – ADOPTION OF CONSTITUTION

**§ XVIII(a) – ADOPTION CLAUSE.** This Constitution shall become the governing instrument for the Tribe when adopted through a Secretarial election called and conducted pursuant to Part 81 of Title 25 of the Code of Federal Regulations and approved by the Secretary of the United States Department of the Interior or his designee ("Secretary") pursuant to the Indian Reorganization Act, 25 U.S.C. § 5123(d), and the regulations prescribed thereunder, including 25 C.F.R. § 81.45. Any subsequent amendment of this Constitution, including an amendment in the manner of a revocation of this Constitution and adoption of a substitute governing document for the Tribe, shall be conducted pursuant to applicable provisions of this Constitution and Tribal law and shall not require a Secretarial election or the approval of the Secretary in order to be effective.

# EXHIBIT 16



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Pacific Regional Office
2800 Cottage Way
Sacramento, California 95825

IN REPLY REFER TO:

Tribal Government Services

**SEP 11 2017**

Certified Mail No: 7015 3010 0000 3622 3328
Return Receipt Requested

Robert Uram, Attorney at Law
 for Yakima Dixie
Sheppard, Mullin, Richter and Hampton, LLP
4 Embarcadero Center, 17th Floor
San Francisco, California 94133

Certified Mail No: 7015 3010 0000 3622 3304
Return Receipt Requested

Manuel Corrales, Jr., Attorney at Law
 for Sylvia Burley
17140 Bernardo Center Drive, Suite 358
San Diego, California 92128

Certified Mail No: 7015 3010 0000 3622 3311
Return Receipt Requested

Robert Rosette, Attorney at Law
 for Sylvia Burley
565 West Chandler Boulevard, Suite 212
Chandler, Arizona 85225

The purpose of this correspondence is to inform you that the Bureau of Indian Affairs, Pacific Region, is taking action consistent with the Assistant Secretary - Indian Affairs' (AS-IA) decision of December 30, 2015 (2015 AS-IA Decision), by determining whether the 2013 Constitution of the California Valley Miwok Tribe (2013 Constitution) was properly ratified by the tribal community of the California Valley Miwok Tribe (Tribe).

The Tribe has been embroiled in multiple long-standing disputes dating back to 1999, at the center of which are two factions claiming to represent the tribal community: one consisting of Yakima Dixie and his representatives (Dixie Group) and the other consisting of Silvia Burley and her representatives (Burley Group). These disputes have been discussed at length in decisions by the Central California Agency, this Office, the Interior Board of Indian Appeals, the AS-IA, the District Court, and the United States Court of Appeals. Consequently, due to these in depth decisions, I will only reference the essential facts necessary to determine the validity of the election ratifying the 2013 Constitution.

The 2015 AS-IA Decision found that the Dixie Group had not demonstrated that the 2013 Constitution was validly ratified, and authorized this Office to receive additional submissions from the Dixie Group for the purpose of establishing the validity of the 2013 Constitution. In the alternative, the Tribe was encouraged by the AS-IA to petition for a Secretarial Election under 25 Code of Federal Regulations Part 81.



TAKE PRIDE
IN AMERICA

Further, the Assistant Secretary concluded that the Tribe's membership is more than five people, and that the 1998 General Council does not consist of valid representatives of the Tribe. The AS-IA found that for purposes of reorganization the Tribe's membership is properly drawn from: (1) individuals listed on the 1915 Terrell Census and their descendants; (2) the descendants of Rancheria resident Jeff Davis (who was the only person on the 1935 IRA voters list for the Rancheria); and (3) the heirs of Mabel Dixie (the sole Indian resident of the Rancheria eligible to vote on its termination in 1967) as identified by OHA in 1971 and their descendants (Dixie Heirs) (all three groups are collectively identified herein as the Eligible Groups). There is no dispute that there may be as many as 250 individuals who fall within the Eligible Groups as defined above, which is inclusive of the Burley Group and a portion of the Dixie Group.

The Burley Group challenged the 2015 AS-IA Decision in *California Valley Miwok Tribe v. Zinke,* Civ. No. 2:16-01345 WBS CKD (E.D.Cal., May 31, 2017). The Court found the AS-IA was not arbitrary and capricious in this decision, holding:

> The federal government has a 'distinctive obligation of trust' in its dealings with Indians. *See, e.g., United States v. Jicarilla Apache Nation,* 564 U.S. 162, 192 (2011)." Part of this obligation includes ensuring that the United States is "conducting government-to-government relations with 'valid representatives of the [tribe] as a whole.' *Seminole Nation of Okla. v. Norton,* 223 F. Supp. 2d 122, 140 (D.D.C. 2002); see *Aguayo v. Jewell,* 827 F.3d 1213, 1224 (9th Cir. 2016) ('The [Assistant] Secretary properly exercises discretion not to approve a governing document when it does not 'reflect the involvement of the whole tribal community.'); *cf. Seminole Nation v. United States,,* 316 U.S. 286, 296-97 (1942).

On January 27, 2016, and March 9, 2016, my staff and I met with the Burley and Dixie Groups, respectively, to discuss each Group's position as it related to the 2015 AS-IA Decision. During the January 27, 2016, meeting the Burley Group detailed their position that the 2013 Constitution is not valid as they were not provided the opportunity to participate in its creation and/or election. The Burley Group reiterated this position in its February 22, 2016, letter submitted by Robert Rosette, Attorney for the Burley Group. In addition, the Burley Group contended that the Dixie Group allowed individuals to participate who are not members of the Eligible Groups.

As authorized by the 2015 AS-IA Decision and following their March 9, 2016, meeting with me and my staff, the Dixie Group chose not to request a Secretarial Election, and on April 18, 2016, submitted a detailed report (Election Report) outlining the modified Secretarial Election process they utilized to ratify the 2013 Constitution. My staff reviewed the Dixie Group's files of those individuals who were provided the opportunity to vote on the 2013 Constitution. In addition, this Office reviewed the family history of the Burley Group. It appears that a majority of those who participated in the 2013 constitutional election and all of the Burley Group descend from Rancheria resident Jeff Davis. Following a review of the Election Report, it appears the Dixie Group notified 183 individuals who qualify as members of the Eligible Groups, and 17 individuals who descend from the 1929 Census of Calaveras County. The 2013 Constitution extended membership eligibility to the Eligible Groups and, in addition, the descendants of the 1929 Census of Calaveras County.

However, the cornerstone of a successful organizational election is ensuring every known eligible individual is afforded their inherent right to participate. Through their attorneys, the Burley Group maintained contact with the Dixie Group as evidenced by multiple filings in federal court and correspondence with the Bureau; however, they were not included on the list of Adult, Enrolled Members, Eligible to Vote in Election of July 6, 2013, created by the Dixie Group. According to the Election Report the Dixie Group noticed the 200 individuals they deemed eligible to participate in the impending 2013 constitutional election by:

- Mailing an election notice and voting materials to each documented adult member of the Dixie Group
- Posting notice of the election at U.S. Post Offices in West Point, California and San Andreas, California
- Mailing multiple election reminders to the known members of the Dixie Group
- Announcing the election at each of the Dixie Group's monthly meetings
- Making the voter list available at the Dixie Group's monthly meetings
- Posting the eligible voter list at the Dixie Group's headquarters in Sheep Ranch

Organizing under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. § 461 et. seq., requires a majoritarian participation of those individuals eligible to participate, and an eligible individual should not be denied the right to participate. The Bureau of Indian Affairs has the authority and responsibility to decline to recognize the results of tribal actions when those results are tainted by violations of the Indian Civil Rights Act (ICRA). *See United Keetoowah Band of Cherokee Indians v. Muskogee Area Director*, 22 IBIA 75 (1992). Further, the ICRA provides that no Indian tribe, in exercising powers of self-government, "shall deny any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." *25 U.S.C. § 1302 (a) (8)*. In this instance, due process includes proper notice of the election to all known members of the Eligible Groups. My staff made a specific effort to consult with the Dixie Group and their attorneys to determine what, if any, effort was made to notify the Burley Group. The Dixie group was unable to provide any documentation showing the Burley group was provided notice of the election.

Consequently, this Office cannot endorse or approve this tribal action adopting the 2013 Constitution of the California Valley Miwok Tribe as the process in which it was ratified violated the civil rights of the Burley Group. I encourage the Tribe to consider turning its efforts to working together in coordination with the Superintendent, Central California Agency, in petitioning for a Secretarial Election under 25 C.F.R. Part 81.

This decision may be appealed to the Interior Board of Indian Appeals, 801 North Quincy Street, Arlington, Virginia 22203, in accordance with regulations in 43 CFR § 4.310 4.349. Your Notice of Appeal to the Board must be signed by you or your attorney and must be mailed within 30 days of the date you receive this decision. It should clearly identify the decision being appealed. If possible, attach a copy of the decision. You must send copies of your Notice of Appeal to (1) The Assistant Secretary-Indian Affairs, 4160 MIB, U.S. Department of the Interior, 1849 C Street, N.W. Washington, D.C. 20240, (2) each interested party known to you, and (3) this Office. Your Notice of Appeal sent to the Board must certify that you have sent copies to these parties. If you file a Notice of Appeal, the Board will notify you of further appeal procedures. If no appeal is timely filed, this decision will become final for the Department of the Interior at the expiration of the appeal period. No extensions of time may be granted for filing a Notice of Appeal.

Sincerely,

Amy L. Dutschke

Regional Director

cc: Superintendent, Central California Agency
Director, Bureau of Indian Affairs
Assistant Secretary – Indian Affairs, Department of the Interior

3

# EXHIBIT 17



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
801 NORTH QUINCY STREET
SUITE 300
ARLINGTON, VA 22203

| | | |
|---|---|---|
| SILVIA BURLEY, CHAIRWOMAN, | ) | Pre-Docketing Notice and Order to |
| AND THE CALIFORNIA VALLEY | ) | Show Cause |
| MIWOK TRIBE, | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Docket No. IBIA ____ |
| | ) | |
| ACTING PACIFIC REGIONAL | ) | |
| DIRECTOR, BUREAU OF INDIAN | ) | |
| AFFAIRS, | ) | |
| Appellee. | ) | February 25, 2019 |

On February 11, 2019, the Board of Indian Appeals (Board) received a notice of appeal from Silvia Burley, Chairwoman, and the California Valley Miwok Tribe (collectively, Appellants),[1] through John M. Peebles, Esq., of Fredericks, Peebles & Morgan, LLP.  Appellants seek review of a December 21, 2018, decision (Decision) of the Acting Pacific Regional Director (Regional Director), Bureau of Indian Affairs (BIA), validating a petition requesting a Secretarial election permitting the eligible voters of the California Valley Miwok Tribe to adopt or reject the proposed Constitution of the California Valley Miwok Tribe.[2]

Procedural regulations governing administrative appeals to the Board are found in 43 Code of Federal Regulations (C.F.R.) Part 4.  A copy of these regulations is enclosed for non-Federal parties.

---

[1] The appeal was filed on behalf of Silvia Burley, as Chairwoman, and on behalf of the California Valley Miwok Tribe, and the Board has captioned the case accordingly.  The Board's caption of this case shall not be construed as a determination on the merits regarding the representation of Ms. Burley as Chairwoman, or her authority to bring this appeal on behalf of the California Valley Miwok Tribe.

[2] Appellants assert that they were notified by a third party of the Decision on February 6, 2019.  Notice of Appeal, Feb. 8, 2019, at 2.  For purposes of this pre-docketing notice, the Board assumes that Appellants' appeal is timely as an appeal from the Decision, if an appeal would otherwise properly lie with the Board.  The Board expresses no view at this time on whether or not Appellants have standing.

## Order for Appellants to Show Cause

As a threshold matter, the Board notes that there is a substantial question whether the Board has jurisdiction over this appeal. The Board's jurisdiction is limited to the authority vested in it by regulation or otherwise delegated to it by the Secretary of the Interior. *See* 43 C.F.R. § 4.1(b)(1). Generally, the Board has jurisdiction to hear appeals from administrative actions or decisions of BIA officials issued under regulations in 25 C.F.R. Chapter 1. *See* 43 C.F.R. § 4.330(a). However, the Board is not authorized to review appeals from decisions that are subject to appeal to a higher official in the Bureau of Indian Appeals prior to that official's review, *id.* § 4.331(a), or "[w]here otherwise provided by law or regulation," *id.* § 4.331(c). A decision which, by regulation, is final for the Department of the Interior (Department) at the time of its rendition, is not subject to further review by the Board. *See* 25 C.F.R. § 2.6(a); *see also Two Shields v. Great Plains Regional Director,* 64 IBIA 10, 11 (2016) (regional director's decisions denying challenges to Secretarial election were final for the Department and outside the Board's jurisdiction).

In the present case, the Regional Director's decision to validate the petition requesting a Secretarial election was subject to Federal regulations found at 25 C.F.R. Part 81, which establish the procedures for authorizing and conducting Secretarial elections. Section 81.62 lays out the procedures for validating a petition for a Secretarial election, and requires that the Approving Official, here, the Regional Director, (1) determine whether the petition complies with the requirements of subpart F of Part 81, 25 C.F.R. § 81.62(b)(1), and (2) inform, in writing, the spokesperson for the petitioners and the recognized tribal governing body whether the petition is valid and the basis for that determination, *id.* § 81.62(b)(2). The Approving Official is also required to include with the determination of the petition's validity "a statement that the decision of the Authorizing Official is a final agency action." *Id.* § 81.62(b)(2). The term "final agency action" means that the Authorizing Official's approval or disapproval action is "final for the Department." *Id.* § 81.4 (definition of "Final agency action"). Accordingly, the Board has held that under § 81.45(f), a similar provision of the regulations governing Secretarial elections, the Board lacks jurisdiction over an appeal from a regional director's decision denying an appellant's challenge to the results of a Secretarial election. *See Two Shields,* 64 IBIA at 11 (dismissing appeal). Therefore, before proceeding further with this appeal, the Board will order Appellants to show cause why the appeal should not be dismissed for lack of jurisdiction.

<u>On or before March 21, 2019, Appellants are ordered to show cause (i.e., explain), why this appeal should not be summarily dismissed by the Board for lack of jurisdiction.</u> The Regional Director and other interested parties may file answers to Appellants' response to show cause within 15 days of receipt of the response, and Appellants may file a reply within 5 days of any answer brief. <u>Failure by Appellants to respond to or comply with this order may result in summary dismissal of the appeal without further notice.</u>

Copies of all pleadings filed with the Board must be served on all interested parties. 43 C.F.R. §§ 4.310(b), 4.333(a). Parties who choose to serve and file by U.S. mail may use regular first-class mail; they do not need to use certified mail unless they wish to do so for their own record keeping purposes. If counsel is appearing for an interested party, counsel should enter an appearance, after which service should be made on counsel. A certificate or affidavit evidencing service shall be filed concurrently with the document furnished to the Board.

The parties are advised that the Board will not accept any filing by facsimile transmission (fax) unless the Board has first granted permission for the filing of that particular document by fax. The Board may grant permission to file by fax in extraordinary circumstances. Because documents filed with the Board are filed as of the date of mailing, extraordinary circumstances do not include the fact that a filing is due that day. Any document filed by fax without permission will not be accepted.

The Board's Internet website, containing a free, searchable database of its decisions, is located at www.doi.gov/oha/organization/ibia. The Board's decisions are also available on the for-fee websites of WestLaw and Lexis-Nexis, although the Board's website generally is the most current.

## Further Proceedings

In accordance with 43 C.F.R. § 4.336, this case will be assigned a docket number 20 days after the date of receipt noted above unless the Board has been properly notified before that date that the Assistant Secretary - Indian Affairs has assumed jurisdiction over the appeal. If the Assistant Secretary - Indian Affairs properly notifies the Board of an assumption of jurisdiction under 25 C.F.R. § 2.20(c) and 43 C.F.R. § 4.332(b), the parties will be so informed, and the appeal will be transmitted to her.

Pending further order, the Regional Director need not prepare or transmit the administrative record.

Robert E. Hall
Administrative Judge

Enclosure:  Copy of appeal regulations (for non-Federal parties)
Distribution: See attached list.

3

**Distribution:**

John M. Peebles, Esq.
for Appellants, Silvia Burley, Chairwoman,
   and the California Valley Miwok Tribe
Fredericks, Peebles & Morgan, LLP
2020 L Street, Suite 250
Sacramento, CA 95811
   BY CERTIFIED MAIL

James Rusk, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109

Central California Agency Superintendent
Bureau of Indian Affairs
650 Capitol Mall, Suite 8-500
Sacramento, CA 95814-4710

Pacific Regional Director
Bureau of Indian Affairs
2800 Cottage Way
Sacramento, CA 95825

Pacific Southwest Regional Solicitor
Office of the Solicitor
U.S. Department of the Interior
2800 Cottage Way, Room E-1712
Sacramento, CA 95825

Associate Solicitor - Indian Affairs
Office of the Solicitor
MS 6513 - MIB
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Assistant Secretary - Indian Affairs
U.S. Department of the Interior
MS 3642 - MIB
1849 C Street, NW
Washington, DC 20240

RECEIVED

FEB 2 8 2019

FP&M-Sacramento

Office of the Secretary, Interior

contrary to the act and this part, may be seized wherever found and at any time, by the proper field officer or by any person duly authorized by the Secretary having jurisdiction, and disposed of as the Secretary shall determine, by deposit in the proper national depository or otherwise.

§ 3.17  Preservation of collection.

Every collection made under the authority of the act and of this part shall be preserved in the public museum designated in the permit and shall be accessible to the public. No such collection shall be removed from such public museum without the written authority of the Secretary of the Smithsonian Institution, and then only to another public museum, where it shall be accessible to the public; and when any public museum, which is a depository of any collection made under the provisions of the act and this part, shall cease to exist, every such collection in such public museum shall thereupon revert to the national collections and be placed in the proper national depository.

# PART 4—DEPARTMENT HEARINGS AND APPEALS PROCEDURES

## Subpart A—General; Office of Hearings and Appeals

Sec.
4.1  Scope of authority; applicable regulations.
4.2  Membership of appeals boards; decisions, functions of Chief Judges.
4.3  Representation before appeals boards.
4.4  Public records; locations of field offices.
4.5  Power of the Secretary and Director.

## Subpart B—General Rules Relating to Procedures and Practice

4.20  Purpose.
4.21  General provisions.
4.22  Documents.
4.23  Transcript of hearings.
4.24  Basis of decision.
4.25  Oral argument.
4.26  Subpoena power and witness provisions generally.
4.27  Standards of conduct.
4.28  Interlocutory appeals.
4.29  Remands from courts.
4.30  Information required by forms.
4.31  Request for limiting disclosure of confidential information.

## Subpart C [Reserved]

## Subpart D—Rules Applicable in Indian Affairs Hearings and Appeals

SCOPE OF SUBPART; DEFINITIONS

4.200  How to use this subpart.
4.201  Definitions.
4.202–4.308  [Reserved]

GENERAL RULES APPLICABLE TO PROCEEDINGS ON APPEAL BEFORE THE INTERIOR BOARD OF INDIAN APPEALS

4.310  Documents.
4.311  Briefs on appeal.
4.312  Board decisions.
4.313  Amicus Curiae; intervention; joinder motions.
4.314  Exhaustion of administrative remedies.
4.315  Reconsideration of a Board decision.
4.316  Remands from courts.
4.317  Standards of conduct.
4.318  Scope of review.

APPEALS TO THE BOARD OF INDIAN APPEALS IN PROBATE MATTERS

4.320  Who may appeal a judge's decision or order?
4.321  How do I appeal a judge's decision or order?
4.322  What must an appeal contain?
4.323  Who receives service of the notice of appeal?
4.324  How is the record on appeal prepared?
4.325  How will the appeal be docketed?
4.326  What happens to the record after disposition?

APPEALS TO THE BOARD OF INDIAN APPEALS FROM ADMINISTRATIVE ACTIONS OF OFFICIALS OF THE BUREAU OF INDIAN AFFAIRS: ADMINISTRATIVE REVIEW IN OTHER INDIAN MATTERS NOT RELATING TO PROBATE PROCEEDINGS

4.330  Scope.
4.331  Who may appeal.
4.332  Appeal to the Board; how taken; mandatory time for filing; preparation assistance; requirement for bond.
4.333  Service of notice of appeal.
4.334  Extensions of time.
4.335  Preparation and transmittal of record by official of the Bureau of Indian Affairs.
4.336  Docketing.
4.337  Action by the Board.
4.338  Submission by administrative law judge of proposed findings, conclusions and recommended decision.
4.339  Exceptions or comments regarding recommended decision by administrative law judge.
4.340  Disposition of the record.

WHITE EARTH RESERVATION LAND SETTLE-
MENT ACT OF 1985; AUTHORITY OF ADMINIS-
TRATIVE JUDGES; DETERMINATIONS OF THE
HEIRS OF PERSONS WHO DIED ENTITLED TO
COMPENSATION

4.350   Authority and scope.
4.351   Commencement of the determination
        process.
4.352   Determination of administrative judge
        and notice thereof.
4.353   Record.
4.354   Reconsideration or rehearing.
4.355   Omitted compensation.
4.356   Appeals.
4.357   Guardians     for     minors     and
        incompetents.

**Subpart E—Special Rules Applicable to
Public Land Hearings and Appeals**

APPEALS PROCEDURES

*Appeals Procedures; General*

4.400   Definitions.
4.401   Documents.
4.402   Summary dismissal.
4.403   Finality of decision; reconsideration.
4.404   Consolidation.
4.405   Extensions of time.
4.406   Intervention; amicus curiae.
4.407   Motions.

APPEALS TO THE BOARD OF LAND APPEALS

4.410   Who may appeal.
4.411   Appeal; how taken, mandatory time
        limit.
4.412   Statement of reasons; statement of
        standing; reply briefs.
4.413   Service of notice of appeal.
4.414   Answers.

ACTIONS BY BOARD OF LAND APPEALS

4.415   Motion for a hearing on an appeal in-
        volving questions of fact.
4.416   Appeals of wildfire management deci-
        sions.

HEARINGS PROCEDURES

*Hearings Procedures; General*

4.420   Applicability of general rules.
4.421   Definitions.
4.422   Documents.
4.423   Subpoena power and witness provi-
        sions.

HEARINGS ON APPEALS INVOLVING QUESTIONS
OF FACT

4.430   Prehearing conferences.
4.431   Fixing of place and date for hearing;
        notice.
4.432   Postponements.
4.433   Authority of the administrative law
        judge.
4.434   Conduct of hearing.

4.435   Evidence.
4.436   Reporter's fees.
4.437   Copies of transcript.
4.438   Action by administrative law judge.

CONTEST AND PROTEST PROCEEDINGS

4.450   Private contests and protests.
4.450-1  By whom private contest may be ini-
         tiated.
4.450-2  Protests.
4.450-3  Initiation of contest.
4.450-4  Complaints.
4.450-5  Service.
4.450-6  Answer to complaint.
4.450-7  Action by manager.
4.450-8  Amendment of answer.
4.451   Government contests.
4.451-1  How initiated.
4.451-2  Proceedings in Government con-
         tests.
4.452   Proceedings before the administrative
        law judge.
4.452-1  Prehearing conferences.
4.452-2  Notice of hearing.
4.452-3  Postponements.
4.452-4  Authority of administrative law
         judge.
4.452-5  Conduct of hearing.
4.452-6  Evidence.
4.452-7  Reporter's fees.
4.452-8  Findings and conclusions; decision
         by administrative law judge.
4.452-9  Appeal to Board.

GRAZING PROCEDURES (INSIDE AND OUTSIDE
GRAZING DISTRICTS)

4.470   How to appeal a final BLM grazing de-
        cision to an administrative law judge.
4.471   How to petition for a stay of a final
        BLM grazing decision.
4.472   Action on an appeal and petition for a
        stay.
4.473   Time and place of hearing; notice; in-
        tervenors.
4.474   Authority of administrative law judge.
4.475   Service.
4.476   Conduct of hearing: reporter's fees;
        transcript.
4.477   Findings and conclusions; decision by
        administrative law judge.
4.478   Appeals to the Board of Land Appeals;
        judicial review.
4.479   Effectiveness of decision during ap-
        peal.
4.480   Conditions of decision action.

**Subpart F—Implementation of the Equal
Access to Justice Act in Agency Pro-
ceedings**

GENERAL PROVISIONS

4.601   What is the purpose of this subpart?
4.602   What definitions apply to this sub-
        part?
4.603   What proceedings are covered by this
        subpart?

**Office of the Secretary, Interior**

## Subpart D—Rules Applicable in Indian Affairs Hearings and Appeals

AUTHORITY: 5 U.S.C. 301; 25 U.S.C. 2, 9, 372–74, 410; Pub. L. 99–264, 100 Stat. 61, as amended.

CROSS REFERENCE: For regulations pertaining to the processing of Indian probate matters within the Bureau of Indian Affairs, see 25 CFR part 15. For regulations pertaining to the probate of Indian trust estates within the Probate Hearings Division, Office of Hearings and Appeals, see 43 CFR part 30. For regulations pertaining to the authority, jurisdiction, and membership of the Board of Indian Appeals, Office of Hearings and Appeals, see subpart A of this part. For regulations generally applicable to proceedings before the Hearings Divisions and Appeal Boards of the Office of Hearings and Appeals, see subpart B of this part.

### SCOPE OF SUBPART; DEFINITIONS

SOURCE: 66 FR 67656, Dec. 31, 2001, unless otherwise noted.

### § 4.200  How to use this subpart.

(a) The following table is a guide to the relevant contents of this subpart by subject matter.

| For provisions relating to . . . | Consult . . . |
|---|---|
| (1) Appeals to the Board of Indian Appeals generally. | §§ 4.310 through 4.318. |
| (2) Appeals to the Board of Indian Appeals from decisions of the Probate Hearings Division in Indian probate matters. | §§ 4.201 and 4.320 through 4.326. |
| (3) Appeals to the Board of Indian Appeals from actions or decisions of BIA. | §§ 4.201 and 4.330 through 4.340. |
| (4) Review by the Board of Indian Appeals of other matters referred to it by the Secretary, Assistant Secretary-Indian Affairs, or Director-Office of Hearings and Appeals. | §§ 4.201 and 4.330 through 4.340. |
| (5) Determinations under the White Earth Reservation Land Settlement Act of 1985. | §§ 4.350 through 4.357. |

(b) Except as limited by the provisions of this part, the regulations in subparts A and B of this part apply to these proceedings.

[73 FR 67287, Nov. 13, 2008]

### § 4.201  Definitions.

*Administrative law judge (ALJ)* means an administrative law judge with OHA appointed under the Administrative Procedure Act, 5 U.S.C. 3105.

*Agency means:*

(1) The Bureau of Indian Affairs (BIA) agency office, or any other designated office in BIA, having jurisdiction over trust or restricted land and trust personalty; and

(2) Any office of a tribe that has entered into a contract or compact to fulfill the probate function under 25 U.S.C. 450f or 458cc.

*BIA* means the Bureau of Indian Affairs within the Department of the Interior.

*Board* means the Interior Board of Indian Appeals within OHA.

*Day* means a calendar day.

*Decedent* means a person who is deceased.

*Decision or order* (or *decision and order*) means:

(1) A written document issued by a judge making determinations as to heirs, wills, devisees, and the claims of creditors, and ordering distribution of trust or restricted land or trust personalty;

(2) The decision issued by an attorney decision maker in a summary probate proceeding; or

(3) A decision issued by a judge finding that the evidence is insufficient to determine that a person is deceased by reason of unexplained absence.

*Devise* means a gift of property by will. Also, to give property by will.

*Devisee* means a person or entity that receives property under a will.

*Estate* means the trust or restricted land and trust personalty owned by the decedent at the time of death.

*Formal probate proceeding* means a proceeding, conducted by a judge, in which evidence is obtained through the testimony of witnesses and the receipt of relevant documents.

*Heir* means any individual or entity eligible to receive property from a decedent in an intestate proceeding.

*Individual Indian Money (IIM) account* means an interest-bearing account for trust funds held by the Secretary that belong to a person who has an interest in trust assets. These accounts are under the control and management of the Secretary.

*Indian probate judge (IPJ)* means an attorney with OHA, other than an ALJ, to whom the Secretary has delegated

the authority to hear and decide Indian probate cases.

*Interested party* means any of the following:

(1) Any potential or actual heir;

(2) Any devisee under a will;

(3) Any person or entity asserting a claim against a decedent's estate;

(4) Any tribe having a statutory option to purchase the trust or restricted property interest of a decedent; or

(5) Any co-owner exercising a purchase option.

*Intestate* means that the decedent died without a valid will as determined in the probate proceeding.

*Judge*, except as used in the term "administrative judge," means an ALJ or IPJ.

*LTRO* means the Land Titles and Records Office within BIA.

*Probate* means the legal process by which applicable tribal, Federal, or State law that affects the distribution of a decedent's estate is applied in order to:

(1) Determine the heirs;

(2) Determine the validity of wills and determine devisees;

(3) Determine whether claims against the estate will be paid from trust personalty; and

(4) Order the transfer of any trust or restricted land or trust personalty to the heirs, devisees, or other persons or entities entitled by law to receive them.

*Restricted property* means real property, the title to which is held by an Indian but which cannot be alienated or encumbered without the Secretary's consent. For the purposes of probate proceedings, restricted property is treated as if it were trust property. Except as the law may provide otherwise, the term "restricted property" as used in this part does not include the restricted lands of the Five Civilized Tribes of Oklahoma or the Osage Nation.

*Secretary* means the Secretary of the Interior or an authorized representative.

*Trust personalty* means all tangible personal property, funds, and securities of any kind that are held in trust in an IIM account or otherwise supervised by the Secretary.

*Trust property* means real or personal property, or an interest therein, the title to which is held in trust by the United States for the benefit of an individual Indian or tribe.

*Will* means a written testamentary document that was executed by the decedent and attested to by two disinterested adult witnesses, and that states who will receive the decedent's trust or restricted property.

[73 FR 67287, Nov. 13, 2008]

§§ 4.202–4.308   [Reserved]

GENERAL RULES APPLICABLE TO PROCEEDINGS ON APPEAL BEFORE THE INTERIOR BOARD OF INDIAN APPEALS

SOURCE: 70 FR 11825, Mar. 9, 2005, unless otherwise noted.

§ 4.310   Documents.

(a) *Filing.* The effective date for filing a notice of appeal or other document with the Board during the course of an appeal is:

(1) For most documents, the date of mailing or the date of personal delivery; or

(2) For a motion for the Board to assume jurisdiction over an appeal under 25 CFR 2.20(e), the date that the Board receives the motion.

(b) *Serving notices of appeal and pleadings.* Any party filing a notice of appeal or pleading before the Board must serve copies on all interested parties in the proceeding. Service must be accomplished by personal delivery or mailing.

(1) Where a party is represented in an appeal by an attorney or other representative authorized under 43 CFR 1.3, service of any document on the attorney or representative is service on the party.

(2) Where a party is represented by more than one attorney, service on any one attorney is sufficient.

(3) The certificate of service on an attorney or representative must include the name of the party whom the attorney or representative represents and indicate that service was made on the attorney or representative.

(c) *Computation of time for filing and service.* Except as otherwise provided by law, in computing any period of time

64

prescribed for filing and serving a document:

(1) The day upon which the decision or document to be appealed or answered was served or the day of any other event after which a designated period of time begins to run is not to be included;

(2) The last day of the period is to be included, unless it is a nonbusiness day (e.g., Saturday, Sunday, or Federal holiday), in which event the period runs until the end of the next business day; and

(3) When the time prescribed or allowed is 7 days or less, intermediate Saturdays, Sundays, Federal holidays, and other nonbusiness days are excluded from the computation.

(d) *Extensions of time.* (1) The Board may extend the time for filing or serving any document except a notice of appeal.

(2) A request to the Board for an extension of time must be filed within the time originally allowed for filing.

(3) For good cause the Board may grant an extension of time on its own initiative.

(e) *Retention of documents.* All documents received in evidence at a hearing or submitted for the record in any proceeding before the Board will be retained with the official record of the proceeding. The Board, in its discretion, may permit the withdrawal of original documents while a case is pending or after a decision becomes final upon conditions as required by the Board.

§ 4.311  Briefs on appeal.

(a) The appellant may file an opening brief within 30 days after receiving the notice of docketing. The appellant must serve copies of the opening brief upon all interested parties or counsel and file a certificate with the Board showing service upon the named parties. Opposing parties or counsel will have 30 days from receiving the appellant's brief to file answer briefs, copies of which must be served upon the appellant or counsel and all other interested parties. A certificate showing service of the answer brief upon all parties or counsel must be attached to the answer filed with the Board.

(b) The appellant may reply to an answering brief within 15 days from its receipt. A certificate showing service of the reply brief upon all parties or counsel must be attached to the reply filed with the Board. Except by special permission of the Board, no other briefs will be allowed on appeal.

(c) BIA is considered an interested party in any proceeding before the Board. The Board may request that BIA submit a brief in any case before the Board.

(d) An original only of each document should be filed with the Board. Documents should not be bound along the side.

(e) The Board may also specify a date on or before which a brief is due. Unless expedited briefing has been granted, such date may not be less than the appropriate period of time established in this section.

§ 4.312  Board decisions.

Decisions of the Board will be made in writing and will set forth findings of fact and conclusions of law. The decision may adopt, modify, reverse, or set aside any proposed finding, conclusion, or order of an administrative law judge, Indian probate judge, or BIA official. Distribution of decisions must be made by the Board to all parties concerned. Unless otherwise stated in the decision, rulings by the Board are final for the Department and must be given immediate effect.

§ 4.313  Amicus curiae; intervention; joinder motions.

(a) Any interested person or Indian tribe desiring to intervene, to join other parties, to appear as amicus curiae, or to obtain an order in an appeal before the Board must apply in writing to the Board stating the grounds for the action sought. The Board may grant the permission or relief requested for specified purposes and subject to limitations it established. This section will be liberally construed.

(b) Motions to intervene, to appear as amicus curiae, to join additional parties, or to obtain an order in an appeal pending before the Board must be served in the same manner as appeal briefs.

§ 4.314 Exhaustion of administrative remedies.

(a) No decision of an administrative law judge, Indian probate judge, or BIA official that at the time of its rendition is subject to appeal to the Board, will be considered final so as to constitute agency action subject to judicial review under 5 U.S.C. 704, unless it has been made effective pending a decision on appeal by order of the Board.

(b) No further appeal will lie within the Department from a decision of the Board.

(c) The filing of a petition for reconsideration is not required to exhaust administrative remedies.

§ 4.315 Reconsideration of a Board decision.

(a) Reconsideration of a decision of the Board will be granted only in extraordinary circumstances. Any party to the decision may petition for reconsideration. The petition must be filed with the Board within 30 days from the date of the decision and must contain a detailed statement of the reasons why reconsideration should be granted.

(b) A party may file only one petition for reconsideration.

(c) The filing of a petition will not stay the effect of any decision or order and will not affect the finality of any decision or order for purposes of judicial review, unless so ordered by the Board.

§ 4.316 Remands from courts.

Whenever any matter is remanded from any Federal court to the Board for further proceedings, the Board will remand the matter to an administrative law judge, an Indian probate judge, or BIA. In the alternative, to the extent the court's directive and time limitations permit, the parties will be allowed an opportunity to submit to the Board a report recommending procedures for it to follow to comply with the court's order. The Board will enter special orders governing matters on remand.

§ 4.317 Standards of conduct.

(a) *Inquiries about cases.* All inquiries about any matter pending before the Board must be made to the Chief Administrative Judge of the Board or the administrative judge assigned the matter.

(b) *Disqualification.* An administrative judge may withdraw from a case in accordance with standards found in the recognized canons of judicial ethics if the judge deems this action appropriate. If, before a decision of the Board, a party files an affidavit of personal bias or disqualification with substantiating facts, and the administrative judge concerned does not withdraw, the OHA Director will determine the matter of disqualification.

§ 4.318 Scope of review.

An appeal will be limited to those issues that were before the administrative law judge or Indian probate judge upon the petition for rehearing, reopening, or regarding tribal purchase of interests, or before the BIA official on review. However, except as specifically limited in this part or in title 25 of the Code of Federal Regulations, the Board will not be limited in its scope of review and may exercise the inherent authority of the Secretary to correct a manifest injustice or error where appropriate.

APPEALS TO THE BOARD OF INDIAN APPEALS IN PROBATE MATTERS

SOURCE: 70 FR 11826, Mar. 9, 2005, unless otherwise noted.

§ 4.320 Who may appeal a judge's decision or order?

Any interested party has a right to appeal to the Board if he or she is adversely affected by a decision or order of a judge under part 30 of this subtitle:

(a) On a petition for rehearing;

(b) On a petition for reopening;

(c) Regarding purchase of interests in a deceased Indian's estate; or

(d) Regarding modification of the inventory of an estate.

[76 FR 7505, Feb. 10, 2011]

§ 4.321 How do I appeal a judge's decision or order?

(a) A person wishing to appeal a decision or order within the scope of § 4.320 must file a written notice of appeal within 30 days after we have mailed the judge's decision or order and accurate

**Office of the Secretary, Interior**

**§ 4.325**

appeal instructions. We will dismiss any appeal not filed by this deadline.

(b) The notice of appeal must be signed by the appellant, the appellant's attorney, or other qualified representative as provided in § 1.3 of this subtitle, and must be filed with the Board of Indian Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, Virginia 22203.

[73 FR 67288, Nov. 13, 2008]

### § 4.322  What must an appeal contain?

(a) Each appeal must contain a written statement of the errors of fact and law upon which the appeal is based. This statement may be included in either the notice of appeal filed under § 4.321(a) or an opening brief filed under § 4.311(a).

(b) The notice of appeal must include the names and addresses of the parties served.

[73 FR 67288, Nov. 13, 2008]

### § 4.323  Who receives service of the notice of appeal?

(a) The appellant must deliver or mail the original notice of appeal to the Board.

(b) A copy of the notice of appeal must be served on the judge whose decision is being appealed, as well as on every other interested party.

(c) The notice of appeal filed with the Board must include a certification that service was made as required by this section.

[73 FR 67288, Nov. 13, 2008]

### § 4.324  How is the record on appeal prepared?

(a) On receiving a copy of the notice of appeal, the judge whose decision is being appealed must notify:

(1) The agency concerned; and

(2) The LTRO where the original record was filed under § 30.233 of this subtitle.

(b) If a transcript of the hearing was not prepared, the judge must have a transcript prepared and forwarded to the LTRO within 30 days after receiving a copy of the notice of appeal. The LTRO must include the original transcript in the record.

(c) Within 30 days of the receipt of the transcript, the LTRO must do the following:

(1) Prepare a table of contents for the record;

(2) Make two complete copies of the original record, including the transcript and table of contents;

(3) Certify that the record is complete;

(4) Forward the certified original record, together with the table of contents, to the Board by certified mail or other service with delivery confirmation; and

(5) Send one copy of the complete record to the agency.

(d) While the appeal is pending, the copies of the record will be available for inspection at the LTRO and the agency.

(e) Any party may file an objection to the record. The party must file his or her objection with the Board within 15 days after receiving the notice of docketing under § 4.325.

(f) For any of the following appeals, the judge must prepare an administrative record for the decision and a table of contents for the record and must forward them to the Board:

(1) An interlocutory appeal under § 4.28;

(2) An appeal from a decision under §§ 30.126 or 30.127 regarding modification of an inventory of an estate; or

(3) An appeal from a decision under § 30.124 determining that a person for whom a probate proceeding is sought to be opened is not deceased.

[76 FR 7505, Feb. 10, 2011]

### § 4.325  How will the appeal be docketed?

The Board will docket the appeal on receiving the probate record from the LTRO or the administrative record from the judge, and will provide a notice of the docketing and the table of contents for the record to all interested parties as shown by the record on appeal. The docketing notice will specify the deadline for filing briefs and will cite the procedural regulations governing the appeal.

[73 FR 67288, Nov. 13, 2008]

67

### § 4.326 What happens to the record after disposition?

(a) After the Board makes a decision other than a remand, it must forward to the designated LTRO:

(1) The record filed with the Board under § 4.324(d) or (f); and

(2) All documents added during the appeal proceedings, including any transcripts and the Board's decision.

(b) The LTRO must conform the duplicate record retained under § 4.324(b) to the original sent under paragraph (a) of this section and forward the duplicate record to the agency concerned.

[73 FR 67288, Nov. 13, 2008]

APPEALS TO THE BOARD OF INDIAN APPEALS FROM ADMINISTRATIVE ACTIONS OF OFFICIALS OF THE BUREAU OF INDIAN AFFAIRS: ADMINISTRATIVE REVIEW IN OTHER INDIAN MATTERS NOT RELATING TO PROBATE PROCEEDINGS

SOURCE: 54 FR 6487, Feb. 10, 1989, unless otherwise noted.

### § 4.330 Scope.

(a) The definitions set forth in 25 CFR 2.2 apply also to these special rules. These regulations apply to the practice and procedure for: (1) Appeals to the Board of Indian Appeals from administrative actions or decisions of officials of the Bureau of Indian Affairs issued under regulations in 25 CFR chapter 1, and (2) administrative review by the Board of Indian Appeals of other matters pertaining to Indians which are referred to it for exercise of review authority of the Secretary or the Assistant Secretary—Indian Affairs.

(b) Except as otherwise permitted by the Secretary or the Assistant Secretary—Indian Affairs by special delegation or request, the Board shall not adjudicate:

(1) Tribal enrollment disputes;

(2) Matters decided by the Bureau of Indian Affairs through exercise of its discretionary authority; or

(3) Appeals from decisions pertaining to final recommendations or actions by officials of the Minerals Management Service, unless the decision is based on an interpretation of Federal Indian law (decisions not so based which arise from determinations of the Minerals Management Service, are appealable to the Interior Board of Land Appeals in accordance with 43 CFR 4.410).

### § 4.331 Who may appeal.

Any interested party affected by a final administrative action or decision of an official of the Bureau of Indian Affairs issued under regulations in title 25 of the Code of Federal Regulations may appeal to the Board of Indian Appeals, except—

(a) To the extent that decisions which are subject to appeal to a higher official within the Bureau of Indian Affairs must first be appealed to that official;

(b) Where the decision has been approved in writing by the Secretary or Assistant Secretary—Indian Affairs prior to promulgation; or

(c) Where otherwise provided by law or regulation.

### § 4.332 Appeal to the Board; how taken; mandatory time for filing; preparation assistance; requirement for bond.

(a) A notice of appeal shall be in writing, signed by the appellant or by his attorney of record or other qualified representative as provided by 43 CFR 1.3, and filed with the Board of Indian Appeals, Office of Hearings and Appeals, U.S. Department of the Interior, 801 North Quincy Street, Arlington, Virginia 22203, within 30 days after receipt by the appellant of the decision from which the appeal is taken. A copy of the notice of appeal shall simultaneously be filed with the Assistant Secretary—Indian Affairs. As required by § 4.333 of this part, the notice of appeal sent to the Board shall certify that a copy has been sent to the Assistant Secretary—Indian Affairs. A notice of appeal not timely filed shall be dismissed for lack of jurisdiction. A notice of appeal shall include:

(1) A full identification of the case;

(2) A statement of the reasons for the appeal and of the relief sought; and

(3) The names and addresses of all additional interested parties, Indian tribes, tribal corporations, or groups having rights or privileges which may be affected by a change in the decision,

whether or not they participated as interested parties in the earlier proceedings.

(b) In accordance with 25 CFR 2.20(c) a notice of appeal shall not be effective for 20 days from receipt by the Board, during which time the Assistant Secretary—Indian Affairs may decide to review the appeal. If the Assistant Secretary—Indian Affairs properly notifies the Board that he has decided to review the appeal, any documents concerning the case filed with the Board shall be transmitted to the Assistant Secretary—Indian Affairs.

(c) When the appellant is an Indian or Indian tribe not represented by counsel, the official who issued the decision appealed shall, upon request of the appellant, render such assistance as is appropriate in the preparation of the appeal.

(d) At any time during the pendency of an appeal, an appropriate bond may be required to protect the interest of any Indian, Indian tribe, or other parties involved.

[54 FR 6487, Feb. 10, 1989, as amended at 67 FR 4368, Jan. 30, 2002]

### §4.333 Service of notice of appeal.

(a) On or before the date of filing of the notice of appeal the appellant shall serve a copy of the notice upon each known interested party, upon the official of the Bureau of Indian Affairs from whose decision the appeal is taken, and upon the Assistant Secretary—Indian Affairs. The notice of appeal filed with the Board shall certify that service was made as required by this section and shall show the names and addresses of all parties served. If the appellant is an Indian or an Indian tribe not represented by counsel, the appellant may request the official of the Bureau whose decision is appealed to assist in service of copies of the notice of appeal and any supporting documents.

(b) The notice of appeal will be considered to have been served upon the date of personal service or mailing.

### §4.334 Extensions of time.

Requests for extensions of time to file documents may be granted upon a showing of good cause, except for the time fixed for filing a notice of appeal which, as specified in §4.332 of this part, may not be extended.

### §4.335 Preparation and transmittal of record by official of the Bureau of Indian Affairs.

(a) Within 20 days after receipt of a notice of appeal, or upon notice from the Board, the official of the Bureau of Indian Affairs whose decision is appealed shall assemble and transmit the record to the Board. The record on appeal shall include, without limitation, copies of transcripts of testimony taken; all original documents, petitions, or applications by which the proceeding was initiated; all supplemental documents which set forth claims of interested parties; and all documents upon which all previous decisions were based.

(b) The administrative record shall include a Table of Contents noting, at a minimum, inclusion of the following:

(1) The decision appealed from;

(2) The notice of appeal or copy thereof; and

(3) Certification that the record contains all information and documents utilized by the deciding official in rendering the decision appealed.

(c) If the deciding official receives notification that the Assistant Secretary—Indian Affairs has decided to review the appeal before the administrative record is transmitted to the Board, the administrative record shall be forwarded to the Assistant Secretary—Indian Affairs rather than to the Board.

### §4.336 Docketing.

An appeal shall be assigned a docket number by the Board 20 days after receipt of the notice of appeal unless the Board has been properly notified that the Assistant Secretary—Indian Affairs has assumed jurisdiction over the appeal. A notice of docketing shall be sent to all interested parties as shown by the record on appeal upon receipt of the administrative record. Any objection to the record as constituted shall be filed with the Board within 15 days of receipt of the notice of docketing. The docketing notice shall specify the time within which briefs shall be filed, cite the procedural regulations governing the appeal and include a copy of

§ 4.337

the Table of Contents furnished by the deciding official.

§ 4.337  Action by the Board.

(a) The Board may make a final decision, or where the record indicates a need for further inquiry to resolve a genuine issue of material fact, the Board may require a hearing. All hearings shall be conducted by an administrative law judge of the Office of Hearings and Appeals. The Board may, in its discretion, grant oral argument before the Board.

(b) Where the Board finds that one or more issues involved in an appeal or a matter referred to it were decided by the Bureau of Indian Affairs based upon the exercise of discretionary authority committed to the Bureau, and the Board has not otherwise been permitted to adjudicate the issue(s) pursuant to § 4.330(b) of this part, the Board shall dismiss the appeal as to the issue(s) or refer the issue(s) to the Assistant Secretary—Indian Affairs for further consideration.

§ 4.338  Submission by administrative law judge of proposed findings, conclusions and recommended decision.

(a) When an evidentiary hearing pursuant to § 4.337(a) of this part is concluded, the administrative law judge shall recommend findings of fact and conclusions of law, stating the reasons for such recommendations. A copy of the recommended decision shall be sent to each party to the proceeding, the Bureau official involved, and the Board. Simultaneously, the entire record of the proceedings, including the transcript of the hearing before the administrative law judge, shall be forwarded to the Board.

(b) The administrative law judge shall advise the parties at the conclusion of the recommended decision of their right to file exceptions or other comments regarding the recommended decision with the Board in accordance with § 4.339 of this part.

§ 4.339  Exceptions or comments regarding recommended decision by administrative law judge.

Within 30 days after receipt of the recommended decision of the adminis-

trative law judge, any party may file exceptions to or other comments on the decision with the Board.

§ 4.340  Disposition of the record.

Subsequent to a decision by the Board, the record filed with the Board and all documents added during the appeal proceedings, including the Board's decision, shall be forwarded to the official of the Bureau of Indian Affairs whose decision was appealed for proper disposition in accordance with rules and regulations concerning treatment of Federal records.

WHITE EARTH RESERVATION LAND SETTLEMENT ACT OF 1985; AUTHORITY OF ADMINISTRATIVE JUDGES; DETERMINATIONS OF THE HEIRS OF PERSONS WHO DIED ENTITLED TO COMPENSATION

SOURCE: 56 FR 61383, Dec. 3, 1991, unless otherwise noted.

§ 4.350  Authority and scope.

(a) The rules and procedures set forth in §§ 4.350 through 4.357 apply only to the determination through intestate succession of the heirs of persons who died entitled to receive compensation under the White Earth Reservation Land Settlement Act of 1985, Public Law 99–264 (100 Stat. 61), amended by Public Law 100–153 (101 Stat. 886) and Public Law 100–212 (101 Stat. 1433).

(b) Whenever requested to do so by the Project Director, an administrative judge shall determine such heirs by applying inheritance laws in accordance with the White Earth Reservation Settlement Act of 1985 as amended, notwithstanding the decedent may have died testate.

(c) As used herein, the following terms shall have the following meanings:

(1) The term *Act* means the White Earth Reservation Land Settlement Act of 1985 as amended.

(2) The term *Board* means the Board of Indian Appeals in the Office of Hearings and Appeals, Office of the Secretary.

(3) The term *Project Director* means the Superintendent of the Minnesota Agency, Bureau of Indian Affairs, or other Bureau of Indian Affairs official

70

**Office of the Secretary, Interior** §4.352

with delegated authority from the Minneapolis Area Director to serve as the federal officer in charge of the White Earth Reservation Land Settlement Project.

(4) The term *party (parties) in interest* means the Project Director and any presumptive or actual heirs of the decedent, or of any issue of any subsequently deceased presumptive or actual heir of the decedent.

(5) The term *compensation* means a monetary sum, as determined by the Project Director, pursuant to section 8(c) of the Act.

(6) The term *administrative judge* means an administrative judge or an administrative law judge, attorney-advisor, or other appropriate official of the Office of Hearings and Appeals to whom the Director of the Office of Hearings and Appeals has redelegated his authority, as designee of the Secretary, for making heirship determinations as provided for in these regulations.

(7) The term *appellant* means a party aggrieved by a final order or final order upon reconsideration issued by an administrative judge who files an appeal with the Board.

[56 FR 61383, Dec. 3, 1991; 56 FR 65782, Dec. 18, 1991, as amended at 64 FR 13363, Mar. 18, 1999]

**§4.351  Commencement of the determination process.**

(a) Unless an heirship determination which is recognized by the Act already exists, the Project Director shall commence the determination of the heirs of those persons who died entitled to receive compensation by filing with the administrative judge all data, identifying the purpose for which they are being submitted, shown in the records relative to the family of the decedent.

(b) The data shall include but are not limited to:

(1) A copy of the death certificate if one exists. If there is no death certificate, then another form of official written evidence of the death such as a burial or transportation of remains permit, coroner's report, or church registry of death. Secondary forms of evidence of death such as an affidavit from someone with personal knowledge concerning the fact of death or an obituary or death notice from a newspaper

may be used only in the absence of any official proof or evidence of death.

(2) Data for heirship finding and family history, certified by the Project Director. Such data shall contain:

(i) The facts and alleged facts of the decedent's marriages, separations and divorces, with copies of necessary supporting documents;

(ii) The names and last known addresses of probable heirs at law and other known parties in interest;

(iii) Information on whether the relationships of the probable heirs at law to the decedent arose by marriage, blood, or adoption.

(3) Known heirship determinations, including those recognized by the Act determining the heirs of relatives of the decedent, and including those rendered by courts from Minnesota or other states, by tribal courts, or by tribunals authorized by the laws of other countries.

(4) A report of the compensation due the decedent, including interest calculated to the date of death of the decedent, and an outline of the derivation of such compensation, including its real property origins and the succession of the compensation to the deceased, citing all of the intervening heirs at law, their fractional shares, and the amount of compensation attributed to each of them.

(5) A certification by the Project Director or his designee that the addresses provided for the parties in interest were furnished after having made a due and diligent search.

[56 FR 61383, Dec. 3, 1991; 56 FR 65782, Dec. 18, 1991]

**§4.352  Determination of administrative judge and notice thereof.**

(a) Upon review of all data submitted by the Project Director, the administrative judge will determine whether or not there are any apparent issues of fact that need to be resolved.

(b) If there are no issues of fact requiring determination, the administrative judge will enter a preliminary determination of heirs based upon inheritance laws in accordance with the Act. Such preliminary determination will be entered without a hearing, and, when possible and based upon the data

71

RECEIVED

FEB 2 8 2019

FP&M-Sacramento